1          IN THE UNITED STATES DISTRICT COURT
           FOR THE EASTERN DISTRICT OF TEXAS
2               MARSHALL DIVISION

3  COMMIL USA            *   Civil Docket No.
                   *   2:07-CV-341
4  VS.                *   Marshall, Texas
                   *
5                   *   May 12, 2010
  CISCO SYSTEMS, INC., ET AL *  8:30 A.M.
6

7             TRANSCRIPT OF JURY TRIAL
       BEFORE THE HONORABLE CHAD EVERINGHAM
8        UNITED STATES MAGISTRATE JUDGE

9  APPEARANCES:

10  FOR THE PLAINTIFFS:     MR. MARK S. WERBNER
                     MR. RICHARD A. SAYLES
11                  MR. MARK D. STRACHAN
                     MS. EVE L. HENSON
12                  MR. CHRISTOPHER W. HOGUE
                     Sayles Werbner
13                  1201 Elm Street
                     4400 Renaissance Tower
14                  Dallas, TX   75270

15

16  FOR THE DEFENDANTS:     MR. JEFFREY E. OSTROW
  (CISCO)              MR. HARRISON J. FRAHN, IV
17                  MR. PATRICK E. KING
                     Simpson Thacher & Bartlett
18                  2550 Hanover St.
                     Palo Alto, CA   94304
19

20  APPEARANCES CONTINUED ON NEXT PAGE:

21

  COURT REPORTERS:        MS. SUSAN SIMMONS, CSR
22                  MS. SHELLY HOLMES, CSR
                     Official Court Reporters
23                  100 East Houston, Suite 125
                     Marshall, TX   75670
24                  903/935-3868

25  (Proceedings recorded by mechanical stenography,
  transcript produced on CAT system.)

APPEARANCES CONTINUED:

FOR THE DEFENDANTS:        MR. OTIS CARROLL
(CISCO)                    MR. PATRICK KELLEY
                           Ireland Carroll & Kelley
                           6101 South Broadway
                           Suite 500
                           Tyler, TX   75703

                           MR. MICHAEL E. JONES
                           MR. PATRICK C. CLUTTER, IV
                           Potter Minton
                           110 North College
                           Suite 500
                           Tyler, TX   75702

                 *      *      *      *      *      *


                    P R O C E E D I N G S

                (Jury in.)

                    THE COURT:  All right.  Please be seated.

Good morning, Ladies and Gentlemen.  Thank you for being

here timely.

                    Continue with your examination.

                    MR. WERBNER:  Thank you, Your Honor.  May

it please the Court.

                    THE COURT:  Mr. Werbner.

   YARON SOFFER, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

              DIRECT EXAMINATION (CONTINUED)

BY MR. WERBNER:

     Q.   Mr. Soffer, at the end of the day, we were

1  talking about your background.

2        THE COURT:  Let him go ahead and get in

3  the stand there.

4        Q.  (By Mr. Werbner) Yesterday we were talking

5  about your background and the origins of the '395

6  patent, the formation of Commil Limited.  I want to pick

7  up there.

8        Are you with me?

9        A.  Yes.

10       Q.  I want to just for a moment discuss the very

11  beginning of Commil Limited.  How many employees were

12  there when it was first formed in 2000?

13       A.  When we -- when we actually formed the

14  company, it only had actually three founders.  And after

15  we raised some money, we began recruiting more

16  employees.

17       Q.  You mentioned raising money.  Would you tell

18  the jury about the funds that the state of Israel

19  Scientist Department invested in your company?

20       A.  Yes.  The Israeli government has a special

21  office called the Chief Scientist, that his goal is to

22  support innovation and new technologies to help

23  companies that develop a product but develop also

24  technologies without necessarily having a right -- a

25  business plan for the short-term to encourage

1  developments for the long run and for the short run.

2      Q.    And did Commil Limited receive a grant from

3  the state of Israel through their Chief Science

4  Department?

5      A.    Yes, a couple of them.

6      Q.    And what were the magnitude of those grants

7  that that group made to Commil Limited?

8      A.    I don't recall the exact numbers, but it's

9  something between 1.5 to $2 million.

10     Q.    One and a half to $2 million?

11     A.    I think so.

12     Q.    Before we move on, just let the jury know, in

13  Israel where you live and your involvement in the

14  high-tech area, so that the jury knows, how robust or --

15  or significant is the high-tech industry in Israel over

16  the last 10 years?

17     A.    It has become very strong.  There are many

18  products that we all use that became -- began in Israel.

19  It's -- I think it's a mixture of the education, the

20  state of mind of innovation, the defense force.  I guess

21  it's a mixture of them.

22     Q.    What products that we might know have been

23  invented in Israel?

24              MR. OSTROW:  Objection, Your Honor.  It's

25  irrelevant.

THE COURT:  Overruled.

A.   I'm not sure I'm familiar with all of them, but this disk key that you all use was invented in Israel.

Q.   Like the little thumb drive, or what do you call it?

A.   Disk key, I think.

Q.   Is that the same as the thumb drive that plugs into a computer?

A.   I guess.

Q.   We can hold one up, but are there any other examples?

A.   I think that most of the Intel processors that you use in laptops and PCs are designed in Israel, and probably many others.

Q.   Are there highways that you can drive down there where you can see companies like Cisco and Microsoft and other companies located in Israel because of that high-tech development?

A.   I'm not sure that you will call them highways in American terms, but there are roads that you could see a lot of companies like that, a lot of buildings.

Q.   Does Cisco have an office in Israel?

A.   I am not sure about that.  They used to have some R&D group, but I'm -- I don't know.

1    Q.   I don't think it's necessary to go into any

2  detail, but because it's been raised, I want you to talk

3  to the jury a little bit about the progress that Commil

4  Limited made.

5         Would you address what was, after the funding

6  came in, the sort of business plan of Commil Limited?

7    A.   It was to have a product that would allow

8  people to use their cellular phones as cordless phones

9  wired at home, so they would not have to pay for the

10  cellular operator while getting calls at home, yet they

11  can use the same phone with the same contact book, and

12  the nice look and feel that cell phones have also at

13  home or in -- in work without going through cellular

14  infrastructure.

15         We raised money for that and recruited people.

16  At the top, I think, the company had 30 employees.

17    Q.   All right.  And turning that in terms, let's

18  say, of the courtroom -- let's say I had this phone with

19  a short-range communication protocol, let's say, Wi-Fi

20  or Bluetooth, and there was a system in here, and I,

21  let's say, with the cellular phone might be paying 50

22  cents a minute or those sort of things.

23         How would this system that your company was

24  working on let me not have to pay 50 cents a minute for

25  those calls with my cellular phone?

A.   We took advantage of the fact that cellular phones started to have additional RF technology, other than the cellular of technology also back then Bluetooth today, Wi-Fi, which is short-range communication protocol, in addition to the cellular protocol.

And then when you're in the building, the phone would have initiated the call through the Bluetooth or Wi-Fi to the nearest access point and from there to the local telephony system.

Q.   At the time in early 2000, when you decided that would be the direction of the company, what were the charges, typically, of cellular companies in Israel?

A.   I don't remember.  They were very high, but I don't recall the numbers.

Q.   And what was the thinking about how such a product would be usable in people's offices?

A.   We had business plan that showed that it could save an organization a lot of money, and in addition, increase the people -- the employees' availability. It also addressed the other problems, like if somebody is calling the switchboard and asking for a Mr. Smith and he's not near his desk, nobody can reach him.  But with this system, the switchboard could just dial forward to his extension, and it would go to his cellular phone whenever -- wherever he is in the

1  building.

2      Q.    Did Commil Limited, as it was putting together

3  its business plan in early 2000, consider other

4  short-range communication protocols than Bluetooth?

5      A.    Not really, because the business model was

6  based on the cellular phones, and back then, there was a

7  clear road map how Bluetooth goes into the cellular

8  phones.  And there was no -- there were no other

9  technologies that were going to the phone back then.

10 Later in 2001/2002, we began to see a road map -- a

11 similar road map for Wi-Fi, but it took quite a while

12 until it really happened.

13     Q.    When the three of you worked on the patent

14 application that became the '395 patent at -- were you

15 aware of Wi-Fi at the time?

16     A.    Sure.

17     Q.    Okay.  Then why did the business choose to go

18 commercially in the beginning with the Bluetooth device

19 instead of a Wi-Fi device?

20     A.    I think it's a mixture of several things.

21 One, Wi-Fi began some -- sometime in 1990, around 1990,

22 and it was not catching up as it was supposed to.  So in

23 2000, it was over its hype and nobody really developed

24 major technologies on that.

25            Bluetooth was -- it's also a mixture of

politics between companies.  Bluetooth was founded by

Nokia and Ericsson being cellular phone manufacturers,

and they pushed that into the cellular phones.

It's also a matter of geography.  Wi-Fi back

then was considered an American technology while

Bluetooth was considered European technology.  So it's

not necessarily the best thing to do, but that was the

dynamic.

And also, there was power consumption concerns

that back then Wi-Fi was consuming too much power, and

Bluetooth was designed to be low-power, which is very

important in batteries.

Q.   So would it be fair to say, based on those

factors, that it was a -- a business decision, a

commercial decision on the direction that y'all wanted

the company to go at that time?

A.   Absolutely.

Q.   Had -- did things change four or five years

later as far as Bluetooth and Wi-Fi?

A.   Yes, it did.  Bluetooth -- first of all,

Bluetooth had the same curve that happened to Wi-Fi.  We

see that in every technology.  It starts with the hype.

Many companies going in, things doesn't go as smoothly

as expected and then it goes down.

So in 2004, Bluetooth was where Wi-Fi was in

1  the year 2000.  So it was like a dead duck, while Wi-Fi

2  was catching up for new applications, because later

3  computers became more common, and Wi-Fi -- the Wi-Fi

4  manufacturers moved toward this direction.

5          And also, cellular phones having better

6  processing power and better batteries.  And from the

7  other hand, Wi-Fi having improvements to -- to have

8  lower power consumption, this led a trend to put Wi-Fi

9  in cellular phone.

10      Q.  Would it be fair to say that they were

11  competing technologies as the 2000 years were passing in

12  terms of which would be more commercially attractive to

13  people?

14      A.  Not really, because they addressed different

15  markets.

16      Q.  Explain what you mean.

17      A.  Wi-Fi -- it's like Wi-Fi started with

18  replacing cables that connected PCs in an office and

19  shifted into mobile devices.  And Bluetooth started as

20  something between -- to connect the phone and the

21  headset and cordless telephony like very small things.

22          And I think that they a little bit overlapped

23  over time, but I wouldn't say that they were

24  head-to-head competing overall.  On some applications,

25  maybe.

1    Q.   When based on your experience and training in

2  your work on what you and I have been discussing, how

3  similar or different were Bluetooth and Wi-Fi as far as

4  technology goes?

5    A.   They have lot of similarities and a lot of

6  differences.  Similarities, both being short-range

7  wireless protocols; they both support voice and data;

8  they both use digital technology, meaning that --

9    Q.   What kind of technology?

10    A.   Digital.

11    Q.   Digital?

12    A.   Meaning that it's packets of data, bits going

13  over the air.  I guess there are more common things.

14  And from the other hand, Wi-Fi was with higher bit rate

15  originally oriented to data for -- for computers.  Wi-Fi

16  doesn't support all layers up to the application,

17  meaning that if you want, for example, to browse the

18  internet, Wi-Fi doesn't define that.  It just gives you

19  the physical media that allow the computer to talk with,

20  but it doesn't care what you do on top of that.

21        Later on, they had to do some tweaking for

22  voice and other applications, but basically Wi-Fi was

23  only supporting part of the food chain, let's say, the

24  wireless food chain.

25        Bluetooth defined the whole layers, meaning

1 that if you press a button on your headset, in a Nokia

2 headset, the Ericsson phone will understand this

3 message.  So in order to do this ability, Bluetooth

4 defined all those layers, which also caused some delay

5 in implementation, because it was more sophisticated.

6 It took companies longer to integrate and interoperate

7 things together.

8      Q.   In designing the product, this Bluetooth

9 product at the early stage of Commil Limited in Israel,

10 were you working on any feature that dealt with the

11 mobility of the product, the ability of the product to

12 maintain a smooth voice communication as the product

13 moved?

14      A.   Maybe just for clarification, you being

15 Commil, not myself.

16      Q.   Right, right.  The company that you were a --

17 a part of at the time.

18      A.   Yes.  Our innovation or competitive edge was

19 the ability to let people walk around or move while they

20 are communicating with the system, either voice or data.

21 So instead of having a call here and then when you walk

22 out of the room, the call will be disconnected, to give

23 the system cellular-like capabilities that the call will

24 be seamlessly handed from one access point to the other.

25      Q.   Elaborate a little bit on the cellular-like

1  experience and the seamless handoff.  I want to be sure
2  we're all clear about that.
3       A.   I think we need to understand -- to
4  distinguish between portable device and mobile device.
5       Q.   All right. Would you do that, please?
6       A.   Yes.
7            Portable device, like a laptop, is a device
8  that you can carry on with you; it's not too heavy.  You
9  could turn it on here in the courthouse, connect to the
10 Wi-Fi or whatever, do whatever you like, and then close
11 it, drive to Starbucks, open it, and do that again.  So
12 it's portable in the sense that it can be used here and
13 another place.
14           It's not mobile in a sense that if you turn it
15 on here, connect it to the Wi-Fi, and then drive with
16 the laptop open, which is not too safe, but let's say
17 you do that to Starbucks, the connection will not be
18 kept.
19           In cellular, the mobile handset keeps the
20 communication.  You could talk while driving or while
21 moving from one place to the other.
22           Commil's technology and Commil's business was
23 to take devices that were portable in nature, like
24 cordless phone at home or the cordless application in a
25 mobile phone, and allow it to be mobile in a sense that

1  this phone would be able to move between access points.

2  Although it was not designed to switch from one access

3  point to the other, the access point is it moves with

4  the device, logically speaking.

5      Q.   And when you say -- so when the mobile device

6  moves from one access point to the other, what is that

7  called when the functioning of it to allow the

8  communication is handled from the first access point to

9  the second one?

10      A.   I don't believe I understood the question.

11      Q.   Okay.  So let's say there's an access point in

12  here and there's one out in the hall.  If I move from

13  here out there and it remains cellular-like, what do you

14  call it?  Handoff, pass off?  I heard you say --

15      A.   It's handoff or handover.  One is U.S. term

16  and one is European.  And I never remember who is who.

17      Q.   But the handoff or handover relates to going

18  from one access point to the other without any

19  interruption in what you're doing?

20      A.   Yes, sir.

21      Q.   How in Commil Limited's development of its

22  Bluetooth product was that achieved, if it was?

23      A.   We had several names for that, but one -- one

24  of them being a virtual access point meaning that --

25      Q.   A virtual?

1    A.    Virtual access point.

2    Q.    Go ahead.

3    A.    Meaning that if you have access points around

4 the building, the access points cannot move when the guy

5 goes.  They cannot physically move, but they're

6 logically being moved, meaning that the state machine in

7 the formation that the access point has about the

8 connection with the device, is it connected, is it in

9 the middle of a phone call, what channel did you get for

10 this call, what is the exact timing of the

11 communication.

12        This moves from one access point to the other

13 in a very sophisticated way, so when the mobile unit

14 moves, this state machine and some parameters are moving

15 with it.

16    Q.    And what moves the information in the state

17 machine of Access Point 1 to have that state machine or

18 the state data to the second access point?

19    A.    The system had, in addition to the access

20 point, a switch or a controller that provided the

21 communication with the external world and also handled

22 the mobility.

23        So this switch would have told the access

24 points to search for potential mobile new units that are

25 going to arrive to the coverage area, and when this

switch took the decision to make this handover, he would

ask one access point for its parameters and send it to

the other access point.

Q. All right. You mentioned state machine. Can

you just one more time say what that is that the

controller or the switch moves from one access point to

another, let's say if I'm using the system wirelessly?

A. I'll try to give an example.

In the cellular phone, when you press the

digit 4, it could have different meaning if you are in

the middle of the phone call and maybe will put a tone

inside, or if you are dialing or if you are writing SMS.

So the same action has effect, which depends on history,

on what state are you now. Or when you press okay in --

in the menu, it depends in what stage of the menu you

are in. In some places okay it will say quit. In some

cases it will say continue.

So state machine is saying what was the

history that led me to this point, and what am I going

to do in this point of time, if certain event happened.

Q. So if there's not in my example where I'm here

using wirelessly my laptop here and then I move and

become associated or connected to a second access point

out there, if there isn't a state machine being handled

by the switch, what's the consequence?

1    A.    You will have to restart the session.  You

2  will dis -- be disconnected and then you will have to

3  relog in or reassociate, depends on the exact

4  application, and then it answers.  But you would have to

5  reconnect.

6    Q.    All right.  Let's move forward

7      Was a prototype of what you've been discussing

8  with me made by Commil Limited at some point?

9    A.    Yes.

10    Q.    What was it called, that product?

11    A.    It was called Cellarion.

12    Q.    Were you happy with the commercial popularity

13  of that device when it was ready to be sold to the

14  market?

15    A.    Not really.

16    Q.    And would you tell the jury why that -- that

17  is?

18    A.    It was a mixture of reasons.  One is that our

19  product was based on the assumption that the telephone

20  handsets, the mobile phones, will have Bluetooth inside

21  with cordless telephony application, meaning that we

22  will be able to make phone call over Bluetooth with the

23  mobile phone.

24      This was something that was planned by the

25  Bluetooth organization but was stopped by the cellular

1  companies.

2      Q.    What do you mean stopped by the cellular

3  companies?

4      A.    Aggressively stopped.  I don't remember the

5  names.  I think it was Samsung or Ericsson introduced a

6  phone like that to the market, and after a week, they

7  took it off the shelf, because one of the major cellular

8  operators told me they would stop buying phones from

9  them, if they enabled this option, because it will take

10 revenues from the cellular operators to the fixed

11 operators.

12          And we anticipated that there will be some

13 fight from the cellular operators, but we didn't

14 anticipate how strong of a fight they will give.  And to

15 prove that, 10 years later, even with Wi-Fi, you cannot

16 really do this -- what they call today fixed mobile

17 convergence.  Use your phone, the mobile phone, as

18 extension while at home, because cellular operators

19 doesn't like this.  So this is one reason.

20          And the other was that the product was very

21 complicated.  It took us a long time to build it, and it

22 was too expensive.  And it took a while or it would have

23 taken a lot of money to make it commercially.

24     Q.    The Cellarion?

25     A.    Yeah.

1    Q.   In addition to the Chief Scientist of Israel

2  putting a million half to 2 million in Commil Limited,

3  by the time you're talking about, had the company raised

4  other funds?

5    A.   Yes.  It raised money several rounds.  In the

6  point of time that I'm talking about, the Cellarion, it

7  was between some rounds.  So I think at that point of

8  time, the company raised a total of $11 million, give or

9  take.  And the total with the funds -- with the rounding

10  that followed, about $15 million, but this may include

11  the Chief Scientist.  I'm not sure about that.

12    Q.   About when was it that Commil Limited realized

13  that because of the interference of the cell companies,

14  because of these other factors that you mentioned, that

15  product was -- was not going to be successful

16  commercially in the marketplace?

17    A.   It's a tough question, because the signs were

18  there, but we were -- we were still trying to push it up

19  the hill.  So there was no clear moment when you can say

20  we understood that.

21        Given the crisis of the year 2001, at some

22  point in time, because we understood that the market

23  will be slower than we anticipated and we have to wait

24  until the phones will be there with the application and

25  so on, we began to look at the other possible products

1  but as side products, not as the main business of the

2  company.

3          I'm not sure that this answers the question.

4      Q.    Well, I think -- I think it does.  I'm just

5  trying to build approximately for all of us here in the

6  courtroom the timeline.  You know, we talked about the

7  patent in late '99, the application in early 2000.

8          You've told us about once that was done, the

9  various business choices you made about the products you

10 wanted to test in the marketplace and the financing.

11 So I'm just trying to help us understand through that

12 chronology you've given where we are on the timeline.

13         Can you do that any more just as an

14 approximation than you've done so far?  If not, that's

15 okay.  But I --

16     A.    Okay.  So -- so no.

17     Q.    Okay.

18     A.    I don't really understand that.

19     Q.    Okay.  How long were you working on the

20 Cellarion?  You know, how long was it from the beginning

21 to having the prototype?

22     A.    I don't remember exact dates.  The beginning

23 was that we do -- did that -- before the company was

24 established, we filed the patent but continued to design

25 the product.  I think that in the year 2002, we had a

working prototype.  Maybe 2003, we sold a couple of

those to Korea, Japan.  We installed the system in

Michigan in Ann Arbor in operating rooms where doctors

had a way to communicate with the switchboard, because

you are not allowed to use cellular phones in operating

rooms.  But it didn't get more than that.

Q.   So did Commil Limited at any point consider a

Wi-Fi product to test the commercial market for that?

A.   Considered in many -- in many points of time,

because this issue of when Bluetooth began to decline

and Wi-Fi began its new hype, this issue has been raised

every couple of months since 2001, 2002.  I don't

remember exactly.

And every some period of time, we looked into

that.  Usually, I objected to the company moving to

Wi-Fi.

Q.   Why is that?

A.   Because I thought that until we see telephone

sets with Wi-Fi, there is no business model that

justifies switching to Wi-Fi, only because of the hype.

And I also thought that the company cannot do both

Bluetooth and Wi-Fi.

Q.   Why not?

A.   Due to resources.  You need more people and

you need different product with some flavors, and

1 investors were not interested in putting more money. It

2 was, again, in the year 2001, crisis, salaries were

3 going down, everybody were keeping their money in their

4 hands to see how things evolved.

5      And I thought the company could not do both.

6 And I also thought that one of the major things in

7 startup companies is focus. If you lose focus, you

8 don't stand a chance. If you are focused, you have

9 better chance. Still it's not 100 percent, and I

10 thought it was wise to focus on Bluetooth.

11     Q.   Was that a correct decision you think?

12     A.   I couldn't tell.

13     Q.   What position did you have at Commil Limited

14 at the time we're discussing?

15     A.   I was the CEO.

16     Q.   The Chief Executive Officer?

17     A.   Yes, sir.

18     Q.   Ultimately, you left the company and based on

19 your friends and your other colleagues there, is it true

20 that Commil Limited at some point stopped its business?

21     A.   Yes.

22     Q.   What is your understanding as to why that

23 occurred?

24     A.   I left the company to meet -- in 2004, I left

25 my position as CEO. The company shifted to Wi-Fi. It

1   was like a package where the investors put more money in

2   the company moved to Wi-Fi.  And they pursued this

3   direction for some time, a year, year and a half, and

4   they had people working on that.  I am not familiar with

5   the details.

6          But to do a product, a full Wi-Fi product,

7   required a lot of resources, and the investors were not

8   willing to put those resources.  So the -- there was so

9   much the company could do with the given resources, and

10  it ended up letting all the people go.

11     Q.   In your opinion, did the company stop its

12  business because its intellectual property as described

13  in the patent wasn't good?

14     A.   No.

15     Q.   Would you explain?

16     A.   I don't think that the business relates to the

17  patent, meaning that the patent was very wide and

18  supported a variety of technologies and innovations, yet

19  implementation has its own rule, and the business plan,

20  the business success has many other factors like, as I

21  mentioned, the availability of some applications in the

22  mobile phone, which was not in the hands of Commil.

23     Q.   When you say not in the hands, you mean not in

24  the control of -- of Commil?

25     A.   Yeah.

1    Q.    All right.  Go ahead.

2    A.    There are many other factors, when you try to

3 take an idea or a technology to a valid product.

4    Q.    All right.  The party in this case is not

5 Commil Limited, but Commil USA.  Are you aware of that?

6    A.    Yes, sir.

7    Q.    Do you and Mr. Barak and Mr. Arazi have a

8 percentage connected with the licensing or enforcement

9 of this patent?

10    A.    Yes, we do.

11    Q.    What is that percentage?

12    A.    Together, we have 18 percent out of the net

13 income, I'll say.

14    Q.    All right.  The net recovery or the net

15 outcome?

16    A.    Yes.  Yes, sir.

17    Q.    How long has it that you and Mr. Arazi and Mr.

18 Barak have had the 18-percent interest in this company

19 or the revenues that it generates?

20    A.    In Commil USA?

21    Q.    Yes.

22    A.    Maybe two years.

23    Q.    During the years, I think we heard it was

24 three, that this lawsuit has been moving to this trial,

25 have you played any role as a consultant or expert in

assisting in the case?

    A.    I don't think as an expert.  As a consultant,
yes.

    Q.    All right.  And were you paid for that work?

    A.    Yes, by the hour.

    Q.    And how much by the hour were you paid?

    A.    $100.

    Q.    And total for assisting me and the other
lawyers working on behalf of the Plaintiff, what do you
think the total amount you've received for your
assistance is?

    A.    Maybe $15,000, maybe 20.

    Q.    And that's over the last two years or so?

    A.    Yes, sir.

    Q.    Tell the jury what types of things you did
over the two years or so for which you charged as a
consultant a hundred dollars an hour?

    A.    I was mainly looking for documents and old
stuff from Commil, going over thousands of e-mails and
files, presentations, and trying to find all the
material that is relevant to this case, going over
note -- old notebooks, this kind of thing.

    Q.    And who asked you to do that?

    A.    You did.

    Q.    All right.  Were all those documents that you

were searching for and going through located in Israel

as opposed to the United States?

    A.   Yes.

    Q.   Did you give a deposition in this case where

you sat down under oath and let the lawyers for Cisco

ask you questions?

    A.   Yes, twice.

    Q.   And where did that occur?

    A.   In Israel.

    Q.   So the lawyers for Cisco came all the way over

to Israel and twice took your deposition in the case?

    A.   Yes, sir.

    Q.   Finally, sir, though you've described the

process that led up to obtaining a patent, we really

didn't go into your views or opinions about whether the

Cisco products violate that patent or not; is that

correct?

    A.   Yes.

    Q.   And why is it that you haven't given any

opinions or views about comparing the '395 patent on

which you're an inventor to the Cisco products?

    A.   I never dived into the -- because of the Cisco

product and the Cisco intellectual property to be able

to evaluate that.

    Q.   Are you here as an expert witness or just to

1  tell the facts of your involvement that relates to

2  Commil Limited in the obtaining of the '395 patent?

3       A.   I don't think I'm an expert witness.

4       Q.   All right.  And because you aren't expressing

5  an opinion about the comparison between the '395 patent

6  and the Cisco products, would you just leave that up to

7  the experts who have evaluated that?

8       A.   Yes, sir.

9            MR. WERBNER:  I'll pass the witness, Your

10 Honor.

11           MR. OSTROW:  May it please the Court.

12           THE COURT:  Cross-examination?

13           MR. OSTROW:   Thank you, Your Honor.

14           Before I do that, with the Court's

15 permission, I'd like to hand up some witness binders.

16           THE COURT:  Of course.

17           MR. OSTROW:  Ms. Lockhart?

18           COURTROOM DEPUTY:  Yes.  Here you go,

19 Judge.

20                    CROSS-EXAMINATION

21 BY MR. OSTROW:

22      Q.   So for reasons that may or may not be clear --

23           MR. OSTROW:  May I approach the witness,

24 Your Honor?

25           THE COURT:  Yes.

1     Q.   (By Mr. Ostrow) There are two separate

2 binders.  There's an original binder which is a little

3 thicker, and then the supplemental binder, and I'll tell

4 you which binder, if at all, we're going to look at.

5     A.   Okay.

6     Q.   All right.  Good morning, Mr. Soffer.

7     A.   Good morning.

8     Q.   We've never met before, have we?

9     A.   I don't think so.

10    Q.   So I thought I'd take the opportunity to

11 introduce myself.

12         My name is Jeffrey Ostrow.  Would it be okay

13 if I asked you some questions this morning?

14    A.   Yes, sir.

15    Q.   I want to focus your attention back to the

16 beginning when you were meeting with Mr. Arazi and

17 Mr. Barak, all right?

18    A.   Okay.

19    Q.   That was about in the second half of 1999?

20    A.   Yes.

21    Q.   You testified on direct that the three of you

22 got together and were discussing a number of ideas?

23    A.   Yes.

24    Q.   You took notes at these meetings, sir, didn't

25 you?

1    A.   Most of them, yes.

2           MR. OSTROW:  Can we have DTX1040?

3    Q.   (By Mr. Ostrow) Sir, these are your notes in

4  evidence from the December 15th, 1999 meeting.  Do you

5  remember these notes?

6    A.   The letters are too small for me.

7    Q.   We can blow it up, at least blow part of it

8  up.

9           Do these look like your notes from that

10  meeting from December 1999?

11    A.   I cannot tell -- just let me review this for a

12  second.

13    Q.   Please, sir, take your time.

14    A.   Yeah, it looks like that.  I haven't read all

15  the text, but yes.

16           MR. OSTROW:  Can we focus in, Tracy, on

17  Bullet Point 10?

18    Q.   (By Mr. Ostrow) Sir, on December 15th, 1999,

19  you and Mr. Arazi and Mr. Barak were discussing

20  Bluetooth, right?

21    A.   In addition to all other ideas, yes.

22    Q.   And as indicated in the notes and specifically

23  where Tracy's highlighting right now, you had not yet

24  read the Bluetooth standard at December 15th, 1999; is

25  that right?

1       A.   I assume we haven't read at all.  Maybe we

2    read part of that, yes, but we haven't read it all.

3       Q.   And you agreed, the three of you, that -- at

4    that meeting that you'd take some time to study the

5    standard.

6            Do you recall that?

7            I can just point you specifically to a

8    provision of the document, sir.  Each of you have little

9    tasks to do according to this document, and each of you

10   is listed as having to study the Bluetooth standard.

11           Do you see that?

12      A.   Yes, sir.

13      Q.   Okay.  I can take you through all three --

14      A.   No, no, it's okay.  I see that.

15      Q.   Okay.  And after this meeting, in fact, you

16   did go and study the Bluetooth standard, didn't you?

17      A.   Yes, we did.

18               MR. OSTROW:  And let's put up 1041.

19      Q.   (By Mr. Ostrow) Let's look at the English

20   version.

21               MR. OSTROW:  Thank you.  Let's blow up

22   Bullet No. 1.

23      Q.   (By Mr. Ostrow) Do you recall these being your

24   notes from the December 16th meeting?

25      A.   I don't recall, but I accept this document.

          1    Q.   Okay.  And it seems, sir, at this meeting --

          2              MR. OSTROW:  If we could put a highlight

          3    on the first sentence.

          4    Q.   (By Mr. Ostrow) It seems, sir, at this meeting

          5    you've discovered what I think you described as a

          6    problem.

          7              MR. OSTROW:  If we can, extend it down to

          8    second sentence.  That would be great.

          9    Q.   (By Mr. Ostrow) The Bluetooth standard, right?

         10    It says it seems that the standard does not support the

         11    subject of handoff in a very clear way.

         12         Do you see that?

         13    A.   Yes, sir.

         14    Q.   Do you recall identifying that being a problem

         15    on the Bluetooth standard?

         16    A.   At one point of time, yes.

         17    Q.   So right about this time, December of 1999?

         18    A.   Maybe, give or take few days, yes.

         19    Q.   Okay.  So we're talking about a few days?

         20    A.   Yeah, yeah.  Yeah, yeah.

         21    Q.   Okay.  And specifically, sir, the three of you

         22    came to understand that the Bluetooth standard did not

         23    support mobility between state -- let me start over

         24    again.

         25         You came to understand that the Bluetooth

standard did not support mobility between base stations,
right?

     A.    This is correct.

     Q.    And that's what you told the Patent Office,
right?

     A.    I -- I don't think that we told the Patent
Office that Bluetooth doesn't support it.  I don't
remember the exact phrasing, but the technology was how
to use -- how to do such handovers and technology that
doesn't support that, yes.

     Q.    Let's take a quick look just for a second at
the provisional application, which is DTX1051, and
specifically at Page 7 of DTX1051.

                    MR. OSTROW:  If we can blow up the second
paragraph.  The second paragraph -- or am I wrong?  Is
it the first paragraph?

                    Hold on a second.  I don't want to waste
your time, sir.

     Q.    (By Mr. Ostrow) By the way, these documents
are in front of you in these binders, if you want.  This
one is in the first binder.

     A.    First being the top one?

     Q.    The thicker of the two, yes, sir.

     A.    Okay.

     Q.    So it's in the second paragraph about halfway

1   down.  Bluetooth does not support mobility between base

2   stations, since it was primarily designed for

3   short-range communication.

4          Do you see that?

5            MR. OSTROW:  Maybe Tracy can highlight

6   it.

7      Q.  (By Mr. Ostrow) Are you on Page 7?

8      A.  Okay.

9      Q.  All right.  Good enough.

10          MR. OSTROW:  We can put that one aside.

11      Q.  (By Mr. Ostrow) And the three of you -- I

12   think you testified on direct, the three of you

13   ultimately came up with what you thought was a solution

14   to this problem, right?

15      A.  Yes, we did.

16      Q.  And the origin of this idea came from thinking

17   about Bluetooth, right?

18      A.  Yes.

19      Q.  You wanted to take protocols not designed for

20   mobility.  You wanted to make them mobile, right?

21      A.  That was the original idea, yes.

22      Q.  When you came up with the solution, and I

23   think Mr. Werbner asked you and you said it was right

24   before the year 2000, right?

25      A.  Yes.

1    Q.   When you came up with the solution, you hadn't

2  looked at the 802.11 protocol, the Wi-Fi protocol, to

3  determine whether or not it supported mobility, had you?

4    A.   Not at this point.

5    Q.   And a little while after the documents we just

6  looked at, specifically your notes, you went through

7  venture capitalists, right?

8    A.   Yes.

9    Q.   And you raised, I think you testified at this

10  stage, ballpark $15 million?

11    A.   At this stage, only 1 -- $1 million.

12    Q.   Oh, so at this point, we're still talking

13  about the very early stage fund raise?

14    A.   Excuse me.  I didn't know to what point of

15  time you're referring.

16    Q.   Let me be clear then.  So at the time you

17  filed the patent application, you had raised about a

18  million and a half to $2 million?

19    A.   After we filed the application, I think.

20    Q.   But at some -- I don't mean to interrupt, sir.

21    A.   Or right in -- I don't remember the exact

22  timing, but I think that we first filed the patent and

23  then got the funding.

24    Q.   Okay.  But at some point in time during the

25  evolution of the company, you had raised about $15

million?

    A.   Overall, yes.

    Q.   When you filed the patent application, you were familiar, and I think you testified this -- on this to direct -- that you -- you were already familiar with the Wi-Fi protocol, right?

    A.   Yes.

    Q.   You didn't mention the Wi-Fi protocol in your patent application, right?

    A.   Maybe we did not.

    Q.   You testified on direct that technologies are subject to curves, right?  I think that's the word you used.

    A.   Yes, sir.

    Q.   So it was possible at that point that the Wi-Fi technology would be one that would come back up on a curve some day, right?

    A.   Right.

    Q.   And you also testified there were significant differences between the two technologies, Wi-Fi and Bluetooth, right?

    A.   Yes, sir.

    Q.   The patent issued on, I think, August 6th, 2002.  Do you recall that?

    A.   Maybe granted, not issued.

1    Q.    Fair enough.

2    A.    Okay.

3    Q.    The date on the front of the patent is August

4 6th, 2002?

5    A.    Yes, sir.

6    Q.    Have you seen the Court's claims

7 construction --

8    A.    No, sir.

9    Q.    -- in this case?

10         Okay.  Do you understand that the patent

11 requires short-range protocol?

12    A.    Yes, sir.

13    Q.    Do you understand that it requires all the

14 real-time to happen in one place?

15    A.    I think that it requires the -- the -- the

16 time-sensitive functions to be rendered at the access

17 point, yes.

18    Q.    And in order to do that, the protocol needs to

19 be divided?

20    A.    Yes.

21    Q.    Who divides the protocol?

22    A.    I don't understand the question.

23    Q.    So is it the person who designs the system

24 that divides the protocol, or is it the customer upon

25 buying the product and rolling it out in their office

1  that divides the protocol?

2       A.   Do you mean who decides where to divide the

3  protocol?

4       Q.   Yes.

5       A.   The guy who develops the system.

6       Q.   And that -- is that implemented in the product

7  by the person who designed the system?

8       A.   Yes, sir.

9       Q.   All right.  The customer doesn't have any

10 impact or input into where the protocol is divided?

11      A.   I really hope he shouldn't.

12      Q.   He shouldn't and he doesn't, in fact, right?

13      A.   He doesn't, right.

14      Q.   You have a lot of education in the wireless

15 space, don't you?

16      A.   Education?  I have experience.  I don't know

17 if my education is exactly in the wireless specifically.

18      Q.   You have a lot of electrical engineering

19 education?

20      A.   Yes, sir.

21      Q.   And a lot of experience in wireless space?

22      A.   Yes, sir.

23      Q.   Would it be fair to say you've worked for

24 years in the wireless space?

25      A.   Yes, sir.

1     Q.   Would it be fair to say that your co-inventor,

2  Mr. Arazi, has a lot of experience in the wireless

3  space?

4     A.   Yes.

5     Q.   And he's worked for years in the wireless

6  space?

7     A.   Yes, he did.

8     Q.   And your other inventor co-inventor,

9  Mr. Barak, has lots of experience in the wireless space?

10     A.   Yes.

11     Q.   And he also worked for years in the wireless

12  space.  Didn't he also work for years in the wireless

13  space?

14     A.   Yes, he did.

15     Q.   I want to turn your attention, if I might, to

16  the Bluetooth product, the Cellarion product that you

17  developed while you were at Commil.  And when I say you,

18  I will use it the same way that you used it, which is

19  Commil.

20     A.   Okay.

21     Q.   At the time you were developing the product,

22  Commil had about 30 or so employees?

23     A.   Again, when we started developing the product,

24  we were only three.  After a year, we were 13.  And

25  after two years, we were 30.  And the product was

1   developed during this period.

2       Q.   So during this period, while you were

3   developing the product, you had between three and thirty

4   employees?

5       A.   Yeah, but I would say the average was 20 -- 20

6   plus, 25.

7       Q.   Fair enough.

8            In this period of time, all of you were

9   focused on the same thing.  It was this Bluetooth

10  Cellarion product, right?

11      A.   Yes.

12      Q.   Okay.  And at this point, a couple years in,

13  let's say you had raised your $15 million; is that fair?

14      A.   I didn't get that.

15      Q.   By the time you had 30 employees, had you

16  raised the $15 million?

17      A.   No.  When we had 30?  30?

18      Q.   Yes, 30, 3-0, sir.

19      A.   Although the last round was connected to

20  letting half of the people go, so it's not really

21  accurate, but give or take.

22      Q.   Give or take.  And you built the Cellarion

23  product from the ground up, right?

24      A.   Yes, sir.

25      Q.   And Cellarion used the Bluetooth protocol,

1  didn't it?

2      A.   Used?  It was supporting devices over the

3  Bluetooth protocol.

4      Q.   So it supported devices that used the

5  Bluetooth?

6      A.   Yes, sir.

7      Q.   All right.  And the Cellarion system used the

8  invention claimed in the '395 patent, didn't it?

9      A.   It uses -- used some of them.  I don't think

10 necessarily used it all.

11     Q.   But it used at least some of the invention in

12 the '395 patent?

13     A.   Yes, sir.

14     Q.   And the Cellarion product, as you testified on

15 direct, was not commercially successful, was it?

16     A.   No, it was not.

17             MR. OSTROW:  Can we put up 1055, please?

18     Q.   (By Mr. Ostrow) July 15th, 2002, sir, this is

19 an e-mail from you to -- again, if you want to take a

20 look at it in hard copy, I believe it's in your first

21 binder.

22     A.   That's fine.

23     Q.   Do you see that?

24     A.   Yes.

25     Q.   You still had some pretty fundamental

questions about how Wi-Fi worked, didn't you?

In other words, you were asking about roaming and handover, how does the frequency selection go, voice over WLAN. You were asking all these questions, right?

A. What's the question?

Q. Were you asking Mr. Arazi some questions?

A. Yes.

Q. And these questions were about Wi-Fi?

A. Yes, sir.

Q. And you were asking Mr. Arazi these questions, because you believed he was the one who knew in most of the company about Wi-Fi?

A. Not really knew, but he was the one that I thought should get the answers, not necessarily from his -- from his head.

Q. So maybe from someplace else?

A. Maybe go to literature or talk with others. The fact that I'm asking him the question doesn't say that he needed to know that by heart.

Q. And, in fact, a couple months later, you asked him whether or not it was time to do some homework on Wi-Fi, didn't you?

A. Probably.

MR. OSTROW: Let's take a look at 1036, the second -- second e-mail.

1     Q.    (By Mr. Ostrow) And you are, Mr. Soffer,

2 asking Mr. Barak and Mr. Arazi whether it's time to do

3 some homework.

4          Do you see that?

5     A.    Yes.

6     Q.    And at this point, sir, I think as you

7 mentioned a minute ago, one of the things you were

8 considering was asking a third party to come in and help

9 you out with Wi-Fi, right?

10    A.    I don't believe I said that, but it's written

11 here.

12    Q.    Do you --

13    A.    It's written here.  I didn't say that before.

14 I think you asked me.

15    Q.    I'm sorry.  Do you believe it to be true?

16    A.    Yes, sir.

17    Q.    Okay.  Fair enough.  I don't want to get mixed

18 up in some words with you.

19          And around this time, the end of '02,

20 beginning of '03, Commil asked a gentleman named Micky

21 Golan to help out?

22    A.    I don't remember when it was, but, yes, it

23 sounds about the right period.

24    Q.    Mr. Golan was an outside consultant?

25    A.    Yes.

1    Q.    He was knowledgeable when it came to talking

2    about technology?

3    A.    Yes, he was.

4    Q.    And you trusted him?

5    A.    To some extent.

6    Q.    And Commil, though, relied on him with respect

7    to the 802.11 and Bluetooth standards, right?

8    A.    Relied on him?  Got his opinion.  We didn't

9    rely on him.

10   Q.    Did you hire him to help you out with the

11   802.11 and Wi-Fi product?

12   A.    We hired him to do some evaluation for us

13   between technologies or what Commil had to do with the

14   Wi-Fi, yes.

15   Q.    In order to figure out what Commil had to do

16   to implement its solution in Wi-Fi?

17   A.    Yes.

18   Q.    All right.

19              MR. OSTROW:  Let's take a look at 1061,

20   Tracy.

21   Q.    (By Mr. Ostrow) So this is a report that

22   Mr. Golan produced for Commil.  Do you recognize it?

23              If you want to take a better look, this is

24   also in the first binder.

25   A.    I don't remember that, but I accept that as

correct.

    Q.   You accept that as correct.

       And it says in the very first page of the report -- there it is in the general section.  It appears that Mr. Golan is reporting back to Commil about the questions he had been asked to look at.

       Do you see that?

    A.   Yes, sir.

    Q.   So the two questions were, does the technology available today support handover with application to voice communication.

       Do you see that?

    A.   Yes.

    Q.   And is Commil's technology adaptable to support 802.11b, right?

    A.   Right.

    Q.   So you're asking Mr. Golan, Commil again -- when I said you, I mean Commil -- is asking Mr. Golan to help it out with the 802.11 or Wi-Fi project, right?

    A.   Not Wi-Fi project.  To evaluate -- to evaluate the possibilities or the consequences of going to Wi-Fi.  There was no Wi-Fi project.

    Q.   Not yet?

    A.   Not in this time.

    Q.   Okay.

1          MR. OSTROW:  Let's take a look at the

2  last page.  Can you blow up the summary?

3      Q.    (By Mr. Ostrow) Mr. Golan's reporting back to

4  Commil, including you, that based on the gathered

5  information, disregarding Reference 12, the present

6  802.11b provides fast handover that is easily

7  implemented by the mobile device and is adequate for

8  voice communication.

9          Do you see that?

10     A.    Yes, sir.

11     Q.    Second sentence says:  I do not recommend for

12  Commil to try to modify their technology to support

13  802.11b.

14          Do you see that?

15     A.    Yes, sir.

16     Q.    And Mr. Barak reported these reports to you,

17  didn't he?

18     A.    Either him or Nitzan.  I don't recall.

19     Q.    But somebody reported these reports?

20     A.    Somebody, yes.

21          MR. OSTROW:  Let's take a look at, I

22  believe the next one is 1062.

23     Q.    (By Mr. Ostrow) This is an e-mail from

24  Mr. Barak to you.  I think this is exactly the language

25  we just saw from Mr. Golan's report, but please, if you

have any reason to disbelieve me, go ahead and go back

and look at 1061.

First sentence:  Based on the gathered

information, et cetera, the present 802.11b provides

fast handover that is easily implemented by the mobile

device and is adequate for voice communication.

Do you see that?

A.   Yes.

Q.   What is Mr. Golan telling you there?

A.   He is telling us that according to his

opinion, there is no value in Commil going into this

business.

Q.   Because?

A.   Technology -- technologically speaking.

Q.   Technologically speaking.

A.   Yes.

Q.   Because the problem that you were trying to

solve had already been solved in Wi-Fi, right?

A.   That is what he is saying.  Solve but does not

exist.  That was his -- that is what he's saying, yes.

Q.   Solve but do not exist.

Let's look at the next sentence:  I do

recommend for Commil to try to modify their technology

to support 802.11b.

Do you see that?

1      A.    Yes.

2      Q.    And you agreed with that statement when he

3 made it, didn't you?

4      A.    For a different reason.

5      Q.    But you agreed?

6      A.    Yes.

7      Q.    But by 2004, sir --

8             MR. OSTROW:  You can take that down,

9 Tracy.

10     Q.    (By Mr. Ostrow) -- would it be fair to say

11 that Wi-Fi was pretty critical to Commil's survival?

12     A.    It's a tough question.  Commil could not

13 survive on Bluetooth.  Was Wi-Fi good enough for Commil

14 survival, I don't know.

15     Q.    Did you have anything else planned at the end

16 of 2004?

17     A.    I myself to spend time with my family, yes.

18     Q.    Okay.  I understand.

19            So I'm speaking specifically about Commil now.

20 Other than the Bluetooth product, which as you said,

21 didn't do particularly well in the market, at this point

22 in 2004, Commil was focusing on a Wi-Fi solution, wasn't

23 it?

24     A.    Yes, but I was not the CEO back then, so I was

25 not involved in the details.

1    Q.   But you know it was happening?

2    A.   Yes, sir.

3    Q.   And you were still -- you had resigned as CEO

4 at some point, but you were still on the Board of

5 Directors, weren't you?

6    A.   Yes, sir.

7    Q.   And you had responsibilities as a Board

8 member, right?

9    A.   Yes, sir.

10    Q.   You were to pay attention to what was going on

11 at the company, right?

12    A.   Yes.

13    Q.   Okay.  And you did that?

14    A.   Yes.

15    Q.   Okay.  And by November 2004, would it be fair

16 to say that Commil didn't even have the beginning of a

17 working solution for Wi-Fi?

18    A.   I don't remember the timeline.  I know that

19 they were working on that.  I don't remember the

20 milestones or things like that.

21    MR. OSTROW:  Let's take a look at 1069.

22 Blow that up.

23    Q.   (By Mr. Ostrow) It's an e-mail from Mr. Dovev

24 who replaced you as CEO, right?

25    A.   Yes.

1   Q. Let me back up and lay a foundation.

2     Mr. Dovev replaced you as CEO when you stepped

3 down?

4   A. Yes, sir.

5   Q. And here's an e-mail from him.  The first part

6 says --

7     MR. OSTROW:  Through the third -- the

8 third line, please, Tracy.

9   Q. (By Mr. Ostrow) My concern is that coming up

10 with a Wi-Fi-based proposition is a bit too mature for

11 us.  And I tried make clear.  Perhaps I failed.  We have

12 a conceptual framework for how to make the thing work,

13 but not even the beginning of a working solution.

14     Do you see that?

15   A. I see that.

16   Q. Is that a fair statement as to where Commil

17 was on its Wi-Fi solution by November of 2004?

18   A. I don't know.  I don't have -- I'm not one of

19 the people that this e-mail was sent to, but I don't

20 know.

21   Q. Would it be --

22   A. I don't remember.

23   Q. Would it be maybe better to ask Mr. Arazi that

24 question?

25   A. Maybe.

1    Q.   At some point, Commil started to build a Wi-Fi

2  team, didn't it?

3    A.   Yes, sir.

4    Q.   And in December 2004, Commil raised an

5  additional $4.7 million, right?

6    A.   I don't remember the numbers, but it sounds

7  right.

8            MR. OSTROW:  Let's put up 1056 at --

9  there it is.

10   Q.   (By Mr. Ostrow) Here's a Commil document from

11 right around then, December 2004, and it references the

12 $4.7 million.

13       Do you see that?

14   A.   Okay.

15   Q.   Do you have any reason to believe that's not

16 the case?

17   A.   No.

18   Q.   Okay.  So at the end of December 2004, Commil

19 had raised a little less than $5 million, right?

20   A.   Yes.

21   Q.   And that money was used for presumably the

22 Wi-Fi project, right?

23   A.   If I remember correctly, this also included

24 the bridge loan of 1.7 that was given before, but --

25 never mind.

1      Q.   Never mind.

2           But the money -- at this point, December '04,

3 we've discussed that Commil was focused on the Wi-Fi

4 product, right?

5      A.   Yes.  I think that we were -- we were still

6 doing some Bluetooth stuff, but they had a lot of

7 attention on Wi-Fi.

8      Q.   In late 2004, Commil began to look to hire

9 engineers in Wi-Fi, right?

10     A.   Sometime in 2004, yes.

11     Q.   And you personally interviewed a few of those

12 engineers?

13     A.   I doubt it.  If I did, then I don't remember.

14     Q.   You don't remember interviewing a guy named

15 Andrei Kojukhov?

16          And I'll try to spell that for the court

17 reporter, K-O-J-U-K-H-O-V.  How is that?

18     A.   I don't, but I interviewed like 15,000 people

19 in the 20 years that I'm in the business, so I don't

20 recall.

21     Q.   So you -- but you had reviewed a lot of people

22 in connection with the Wi-Fi project at Commil, right?

23     A.   Not necessarily.  Not that I recall, but

24 maybe.

25     Q.   You don't remember meeting Mr. Kojukhov?

1    A.    No.

2    Q.    Okay.  Do you know if Mr. Kojukhov was a Wi-Fi

3 expert?

4    A.    I don't even recall the name.

5    Q.    Do you know if Commil ever hired Mr. Kojukhov?

6    A.    Same answer.

7    Q.    Should I ask these questions to Mr. Arazi?

8 Would he know?

9    A.    Okay.

10    Q.    Would he know, do you think?

11    A.    Maybe, yes.  He was in the company in that

12 period, and he was working there.  I was an outsider,

13 you know.

14    Q.    Sir, you were still on the Board of Directors,

15 right?

16    A.    The Board of Directors doesn't meet each one

17 of the employees, so...

18    Q.    I understand that, but it wasn't a very big

19 company, as you've said.

20    A.    Yeah, it was not.

21    Q.    So you didn't know most of the employees at

22 Commil?

23    A.    At that point in time, new ones, not

24 necessarily.

25    Q.    So it's possible you met Mr. Kojukhov; you

1  just don't recall?

2      A.   Yes, it's possible.

3      Q.   Okay.  And Mr. Kojukhov, I'll tell you, worked

4  with Commil on a number of elements of the Wi-Fi

5  projects.  Do you have any reason to believe that's not

6  true?

7      A.   No.

8      Q.   Do you know if Mr. Kojukhov was helping to

9  determine how to split the Wi-Fi protocol?

10     A.   I don't know.

11     Q.   You don't know?

12        Do you know if Mr. Kojukhov looked at how

13  other companies split their protocols?

14     A.   No.

15     Q.   You don't know?

16        Do you know if Mr. Kojukhov looked at CAPWAP?

17  Do you know what CAP --

18     A.   No.

19     Q.   I'm sorry.  You don't know?

20     A.   No.

21     Q.   Do you know what CAPWAP is?

22     A.   I heard the name.

23     Q.   Do you know if Mr. Kojukhov reported back to

24  Commil regarding CAPWAP?

25     A.   I don't know.

1          MR. OSTROW:  Let's take a look at 1138.

2   Let's blow up the text.

3        Q.    (By Mr. Ostrow) Do you recall Mr. Kojukhov or

4   hearing from anybody that Mr. Kojukhov reported back

5   that -- about CAPWAP, that this baby is not ours?

6        A.    Not really.

7        Q.    Should I ask Mr. Arazi this question?

8        A.    Okay.

9        Q.    Would he know better than you would?

10       A.    He's one of the people in this correspondence.

11       Q.    Do you know, sir, whether or not Commil's

12   Wi-Fi solution, the one he was working on at the end of

13   the 2004 and 2005 and perhaps earlier than that, was

14   based on the '395 patent?

15       A.    I think it does, but I don't know that

16   directly.

17       Q.    Do you think it does?

18       A.    Yes.  Or it was supposed to.

19       Q.    I'm sorry.  I missed that.

20       A.    Or was supposed to.

21       Q.    It was supposed to.

22            Do you know whether or not Commil went and

23   hired a consulting firm to help it with the Wi-Fi

24   project?

25       A.    I didn't know that.

1    Q.   Do you -- have you ever heard --

2    A.   I don't remember that.

3    Q.   You don't remember that?

4         Did you ever hear of a company called Tata

5    Elxsi?

6    A.   No.

7    Q.   No?

8    A.   Don't -- don't remember.

9    Q.   I'll spell that for the court reporter.

10   A.   Okay.

11   Q.   It's T-A-T-A.  Next word, E-L-X-I-S -- S-I.

12   I'm sorry.

13   A.   Is it an Indian company?

14   Q.   It is an Indian company.

15   A.   Okay.

16   Q.   You didn't know that Commil went out and hired

17   an Indian company to help it with its development of the

18   Wi-Fi solution?

19   A.   If I knew, I forgot that.

20        MR. OSTROW:  Let's take a look at 1058.

21   1058.  Sorry.

22   Q.   (By Mr. Ostrow) Have you seen this before?

23   A.   It's too small for me.

24   Q.   All right.  1058 is in your supplemental

25   binder, if you want to look at it.  It's the smaller of

1  the two binders.

2       A.    1058?

3       Q.    Yes, sir.  It should be in numerical order

4  inside the binder.

5       A.    Okay.  I found that.

6       Q.    You found it?

7       A.    Yes.

8       Q.    Sir, this is a document from -- I'm not even

9  going to try to keep saying this.  Can I just call them

10 Tata?  Would that be okay?

11      A.    Fine with me.

12      Q.    This is a document from Tata, right?

13           MR. WERBNER:  Your Honor, I'm sorry to

14 interrupt.  Could we just have the date of that?

15           MR. OSTROW:  I can try to find it for

16 you, Mr. Werbner.

17           MR. WERBNER:  If it takes too much time,

18 that's fine.  We'll find it later.

19           MR. OSTROW:  I'm not sure the document is

20 dated, but it's --

21           THE COURT:  The bottom of the page seems

22 to indicate May 5th of '05.

23           MR. OSTROW:  Oh, you're right.  Thank

24 you, Your Honor.

25           THE COURT:  Not this page.

1          MR. OSTROW:  One of the other pages?

2          THE COURT:  Yes.

3          MR. OSTROW:  Thank you, Your Honor.

4     Q.   (By Mr. Ostrow) Do you have any recollection

5  whatsoever of Commil going out and hiring Tata to help

6  it with its Wi-Fi solution?

7     A.   No, sir.

8     Q.   So if I showed you a series of e-mails and

9  reports back from Tata to the company about the attempt

10 to implement the Wi-Fi solution, you wouldn't know

11 anything about any of that?

12    A.   I doubt it.

13    Q.   Should I ask Mr. Arazi?

14    A.   You can.

15    Q.   Do you think he may know?

16    A.   I don't know.

17    Q.   He was involved with the company back then,

18 wasn't he?

19    A.   Yes, sir.

20         MR. OSTROW:  Let's take a look at 1081.

21    Q.   (By Mr. Ostrow) This, I believe, is also in

22 the supplemental binder, which is the smaller of the

23 two.

24         MR. OSTROW:  Middle of the page, not --

25 middle of the page, please.

1    Q.    (By Mr. Ostrow) Who's a Mr. Arik Ramon?

2    A.    He was Commil's VP, R&D.

3    Q.    And he reported up to Mr. Dovev?

4    A.    At some point of time, he reported to me, and

5    after that, to Mr. Dovev, yes.

6    Q.    So he was working at Commil when you were the

7    CEO?

8    A.    Yeah.  I think that he joined in 2004 or 2003.

9    Q.    And he was the person who was in charge of

10   R&D, so he knew an enormous amount about the technology

11   of the company, right?

12   A.    Yes.  Nitzan Arazi was responsible for the

13   technology, but he was responsible for the R&D.

14   Q.    So you said Mr. Arazi was responsible for the

15   technology?

16   A.    It's a combination, yeah.

17   Q.    And Mr. Ramon, the head of R&D, is reporting

18   to Mr. Arazi.

19        And, look, there's Mr. Kojukhov.  I found him.

20   Hopefully, we spelled his name right.  That's probably a

21   better indication for the court reporter as to how to

22   spell his name than I gave you.

23        And they're talking about shutting down the

24   Wi-Fi project.

25        Do you see that?

1          Particularly, number two, saying:  We were

2   unable to prove that all the technical issues were

3   solved or could be solved in a reasonable timeframe.

4          Do you see that?

5      A.   Yes.

6      Q.   We were unable, in one, to meet our target

7   date for proof of concept.

8          Do you see that?

9      A.   Yes.  Yes, sir.

10     Q.   Due to the above issues, we were unable to

11  predict when we can have a product ready for shipping.

12         Do you see that?

13     A.   Yes, sir.

14     Q.   Along the way, sir --

15              MR. OSTROW:  We can take this down.

16     Q.   (By Mr. Ostrow) -- would it be fair to say

17  that in connection with the Wi-Fi product, Commil tried

18  to partner with other companies?

19     A.   I guess it did.

20     Q.   Do you know how many?

21     A.   No, I do not.

22     Q.   Would it be fair to say maybe 30?

23     A.   I don't know.

24              MR. OSTROW:  Let's take a look at 1094.

25     Q.   (By Mr. Ostrow) This, I believe, is the last

1  tab in the first binder, if you want to look at it.  And

2  I can spend a couple of minutes explaining why 1094

3  comes after 1051, but, you know, the numerical order,

4  but I won't bother you with that.

5          Here's an e-mail from Edgar Miller and

6  Mr. Dovev and others, and then Mr. Dovev forwards the

7  e-mail on to a number of people, including Mr. Arazi,

8  Mr. Barak, and Mr. Ramon.

9          Do you see that?

10     A.   Yes, sir.

11     Q.   All right.  Who is Edgar Miller?

12     A.   I recall the name, but I don't know.

13     Q.   Could it be that he worked for one of your

14  investors?

15     A.   I don't think so.

16     Q.   What's Palladian; do you know?  Do you see in

17  his e-mail address there, it refers to Palladian?

18     A.   I'm not familiar with this name.

19     Q.   Doesn't refresh your recollection at all?

20     A.   No.

21     Q.   All right.  But do you know if Mr. Miller was

22  tasked to try to go out and try to partner with other

23  companies?

24     A.   No.

25     Q.   You don't know?

1     A.    No.

2     Q.    You know that at the time, though, it was

3 going on.  You remember the Board of Directors, right?

4     A.    Yes.

5     Q.    And so you knew at the time that Commil was

6 out looking for partners, right?

7     A.    Yes, sir.

8     Q.    Okay.  And if we flip through this document --

9 take as much time as you need -- I see the list goes to

10 30 companies that Commil was trying to work with.  And

11 we can --

12     A.    What was the name?

13     Q.    I didn't give you a name.  I just said, sir,

14 that you can look through the document, and you'll see

15 there's a list, a numerical list of 30 companies, if you

16 flip through it that --

17     A.    This guy was doing a good job.

18     Q.    He was doing a good job, right?  A lot of the

19 people -- he was doing -- he was doing the best he

20 possibly could, right?

21     A.    Maybe.  I don't know him.

22     Q.    But it looks to you as if he was doing a good

23 job to find a partner?

24     A.    It was a joke.  It was a joke.

25     Q.    Oh, I'm sorry.

1          And one of the people he approached -- people
2    is a bad word.  We keep getting mixed up with that one.
3    One of the companies he proposed was Cisco?
4          A.    Maybe.
5                MR. OSTROW:  Let's take a look at bullet
6    12, which is on Page 3 of the document.  I'm going to
7    use my screen this time.  I don't want to be
8    disrespectful to the jury and turn my back.
9          Q.    (By Mr. Ostrow) So it says:  The Corporate
10   Business Development and Acquisitions Group do not want
11   to pursue an opportunity with Commil any further.
12                Do you see that?
13         A.    Yes.
14         Q.    Their reasons are somewhat vague, but the main
15   thrust of their rationale appears to be they have zero
16   interest in Bluetooth, and they do not appear to have
17   confidence in Commil's ability to develop a Wi-Fi
18   mobility management system.
19                Do you see that?
20         A.    Yes, sir.
21         Q.    So is it fair to say that Mr. Miller was
22   reporting back to the CEO and Mr. Dovev that Cisco was
23   not interested in Commil's product, right?
24                MR. WERBNER:  Your Honor, on optional
25   completeness, can we have the next line read?

1          MR. OSTROW:  I'll read the next part of

2   it, sure.

3      Q.   (By Mr. Ostrow) As they had no basis for

4   coming to such a conclusion (i.e., they had not

5   discussed Commil's Wi-Fi capabilities in detail).  EM

6   will discuss their reasons with them in more depth.

7   Next Step:  Get detailed feedback from Cisco executives

8   as to their reasons for not continuing the discussions.

9          Do you see that?

10     A.   Yes, sir.

11     Q.   Do you know anything else about the

12  relationship between Cisco -- excuse me.  Withdraw the

13  question.

14         Do you know anything else about the

15  interactions between anybody on behalf of Commil and

16  anybody on behalf of Cisco?

17     A.   In that point of time, no.

18     Q.   At this point of time.  At any point in time?

19     A.   I remember that in some point of time, we had

20  some -- we used the test lab in Israel for -- I think

21  that they had voice over IP switch that one of our

22  customers wanted us to use connecting to their system.

23         So I have a vague memory that R&D was using

24  their lab --

25     Q.   All right.

1      A.    -- but I don't remember the details.

2      Q.    But after this document, sir, do you have any

3  reason to believe that Cisco changed their view and

4  started that interest?

5      A.    I don't know.

6      Q.    Do you have any reason to doubt the conclusion

7  in here that Cisco didn't have any confidence in

8  Commil's ability to develop a Wi-Fi mobility management

9  system?

10     A.    I cannot evaluate Cisco's conclusion.  I can

11  evaluate this Edgar conclusion.

12     Q.    This was his conclusion.

13     A.    If it's written, probably this is what he had

14  in mind, but I have nothing to say about that.

15     Q.    This isn't a Cisco document; this is a Commil

16  document, sir, right?

17     A.    Yes, sir.

18     Q.    So this is a Commil person reporting back to

19  Commil that Cisco wasn't interested, right?

20     A.    Okay.

21     Q.    Is that right?

22     A.    Yes.

23     Q.    And, in fact, of the 30 companies --

24            MR. OSTROW:  We can take that down and go

25  back to look at the whole document.

1     Q.   (By Mr. Ostrow) Of the 30 companies listed on

2 this document, although there's some prospects up at the

3 front and some noes at the very back, at the end of the

4 day, none of these companies was willing to partner with

5 Commil, were they?

6     A.   I guess not.

7     Q.   Sir, would it be fair to say that Commil spent

8 about 20 person years specifically modifying the

9 technology for its Wi-Fi project in 2004, 2005?

10     A.   20 man years?

11     Q.   Yes.

12     A.   I think that's a fair estimation for --

13 besides the technology from Bluetooth that was

14 applicable to Wi-Fi.

15     Q.   So that's on top of that.

16     A.   Yeah.

17     Q.   And had lots of employees.  I don't know the

18 exact number.  I'm not sure you even know at this point,

19 the exact number of employees working on Wi-Fi, but it

20 had a bunch of employees working on Wi-Fi?

21     A.   Yes, sir.

22     Q.   And it spent millions of dollars on its Wi-Fi

23 solution?

24     A.   Yes, sir.

25     Q.   And despite all that, Commil never got to a

1  proof of concept in the Wi-Fi product, did it?

2      A.    I don't remember.  I saw the documents, but I

3  don't remember that personally.

4      Q.    Do you have any reason to believe they did?

5      A.    No.  I don't remember one way or another.

6      Q.    Do you recall during the meetings -- you

7  testified about a minute ago about using the Cisco

8  facilities in Israel.

9      A.    Yes.

10     Q.    Do you recall during those meetings if you

11 talked about the patent?

12     A.    In those meetings, I doubt it, but I don't

13 know.  Maybe introduction meeting or something.

14     Q.    Sir, you stand to receive 6 percent of the

15 proceeds in this litigation, right?

16     A.    Yes, sir.

17     Q.    When was the last time you saw Mr. Arazi?

18     A.    Yesterday morning.

19     Q.    Where was that?

20     A.    In the hotel in Marshall.

21     Q.    He came here to Texas?

22     A.    Yes, sir.

23     Q.    To help out with this trial?

24     A.    Yes, sir.

25     Q.    Where is he now?

1      A.    I don't know.

2      Q.    Do you know if he went back to Israel?

3      A.    I think so.

4             MR. OSTROW:  I don't have anything else,

5  Your Honor.

6             THE COURT:  Okay.

7             MR. WERBNER:  Your Honor, I have no

8  questions.

9             May the witness be excused?

10            THE COURT:  Any objection?

11            MR. OSTROW:  No, sir.

12            THE COURT:  Okay.  You're finally

13 excused.

14            THE WITNESS:  Thank you very much.

15            THE COURT:  You may step down.

16            Who will be your next witness?

17            MR. SAYLES:  May it please the Court.

18 Our next offer of proof will be some stipulations I

19 would like to present to the jury, and I would

20 respectfully request that the Court inform the jury of

21 the effect and nature of stipulations.

22            THE COURT:  Of course.

23            Ladies and Gentlemen, what you're about

24 to hear are what are called stipulations that are being

25 offered to you.

1　　　　　　　Oftentimes, in the course of -- of a

2　lawsuit, the attorneys for both sides will get together

3　and agree or stipulate as to the existence of certain

4　facts.  What that does is alleviate one side or the

5　other from the -- the need to present to you evidence of

6　those facts.

7　　　　　　　In other words, the stipulations you're

8　about to hear, the parties agree that these facts are

9　true, and you are to accept the stipulations as true

10　without hearing any further evidence as to these facts.

11　　　　　　　That being said, you may present your

12　stipulations.

13　　　　　　　MR. SAYLES:  All right.  The parties

14　agree the following facts are uncontested:

15　　　　　　　1.  Plaintiff Commil is a limited

16　liability corporation organized under the laws of Texas

17　and maintains its principal place of business at 10655 6

18　Pines Drive, The Woodlands, Texas.

19　　　　　　　Stipulation No. 4.  Nitzan Arazi, Haim

20　Barak, and Yaron Soffer filed provisional patent

21　applications with the United States Patent & Trademark

22　Office on April the 7th, 2000, and then again on June 1,

23　2000, covering their inventions.

24　　　　　　　No. 5.  On February 12th, 2001, the named

25　inventors, Nitzan Arazi, Haim Barak, and Yaron Soffer,

assigned the rights to their invention to Commil,

Limited.

No. 6.  On February 16th, 2001, the named

inventors filed an application for the issuance of a

patent on their invention, which was assigned

No. 9,784,109.

No. 7.  On November 15th of 2001, their

application was published.

No. 8.  On August the 6th, 2002, their

inventions were issued a patent by the United States

Patent & Trademark Office, the '395 patent.

No. 9.  On March 18th, 2007, Commil, the

Plaintiff, became the assignee of the '395 patent.

Those are the stipulations at this time.

And at this time, Your Honor, we would

call, by way of deposition, an adverse witness, Bob

O'Hara, who is a former Cisco employee.

After Cisco was acquired by Airespace, he

was the Chief Technical Officer for Cisco.  He is now

retired from Cisco.

The total time is 26 minutes.  The time

is divided 24 minutes to the Plaintiff and 2 minutes to

the Defense.

MR. FRAHN:  Your Honor --

THE COURT:  Yes.

1          MR. FRAHN:   -- a quick process problem we

2  haven't been able to work out.

3          THE COURT:  Why don't you approach.

4          MR. FRAHN:  Thank you, Your Honor.

5          (Bench conference.)

6          MR. FRAHN:  It's come to my attention

7  that the Plaintiff has refused to play the clips in the

8  order from the deposition.  They want to play all of

9  their clips and then play our counters separate.

10          MR. SAYLES:  I believe you're incorrect.

11          MR. FRAHN:  Well, I just got this note

12  passed up that says:  Plaintiff refuses to play the

13  clips in chronological order.

14          THE COURT:  Well, we discussed that in

15  chambers, Mr. Sayles.

16          MR. FRAHN:  I understand that the clips

17  are not going from Page 1 to page end; is that correct?

18          MR. STRACHAN:  The clips are all of our

19  designations.  When they had optional completeness to

20  fill in between the lines before or after the clip, we

21  played that in order.

22          They also had additional designations

23  that weren't optional completeness.  We put those at the

24  end, because they were not a part of it.  But anything

25  they have that fills in the gaps, we're playing in those

1  gaps.

2                    MR. SAYLES:  That's what I thought.

3                    MR. FRAHN:  Okay.

4                    MR. SAYLES:  I thought we did it your

5  way.

6                    MR. FRAHN:  All right.  That's what I was

7  told.

8                    MS. HENSON:  That's what I've been

9  working on all weekend.

10                    MR. FRAHN:  Okay.  Then let us roll.

11                    THE COURT:  Nothing for me to resolve?

12                    MR. FRAHN:  Thank you, Your Honor.

13                    MR. SAYLES:  Thank you, Your Honor.

14                    (Bench conference concluded.)

15                    THE COURT:  All right.  Ladies and

16  Gentlemen, recall my prior instructions on deposition

17  testimony.  You're going to hear some at this time.

18                    (Video playing.)

19                    QUESTION:  Would you please go to Tab 4

20  and hand that document to the court reporter to be

21  marked as Deposition Exhibit 118, and then you can get

22  it back, and we'll talk about it.

23                    On the third paragraph of it, it says:

24  Airspace solved the centralized architecture dichotomy

25  by creating a new design for 802.11 service delivery

1  called split MAC.

2                  Do you see that?

3                  ANSWER:  Yes.

4                  QUESTION:  What was the thing that was

5  being solved?  It refers to solving the centralized

6  architecture dichotomy.

7                  ANSWER:  So I believe that the statement

8  there is referring to the previous paragraph where it

9  described a problem where fresh information has to be

10  constantly fed to the centralized devices managing the

11  network, because that centralized device can't make

12  accurate decisions without up to date, i.e., fresh

13  information.

14                  And that centralizing, that

15  decision-making can adversely affect the performance of

16  the system if that centralization is not done smartly,

17  intelligently.

18                  QUESTION:  The next sentence where we

19  were looking says, quote:  This patent-pending

20  architecture has revolutionized enterprise wireless

21  networking by splitting the processing of 802.11

22  protocol between two devices:  The access point and a

23  centralized WLAN switch or appliance.

24                  Do you see that?

25                  ANSWER:  Yes.

1              QUESTION:  What do you know about that

2  reference to patent-pending architecture, if anything?

3              ANSWER:  I don't know.  I can't

4  speculate.

5              QUESTION:  Okay.  Here again, the

6  centralized controller is referred to as a switch, isn't

7  it?

8              ANSWER:  It appears so, yes.

9              QUESTION:  All right.  Did you ever call

10  it that during your work on the project?

11              ANSWER:  I'm sure that at some point,

12  that I have referred to it as the wireless LAN switch,

13  yes.

14              QUESTION:  Now, on the next page, the one

15  ending in Bates stamp 23 and 24, the second column

16  appears to explain why the functions were kept inside of

17  the access point, doesn't it?

18              ANSWER:  That's -- that's how it appears,

19  yes.

20              QUESTION:  And do many, if not all, of

21  the explanations deal with time-sensitive or real-time

22  operations?

23              ANSWER:  The -- the list has some

24  functions that -- that have aspects related to time and

25  others that do not.

1               QUESTION:  Then on the page ending with

2   the Bates No. 24, just below this chart, it states,

3   quote:  All other functionality is handled in the WLAN

4   switch, slash, appliance whereby time sensitivity is not

5   a concern and system-wide visibility is required.

6               Do you see that?

7               ANSWER:  I do.

8               QUESTION:  So doesn't that make clear in

9   this Airespace document that what it's describing as

10  patent-pending architecture is the splitting or

11  divisions of the time-sensitive functions between the

12  access point and the controller?

13              ANSWER:  So the -- the statement says

14  what the statement says.  It is not an accurate

15  reflection of the architecture and the location of the

16  functionalities.

17              The next statement in the list below

18  lists three functions that are also time critical and

19  require very time-sensitive processing.

20              There are other functions, including the

21  completion of security handshake and setup of QOS

22  parameters that take place --

23              THE REPORTER:  What parameters?

24              ANSWER:  QOS, quality of service,

25  parameters that take place in the wireless LAN

1  controller that are also time-sensitive.

2              And so the -- as I said, the statement

3  isn't entirely correct.

4              QUESTION:  Do you know why this Airespace

5  document states that all the other functionality, from

6  what was listed in the access point, is handled in the

7  switch, whereby the time sensitivity is not a concern?

8              ANSWER:  No, I don't know why.

9              QUESTION:  Let's start with Deposition

10 Exhibit 119.  Are you familiar with this document?

11             ANSWER:  No, I don't recognize the

12 document.

13             QUESTION:  Let's look at the fifth

14 paragraph on the first page of this document, which

15 reads, quote:  Splitting the MAC of the access point

16 between access point and the wireless switch, slash,

17 appliance allows timing-critical functions to remain in

18 the access point while also enhancing security,

19 manageability, and scalability.

20             A split-MAC architecture closely mimics

21 solutions that have been used by wireless carriers for

22 years, end quote.

23             Do you see that?

24             ANSWER:  Yes.

25             QUESTION:  Is that, as you read it,

inconsistent with what you have just said about whether

the splitting has something to do with gaining the

rapidness that you were seeking?

ANSWER: So this -- this statement

appears to be substantially similar to the one we were

just discussing, and it doesn't accurately describe how

the system was put together.

QUESTION: But it is different from what

you believe to be accurate?

ANSWER: It is -- it is an incomplete

description of our system and is inaccurate with respect

to placement of time-critical functions.

QUESTION: Do you know why it's contained

in this document of Airespace?

ANSWER: No, I do not.

QUESTION: And you stated right after

that in this Exhibit 122, quote: We accomplish this, in

part, by separating the real-time aspects of the 802.11

protocol from most of the management aspects of the

protocol.

In particular, the real-time frame

exchange protocol and certain real-time portions of MAC

management are accomplished in our lightweight access

point, while the MAC management part of the protocol

that relates to authentication, security, management,

1   and mobility are accomplished in our wireless LAN

2   switch.

3                   Do you see that?

4                   ANSWER:  Yes.

5                   QUESTION:  Is that an accurate statement?

6                   ANSWER:  That -- that statement's

7   accurate in -- in what it says, but it's not a complete

8   description of what the system does, and it's separate

9   from the listing of the goals.  It doesn't necessarily

10  imply that one particular goal is accomplished by the

11  real-time aspects in one place or another.

12                  QUESTION:  Well, is there something about

13  that sentence that bothers you?

14                  ANSWER:  No.

15                  QUESTION:  Okay.  So is that sentence

16  that I just read that begins, quote, we accomplished

17  this, then runs to the end of Paragraph 3, accurate?

18                  ANSWER:  So the -- the statement is -- is

19  accurate as far as it goes, and it is an incomplete

20  description of the accomplishment of the goals that are

21  started earlier in the paragraph.

22                  QUESTION:  Don't you, in Paragraph No. 4

23  of Exhibit 122, in the middle of May 2003, refer to the

24  controller as a switch?

25                  ANSWER:  Yes.  In Paragraph No. 4, the

1  controller is referred to as a switch.

2           QUESTION:  In the last paragraph,

3  Mr. O'Hara, of Exhibit 122, it states, quote:  Splitting

4  the MAC in the correct place enables the many functions

5  described above that would be difficult or impossible to

6  accomplish with a network full of standard APs.

7           Do you see that?

8           ANSWER:  Yes.

9           QUESTION:  Is that accurate?

10          ANSWER:  Yes.

11          QUESTION:  I understand in your last

12  answer about the ethernet switch, but how about a

13  wireless switch?

14          THE ATTORNEY:  Objection, form.

15          ANSWER:  So other than as a term, there

16  really isn't a wireless switch.  There's no equivalent

17  functionality in the wireless LAN arena to the ethernet

18  switch from which the original part of that name was

19  derived.

20          QUESTION:  Did you -- turning now to the

21  PDF or the sort of presentation attached, did you write

22  any portion of this?

23          ANSWER:  Let's see.  Let's see.  When was

24  this?  I don't recall writing any of this, no.

25          QUESTION:  Let's look at the page with

1  the Bates stamp 8249.  And do you see the heading,

2  Putting LWAPP to Use?

3             ANSWER:  Yes.

4             QUESTION:  It reads, quote:  Airespace

5  revolutionized the WLAN industry in 2002 when it first

6  introduced the concept of a split MAC.

7             This refers to the ability to separate

8  the real-time aspects of 802.11 protocol from most of

9  the management aspects of the protocol, in particular,

10  the real-time frame exchange protocol and certain

11  real-time portions of MAC management are accomplished in

12  a lightweight AP, and then it goes on.

13             Do you see that?

14             ANSWER:  Yes.

15             QUESTION:  Is that paragraph that we're

16  looking at on this exhibit accurate?

17             THE ATTORNEY:  Including the part you

18  didn't read?

19             QUESTION:  Yes.

20             ANSWER:  So yes.  It's -- it's generally

21  an accurate description of -- of the system.

22             QUESTION:  Exhibit 121 is not a marketing

23  document, is it?

24             ANSWER:  No.  It appears to be an

25  internal e-mail.

1          QUESTION:  And it appears to be one you

2 wrote to the CEO of Airespace, correct?

3          ANSWER:  That's how it appears, yes.

4          QUESTION:  Assuming that it's not a

5 forgery, why would you have written to the CEO at the

6 end of April 2003 that the lightweight access point

7 performs only time-critical portions of the 802.11

8 protocol?

9          ANSWER:  So as it says at the top of the

10 e-mail, this is a set of notes from a discussion.  It's

11 documentation, apparently, of a discussion that was

12 held, and these notes are unattributed.  I don't know

13 who said that or why.  It's simply a documentation of

14 something that someone said.

15          At -- let's see, at this time, after we

16 had introduced our product, it was helping him to better

17 understand the architecture and why we had done things

18 the way that we did.

19          QUESTION:  This 122 e-mail you wrote to

20 him is not a marketing document, is it?

21          ANSWER:  No, it is not.

22          QUESTION:  What was the purpose of it?

23          ANSWER:  So I -- from -- from the

24 introduction there, that Steve had, apparently,

25 requested of me to describe what split MAC was and why

1  we did what we did.  I don't know what his purpose was

2  in requesting it.

3                QUESTION:  Isn't it true that one of the

4  goals of splitting the MAC was to improve mobility in

5  the LAN?

6                ANSWER:  So the -- the statement in this

7  e-mail says that of -- in order to accomplish specific

8  goals.  And improving the mobility of the wireless LAN

9  is among that list.  That was why Airespace split the

10 MAC.

11               QUESTION:  That's accurate then.

12               ANSWER:  That's -- that's an accurate

13 reflection of the statement, yes.

14               QUESTION:  So one of the goals of this

15 new system with the split MAC was to improve mobility in

16 the network, correct?

17               ANSWER:  Among -- among all the goals

18 that I listed there in that statement, improving

19 mobility is one of them.

20               QUESTION:  And what was achieved with the

21 Airespace system that was distributed and sold insofar

22 as this seamless handoff, understanding what you mean by

23 that term?

24               ANSWER:  So the -- the Airespace system

25 reacted rapidly the mobile device, essentially just

1  appearing randomly at some access point.

2                    It was able to complete the association

3  process, the security authentication process, and the

4  establishment of quality-of-service parameters rapidly

5  enough that the -- the data flow between the mobile

6  station and the rest of the network was interrupted for

7  a small enough period of time that there was no -- in

8  our most stringent test, there was no audible artifact

9  in, for example, a wireless LAN voice over IP

10 communication.

11                    QUESTION:  Were you anticipating that it

12 could be used as a system to support a voice over IP or

13 over the internet?  Yeah, IP, right?

14                    ANSWER:   The -- one of the -- one of the

15 important applications of the wireless LAN system in a

16 number of our potential customers was voice over IP.

17 Many healthcare providers, for example, were using

18 wireless LAN handsets for their internal communications.

19                    QUESTION:  But with the fat access

20 points, as you went from one access point to the other,

21 if you were using communications on a telephone, if it

22 wasn't rapid, that would create a big problem, wouldn't

23 it?

24                    ANSWER:  What happened with the fat --

25 excuse me -- what happened with the fat access points

when a voice over IP handset would move from one access
point to another would be that there was often -- not
always but often an audible click or pop or gap in the
communication.  So the user of the phone was aware that
something happened.

And with our system, one of the
requirements was that that not happen in our system.
My -- my first -- excuse me -- my first discussions of
what we wound up describing in our marketing literature,
in our specifications as split MAC probably occurred
very early after my joining Airespace.  It was probably
in mid to late September of 2001.  But I don't know if
those were the first discussions of those.  They were my
first discussions.

QUESTION:  The first sell was April of
'03?

ANSWER:  Yes, I believe so.

QUESTION:  Before the development of this
product, were there wireless LAN controllers being sold
in the marketplace?

ANSWER:  I was not aware of any other
wireless LAN controller being sold.  And I believe ours
was the first one introduced for sale.

QUESTION:  Cisco bought Airespace for
approximately $450 million; is that right?

1          ANSWER:  That's correct.

2          QUESTION:  And the only product that

3 Airespace had and was selling at the time was this LWAPP

4 system?

5          ANSWER:  So -- so the Airespace products

6 consisted of the wireless LAN controller in several

7 fashions and models, several different models of

8 lightweight access points, the wireless LAN Airespace

9 controller system, the management system, and a planning

10 system, as well as all of the engineering personnel and

11 knowledge in the company.

12          QUESTION:  Do you know what the

13 Airespace -- the extent of their sales of those systems

14 either by revenue or number of units?

15          ANSWER:  I believe, at that time, we were

16 at approximately a rate of $100 million annually.

17          QUESTION:  Do you recognize this

18 document?

19          ANSWER:  No, I do not.

20          QUESTION:  Do you recognize the

21 attachment entitled, Airespace Split-MAC Architecture?

22          ANSWER:  No, I don't.

23          QUESTION:  You'll notice under there is

24 sort of a subtitle.  It says:  Using 802.11 Innovation

25 to Improve LAN Performance, Mobility, and Security.

1             Do you see that?

2             ANSWER:  Yes.

3             QUESTION:  So a split-MAC effort to

4  improve mobility is listed here as one of the three

5  things in the subtitle?

6             ANSWER:  The subtitle does list improving

7  mobility among the three -- three other aspects -- or

8  three aspects that are improved.

9             QUESTION:  Do you agree that improving

10  mobility was one of the important features of the

11  split-MAC architecture?

12             ANSWER:  So the improvement of mobility

13  was a necessity, a requirement for our system.  The

14  mobility, as it existed prior to the introduction of our

15  system, was inadequate to meet the needs of our

16  customers.

17             QUESTION:  In what way?

18             ANSWER:  In that it was both too slow and

19  was unable to span multiple subnets.  The addressing of

20  the mobile devices was not handled properly and required

21  a tremendous amount of time to update if a device moved

22  from one subnet to another.

23             QUESTION:  But also if it was functioning

24  as voice over, WLAN, right?

25             ANSWER:  In any case, the -- the -- the

1  movement from one point in the network to another was

2  required to be improved.

3              QUESTION:  Wasn't it recognized from the

4  very beginning of your development on what became the

5  lightweight access point project that it should be able

6  to support voice over the LAN?

7              ANSWER:  The voice -- voice over IP on

8  the wireless LAN was an important application that we

9  were required to support with our system.

10             QUESTION:  Why were you required?

11             ANSWER:  Because the customers --

12 potential customers were using that voice over IP over

13 wireless LAN or intending to use it and would not have

14 purchased a system that did not support it.

15             QUESTION:  And is that something you knew

16 from the beginning of the work, or at what point did

17 that knowledge come to you and the others developing the

18 system?

19             ANSWER:  That was -- that was something

20 that we suspected early on and was confirmed in some of

21 our early discussions with potential customers while we

22 were still seeking funding.

23             QUESTION:  Was there any problems

24 encountered in being able to accomplish that?

25             ANSWER:  So problems that -- yeah.  There

were innumerable problems encountered in trying to
develop the system so that it would support the voice
over IP protocol throughout a campus-wide wireless LAN
system.

QUESTION:  And were any of them solved by
determining where to place certain functions of the
802.11 protocol as between the switch and the access
point?

ANSWER:  The -- so were any of the
problems solved with respect to the support of voice
over IP in a campus-wide wireless LAN by the placement
of functions between the access point and wireless LAN
controller?  Yes.

By centralizing a number of functions at
the wireless LAN controller where the data existed to
allow those functions to execute most quickly, we were
able to solve a great number -- potentially almost all
of the functions -- or all of the problems with voice
over wireless LAN support.

(End of video clip.)

THE COURT:  Does that complete the offer?

MR. SAYLES:  Yes, it does, Your Honor.

THE COURT:  All right.  Thank you.

We're going to take our morning recess at
this time.

1          Ladies and Gentlemen, take 20 minutes.

2   Be back ready to come in the courtroom at 10:35.

3          Remember my prior instructions, and don't

4   talk about the case.

5          LAW CLERK:  All rise.

6          (Jury out.)

7          THE COURT:  All right.  Y'all have a

8   seat.

9          All right.  Mr. Strachan?

10         MR. STRACHAN:  Yes, Your Honor.

11         THE COURT:  You have some --

12         MR. STRACHAN:  I'm getting it right now.

13         THE COURT:  -- prospective exhibits for

14   me?

15         MR. STRACHAN:  May I approach, Your

16   Honor?

17         THE COURT:  Yes.  We had a conversation

18   in chambers this morning concerning the process for

19   laying a foundation for the summaries of these license

20   agreements.  And what I indicated was that my thought

21   had been to have the Plaintiff lay a foundation in front

22   of the jury and then offer the exhibits at that time.

23         I've got time over lunch, if you'd like a

24   hearing outside the presence of the jury, and I'm -- I'm

25   happy to give it to you, if that's what you want.

1          MR. STRACHAN:  Your Honor, what I've

2   handed you is the exhibit notebook for this damage

3   witness.  Tab 5 is the actual license and summaries that

4   will be the subject of the discussion.

5          What -- I would, I think, Your Honor,

6   like to have a hearing outside the presence of the jury

7   so that we don't have to stop during the jury

8   presentation and get a ruling on each of these.

9          THE COURT:  All right.  Well,

10  Mr. Carroll, do you have someone who can be available

11  over the noon hour?

12          MR. CARROLL:  Well, unfortunately, it

13  will be me, Judge, but yes.

14          THE COURT:  Well, you'll do.  You'll do.

15          MR. CARROLL:  Thank you.

16          THE COURT:  I've got a criminal matter

17  over the noon hour as well, but do you have witnesses or

18  proffers that you can make up until the noon hour?

19          MR. STRACHAN:  Oh, yes, sir.

20          THE COURT:  Okay.  I just -- I didn't

21  know when you were planning to call your damage expert.

22          MR. STRACHAN:  We have some additional

23  video depositions and a fact witness, and then we'll

24  call Mr. Carlile.

25          THE COURT:  All right.  Well --

1          MR. WERBNER:  We're going to call

2   Jonathan David before that.  So Mr. Carlile will be

3   after lunch, I'm sure.

4          THE COURT:  Okay.  Okay.  Well, let's do

5   it about 12:15.  I'll try to do the initial appearance

6   at noon, and we'll -- I'll break the jury until 1:30,

7   and that will give you a chance to --

8          MR. CARROLL:  May I ask a question?

9   The summaries, is that the same that's in his expert

10  report?

11         MR. STRACHAN:  Yes.  But I have a copy

12  for you as well.

13         MR. CARROLL:  Oh, you do?  Okay.  Thank

14  you.

15         THE COURT:  Okay.

16         MR. SAYLES:  May it please the Court.

17         THE COURT:  Yes.

18         MR. SAYLES:  One other thing.

19         We have our list of exhibits, which the

20  other side has reviewed and approved, and rather than

21  adding exhibits, it was mostly a removal of exhibits

22  that would relate to Aruba.

23         So with the Court's permission, we'll

24  turn in our updated list for today.

25         THE COURT:  All right.  That will be

fine.

Any objection?

MR. OSTROW: No, Your Honor.

THE COURT: All right. Those that are reflected as being admitted are admitted, and those that have been removed from the record as relating to Aruba will be removed.

Anything more from the Plaintiff?

MR. SAYLES: Nothing more from the Plaintiff at this time.

MR. OSTROW: Your Honor, I've just been informed that somebody on our team has not seen this who should have it.

Can we just come back, Your Honor, after the break and take a look at it? Will that be all right?

THE COURT: That will be fine.

MR. OSTROW: All right. Thank you.

THE COURT: Let Mr. Warriner know.

MR. OSTROW: Yes. Yes, sir.

THE COURT: They're admitted subject to you reviewing them and having a problem with them.

MR. OSTROW: Thank you.

LAW CLERK: All rise.

(Recess.)

1              (Jury in.)

2              THE COURT:  Please be seated.

3              Who will be your next witness?

4              MR. SAYLES:  May it please the Court.

5              At this time, the Plaintiff calls Pat

6    Calhoun by deposition and as an adverse witness.  He

7    appeared at deposition, and as is true of all these

8    depositions, was duly sworn; lawyers for both sides

9    appeared.

10             Mr. Calhoun is a Cisco employee.  He was

11   a founder of Airespace.  When Cisco acquired Airespace,

12   he became the Chief Technical Officer at Cisco.

13             And this is 24 minutes, 20 minutes to the

14   Plaintiff and 4 to the Defendant.

15             THE COURT:  All right.  Thank you.

16             (Video playing.)

17             QUESTION:  When was Airespace acquired by

18   Cisco?

19             ANSWER:  I believe it was in March 2005,

20   is when the acquisition closed.

21             QUESTION:  And at that time, you became

22   an employee of Cisco, what was your position?

23             ANSWER:  I was Chief Technology Officer.

24             QUESTION:  For what division?

25             ANSWER:  For the Wireless Networking

Business Unit.

QUESTION: Okay. Well, when did you --
were you involved -- well, let me start over with --
what is Black Storm Network?

ANSWER: When we started the company, the
startup, which eventually became Airespace, the original
name was Black Storm Networks. Sometime in late 2002,
early 2003 -- I can't quite recall the date -- we hired
our marketing leader, VP of Marketing.

One of the objectives that that
individual had was to also provide a name -- you know,
provide a name that he felt was more appropriate for
what it was that we were doing, and came up with the
name Airespace.

QUESTION: What was it in the 802.11 that
would determine what must remain in the access point?

ANSWER: There are some time-sensitive
functions that exist in 802.11 that -- there's some
timing requirements in the 802.11 protocol that must be
met. And those typically occur in -- for the purpose
for -- for the purposes of acknowledging packets,
retransmitting packets.

So those are the -- those are the two
pieces that -- I'm sure there is a couple more that I
can't think of off the top of my head, but those are the

1　two key ones that we needed to make sure that we could

2　comply with.  That required us to be as close to the

3　device as possible.

4　　　　　　　When I say the device, I mean the mobile

5　station as possible.

6　　　　　　　QUESTION:  Did Black Storm/Airespace ever

7　come up with a solution to the 802.11 problem as you've

8　described it?

9　　　　　　　ANSWER:  Yes, we did.

10　　　　　　　QUESTION:  Okay.  And what was that

11　solution called?

12　　　　　　　ANSWER:  It was the wireless LAN

13　controller architecture, the one that has the AC and the

14　WTP.

15　　　　　　　QUESTION:  And did you have any name that

16　you called that solution?

17　　　　　　　ANSWER:  I don't think we actually had a

18　formal name for the solution.  And we referred to them

19　as a wireless controller and an access point, a

20　lightweight access point.

21　　　　　　　QUESTION:  Okay.

22　　　　　　　ANSWER:  I think a lot of the industry

23　referred to it as the LWAPP architecture.  I think the

24　LWAPP architecture just implied the fact that there was

25　a wireless controller in it and a lightweight access

1  point.

2             QUESTION:  The last part of that

3  paragraph says increasing the performance to real-time

4  services.  What are real-time services?

5             ANSWER:  Yeah.  In this case here, the

6  voice and video.

7             QUESTION:  And how are they real-time

8  services?

9             ANSWER:  Real-time, as I think I

10  mentioned earlier, is really this strange term that

11  nobody can really seem to define.  But the industry does

12  generally refer to voice and video as having more

13  time-sensitive requirements.  I think that that's what

14  that was implying.

15             QUESTION:  In the split AP architecture,

16  there is a division of what was previously performed --

17  the 802.11 MAC performed at the access point, the WTP?

18             ANSWER:  The -- that is correct.  And I

19  think we've gone through this a couple times, right.

20  The intent was things that needed to exist in hardware

21  that were time-sensitives needed to remain in the WTP.

22  Everything else would basically go up to the access

23  controller.  That's what this diagram is trying to

24  represent, is that the architectures used lofty words

25  but weren't very specific on -- on what that really

1  meant from an implementation standpoint.

2             This document is trying to say, we need

3  to go clarify what that means.

4             QUESTION:  And my question is -- I think

5  it's simple, really.  And that is simply, on the split

6  AP side, the items associated with the AC have

7  non-real-time and the items associated with WTP have

8  real-time?

9             ANSWER:  In the split AP.  In the split

10 AP case you're talking about, yes.

11            So in this case here, the time-critical

12 functions are showing at the bottom, and the

13 non-time-critical functions in the split AP case are

14 showing to be in the access controller.

15            QUESTION:  Okay.  Let's turn to that.

16 The third paragraph of that document, the second

17 sentence reads:  In the patent-pending architecture --

18 well, let's start over with the first sentence in that

19 paragraph.

20            Airespace solved the above dichotomy by

21 creating a new architecture for 802.11 service delivery

22 called split MAC.

23            At the risk of being repetitive, could

24 you tell me what was the new architecture?

25            ANSWER:  I think as we -- we talked about

this morning, there was the legacy traditional access

802.11 architect, right, where an access point was an

autonomous unit. We also called that autonomous access

points. And then there was the unified wireless. This

is the unified wireless architecture.

QUESTION: Then the second sentence goes

on to read that this patent-pending architecture has

revolutionized enterprise wireless networking by

splitting the processing of the 802.11 protocol between

two devices, the access point.

And I'll stop right there. At various

times in our discussion, we've also referred to that as

WPT, correct?

ANSWER: WTP.

QUESTION: In our discussions earlier

today, the WTP in your references would be the same as

the access point, correct?

ANSWER: In this document, yes.

QUESTION: Yes. Okay. And then it

says -- continuing to read: And a centralized WLAN

controller, parenthesis, i.e., WLAN switch or appliance.

And that centralized WLAN controller, i.e., switch or

appliance, would be the access controller that we've

discussed this morning?

ANSWER: That's correct.

1                    QUESTION:   This particular paragraph --

2   we'll just read it.   The Airespace wireless enterprise

3   platform --

4                    ANSWER:   The paragraph, okay.

5                    QUESTION:   -- tackles this problem head

6   on by splitting the process of 802.11 data and

7   management protocols as well as the access point

8   functionality between AP -- we talked about that -- and

9   the WLAN switch or controller.

10                   I've read it correctly so far, haven't I?

11                   ANSWER:   Uh-huh.

12                   QUESTION:   Okay.   Then it says the AP

13  handles the portions of the protocol that have real-time

14  requirements, which includes, and then it lists nine --

15                   ANSWER:   Yes.

16                   QUESTION:   -- portions of the protocol?

17                   ANSWER:   Yeah.

18                   QUESTION:   Okay.   And it uses this phrase

19  again, real-time, that we've seen earlier this morning,

20  correct?

21                   THE COURT:   Right.

22                   QUESTION:   Okay.   Now, you've said before

23  that real-time is a phrase that can have a lot of

24  different meanings and contexts.   In this context, these

25  nine different portions of the protocol, what does the

1  term real-time mean?

2  　　　　　ANSWER:  I actually don't know, because

3  some of these itemized items actually have nothing to do

4  with time criticality.  Remember we were talking about

5  some are, and then there's things that are just on the

6  chip, such as No. 9.  Encryption, as we discussed this

7  morning, doesn't really have a real-time requirement.

8  　　　　　So I find sort of the opening statement

9  to be very confusing.  But 1 through 5 would be the

10 functions that, as we discussed this morning, have time

11 sensitivity that are generally handled by hardware.

12 　　　　　QUESTION:  The following paragraph begins

13 with:  All remaining functionality is handled in the

14 WLAN switch or appliance, whereby time sensitivity is

15 not a concern and system-wide visibility is required.

16 　　　　　Did I read that correctly?

17 　　　　　ANSWER:  Uh-huh.

18 　　　　　QUESTION:  Okay.  And in that context,

19 time sensitivity would just be the opposite of real-time

20 requirements, time sensitivity?

21 　　　　　ANSWER:  Sure.

22 　　　　　QUESTION:  Do all of the 2000 series --

23 whether it's 2000 or 2100, do all of the 2000 series

24 incorporate Cisco controllers, incorporate the LWAPP

25 architecture we've discussed earlier?

1          ANSWER:  Yes, they do.

2          QUESTION:  Okay.  What about the 3750

3 series, WLAN controller?

4          ANSWER:  Yes.  That would be an

5 integrated ethernet switch with a wireless controller.

6          QUESTION:  Does it incorporate the LWAPP

7 architecture we discussed?

8          ANSWER:  Yes, it does.

9          QUESTION:  Okay.  4400 series, WLAN

10 controller?

11          ANSWER:  That's the Cisco naming for the

12 4000 series that we talked about earlier.

13          QUESTION:  And it incorporates the LWAPP?

14          ANSWER:  It incorporates the LWAPP.

15          QUESTION:  Okay.  6500 series, wireless

16 service module?

17          ANSWER:  That's the same as the one we

18 talked about earlier, the catalyst 6500.

19          QUESTION:  7500 series would be the same?

20          ANSWER:  7500?

21          QUESTION:  Is the 7500 series a wireless

22 service module?

23          ANSWER:  All right.  Yes, that would also

24 include LWAPP.

25          QUESTION:  1000 series?

1                    ANSWER:  Yes.

2                    QUESTION:  And does it incorporate the

3    LWAPP?

4                    ANSWER:  Yes.

5                    QUESTION:  1100 series?

6                    ANSWER:  Yes.

7                    QUESTION:  It incorporates LWAPP?

8                    ANSWER:  Yes.

9                    QUESTION:  1130 AG series?

10                   ANSWER:  Yes.

11                   QUESTION:  Incorporates an LWAPP?

12                   ANSWER:  Yes.

13                   QUESTION:  1200?

14                   ANSWER:  Yes.

15                   QUESTION:  Incorporates LWAPP?

16                   ANSWER:  Yes.

17                   QUESTION:  1230?

18                   ANSWER:  Yes.

19                   QUESTION:  Incorporates LWAPP?

20                   ANSWER:  Yes.

21                   QUESTION:  1240 AG?

22                   ANSWER:  Yes.

23                   QUESTION:  Incorporates LWAPP?

24                   ANSWER:  Yes.

25                   QUESTION:  1250 series?

1                   ANSWER:  Yes.

2                   QUESTION:  Incorporates LWAPP?

3                   ANSWER:  Yes.

4                   QUESTION:  1300 series?

5                   ANSWER:  Is there -- is there -- are you

6 going to say 1500 next?

7                   QUESTION:  You got it.

8                   ANSWER:  What is the 1300?  I'm going to

9 have to say I don't know.

10                  QUESTION:  1500 series?

11                  ANSWER:  Yes.

12                  QUESTION:  And does it incorporate LWAPP?

13                  ANSWER:  Yes.  I wasn't sure if I had 13

14 and 1500 mixed up there.

15                  QUESTION:  I'm going to have the court

16 reporter hand you what's been marked as Deposition

17 Exhibit No. 4.

18                  ANSWER:  Yep.

19                  QUESTION:  And it's entitled, Changing

20 the Game for WLANs:  Airespace's Breakthrough Split MAC

21 Architecture.

22                  But regardless of whether you agree with

23 the proposition or not, this document sets forth that

24 the access point is handling the portions of the

25 protocol or MAC management services that have real-time

1 requirements, and then it lists what those functions

2 are.

3               Whether you agree that they are real-time

4 or not real-time, that's how this table presents it?

5               ANSWER:  The table certainly says that.

6               QUESTION:  And if you go to Page 2, we're

7 seeing the same language that we've been noting

8 throughout these documents, starting with what is the

9 third photograph that says split MAC WLAN systems tackle

10 this problem head on by splitting the processing of

11 802.11 data and management protocols as well as the

12 access point functionality between the AP and the WLAN

13 switch or controller.

14               ANSWER:  Right.

15               QUESTION:  And it goes on to say:  In the

16 split MAC approach, the access point handles the

17 portions of the protocol that have real-time

18 requirements as shown in Table 1.

19               ANSWER:  Well, that's what the document

20 says.

21               QUESTION:  Right.

22               ANSWER:  But it doesn't change, you know,

23 my earlier testimony that that's not the way we

24 implemented the system.

25               QUESTION:  And it goes on to say:  All

other functionality is handled in the WLAN

switch/appliance whereby time sensitivity is not a

concern and system-wide visibility is required.

In -- in terms of showing the differences

as they were set forth in Deposition Exhibit No. 1, your

PowerPoint which is now Deposition Exhibit No. 8, shows

the architectural table on Page 3.  And it shows again

the left column is the local AP; the right-hand column

is the split AP; and the difference is really in where

the MAC -- the various MAC management functions reside

in the infrastructure, correct?

ANSWER:  That is correct.

QUESTION:  And this table reflects that

the split AP has 802.11 non-real-time MAC functions or

management services in the controller and then 802.11

real-time MAC management services or functions in the

access point, correct?

ANSWER:  You know, this is a copy of this

slide, right?  This is not the way I would draw it, but

this is the way that this -- this -- this Exhibit 1

actually defines those two.

QUESTION:  But this was a presentation

that you prepared for a --

ANSWER:  Correct.

QUESTION:  -- presumably an oral

1  presentation that you were giving to an IETF group?

2                ANSWER:  Correct.  And I was trying to

3  point out that this document has problems.

4                QUESTION:  Well, you're pointing that out

5  now, but where in this -- well, yeah, the problem being

6  that the local MAC and the split MAC could be unified?

7                ANSWER:  Exactly, yeah.  So I basically

8  pulled it and I said, look, we've got two different ways

9  of doing things.  Let's not go down this path, because

10  we're going to be imposing a huge tax on all the

11  implementers or all the vendors to have to do two

12  different things.

13                So I was basically saying if we would

14  unify it, we could have a common way of implementing

15  local MAC and split MAC.

16                QUESTION:  You've been handed what's been

17  marked as Deposition Exhibit No. 9.

18                ANSWER:  Uh-huh.

19                QUESTION:  Is that document familiar to

20  you?

21                ANSWER:  No, it's not, but I don't --

22  clearly, it's a Cisco document.

23                QUESTION:  Okay.  And it's entitled Cisco

24  Unified Wireless Network WLAN Controller Deployment

25  Guide?

1          ANSWER:  Uh-huh.  Yeah.

2          QUESTION:  The term Cisco Unified

3   Wireless Network, what does the unified wireless network

4   cover?

5          ANSWER:  The controller, the access

6   points, our management system.

7          QUESTION:  Then if you go down to the

8   next paragraph, it says:  Once joined with controller,

9   the APs are also lightweight in the sense that they

10  handle a subset of the 802.11 MAC functionality.

11         ANSWER:  That is correct.

12         QUESTION:  Is that indicative of the fact

13  that these APs are part of a split MAC architecture?

14         ANSWER:  That is correct.

15         QUESTION:  The next sentence says:

16  Typically, this subset -- presumably of 802.11 MAC

17  functionality -- includes only real-time processing.

18  This architecture enables support for seamless mobility

19  and a number of advanced features in an elegant,

20  scalable way.

21         So, once again, we have in a Cisco

22  document an indication that typically, the split of

23  802.11 MAC functionality in the split MAC architecture

24  is among real-time or time-sensitive criteria.

25         ANSWER:  I see what the document is

reading, right.  I happen to know what the code does.
I'm simply telling you what the code does.

QUESTION:  But that's not what this
document represents.  Well, it says typically.

ANSWER:  Right.  Yeah.  Right.

QUESTION:  In Cisco's 500 series express
mobility light access point product, does that use the
split MAC architecture we've been discussing?

ANSWER:  So my understanding is every one
of our access points supports both split and local.  The
500 is the one that I'm not sure about, to be honest.
It was designed for the mid-market.  That one I would
have to go back and take a look.  That's the one that
I'm a little unsure of.  All the other ones support
both.

QUESTION:  Okay.  How about the Cisco
controller 500 series wireless mobility express?

ANSWER:  Yeah.  All of those controllers
run basically the same code, so they would support both.
The only one I'm unsure of is the 500 access point.  I
believe it runs both, but I'm not...

QUESTION:  Cisco products -- so it is
fair to say that the accused products are based on a
centralized architecture?

ANSWER:  We support both, right.

1          QUESTION:  And in essence, isn't it fair

2    to say that part and parcel of the reason that you

3    developed split MAC architecture was to improve

4    performance of the system?

5          ANSWER:  No.  No.  The -- the original

6    intent of the split MAC architecture was to -- was to

7    simplify the manageability, the operational experience,

8    and the deployability of the solution.

9          So in the old days when autonomous is all

10   that existed, when customers deployed them, every one of

11   the access points had to be managed individually.  So if

12   you had a thousand of those, you had to manage a

13   thousand individual devices in your network, which was a

14   huge burden.

15          The intent was from a manageability

16   standpoint, if we can centralize the manageability to

17   the controller, we provide fewer devices that the IT

18   staff has to touch, and, therefore, it reduces the

19   operational costs and the complexity.

20          QUESTION:  But from a manageability

21   long-term, cost-effective benefit analysis, the

22   preferred usage appears to be this split MAC

23   architecture?

24          ANSWER:  That is correct.

25          QUESTION:  Does the content packet name,

whether it's an MSDU or PDU, change based on whether

it's a voice application, a video application, or just

plain data application?

ANSWER:  Actually, that's a weird

question.  I'm not sure that I get it.  And I'll tell

you why.

We actually don't care what the packet

is, right?  A packet is a packet.  If there's voice in

it, okay.  If there's data in it, that's fine.  As far

as we're concerned, everything is data.

QUESTION:  Right.  Correct.

ANSWER:  There's no differentiation.

QUESTION:  Part of the whole quality of

service value-added functionality has been to somehow

tag voice packets so that they could be recognized as

such and queued it higher in the transmission line;

isn't that true?

ANSWER:  So an end point would know if

it's actually going to be creating a voice --

QUESTION:  Right.

ANSWER:  -- call, and at that point, it

may decide to make use of the 802.11e and actually tell

the network, by the way, I'm going to be sending certain

packets, and I'm planning on prioritizing them

differently.  We actually don't know whether it's voice

1  or not.  For all we know, you know, it could be a

2  request to prioritize web traffic.

3            QUESTION:  Does Cisco have any products

4  that are telephone handsets that can be used for voice

5  over IP?

6            ANSWER:  Okay.  So voice over IP mobile

7  devices, yes.  We do have 7920, 7921, 7925 voice over IP

8  wireless phones, yes.

9            QUESTION:  And those phones still have to

10  operate using the same basic core 802.11 MAC functions

11  that a laptop would?

12            ANSWER:  Exactly.

13            QUESTION:  It may have additional

14  functionality, but it has to at least have that?

15            ANSWER:  At a minimum, yes.

16            QUESTION:  I think you mentioned earlier

17  there was a phone headset, the Cisco 79?

18            ANSWER:  7920.

19            QUESTION:  7920.

20            ANSWER:  We don't actually make that one

21  anymore, but the 7921 and the 7925 is our wireless voice

22  over IP devices.

23            QUESTION:  Now, can those be used on a

24  Cisco unified wireless network or using these accused

25  products, the controllers or --

1               ANSWER:  It's 802.11, so it should be

2 able to interoperate with anything.

3               (End of video clip.)

4               THE COURT:  Does that complete the offer?

5               MR. SAYLES:  It does, Your Honor.

6               THE COURT:  You may call your next

7 witness.

8               MR. SAYLES:  May it please the Court.

9               At this time, the Plaintiff calls Robert

10 Friday by video deposition as an adverse witness.  He is

11 a Cisco employee.  He was a founder and chief scientist

12 at Airespace.

13               The time is a total of 12 minutes; 10

14 minutes to the Plaintiff and 2 minutes to the Defense.

15               THE COURT:  Thank you Mr. Sayles.

16               (Video playing.)

17               QUESTION:  Was the wireless solution that

18 Airespace developed and sold intended to support not

19 only data communications but voice communications?

20               ANSWER:  Yes, it was.

21               QUESTION:  How did the desire to have it

22 support voice communications impact the architecture

23 design of the system, if any?

24               ANSWER:  So the major issue back at the

25 time was basically layer three mobility.  So the issue

1  was how to handle layer three mobility when you move

2  between these subnets to minimize the time between

3  those -- between that transition.

4                QUESTION:  Did that have something to do

5  with supporting voice communication?

6                ANSWER:  In the sense that the user

7  experience -- you did not want the user experience to

8  experience clicks or, you know, transitions, dropouts,

9  when you move between these subnets.

10              QUESTION:  Well, you do know that one of

11  the goals of the Airespace product was to support and

12  allow, with cellular-like handoff, voice over internet

13  communications, right?

14              ANSWER:  The major problem back in the

15  time was this layer three mobility issue and how to

16  handle handoffs across these layer three subnets.  So in

17  that context, that was trying to provide that cellular

18  experience -- experience across these subnets.

19              QUESTION:  And the old architecture that

20  involved the fat access points didn't accomplish that,

21  and the product by Airespace did; is that right?

22              ANSWER:  So the -- what the -- the fat

23  access point did not solve this layer three mobility

24  problem.

25              QUESTION:  The lack of layer three

1  mobility in the old fat access point systems?

2                    ANSWER:  So what -- by not supporting

3  layer three mobility is -- in the old fat access system,

4  you cannot -- you had to reconnect as you moved between

5  these subnets, or you had to get a new IP address.

6                    QUESTION:  And so why did Airespace want

7  to solve that layer three mobility problem?  So that you

8  wouldn't have to reconnect?

9                    ANSWER:  Yes.  So the -- yeah.  So on the

10 layer three, the problem that was being solved is so you

11 didn't have to get a new IP address when you crossed the

12 subnet.

13                   QUESTION:  Because if you did, it would

14 disrupt the communication?

15                   ANSWER:  Getting a new IP address took a

16 period of time and disrupted communications.

17                   QUESTION:  So the solution with that

18 mobility problem was to design a system that could do it

19 faster?

20                   ANSWER:  Yes.

21                   QUESTION:  Were you involved in any way

22 in that endeavor while you were at Airespace?

23                   ANSWER:  I was involved directly in that

24 endeavor.  That was not my area of focus.

25                   QUESTION:  I mean, just before the break,

1  you were telling me that in the fat access point system,

2  because of a level three mobility problem, you would

3  have a disconnection or an interruption as someone, some

4  client, or mobile device moved from one access point to

5  the other, right?

6              ANSWER:  Yes.  So as a client moves from

7  these subnets to a new subnet, they have to get a new IP

8  address.

9              QUESTION:  And that would cause a

10 disconnection?

11             ANSWER:  That would cause an interruption

12 in a communication.

13             QUESTION:  But in the Airespace system,

14 that was not the case?

15             ANSWER:  In the Airespace system, that

16 was not the case.

17             QUESTION:  After Cisco acquired

18 Airespace, they were selling this wireless solution,

19 correct?

20             ANSWER:  After the acquisition, it became

21 a Cisco product.

22             QUESTION:  But it was the same product

23 initially as what you participated in developing at

24 Airespace, correct?

25             ANSWER:  Yes.  It was the -- Cisco

1  acquired -- they sold the same product.

2              QUESTION:  Do you know if the layer three

3  mobility problem was solved at all in the system sold by

4  Airespace?

5              ANSWER:  Yes.  We solved the layer three

6  mobility problem.

7              QUESTION:  How do you know that?

8              ANSWER:  Because I know I can take a

9  client from one subnet to the next subnet and not -- and

10  not have to get a new IP address.

11             QUESTION:  And not lose the connection?

12             ANSWER:  Not lose the connection.

13             THE ATTORNEY:  Objection, form.

14             QUESTION:  So -- but you have really no

15  information on how that was accomplished.

16             ANSWER:  Not -- no specific information.

17  That was not my --

18             QUESTION:  Well, no specific

19  information --

20             ANSWER:  The answer is, no, I have no

21  information on how that was actually accomplished.

22             Well, I will assume it's correct.

23             QUESTION:  Do you have Deposition

24  Exhibit 131 before you, Mr. Friday?

25             ANSWER:  Yes, I do.

1          QUESTION:  Is this a true and correct

2    copy of an e-mail that you sent to Pat Calhoun and Bob

3    O'Hara on or about January 1, 2002?

4          At the top of the next page, it says

5    Black Storm's architecture based on 802.11 signalling

6    also provides 10 millisecond handoffs.

7          What does that mean?

8          ANSWER:  Well -- so I do not know what

9    that meant in the context of this e-mail.

10          In the context of the industry, it either

11    meant two things:  One is it's inheriting the 802.11

12    functionality, handoff functionality, or layer three

13    mobility.

14          QUESTION:  But what is the reference to

15    10 millisecond handoffs?

16          ANSWER:  The answer is I don't remember.

17          QUESTION:  What did you mean by the

18    phrase, quote, cellular-type handoffs, end quote?

19          ANSWER:  Yeah.  So in the context of this

20    e-mail, I don't -- I don't remember what I meant.

21          In the context of the industry at the

22    time, it meant providing a cellular -- you know, a user

23    experience similar to a cellular experience.

24          QUESTION:  What was that?

25          ANSWER:  Was no clicks.

1              QUESTION:  And you wanted to have that as

2    a user moved from one access point to the other?

3              ANSWER:  We wanted to have the user

4    experience -- when the user moved from one access point

5    across subnets, they have the same user experience as a

6    cellular user.

7              QUESTION:  Certainly, you didn't want to

8    have a product at Airespace that created clicks or gaps

9    as a client moved from one access point to the other,

10   correct?

11             ANSWER:  Correct.

12             QUESTION:  And certain steps needed to be

13   taken in the design of the architecture to accomplish

14   that, correct?

15             ANSWER:  Well, I mean, so the problem

16   that was trying to be solved at the time was this layer

17   three mobility problem.  You know, the specific design

18   issues were not in my -- how would I say -- not in my

19   wheelhouse, but that was the problem trying to be

20   solved.

21             QUESTION:  Well, just taking what you

22   wrote, do you have any gripe or hesitation to -- with

23   respect to the words, quote, a new architecture that

24   moves complexity out of the access point back into the

25   network?

1          ANSWER:  No.  I would say, you know, back
2   in the context of what we were trying to do in terms of
3   moving these management functions back in the
4   controller, I mean, that -- that is the context in which
5   I would give you this e-mail.
6          QUESTION:  So you stand behind that
7   phrase, quote, a new architecture that moves complexity
8   out of the access point back into the network?
9          ANSWER:  Yeah.
10          QUESTION:  Yes or no?
11          ANSWER:  I stand behind what we were
12   trying to accomplish back then, moving management
13   functions from the access point back to the controller.
14          QUESTION:  I'm asking you this sentence
15   here, in your e-mail in Exhibit 132, do you stand behind
16   that as accurate within the context of what you were
17   writing, quote, a new architecture that moves complexity
18   out of the access point back into the network?
19          ANSWER:  I mean, my point is, I don't
20   remember writing this e-mail, and I don't remember the
21   context specifically about this e-mail.  I'm trying to
22   help you with the context of what was happening back at
23   that timeframe in January.
24          QUESTION:  Well, I'm just trying to find
25   out if there's something about this sentence in

1 Exhibit 132 that you feel is inaccurate or misleading.

2                  Is there?

3                  ANSWER:  What I'm trying to say is I

4 don't remember.

5                  QUESTION:  Well, you don't know sitting

6 here today, if there's anything misleading or inaccurate

7 in the sentence that appears in 132, quote, a new

8 architecture that moves complexity out of the access

9 point back into the network?

10                  ANSWER:  I don't remember in the context

11 of this e-mail.

12                  QUESTION:  Well, point out to me in that

13 sentence anything that you currently think is

14 inaccurate.

15                  ANSWER:  I don't remember in the context

16 of this e-mail.

17                  QUESTION:  So you're unable to point to

18 any inaccuracy in that sentence at this time?

19                  ANSWER:  Well, I don't remember in the

20 context of this e-mail.  So in the context of January

21 timeframe, immediately after we had split the company

22 up, we had basically started to go out and develop new

23 concepts to raise money again.  Very early in the

24 timeframe.

25                  So that's the context in which this

1  e-mail was written, the timeframe in which it was

2  written.  You know, the focus at that time was around

3  moving management functions from these access points

4  back into the controllers.

5          QUESTION:  Irrespective of the e-mail --

6  forget the e-mail -- in January of '02, would it be

7  accurate to say that the system that Black Storm was

8  going to develop and sell was one that contained a new

9  architecture?  Yes or no?

10          ANSWER:  So this is not a yes/no

11  answer -- question.  So the answer is I don't remember.

12          QUESTION:  Mr. Friday, do you have

13  Deposition Exhibit 133 in front of you?

14          ANSWER:  Yes, I do.

15          QUESTION:  It purports to be an e-mail

16  from you to Matt Barletta dealing with -- under the

17  subject split MAC.  Do you have any reason to doubt this

18  is a true and correct copy of an e-mail that you sent to

19  Mr. Barletta on May 11, 2003?

20          ANSWER:  No, I do not.

21          QUESTION:  You begin addressing Matt

22  Barletta by saying, quote:  Here are my first thoughts

23  on split MAC and the reasons we did it.  I will keep

24  adding this evening.  I have thoughts or suggestions,

25  let me know.

1          I guess if you had thoughts probably is

2   what you meant there; is that correct?

3          ANSWER:  Yes.

4          QUESTION:  Why were you putting down in

5   May of 2003 your thoughts on split MAC and the reasons

6   that you did it, or along with others?

7          ANSWER:  I do not remember.

8          QUESTION:  Well, it doesn't say the

9   time-critical functions must be in the radio because

10  they're in the chip.  It says the time-critical

11  functions need to be in the radio, right?

12         ANSWER:  That's what it says.

13         (End of video clip.)

14         MR. SAYLES:  That concludes the tender of

15  this deposition, Your Honor.

16         THE COURT:  All right.  Who will be your

17  next witness?

18         MR. SAYLES:  May it please the Court.

19  At this time, the Plaintiff calls Jonathan David.

20         THE COURT:  All right.  Mr. David was

21  previously sworn, correct?

22         MR. SAYLES:  Yes, he was.

23         THE COURT:  Mr. David, come around,

24  please.

25         Try to talk into the microphone and keep

1  your voice up for me.

2  THE WITNESS:  Yes, sir.

3  MR. SAYLES:  May it please the Court.

4  THE COURT:  Mr. Sayles.

5  JONATHAN DAVID, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

6  DIRECT EXAMINATION

7  BY MR. SAYLES:

8  Q.  Mr. David, the jury has heard about you, but

9  they haven't heard from you, so let's -- let's start.

10  Tell us your name and where you live.

11  A.  My name is Jonathan David, and I currently

12  live in Israel.

13  Q.  And do you have a home in Houston?

14  A.  No.

15  Q.  Do you have an office in Houston?

16  A.  Yes, in The Woodlands, The Woodlands, Texas,

17  which is outside of Houston.

18  Q.  Where did you grow up?

19  A.  I grew up -- well, I was born in London,

20  England, moved to the United States at age seven, lived

21  for two years in Tucson, Arizona, and then lived in

22  Beaumont, Texas, for five years and then Houston, Texas,

23  up through high school graduation.

24  And then I went to University of Texas, did a

25  bachelor's degree in accounting and a law degree at the

1  University of Texas.

2       Q.    And when did you receive your law degree?

3       A.    1990.

4       Q.    After receiving your law degree, would you

5  tell the ladies and gentlemen of the jury what your work

6  was?

7       A.    Yes.  Straight out of law school, I went to

8  work for a firm in Dallas called Baron & Budd, and they

9  primarily represent working people who have been exposed

10 to asbestos on the job.  And that was primarily who I

11 was representing for the two years that I worked for

12 Baron & Budd.

13      Q.    So when was that two years?

14      A.    That was 1990 to 1992.

15      Q.    And so that was your first job out of law

16 school as a beginning lawyer?

17      A.    Yes, it was.

18      Q.    And after you left Baron & Budd, what did you

19 do next?

20      A.    I moved back to Houston and opened up my own

21 law firm and began to represent basically the same kind

22 of -- same kind of folks, the same kind of cases.

23 Represented actually a lot of building trades people,

24 like pipefitters, boilermakers, carpenters, maintenance

25 workers.

1          And a little bit later on started representing

2   a lot of steel workers.  Eventually was designated by

3   District 12 of the Steel Workers Union, which District

4   12 is the Southwestern United States, Texas, Oklahoma,

5   and pretty much everything southwest through California

6   and even on to Hawaii.

7          So I don't remember how many states, 9 or 11,

8   13 states, something like that.  But I -- we were

9   representing the steel workers on any kind of dust

10  diseases, whether it be asbestos-type diseases, like

11  mesothelioma, which is a cancer that, unfortunately, is

12  hundred-percent fatal disease; asbestosis, and, of

13  course, with the steel workers, also silicosis, which is

14  a disease of the lung that they get from breathing in

15  dust at the foundries and other -- other steel

16  facilities.

17         I actually had a lot of clients up here from

18  Lone Star Steel and other places.

19         And so pretty much the whole way through

20  continue -- we continue today to represent people with

21  mesothelioma or -- and/or their families and get them

22  recoveries for -- for their -- for this condition.

23     Q.   Is your law firm still in operation?

24     A.   Yes, it is.

25     Q.   And so in summary, you have been, through your

career, a plaintiff's injury lawyer as you've described

it?

    A.   I absolutely have, and if I may say so, I'm

proud to be one, so...

    Q.   Now, you live in Israel now?

    A.   Yes, sir.

    Q.   Are you a United States citizen?

    A.   I am.

    Q.   Are you a citizen of Israel?

    A.   No.

    Q.   Would you tell the ladies and gentlemen of the

jury just in brief fashion how it is you came to live in

Israel?

    A.   Well, actually, my mother was born in the old

city of Jerusalem, and she is Israeli, and so I always

had visited there.  I have relatives over there.  And

then I married an Israeli.  So I have four children ages

sixteen down to six.  And we ended up moving there about

six years ago.

         And I actually have a project over there where

I represent about 600 families who were victims of

terrorism, and we, through legal channels, were pursuing

the banks that have been financing the terrorists.  So

that's a project I have going on over there.

    Q.   All right.  Now, let's get right down to

business here.

How did you become aware of the '395 patent?

A.    Right.  Well, as I mentioned, I have relatives over there.  One of my relatives, who I guess he's either a second or a third cousin -- I'm not sure which -- his grandfather and my grandfather were brothers.

But he is involved with -- he's like a lawyer and also an MBA, a master's in business, and he has a niche where the lenders and the banks will call him in whenever a high-tech company is having trouble and maybe getting ready to go under, which is actually quite a common thing.

With -- with a high-tech industry being as prevalent as it is over there, you have a lot of high-tech start-ups with great technology, but a lot of them are failing for all kinds of reasons:  Financing, marketing, management, the timing.  And so a lot of them are going under but still -- but not because of their technology.

They've got great technology, but they're going under for, you know, any number of those kinds of reasons.  And he'll get called in by the lender, because the lender will foreclose on the intellectual property, on the patents, of a failing company.  If they've lent

money to a company and the company fails, the company's

had to put up its patents as collateral. So the lender

will come in and foreclose on those patents, and then

Ari, my second cousin, they'll call him in to see if he

can sell off that intellectual property, those patents.

Q. All right. So he called you about Commil

Limited?

A. Yes. He -- he called me up about this

particular one and said there's something here I think

you need to look at, because evidently this particular

patent he thought was really -- had some potential. And

so he set up a meeting.

I came to meet him and Mr. Yuval Dovev, who

was the Chief Executive Officer of Commil, after

Mr. Soffer who was here this morning, and we met at a

cafe and he began to tell me the Commil story. But more

importantly, tell me about these patents. And he told

me that he --

MR. CARROLL: Excuse me, Your Honor. I'm

going to object to what he was told.

MR. SAYLES: I'll stop him from the

narrative.

THE COURT: Sustain the objection,

Mr. Sayles.

Q. (By Mr. Sayles) Mr. David, let's just take

1  this in little steps, all right?

2      A.   All right.

3      Q.   All right.  After being introduced to the

4  availability of this patent by your cousin, were you

5  interested?

6      A.   Yes.  I was very intrigued, because I

7  understood that -- that the folks at Commil believed

8  that this patent was being infringed and that there was

9  a lot of licensing opportunities out there for this

10 patent.

11     Q.   All right.  Now, did you have the background,

12 training, education, or experience to evaluate this

13 patent yourself?

14     A.   No, no, and no.

15     Q.   Had you ever been involved in the patent world

16 in your -- in your life?

17     A.   No, I had not.

18     Q.   And did you have any education going back to

19 college where you got your degree -- was it accounting?

20     A.   No, sir.  I did not have any science

21 background, never -- never was much good at science,

22 but -- but I did -- I did form an impression that these

23 people really believed in this patent, and so that led

24 me to say I want to check into this.

25     Q.   All right.

1     A.   I want to have this evaluated.

2     Q.   All right.  You've told us that you didn't

3 have the ability to do it.  Now, I don't want you to get

4 into what was said, but did you retain others to help

5 you evaluate this?

6     A.   Yes, I did.  I hired some -- really, a team

7 here in Texas of the best people that I could find and

8 spent some considerable amount of my own money just

9 checking into this patent.

10    Q.   Is that called -- sometimes called due

11 diligence when you're looking at a business opportunity?

12    A.   Yes.

13    Q.   And a common way to say it would be it's doing

14 your homework.

15    A.   Doing your homework.

16         So, basically, there was a team consisting of

17 a firm -- a law firm that does nothing but prosecute

18 patents with the U.S. Patent Office.  And they, I

19 believe, were the first people to take a look at it, and

20 they -- they, basically --

21    Q.   Now, I'm going to stop you right there.  I

22 don't want you to go into what they said.

23    A.   All right.

24    Q.   Are you with me?

25    A.   I'm with you.

1    Q.   All right. So you had a law firm that

2 specializes in patent prosecution evaluate it from that

3 standpoint?

4    A.   Yes.  Yes.  They --

5    Q.   And whom else did you have help on this team?

6    A.   There was also, I believe, a university

7 engineering professor, who I think, you know, did things

8 like reverse engineering these products and figuring out

9 how -- you know, how they work, looking at source code

10 and things of that nature.

11         So -- so there was -- there was also a --

12 there was also a -- what I understood was one of the

13 biggest experts on patent licensing who had done

14 licensing negotiations with -- with Japan on some -- on

15 some very important products.

16         So there was a whole team turning this thing

17 upside down doing -- doing searches just to make sure

18 that the U.S. Patent Office -- you know, really just --

19 just looking at it upside down.

20    Q.   All right.  So that's what you did.

21         About how long did you spend doing your

22 homework before you bought this patent?

23    A.   I don't remember exactly, but I think it was,

24 you know, months.

25    Q.   And did you have to spend some money to pay

these persons even before you were able to make a

decision?

     A.   Yes.  I don't remember the exact amount, but I

believe that it was over a hundred thousand dollars that

I spent just checking this patent out before I ever

thought about actually buying it.

     Q.   All right.  Now, Mr. David, we all know that

you did indeed buy it.  So at a point in time, did you

decide to make the purchase?

     A.   Yes, I did.

     Q.   All right.  Now, I don't want to go into

detail about the purchase, but, ultimately, what was the

basic term of the purchase?  Did you get it all?

     A.   No.  The -- the terms were that it was

$400,000 in cash upfront, and then I also had to give

them a 10-percent back-end.

          It was a little more complicated than that

because it was like a step -- it was like 10 percent of

the amounts over 10 million and then like 5 percent

between 5 and 10 million and so on, something like that.

So -- so it was -- but, generally, I was referring to it

as a 10-percent back-end.

     Q.   And with whom were you dealing at the time you

were making the acquisition of the patent rights?

     A.   I was dealing with this venture capital fund

1  that the jury heard about earlier where Mr. -- or it was

2  put up on the screen.  These were the people who funded

3  and financed Commil and later foreclosed on their

4  patent.

5          And they were basically trying to get this

6  thing off the books because -- it was like a distress

7  sale, like, you know, when their business -- their

8  business is investing in companies, and when those fail,

9  they want to get -- you know, foreclose, get the assets

10 off the books before they get caught up in bankruptcy

11 and stuff and move on.

12         And so it was -- that was the -- that was the

13 context.

14    Q.   All right.  And it was mentioned by Mr. Soffer

15 this morning that the inventors retained an interest.

16         Would you explain that, please?

17    A.   Yes, sir.

18         After the 10-percent back-end that the venture

19 capital fund kept, then you're left with 90 -- I'm left

20 with 90 percent.  And then out of that 90 percent, of

21 course, there's, you know, fees and expenses and so on.

22 And then the inventors get their 18 percent.

23         And then out of -- you know, whatever's left

24 out of that, there's actually a number of my family

25 members that I've assigned shares to, my kids, my

1  parents, that kind of thing.

2          And so I don't -- getting down to the net, I'm

3  not sure, you know, what all that calculates out to at

4  this point.

5      Q.   All right.  And are you an officer of Commil

6  USA, the Plaintiff in this case?

7      A.   Yes, I am.  I believe I'm the executive

8  officer.

9      Q.   And was -- I think this is a stipulated fact,

10 but I want to cover it just briefly with you.

11         After the '395 was acquired, was it indeed

12 assigned to Commil USA, the Plaintiff in this case?

13     A.   Yes, sir.

14     Q.   All right.  Now, I want you to tell the ladies

15 and gentlemen of the jury why it is that you bought this

16 patent.  What was the purpose?

17     A.   Well, basically, to enforce it.

18     Q.   And what can you do with a patent?

19     A.   Enforce it and make sure that -- that if

20 anybody is infringing it, that they pay the royalty

21 that -- that it's entitled to.

22     Q.   And let's just be straight up here.  Does

23 Commil USA have any other business other than the

24 enforcement of this patent?

25     A.   No, sir.

1    Q.   Why didn't you just leave it up to Commil,

2  Limited, over in Israel to enforce their patent rights?

3    A.   Well, of course, Commil, Limited, didn't --

4  didn't own the patent anymore.  It got foreclosed by the

5  venture capital fund.

6         And those kinds of funds, they have a

7  corporate charter or a mandate.  Their mandate is to

8  invest in companies, and if those companies fail, they

9  foreclose and sell off what's left.

10        And they -- they manage -- invest in a bunch

11  of companies.  They are not involved in analyzing

12  intellectual property and seeing if there's infringement

13  and going to other countries and spending money on

14  lawyers and engineers and all that kind of stuff.

15  That's not the business they're in.

16        So they -- they just -- they were interested

17  in selling it off.  And, you know, I did -- I did the

18  homework and -- and figured out that this thing was

19  really extremely valuable and, you know, bought it.

20    Q.   All right.  Now, I just have a final question

21  or two that I want to ask you.

22        In this case, after you acquired the patent,

23  the next thing that happened was a lawsuit was filed

24  against Cisco for patent infringement.

25    A.   Yes.

1      Q.   Why is it that you didn't go knock on the door

2   at Cisco and say:  Let's sit down and talk about a

3   license?

4      A.   Well, there's actually legal or -- or a legal

5   procedural reason for that, and that is, in these kinds

6   of cases, typically, what happens is, if you go and

7   approach Cisco and tell them, hey, you guys are

8   infringing my patent, the first thing that will often

9   happen is Cisco will actually immediately sue you on

10  what's called a declaratory action in their own

11  backyard.

12           And we really, you know, wanted to -- to be

13  the ones deciding where and when, and so we wanted to

14  proceed here in Texas, and that's the reason that we

15  acted first.

16     Q.   All right.  Now, Mr. David, you're a lawyer,

17  but you're not a patent lawyer, right?

18     A.   That is correct.

19     Q.   But you know how court proceedings are

20  conducted.  I'm going to pass the witness now, and I

21  want you to respond to whatever questions they have for

22  you.

23           Will you do that, sir?

24     A.   Yes, sir.

25               THE COURT:  Cross-examination.

1        MR. CARROLL:  Thank you, Your Honor.

2                      CROSS-EXAMINATION

3  BY MR. CARROLL:

4       Q.   Mr. David, I guess I'm confused about who sold

5  you the patent.  Did Commil sell you the patent, or did

6  some bank sell you the patent?

7       A.   Well, neither one.  It was a venture capital

8  fund.

9       Q.   But the assignment of the patent came from

10  Commil, didn't it?

11       A.   That's a good question.  I'm not sure, you

12  know.

13       Q.   Well, see, here's what's confusing to me, I

14  guess.  You told the jury that Commil, the company, kept

15  a 10-percent piece of any money you got, correct?

16       A.   It was -- it was the -- it's the venture

17  capital fund.  They may have done this through -- I

18  guess they must have done this formally through the

19  Commil entity because they owned it at this point.

20       Q.   Okay.  Because, I mean, we all read in the

21  paper or have read in the paper about the -- about the

22  subprime housing mess and everybody getting foreclosed

23  on from their houses.

24            When that happens, the folks who bought the

25  house no longer own it, correct?

A.   Correct.

Q.   And they don't have anything to sell, correct?

A.   That's right.

Q.   And they don't have any back-end to reserve, correct?

A.   That's correct.

Q.   So what I'm trying to understand is, did you buy this patent from the bank and then give Commil, Limited, a back-end, even though they didn't own anything to sell you, or did somehow you buy it from Commil, Limited?

A.   Well, the negotiations were done with the venture capital fund who held all the rights to Commil, the company, and the access.

So, evidently, now that you bring it up, it looks like the formal transaction that they did with me was through Commil, Ltd, which they owned.  But they were -- they're really the ones, you know, calling the shots and owning it.

Q.   So -- so the bank, I guess, your cousin or somebody your cousin partnered with --

MR. CARROLL:  Is -- is Mr. Soffer still here?

MR. WERBNER:  No, sir.

MR. CARROLL:  He's gone?

1           MR. WERBNER:  Yes, sir.

2      Q.   (By Mr. Carroll) So the bank and your cousin

3 foreclosed on poor old Mr. Soffer and his company, and

4 he was out, right?

5      A.   No.  No, sir.  My cousin --

6      Q.   Oh, not your cousin.

7      A.   My cousin was the broker hired by the venture

8 capital fund.

9      Q.   I gotcha.  I gotcha.  He was the one the bank

10 hired to go and unload foreclosed on property from

11 people who couldn't pay their mortgage, right?

12     A.   Well, it wasn't a bank.  It was a venture

13 capital fund.

14     Q.   Same thing.

15     A.   I don't think so, but...

16     Q.   Somebody -- somebody loaned this company

17 money, this bunch of Israeli investors, and they pledged

18 their company and their patent and everything else, and

19 for whatever reason, they failed, and then somebody

20 foreclosed on them, and your cousin got the heads up on

21 it and called you and said:  I've got a heck of a fire

22 sale for you.

23          Is that what happened?

24     A.   Well, there were other bidders in the process.

25     Q.   Oh, I don't doubt that, but up to the point

1  that you said other bidders, your cousin called you and

2  said:  I've got a heck of a deal for you, because we've

3  just foreclosed on somebody that has some assets,

4  correct?

5      A.  Well, he said:  Come take a look at this.  It

6  looks interesting.

7      Q.  Okay.  But -- but the first part of my

8  question is true.  He said:  We foreclosed on people who

9  have got good assets.  I've got first dibs on them.

10 Come look at them.

11         That's what happened.

12     A.  Well, he didn't say:  We foreclosed.  He

13 said --

14     Q.  Or the bank.

15     A.  He was hired by the venture capital fund.

16     Q.  Okay.  You don't want to -- you don't want to

17 link your cousin up to that kind of activity, right?

18     A.  I think I did link him up to it.

19     Q.  Okay.  I mean, you've heard -- you've heard in

20 this whole -- whole subprime mortgage catastrophe, these

21 people they call bottom-feeders who swim around on the

22 bottom buying people's houses that they got kicked out

23 of for next to nothing.

24         Is that what your cousin does?

25     A.  No, sir.  My cousin is a broker for

intellectual property.

Q.   I gotcha.  All right.

Now, one of the things that -- that -- or another thing I guess that I'm confused about is the 18 -- let's see.

MR. CARROLL:  Do we have a clipboard?  I bet we do.  Do you reckon we can bring it right over here?

Q.   (By Mr. Carroll) Mr. David, can you see the clipboard?

A.   Yes, sir.

Q.   You're a trial lawyer, right?  Just like me.

A.   I'm not as good as you.

Q.   Well, you're not as old as me, but thank you for the compliment.

I mean, and one of the things that we do is we try to figure stuff out that typically is over our heads; isn't that true?

A.   Oftentimes, yes, sir.

Q.   I mean, about every time, right?

I mean, you didn't know anything about small cell carcinoma before you got going as a plaintiff's lawyer, did you?

A.   No, I didn't.

Q.   Because I didn't either.

         Okay.  So here's what I'm trying to figure

out, and you help me.  I bet you can.

         Let's -- I'm just going to put this down as

the deal.  I'm going to move this over a tad so

everybody can see it.

         The first thing that happens is 10 percent

goes back to the lender, right, whoever that is, venture

capital --

     A.   Venture capital fund, yes, sir.

     Q.   Okay.  But I mean, they're the ones that held

the mortgage, right?

     A.   I wouldn't call it a mortgage, but I think

you've got the right idea.

     Q.   Something like a mortgage.

     A.   Yes, sir.

     Q.   Okay.  And then you gave 18 points to the

inventors, correct?

     A.   Yes.  Although I think that comes off -- that

that's out of the net.  So there's -- you know, there's

lots of fees and expenses that we haven't talked about.

     Q.   Oh, I'm sure that's so.

     A.   Yes, sir.

     Q.   But -- but the inventors get six points

apiece, right?

     A.   Yes.  Of the net, yes.

1     Q.   Of the net.

2          But they didn't have anything to sell, did

3 they?

4     A.   Have anything to sell?

5     Q.   Yeah.  They didn't own the patent, did they?

6     A.   Well, they didn't own it at the time, but I

7 wanted them to get a stake back into it since they

8 invented it.

9     Q.   Well, they didn't even actually own it before

10 the company went bust and the bank foreclosed, because

11 Mr. Soffer told us that they assigned it to the little

12 company for a dollar apiece.

13          Don't you remember that from yesterday?

14     A.   Yeah, but they were owners of the company.

15     Q.   I see.

16          So you -- this is something you did just out

17 of the kindness of your heart?

18     A.   Well, I mean, they also had to burden

19 themselves a lot with -- with this lawsuit, so I

20 wouldn't say it was totally out of the kindness of my

21 heart, but I did feel that they deserved a stake in --

22 in -- in what they invented themselves, and they had

23 lost that stake.

24     Q.   As a matter of fact, you needed them to help

25 you prosecute this lawsuit, didn't you?

1    A.    Well, they have -- they have certainly acted

2  as consultants, as has already been mentioned by

3  Mr. Soffer, yes.

4    Q.    And as a matter of fact, these two deals, the

5  10-point deal with the bank and the 18-point deal with

6  the inventors, didn't happen at the same time, did they?

7    A.    No, they did not.

8    Q.    As a matter of fact, when you paid the bank

9  your 400,000 bucks and gave them a 10-percent back-end,

10  that was before you sued Cisco, wasn't it?

11    A.    Yes, it was.

12    Q.    And when you sued Cisco and realized what was

13  required to prove what you claim, that's when you gave

14  the inventors their 18 points; isn't that true?

15    A.    Well, we certainly needed their cooperation to

16  help with this effort, yes.

17    Q.    So my question -- the answer to my question

18  is, yes, the 18 points got assigned to the inventors

19  after you pulled the trigger on Cisco.

20    A.    Yes.

21    Q.    And then you told them that you'd pay them --

22  I guess all three of them got the hundred dollars an

23  hour deal that Mr. Soffer described?

24    A.    They all were under that deal.  I don't know

25  if they've all -- how much they've all, you know, billed

1  on it or...

2      Q.    Well, were -- were some of the -- of the three

3  inventors more -- I guess important might not be the

4  right word, but more involved than others in -- in

5  preparing what the jury's heard thus far?

6      A.    I actually don't know how much involvement

7  each one has had versus the others.

8      Q.    And we know Mr. Soffer came to town and

9  testified, correct?

10     A.    That's correct.

11     Q.    And Mr. Soffer told the jury this morning that

12 Mr. Arazi at least made it as far as the hotel here in

13 Marshall, didn't he?

14     A.    Yes, he did.

15     Q.    And I'm going to put his name down here,

16 because I don't think the jury has seen it spelled out.

17 Maybe they have.

18         His name is the very first name on the patent,

19 isn't it?

20     A.    It may be.

21     Q.    You haven't looked at it?  Oh, come on.

22     A.    I mean, I heard -- I heard your colleague say

23 it yesterday.

24     Q.    Okay.  Have you read your own patent?

25     A.    I certainly have not.

1    Q.   You really haven't.  You -- you're not even

2  curious?

3    A.   For me, it's all Greek.

4    Q.   Well, you reckon -- you reckon the jury is

5  going to think any different, and they've got to read

6  the goofy thing.

7         Is that fair?

8    A.   I guess that's their job, and -- and I -- you

9  know, they've also got experts here that have testified

10 to help them with it, just like with me.  I'm not -- I

11 had experts help me with it.

12   Q.   So you're -- you're a lot like me.  When

13 you -- when you bought that patent from the bank, you

14 didn't know the difference between Wi-Fi and hi-fi, did

15 you?

16   A.   That's absolutely correct.

17   Q.   Have you ever rigged up a Bluetooth?  Are you

18 one of these people that walk around with the thing in

19 your ear?

20   A.   I think I have one in my car.  I think I have

21 a Bluetooth in my car.

22   Q.   And are you like one of our jurors talked

23 about on Monday; you had to get your daughter or your

24 son to hook it up?

25   A.   I am one of those, yes.

1    Q.    Yeah.  Because they're hard to hook up, aren't

2  they?

3    A.    Probably so.

4    Q.    Okay.  Now, Mr. Arazi hit the road for Israel

5  this morning, didn't he?

6    A.    I think he might have left yesterday.

7    Q.    Okay.  Do you know that you told us he was a

8  will call; that you all would bring him to trial?

9    A.    You know, that you'd have to ask the lawyers

10 about who all was --

11   Q.    Okay.  I mean, you understand --

12   A.    I guess he was here, you know, if needed for

13 that purpose, but...

14   Q.    Well, y'all didn't tell us you cut him loose

15 to go home, did you?

16   A.    Well, you have to talk with the lawyers about

17 that.

18   Q.    I'm just asking what you know.

19   A.    I don't know.

20   Q.    Well, did you eat dinner with him?  Did you

21 talk to him?  Did you say hi to him?

22   A.    I had dinner at Bodacious Barbecue with him.

23   Q.    I bet not pork.

24   A.    That's correct.

25   Q.    Okay.  So did you know that your side promised

1   us that you would let us have a crack at him live in

2   front of this jury so that we could find out the truth

3   behind whether your -- the little company, Commil, ever

4   could make a Wi-Fi device out of that patent?

5          Did you know that?

6      A.   Well, I imagine we wouldn't have flown him

7   over here if we were hiding him for something, but I

8   don't know --

9      Q.   Well, why did -- why did you send him home

10  before we got a crack at him, before the jury could hear

11  whether it's true or not true that your company -- the

12  little company you bought the patent from couldn't build

13  a Wi-Fi device from their own idea?

14     A.   Sir, I would think that's something that you'd

15  need to take up with the lawyers.

16     Q.   I'm taking it up with you.  You're the guy

17  filing the lawsuit.  Why did you send him home?

18     A.   I didn't send him home.

19     Q.   Well, let me ask you this:  You've been in

20  this courtroom every day that I have and every day that

21  these folks have been in here.

22          And wouldn't you agree -- knowing as little as

23  you know about the technology, not having read the

24  patent, having heard what you heard, wouldn't you agree

25  that the 64-dollar question in this lawsuit, the one the

1  jury is going to have to decide before you get to the

2  pay window, is whether your patent, the one you bought

3  from the bank, covers Wi-Fi?

4          Wouldn't you agree with that?

5          MR. SAYLES:  Excuse me, Your Honor.  This

6  goes way beyond the direct examination, and it's

7  argumentative, and I object to it.

8          THE COURT:  I sustain the objection.

9      Q.  (By Mr. Carroll) All right.  Would you

10  agree -- wouldn't you agree that that is, in fact, the

11  64-dollar question?

12      A.  Could you repeat it?  I'm sorry.

13      Q.  Yeah.

14          Wouldn't you agree, having heard everything

15  you've heard, that the 64-dollar question that everybody

16  thus far has talked about -- by my count there have been

17  three -- you're the third live witness and three or four

18  folks on depositions -- is whether the patent that you

19  bought at foreclosure from the bank covers Wi-Fi?

20      A.  I believe that there's no question about that,

21  yes, sir.

22      Q.  That -- that that's the question that these

23  folks are going to have to decide.

24      A.  I also believe that's the answer.

25      Q.  Oh, I know you believe that, because it -- you

1   get paid pretty big if that is the answer, correct?

2       A.   That's correct.

3       Q.   Okay.  And wouldn't you agree that the person

4   in the little company, the name -- the first named

5   inventor, Mr. Arazi, has been identified by Mr. Soffer,

6   the other named inventor, as being the person who knew

7   the most about his company's efforts to make Wi-Fi work

8   off that patent that you bought?

9           You heard that testimony, didn't you?

10      A.   I don't know -- I don't know that I heard

11  that -- no, I don't -- I don't know that I heard that

12  exactly.

13      Q.   Okay.  So --

14      A.   Possibly.

15      Q.   -- my question to you is, you had your --

16  Mr. Arazi listed as a witness you were going to call and

17  told us you were going to make him available live so the

18  jury could decide what, if anything, to believe that he

19  said, and we relied on that.

20          We don't have one deposition clip to play for

21  the jury designated, and you didn't tell us anything --

22              THE COURT:  Well, Mr. Carroll, let's get

23  to the question instead of argument.

24              MR. CARROLL:  I'm sorry, Your Honor.

25      A.   Well, again, I think that your question is

something for the lawyers, not for me.

I know that y'all already took Mr. Arazi's deposition, so I don't know exactly -- it was our choice whether to, you know, bring him to testify. We brought him here thinking we might and ended up choosing to -- you know, that he might not add all that much and wanted to save time here.

But you -- you've taken his deposition and asked him all the questions you want, and I don't -- I don't think you listed him as a witness you wanted to call. So I don't know why you're asking me all these questions.

Q. (By Mr. Carroll) Well, I'll ask you this last one, and I'll ask you some other questions.

If, in fact, it's true that you told us about a week ago that you would, in fact, bring him live and make him available for us to put on in front of this jury and didn't, is that a fair way to play?

A. I didn't tell you anything, okay? Whatever the lawyers told you, I don't know, sir.

Q. Well, if, in fact, that happened, is that fair?

A. I guess you'd have to ask the Judge. I don't know.

Q. Well, you're a lawyer. Is that how you

practice law?

        MR. SAYLES: I'm going to object to that. It's argumentive.

        THE COURT: Sustained.

    Q. (By Mr. Carroll) One thing that I'm -- not one thing, but another thing I'm curious about, have you seen one piece of paper during the due diligence that Mr. Sayles and you talked about that was generated by any of the three inventors or by anybody at the Israeli company which said what you're telling the jury in this courtroom, and that is, that this patent covers Wi-Fi?

        Have you seen one piece of paper that supports that?

    A. From -- a piece of paper from who?

    Q. From the people who invented the patent.

    A. Well, I -- I know that they've told me that themselves.

    Q. Okay. Can you show us one piece of -- yeah, and they've got -- and they've got an 18-percent skin in this lawsuit, don't they?

    A. Yes, they do.

    Q. Okay. Do you have a -- were you here in Court when Mr. Werbner told the jury that they ought to pay particular attention to the e-mails and letters and memoranda which were written before a lawsuit got filed?

1          Were you here when he said that Monday

2  morning?

3       A.    If he said that, I believe you.

4       Q.    And that makes a lot of sense, doesn't it?

5       A.    Sure.

6       Q.    And when you were a trial lawyer, you used to

7  tell jurors just like that that same thing, and that is,

8  take a look at what people are saying before somebody

9  decided to go to the courthouse.  That's pretty smart,

10 isn't it?

11      A.    I think that they should look at all of the

12 evidence, absolutely.

13      Q.    And so to that point, here's my question,

14 Mr. David:  Have you, Mr. Jonathan David, owner of the

15 company that has filed this lawsuit, seen one piece of

16 paper that you can show to this jury where any of these

17 inventors or anybody at this little company, before they

18 failed, said one thing that supports what you're saying

19 in this courtroom, and that is, our patent covers Wi-Fi?

20      A.    Well, I think that the patent itself talks

21 about the short-range protocols, which is -- includes

22 Wi-Fi.

23      Q.    Okay.  My question is, again, the words Wi-Fi,

24 have you seen anything in any piece of paper where your

25 people or the people who invented this patent and who

owned that little company made the same claim that

you're making in this lawsuit?

    A.   Well, like I say, if you're talking about the

inventors, they themselves have told me --

    Q.   I'm not talking about told.  I know all about

told.

    A.   A piece of paper?

    Q.   I'm talking about pieces of paper.

    A.   I have not -- I have not reviewed all the

thousands of documents and certainly can't call one up

for you here now.

    Q.   Well, guess what?  You're about the -- you're

the next to the last witness that your lawyers are going

to put on.

        Can you think of one piece of paper that the

jury has seen until yet from your side that other than

the patent -- and I understand your argument, but other

than the patent, can you think of one piece of paper

that your folks have offered into evidence that says

maybe we can't make a Wi-Fi, but our patent covers it?

        Have you seen anything like that?

        MR. SAYLES:  Excuse me, Your Honor.  I'm

going to object to that.  What the patent covers is

determined by the words in the claim, and the way he

phrased that question is an improper statement, and I

1  object to it.

2              THE COURT:  I'll sustain the objection.

3              The jury will recall my prior instruction

4  about how to determine whether or not infringement is --

5  is satisfied by comparing the accused products in the

6  case to the claims of the patent as have been construed

7  by the Court.

8              MR. CARROLL:  Your Honor, may I ask a

9  question here?

10     Q.   (By Mr. Carroll) Here's what I'm talking

11  about.  And I certainly apologize to my friend,

12  Mr. Sayles and the Court, because the Judge, in fact,

13  tells us what you have to know to reach infringement,

14  and that's -- the jury's going to know that.

15          But here's my question.

16              MR. CARROLL:  And let's see, flip

17  this over -- well, first of all, let's zoom in on the

18  header up here.

19     Q.   (By Mr. Carroll) Do you remember the testimony

20  this morning as to who Mr. -- is it Dovev?  Is that how

21  you pronounce that?

22     A.   That's Dovev (pronouncing).

23     Q.   Dovev.

24     A.   Yes.

25     Q.   Do you remember what the testimony is about

1  who he was?

2      A.   I've testified today.

3      Q.   Oh, you did.

4      A.   But he -- he --

5      Q.   Okay.  So --

6      A.   -- he was the CEO.

7      Q.   He used to be the boss at Commil Israel,

8  correct?

9      A.   That's correct.

10     Q.   Okay.  And then he send -- he's sending

11 these -- this e-mail to Mr. Soffer, who's testified.

12 And he was an inventor, correct?

13     A.   That's correct.

14     Q.   And then he's sending it to Mr. Arazi, who was

15 the other inventor, and then Mr. Barak, the third

16 inventor, and some other folks, okay?

17         And then it says -- well, first of all, what's

18 the date?  2004, it looks like.

19         Now, is that before or after your U.S. patent

20 that you bought at the foreclosure sell issued?

21         In other words, was your U.S. patent in

22 existence in 2004 when this e-mail got generated?

23     A.   Yes.

24     Q.   It was.

25         And it's not an Israeli patent we're talking

1  about.  It's a United States patent, the very same one

2  you're suing on in this courtroom, correct?

3      A.   Correct.

4      Q.   Okay.  And then let's --

5           MR. CARROLL:  Let's flip over to -- well,

6  let's see.  Scroll on down a little bit.  I'm getting my

7  deals confused here.

8           Okay.  Okay.  Here we go.  Find the one

9  that says turned down.  That's -- Tracy, do you know

10 what I'm talking about?  I'm sorry about this.

11           MR. WERBNER:  Cisco turned down?

12           MR. CARROLL:  Yeah.  Is that on?  There

13 we go.  Okay.

14      Q.   (By Mr. Carroll) All right.  Now, let's --

15 let's you and I look at this with the jury.

16           It says:  Turned down, Cisco.  The Corporate

17 Business Development and Acquisitions Group do not want

18 to pursue an opportunity with Commil any further.  Their

19 reasons are somewhat vague, but the main thrust of their

20 rationale appears to be they have zero interest in

21 Bluetooth and do not have -- do not appear to have

22 confidence in Commil's ability to develop a Wi-Fi

23 mobility management system.

24           As they had no basis for coming to such a

25 conclusion, in other words, they had not discussed

1  Commil's Wi-Fi capability in any detail, EM will discuss

2  their reasons with them in more depth.

3          Next Step:  Get detailed feedback from Cisco

4  executives as to their reasons for not continuing the

5  discussions.

6          Now, nowhere in there do the folks at Commil,

7  who at that time owned what is now your patent, say what

8  you're saying to this jury, and that is, they've got to

9  do business with us because we have the patent rights

10 over there.

11         They don't say that, do they?

12         MR. SAYLES:  Excuse me, Your Honor.  I'm

13 going to object to that.  That's argumentative.  The

14 document doesn't deal with the patent.

15         THE COURT:  I'll sustain the objection.

16 We're going to -- we'll take our lunch recess at this

17 time, Ladies and Gentlemen.

18         Remember my prior instructions.  Don't

19 talk about the case.  I'm going to break you for a

20 little bit longer at this time.  I've got a proceeding

21 or two over the lunch hour I need to attend to.

22         Take until 1:30 today.  Have a nice

23 lunch.  Don't talk about the case.

24         LAW CLERK:  All rise.

25         (Jury out.)

1           THE COURT:  Y'all have a seat.

2           Mr. Carroll, what relevancy does the type

3   of meat the gentlemen ate at Bodacious bring to this

4   case?

5           MR. CARROLL:  None, Your Honor.  I

6   apologize to the Court for that.

7           THE COURT:  All right.  Thank you.

8           Well, we're in recess.

9           LAW CLERK:  All rise.

10          (Recess.)

11          (Jury out.)

12          LAW CLERK:  All rise.

13          THE COURT:  Please be seated.

14          All right.  We've got a hearing outside

15  the presence of the jury for purposes of assessing the

16  comparability of certain license agreement summaries.

17          Mr. Strachan, do you want to call your

18  witness?

19          MR. STRACHAN:  Thank you, Your Honor.

20  May it please the Court.

21          Roger Carlile.  He's has not been sworn,

22  Your Honor.

23          THE COURT:  All right.  Mr. Carlile,

24  please come take the oath, please.

25          (Witness sworn.)

1          THE COURT:  Come around, sir.

2          MR. STRACHAN:  Your Honor, let me return

3   Mr. Carroll's notes to him.

4          THE COURT:  All right.  That will be

5   fine.

6          MR. CARROLL:  Thank you.

7          MR. STRACHAN:  May it please the Court.

8          THE COURT:  Mr. Strachan.

9          MR. STRACHAN:  Your Honor, we come

10  outside the presence of the jury, as you've noted, for

11  the purposes of laying down on the record the predicate

12  for the selection of the comparables pursuant to the

13  requirements of ResQNet.

14          Prior to this hearing, I proffered to the

15  Court a list of exhibits which we will be discussing

16  with the witness.  That notebook concluded at

17  Plaintiff's Exhibit 5, which is the description of the

18  license of the comparables.

19          Your Honor, if I may approach, I have

20  another copy, which is unredacted, and it's probably the

21  one you want for the hearing.

22          THE COURT:  All right.

23          MR. STRACHAN:  Your Honor, also our

24  technician can pull that up on the screen so that -- if

25  we need to do that as well.

1            THE COURT:  Hold on just a second.

2            MR. STRACHAN:  Yes, sir.

3            (Pause in proceedings.)

4            THE COURT:  All right.  Proceed.

5      ROGER CARLILE, PLAINTIFF'S WITNESS, SWORN

6             DIRECT EXAMINATION

7 BY MR. STRACHAN:

8    Q.   Would you state your full name, please, sir?

9    A.   Roger Carlisle.

10   Q.   And, Mr. Carlile, you are the Plaintiff's

11 damage expert in this case, are you not?

12   A.   Yes.

13   Q.   And you understand that we're here today at

14 this hearing to discuss the establishment of the linkage

15 between the comparable royalty rates you used and the

16 technology of the patents-in-suit.

17   A.   Yes.

18   Q.   You're familiar with the requirements of

19 ResQNet case?

20   A.   Yes.

21   Q.   All right.  And did you apply those

22 requirements in selecting the comparable rates to use?

23   A.   Yes.

24   Q.   All right.  Would you please describe for the

25 Court your process in selecting the rates?

1    A.   Well, I begin any search like this, you know,

2 by researching a variety of things, such as articles

3 and -- and, you know, license agreements and those kinds

4 of things.

5         I used Royalty Source, which is a commonly

6 used resource for this by analysts such as myself.  In

7 fact, the other expert, Mr. Becker, testified that he

8 also uses that data source as well.

9    Q.   Okay.  And let me -- to move along, how did

10 you direct your search in Royalty Source to make sure

11 that you were ascertaining royalty rates which were

12 comparable to the technology in this case?

13   A.   I used a set of search terms, and I took those

14 search terms after reading the '395 patent and looking

15 at the accused products.

16   Q.   Okay.  And what were the search terms you

17 used?

18   A.   Things such as -- or the ones actually -- they

19 were wireless private branch exchange, wireless access

20 points, wireless access controller, wireless local area

21 network, and wireless.

22   Q.   And you selected the use of those search terms

23 from the patent itself?

24   A.   Yes.

25   Q.   All right.  And using those search terms, what

1    results were returned to you?

2        A.    I got back excerpts or summaries of 63 license

3    agreements or transactions that I was allowed to look

4    at.

5        Q.    Okay.  And then what did you do with that list

6    of 63?

7        A.    Well, I reviewed them.  They're summaries of

8    the technology.  They don't contain any rates, for

9    example.  So you can't -- there's no bias in the

10   selection.  I can't look at that and say, well, toss

11   this one in, because it's one rate versus another rate.

12   It's summaries of the technology.

13            I did two things with that.  One, I, on my

14   own, took the 63 and -- and took it down to eight that I

15   thought were the most comparable based on the

16   descriptions of the technology.

17       Q.    And I want to make sure.  Your selection of

18   the eight was based upon the similarities between the

19   technology described in the 63 and the technology in the

20   license?

21       A.    Right.

22       Q.    Okay.  And I'm sorry to interrupt you.  Go

23   ahead.

24       A.    That's fine.  It just -- I did another thing,

25   because while I have some experience in the area of

telecommunications and wireless, I'm clearly not a

technical expert.

So I also communicated with Mr. McAlexander's

office and Mr. McAlexander and asked him to help me

analyze that as well.

Q.   Okay.  And did you come up then with -- I

think you said eight?

A.   Right.  In my analysis, I came up with eight

that -- that I thought were most comparable, and I

submitted those to Mr. McAlexander's office to

corroborate that.

I also gave the full 63 and an independent

test to Mr. McAlexander and asked him to select so that

I could compare his independent work against my work as

well.

Q.   And did you give Mr. McAlexander instructions

that in his selection, he was to find the technology

which was closest to the technology of the

patents-in-suit?

A.   In that second independent test, yes, I asked

him to look through the 63 and tell me which of those he

thought would -- were the most comparable to the '395

patent.

Q.   And how did the list he selected, based on

matching technology, compare to the list that you

1  yourself selected?

2      A.   Of -- of the eight that I selected, he --

3  seven of those selections, he also selected.

4      Q.   Okay.

5      A.   I selected one that he didn't select, and he

6  selected one that I didn't select.

7      Q.   All right.  Now, Your Honor has as Exhibit No.

8  5 --

9              MR. STRACHAN:  If we could put that up,

10  please, sir.

11      Q.   (By Mr. Strachan) -- that is the list of

12  actually the eight; is that correct?

13      A.   This is the -- the eight that I selected --

14      Q.   Okay.

15      A.   -- and then submitted to his office with

16  Dr. Duane Laurent and asked him to also, working with

17  Mr. McAlexander, tell me if he thought these were the

18  appropriate selections.

19      Q.   Okay.  And the very first one in Exhibit

20  No. 5, I think, is the one that you, with

21  Mr. McAlexander, decided that was not close enough; is

22  that right?

23      A.   Right.  This is one that they recommended not

24  be used in my analysis, because it wasn't sufficiently

25  comparable.

1    Q.   Okay.  So my point is that you culled, even

2  from the eight, the ones that you and the expert did not

3  most see as -- the technical expert most see as

4  comparable technology, correct?

5    A.   That's correct.

6    Q.   All right.  Now, let's turn to the next

7  page -- or actually, it will be Page 3 of that exhibit

8  and tell us about this -- this licensing agreement that

9  you used.

10    A.   Okay.  This is a license -- or an agreement

11  between the government of Israel and this particular

12  company.  I'll have to find their name here.  Metalink,

13  Limited.  Deals with, as you can see there in the

14  licensed property, wireless local area network chipsets.

15    Q.   Now, I guess we should start with, in your

16  search for this case, did you find any perfectly

17  comparable royalty rates or royalty situation?

18    A.   Well, we don't have -- under Factor 1,

19  Georgia-Pacific Factor 1, we don't have a license of

20  this particular patent, and there were no licenses that

21  I saw that were produced by Cisco under Factor 2 for

22  what they consider to be comparable technology.

23        So we got to this analysis.  And it is rare,

24  you know, at that level to ever have a license that is

25  perfectly comparable.

1    Q.   Okay.  Now, you understand that earlier in the

2  litigation, there was a settlement against one Defendant

3  and then earlier this week was a settlement against

4  another Defendant.

5         You're aware of that?

6    A.   Yes.

7    Q.   And did you -- did you feel like the

8  settlement agreements were -- were valid comparables to

9  use in coming up with a royalty rate?

10   A.   No, I did not.

11   Q.   And why is that?

12   A.   Well, settlements -- for one, I don't have

13 information -- or much information on the one that

14 occurred, I think, just at the beginning of this trial.

15        Secondly, you seldom have all the information,

16 and the -- and the factors surrounding the settlement

17 often don't align with the requirements of a

18 hypothetical negotiation.

19   Q.   Okay.  So without valid license -- without

20 reliable licenses of the patents-in-suit to base it on,

21 and with no Cisco licenses to rely on, did you then go

22 to this process of going through the comparable

23 technology you described for us a while ago?

24   A.   Yes.

25   Q.   Okay.  Now, turning then to this Metalink,

1 Limited, to the government of Israel, this is one that

2 you considered; is that right?

3    A.   Yes.

4    Q.   And you noted that this is not exactly like

5 the technology in suit nor is it exactly like a patent

6 license; is that correct?

7    A.   That's correct.

8    Q.   All right.  Would you describe for us,

9 nonetheless, why you believe that this was reliable and

10 why -- what the link is between the technology of this

11 license and the patent-in-suit?

12    A.   Well, it deals with, you know, wireless

13 technology in a -- in a wireless network and the

14 products in that network.

15    Q.   And the royalty rate in this agreement was

16 described as 4 to 4-1/2 percent; is that correct?

17    A.   Yes.

18              THE COURT:  And what was licensed?

19              THE WITNESS:  This particular screen is

20 very small to read.

21              MR. STRACHAN:  Your Honor, may I give

22 him a --

23              THE COURT:  Yes.

24              THE WITNESS:  I've got my own, actually.

25              MR. STRACHAN:  Okay.

1        THE WITNESS:  I'll read these, if you

2   don't mind.  I just wanted to be clear.

3        I mean, the license here is for the

4   technology that's used in the -- in the development of

5   the wireless chipsets, the access chipsets.

6        THE COURT:  When you say technology, what

7   do you mean?

8        THE WITNESS:  Well, my understanding is,

9   it's the -- it's the -- it's the wireless technology in

10  the chipsets.  They're developing wireless chipsets.

11       THE COURT:  Well, did the government of

12  Israel own a patent?

13       THE WITNESS:  No.  I don't believe this

14  is -- this is a patent.  I think this is -- they

15  invested money into the development of the chipset

16  technology, and there were royalties paid for that.

17       THE COURT:  Okay.  All right.

18       Q.   (By Mr. Strachan) Now, there are some

19  differences between that agreement and a patent of

20  this -- the patent-in-suit or license of this

21  patent-in-suit.

22       Do you understand that?

23       A.   Yes.

24       Q.   And you've taken that -- those differences

25  into account in deciding what would be an appropriate

royalty rate for this hypothetical negotiation in this
case?

A.   Yes.

Q.   Okay.  Let's turn to the next one, which is
Page 4 of the exhibit, the Siemens -- or Siemens
(pronouncing) license.

THE COURT:  Excuse me just a second,
Mr. Strachan.

MR. STRACHAN:  Yes, Your Honor.

THE COURT:  How did you take that into
account?

THE WITNESS:  Well, I -- I mean, what I
try to do is to consider that -- in all of these
agreements that there are certain differences, in terms
of the technology, the scope, and all of that.  I mean,
you have -- it's -- there's not a formula answer to that
process.

I try to consider all of the -- all of
the differences and how those differences work into the
various rates.  I look at the range of the rates across
all the agreements to develop if there's a -- you know,
so if I saw a rate, for example, that was way outside
the range and that was driven by some particular
difference, then I would likely exclude that.

Q.   (By Mr. Strachan) Let's then turn to the next

one on Page 4, which is the same Siemens or Siemens

(pronouncing) license for InterDigital.

           Would you describe what the technology or what

this license was?

      A.   Okay.  This is between InterDigital and

Siemens.  As you can see there in the licensed property,

it talks about it's TDMA and CDMA, which are two

wireless, you know, cellular protocols.  It deals with

the knowhow associated with the B-CDMA chip, the ASICs

chip.

      Q.   All right.  And the royalty rate in that was 5

percent as well?

      A.   Correct.

      Q.   All right.  Did you note that there were some

differences between this and a -- a patent license of

the '395 patent?

      A.   Yes.

      Q.   And what would the differences be?

      A.   Well, again, we're at the chip level and not

the architecture level, but I considered that in the --

the chip-level royalties, and -- and they typically run

lower than architectural -- excuse me -- architectural

level.

           So I considered that -- that, you know, if

this were at the architecture level, it would likely

1    have been an even higher rate.

2        Q.    And did you take that into consideration in

3    coming up with your opinion?

4        A.    Yes.

5        Q.    Let's then turn to the next one, which is Page

6    5, the Repeater Technologies license.  Would you

7    describe the technology in this case, please -- or this

8    license, please?

9        A.    Okay.  Again, if you -- if you read the

10   licensed property section there, it talks about the

11   technology, you know, being -- for their heading, the

12   wireless system technology and products.

13            And it's used to reduce -- it discusses it's a

14   technology used in wireless systems to reduce the number

15   of base stations used in that system.  It's a -- and

16   it's, you know, described as diversity technology.

17       Q.    And this was a patent license?

18       A.    It is a -- it's a license -- yes.  It's a

19   license agreement, which includes patent rights.

20       Q.    And the royalty under this was 3 percent -- or

21   the greater of 3 percent or $75 per unit; is that right?

22       A.    Yeah.  It had a 50,000 upfront fee, and then

23   it had a 3-percent running.

24       Q.    And I think there was also some granting of

25   some common stock to the owner of the -- of the patent?

1    A.    Yes.

2    Q.    Okay.  Now, as with the other two -- I maybe

3  not have asked you, but did you discuss this particular

4  license with Mr. McAlexander to confirm the link between

5  the technology of this license and the technology in

6  suit?

7    A.    Yes.  I discussed each of these with him.

8    Q.    Okay.

9    A.    Each of these seven.

10   Q.    Okay.  And did he confirm for you that the

11 technology described in this license, the Repeater

12 Technologies, was comparable to the technologies of this

13 lawsuit?

14   A.    Yes.  What he confirmed for me was -- is that

15 each of these were in what he considered the same

16 technology product family.  None of them are -- are

17 perfect comparables, but they're all in the -- what he

18 considered to be the same family, which was a reasonable

19 comparison.

20   Q.    All right.  Let's go to the next one then,

21 which is on Page 6, the Zingerang license.  What is the

22 technology in this license?

23   A.    Okay.  Again, if you come down into the

24 licensed property, it's -- the license states -- about a

25 third of the way down:  Licensed technology means

1 proprietary information, software, object code, source

2 code, knowhow, processes, methods, formulas, and carries

3 on -- that comprise or relate to the roaming messenger

4 technology.

5     Q.    And the royalty rate in this was 5 percent

6 with an upfront fee of $100,000?

7     A.    Correct.

8     Q.    And with the others -- did you discuss this

9 particular license with Mr. McAlexander and ascertain

10 that the technology of this license was comparable to

11 the tech -- or I guess comparable to the technology

12 involved in this case?

13     A.    Yes.

14     Q.    Let's then -- turn then to the next one, which

15 is on Page 8, I believe, the Redox Technology license.

16          What is the technology involved in this

17 case -- or this license, rather?

18     A.    Okay.    All right.    In the second sentence, it

19 defines there the term subject technology, which

20 includes pending U.S. patent applications, continues on,

21 talks about the communi -- communications convergent

22 thin client device allowing users to surf, you know, the

23 web, e-mail, movies, MP3, internet, those types of

24 things.

25          And you'll see in the last sentence, it

references wireless fidelity or Wi-Fi and cellular

networks.

     Q.   And the royalty rate in this license was 2-1/2

percent with an upfront fee of 25,000?

     A.   Yes.

     Q.   Did you likewise affirm -- discuss and affirm

with Mr. McAlexander the comparability of this

technology to the patents-in-suit?

     A.   Yes.

     Q.   The next one, Page 9, is the Sky Way license

that, actually, I think I recognize.  This involves the

ability to make a Wi-Fi connection while in the air, in

an airplane; is that right?

     A.   Yes.

     Q.   Okay.  And what is the -- well, I'll let --

this should -- you describe it for the Court what the

technology is.

     A.   Okay.  Well, as it says, it's a license

agreement, includes patent-pending technology, deals

with broadband wireless networks and infrastructures for

airborne customers.

     Q.   Okay.  Now, this was, apparently, an exchange

or agreement between two commonly owned entities.  Did

you consider that when you were selecting this as a

comparable?

1     A.    Yes.

2     Q.    Okay.  And the license -- the rate in this

3 agreement was 5 percent; is that correct?

4     A.    Yes.

5     Q.    Okay.  If we turn to, I believe, the last one

6 on Page 10, it's the Hyundai license.

7           Could you tell us about the technology in this

8 license?

9     A.    Again, if you -- about, you know, almost

10 halfway down the license property section, you see the

11 existing technology acquired were a base transceiver

12 station and a base station controller product lines.

13    Q.    And did you discuss this with Mr. McAlexander?

14    A.    Yes.

15    Q.    And reached the same conclusions regarding the

16 comparability of this technology to the patent-in-suit?

17    A.    Yes.

18    Q.    And the rate in this one is 1 percent, I

19 believe?

20    A.    Yes.

21    Q.    And you understand that ResQNet teaches

22 against just the global use of surveys without looking

23 at individual agreements.  You understand that?

24    A.    Yes, I do.

25    Q.    But, nonetheless, did you use a survey not to

form an opinion but as a backstop or a checkpoint to

make sure that none of these were outside the general

area of this technology?

A.   Yes.  I did look at two surveys that I could

locate that I used as a reasonableness check on this

work.

Q.   And can you tell us what those were?

A.   Yes.  One was the Licensing Economics Review,

and it -- it looked at -- it starts out looking at a

large number of licenses, something like 1500.  I think

they worked down -- in this case, I looked at licenses

for telecommunications and the averages for that.  And I

think they looked at 65 telecommunications licenses.

Q.   And were any of the licenses reflected in

Exhibit No. 5 outside the range of the survey that you

looked at?

A.   No.  The average of that survey for

telecommunications licensing was 5.3 percent, I believe.

Q.   And the conclusion you're proffering in this

case is a licensing rate of 5 percent, is it not?

A.   Correct.

Q.   And, in fact, you've read -- Mr. Becker's, who

is the Defense expert in this case, you've read his

deposition, have you not?

A.   Yes.

1   Q.   And he used the same processes and same

2   sources as you have, correct?

3   A.   Yes.

4   Q.   Okay.  And the differences is just which

5   comparables you two have selected?

6   A.   Yeah.  That would be the primary difference.

7   There's also a computational thing he does to divide by

8   10 that's different.

9            MR. STRACHAN:  Your Honor, that is our

10  proffer of --

11           THE COURT:  Okay.

12           MR. STRACHAN:  I can address by

13  discussion, but that's my questions.

14           THE COURT:  All right.  I'm going to

15  let -- Mr. Carroll, do you have any questions?

16           MR. CARROLL:  Your Honor, I'm not sure

17  exactly how to do this, other than to just maybe ask him

18  a couple -- if -- if the Court please, about these

19  specific licenses.

20                    CROSS-EXAMINATION

21  BY MR. CARROLL:

22   Q.   Mr. Carlile, have you seen the objection to

23  your use -- I mean, have you read the legal paper, the

24  objection to the comparability of these licenses that

25  was filed with Judge Everingham?

1       A.    No.  I was told about it, but I hadn't read

2    it.

3       Q.    Well, that's not your fault.

4             Let me ask you just a couple of basic

5    questions, and I'm going to give you a for instance.

6    On the -- on the -- on the Sky Way Global and Sky Way

7    Aircraft license, can you locate that one?

8       A.    Yes.

9       Q.    That states on its face that it's a

10   related-party transaction, doesn't it?

11      A.    Yes.

12      Q.    And you've testified on deposition that

13   because of that, it doesn't meet the Georgia-Pacific

14   definition of a willing buyer and a willing seller,

15   correct?

16      A.    I'm sorry.  Say that again.

17      Q.    Yeah.  On your deposition, the question was,

18   what is the significance of a related-party transaction,

19   and you testified -- and this is -- and I don't have --

20   I'm sorry, I don't have the deposition to give you.

21            If the Court please, I can walk up here and

22   you can read with me, if you don't --

23      A.    It's fine with me.

24            MR. CARROLL:  Would that be alright?

25            THE COURT:  That's alright.

1      Q.   (By Mr. Carroll) And this is just a synopsis

2  of your deposition.

3           And the question is:  What is the significance

4  of this being a related-party transaction, and your

5  answer is, it doesn't meet the definition of a willing

6  licensor and a willing licensee on its face.  Whether

7  that ultimately had an impact or not, you can't tell

8  from the information available.

9           That's what you testified to, right?

10     A.   I'll trust that you pulled that properly, yes.

11     Q.   Well, I didn't but I'm assuming --

12     A.   I trust that somebody did.

13     Q.   All right.  And my question is, your

14  admission, the way I read it is, is that you haven't

15  done enough research to determine whether this is a

16  reliable license because of that related-party

17  situation?

18     A.   Well, I think what I was saying is, is that I

19  don't know whether that has an impact or not.  You can

20  have related-party transactions that are done at what

21  would be considered fair market value which comes out of

22  a willing licensor or a willing licensee-type

23  transaction, because they're done for tax purposes or

24  other reasons.

25           So I don't know whether it had an impact or

not. But I think if we had the line of questioning

there, what they were going at was trying to decide

whether the fact that it was a related-party transaction

simply disqualified, which I believe I said it did not.

Q. But the fact of the matter is that you can't

tell the Judge here today whether that did or did not

have an impact on the willing buyer and seller

requirement under Georgia-Pacific, because you just

didn't have the data?

A. Yeah. I wasn't in that room with that

negotiation, so I don't know if that had an impact

ultimately or not.

Q. Okay. And the other questions I have in --

and, Mr. Carlisle, I'm going to ask them to you just

kind of generally, and we certainly can refer to the

specifics of the various licenses.

But, for instance, the very first one you

spoke to is a research grant; isn't that true? And

that's the -- let's see -- let's see --

THE COURT: Metalink.

Q. (By Mr. Carroll) The Metalink.

A. Right.

Q. That's not even a license of an existing

patent, is it?

It's a grant of money saying if -- here's

1    money and if you develop something, we get a certain

2    royalty?

3        A.    That's correct.

4        Q.    And you believe that's comparable to a patent

5    licensing situation that the hypothetical negotiation

6    contemplates?

7        A.    I think that the concept of the royalty and

8    the value attached to the product is -- is instructive

9    for that purpose, yes.

10       Q.    But you agree that it's different from a

11   patent license?

12       A.    It's a -- it has a difference, yes.

13       Q.    Okay.  And -- and -- but the purpose of the

14   money was research and development, and there was never

15   even any commitment that a product or a license would --

16   would issue, correct?

17       A.    Well, no, there was a commitment.  I mean,

18   this agreement had a commitment to pay royalties for the

19   products that were developed that came out of that

20   research grant.

21       Q.    Okay.  Now, let me just ask you generally,

22   would you agree with me that the -- that common to all

23   of the transactions that you sponsored as comparables is

24   the fact that you were unable or didn't look at any of

25   the underlying data, other than the summaries that you

1   got out of the search company?

2       A.   Right.  Yeah.  That's -- that's one aspect of

3   using Royalty Source is, is you get the summaries of

4   these things.  You don't have the actual agreements.  In

5   fact, Royalty Source often doesn't have the actual

6   agreements, because most companies don't, you know,

7   disclose the actual agreements.

8       Q.   And so what you're restricted to is what they

9   tell you about them, and they tell you sometimes they're

10  either worldwide or U.S.-wide.  They tell you whether

11  they're exclusive or non-exclusive.  They tell you

12  whether they include one piece of property or it's a

13  suite of property being transferred.  They tell you all

14  those kinds of things, do they not?

15      A.   They provide you all the terms that they have

16  regarding the license.

17      Q.   All right.  And from the -- and you understand

18  the purpose of the hearing today is -- is whether that

19  information is reliable, and the only way I know to ask

20  this question is, how do you make adjustments for things

21  like -- well, some of these licenses that you sponsored

22  were worldwide, correct, rather than nationwide?

23      A.   There were at least in one case, yes.

24      Q.   And some of them were exclusive rather than

25  non-exclusive, correct?

1      A.    Correct.

2      Q.    And some of them granted additional property

3   rights, correct?

4      A.    Correct.

5      Q.    So how did you make those adjustments in order

6   to satisfy the reliability test?

7      A.    Well, again, I'm starting with a range, so

8   what we're looking here is for a starting point of the

9   range.  So as long as those adjustments fall in the

10  range.

11          For example, if I have something, it's a

12  4.5-percent rate, and I think that that adjustment would

13  tend to push the rate down to 4, that's not a problem

14  for me, because I'm starting with a range that says 1 to

15  5, and I'm using the other Georgia-Pacific Factors to

16  use along that range to pick what I think is the proper

17  answer.

18          So you don't -- as you've mentioned, I think

19  we've talked about, you know, there's never a perfect

20  comparable.  It's the same thing as appraising real

21  estate.  I may have a house that's got three bathrooms

22  here and two bathrooms there, one that has, you know, a

23  two-car garage, a three-car garage.

24          What I'm looking for is to take all of that

25  data and give it a range given the appropriate starting

point.  So I only have a concern if they fall out above

the high end of the range or below the low end of the

range.

Q.   So -- so you picked this range and then

independent of the comparables, the range defines

reliability, in your opinion?

A.   Well, I'm not sure if I follow that question.

Q.   In other words, you pick a range, and then the

range itself drives your answer that a particular

adjustment is reliable so long as it's within that

range?

A.   I think the answer to that is yes.  I use this

data to develop what I think is the proper range for a

reasonable royalty based on what I understand, after

talking to the technical expert, is comparable product

or technology families.

And then I begin the analysis of the

Georgia-Pacific Factors to move to the point that I

think represents the reasonable royalty within that

range.

Q.   Okay.  And last question, and this is just

because I really don't understand how you did it, and

that's my problem.

But when you have, for instance -- and

Mr. Jones just handed me a note.  You know, there are --

1  there are transfers of technology or technologies that

2  are described in some of these agreements that you use,

3  correct?

4      A.   I'm sorry.  Say that again.

5      Q.   Isn't it true that some of the agreements --

6  and we can certainly pinpoint the ones in question --

7  involve something that the survey source term transfers

8  of technology?

9      A.   I'll take your word for it.  I mean, I think

10 they mentioned it in a variety of ways:  License,

11 transfer, otherwise, yes.

12     Q.   Okay.  And -- and your testimony to Judge

13 Everingham is that that is for the purpose of

14 reliability comparable to a patent license?

15     A.   Yes, I --

16     Q.   The sale of technology?

17     A.   Yes.  I wouldn't have included these seven

18 that I ultimately selected, if I didn't think they

19 represented comparable technology that was reliable for

20 the use of setting a reasonable royalty range.

21     Q.   Okay.  Did you or have Mr. McAlexander

22 research any of the underlying technology at a -- at a

23 patent -- at a patent level that might be applicable to

24 these agreements?

25     A.   I can't say what Mr. McAlexander did.  I did

1  not have the patents that -- at the patent level for

2  these agreements.

3     Q.   And, again, does your report speak to how you

4  made the adjustments, for instance, to deal with

5  related-party transaction possibilities with technology

6  transfers, for instance, with grants, research grants?

7  Because I didn't see that in your report.

8     A.   Well, what it does is this report describes

9  each of these licenses.  It calls out several of the

10 features that you mentioned.  As I said, it works to the

11 end and concludes that there's a reasonable range of

12 royalties from which I can start my analysis.

13    Q.   And this is the last question I have, and that

14 is, on the one where it is, on its face, a related-party

15 transaction -- I can't remember the name of it; you and

16 I just talked about it.

17    A.   I think that was the Sky High (sic).

18    Q.   Right.  The airplane deal.

19    A.   Right.  Sky Way.  Sorry.

20    Q.   Okay.  And you and I just, I think,

21 established that you do not know from one way or the

22 other from the information you had whether the

23 related-party nature of that transaction took it out of

24 the willing buyer and seller context.

25    A.   I don't know whether that element of it had an

ultimate impact.  The rate falls in the range of

non-related party transactions, so I concluded from that

that it falls in the reasonable range.

Q.  As a matter of fact, it's the same rate you

picked as the rate you want to sponsor to this jury, and

that's 5 percent, correct?

A.  It is the same rate.  It wasn't for that

purpose.

Q.  Okay.

MR. CARROLL:  That's all I have.  Thank

you, Your Honor.

THE COURT:  All right.  Just a second.

MR. STRACHAN:  Yes, sir.

THE COURT:  Tell me this:  The Siemens

license from Interdigital, I believe that's on the

second page.

THE WITNESS:  Yes.

THE COURT:  That deals with TDMA and

CDMA, correct?

THE WITNESS:  Yes.

THE COURT:  Those are cellular telephone

technologies?

THE WITNESS:  Right.

THE COURT:  And tell me how that

technology is comparable to the technology that's at

1  issue in this case.

2  THE WITNESS:  Well, actually, the -- from

3  my perspective, the wireless -- cellular wireless

4  technologies are very similar to Wi-Fi, Bluetooth, and

5  other kinds of technologies.

6  There's been a debate in the Court about

7  long-range and short-range, but all of the issues in

8  terms of signal blockage, handoff between, you know,

9  what's called cell towers in the cellular business

10  versus what's called, you know, base station or access

11  points and Wi-Fi or Bluetooth and others are many of the

12  same issues.  They're dealing with the same sorts of

13  problems and how to solve those.

14  THE COURT:  Well, was -- what was license

15  property, did that include patents?

16  THE WITNESS:  Well, it's described as

17  know-how associated with the -- the chip.

18  THE COURT:  Okay.  All right.  Thank you.

19  Mr. Strachan, do you have anything

20  further?

21  MR. STRACHAN:  No questions, Your Honor.

22  THE COURT:  All right.  All right.  I'm

23  going to permit the expert to rely on the Repeater

24  Technologies summary, Zingerang, Redox, and Hyundai.

25  I'm excluding Metalink, Siemens, and the

Sky Way summaries.

Anything further we need to take up at this time, Mr. Strachan?

MR. STRACHAN:  No, Your Honor.  We'll revise our slides accordingly.

THE COURT:  Thank you.

We're coming back at 1:30, but if you need a few more minutes, let me know.

MR. STRACHAN:  Thank you, Your Honor.

THE COURT:  Anything further from the Defendant?

MR. CARROLL:  No, Your Honor.

LAW CLERK:  All rise.

(Lunch recess.)

*     *     *     *     *

1

2

3                    <u>CERTIFICATION</u>

4

5              I HEREBY CERTIFY that the foregoing is a

6   true and correct transcript from the stenographic notes

7   of the proceedings in the above-entitled matter to the

8   best of my ability.

9

10

11

12  /s/_____          _____
    SUSAN SIMMONS, CSR                   Date
13  Official Court Reporter
    State of Texas No.:  267
14  Expiration Date:  12/31/10

15

16

17  /s/_____              _____
    SHELLY HOLMES, CSR                   Date
18  Deputy Official Court Reporter
    State of Texas No.:  7804
19  Expiration Date  12/31/10

20

21

22

23

24

25