```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF TEXAS
 2                      MARSHALL DIVISION

 3  COMMIL USA                 *    Civil Docket No.
                               *    2:07-CV-341
 4  VS.                        *    Marshall, Texas
                               *
 5                             *    May 17, 2010
    CISCO SYSTEMS, INC., ET AL *    12:45 P.M.

 6

 7                  TRANSCRIPT OF JURY TRIAL
             BEFORE THE HONORABLE CHAD EVERINGHAM
 8                UNITED STATES MAGISTRATE JUDGE

 9  APPEARANCES:

10  FOR THE PLAINTIFFS:        MR. MARK S. WERBNER
                               MR. RICHARD A. SAYLES
11                             MR. MARK D. STRACHAN
                               MS. EVE L. HENSON
12                             MR. CHRISTOPHER W. HOGUE
                               Sayles Werbner
13                             1201 Elm Street
                               4400 Renaissance Tower
14                             Dallas, TX   75270

15

16  FOR THE DEFENDANTS:        MR. JEFFREY E. OSTROW
    (CISCO)                    MR. HARRISON J. FRAHN, IV
17                             MR. PATRICK E. KING
                               Simpson Thacher & Bartlett
18                             2550 Hanover St.
                               Palo Alto, CA   94304
19

20  APPEARANCES CONTINUED ON NEXT PAGE:

21

    COURT REPORTERS:           MS. SUSAN SIMMONS, CSR
22                             MS. SHELLY HOLMES, CSR
                               Official Court Reporters
23                             100 East Houston, Suite 125
                               Marshall, TX   75670
24                             903/935-3868

25  (Proceedings recorded by mechanical stenography,
    transcript produced on CAT system.)
```

<u>APPEARANCES CONTINUED</u>:

FOR THE DEFENDANTS:          MR. OTIS CARROLL
(CISCO)                      MR. PATRICK KELLEY
                             Ireland Carroll & Kelley
                             6101 South Broadway
                             Suite 500
                             Tyler, TX    75703

                             MR. MICHAEL E. JONES
                             MR. PATRICK C. CLUTTER, IV
                             Potter Minton
                             110 North College
                             Suite 500
                             Tyler, TX    75702

                 *      *      *      *      *      *

                         P R O C E E D I N G S

                 (Jury in.)

                 THE COURT:  Please be seated.

                 Closing arguments at this time,

Mr. Sayles.

                 MR. SAYLES:  May it please the Court.

                 Counsel.

                 Ladies and Gentlemen, I know you're ready

for me to get down to business, and I intend to do that

in just a minute, but I want to make a couple of

comments to you that I just simply cannot resist.

                 First of all, our opposing counsel has

done a good job.  They're not the B team.  Let me tell

you, Cisco did not send the B team out here to do damage
control.  They sent the A team.  I commend the opposing
counsel in that regard.

Second, I want to tell you how much I
appreciate your service.  And by doing that, I in no way
ask for any favor, because what we're asking you for
here is a jury verdict that represents justice.  But I
must thank you for your service, because it's only in
the United States of America that we have people like
you who are making decisions like we're having made here
today.

There are two constitutional rights
involved in this case.  The first is patents and the
patent laws derived from the Constitution of the United
States.  And here you are.

The Seventh Amendment to the United
States Constitution permits a trial by jury in all civil
cases.  And here you are.

I know that sometimes when you hear all
the high-powered, highly compensated witnesses in the
case and you hear about the many millions of dollars
involved, you may have a feeling, well, why am I
involved in that?

Well, you're involved in it, because, in
our country, we believe that justice is obtained by

having people just like you make our most important decisions. And I have stood before the bar of justice for 36 years, and I know that with the wisdom in this jury box -- and I've added up your ages, and there's over 340 years of life experience in that jury box -- that you can and you will make a decision that represents justice.

Now, let me go to this case and talk about it for just a moment.

First of all, there are three questions, basically, that you are to decide, and while all the Court's instructions are important, there are three instructions that will be very helpful to you in deciding those issues.

The first question you'll be asked is was there infringement of the '395 patent? Was there infringement? That's the factual question.

From all the evidence that you've seen, I think you'll conclude that, yes, there was. But the important legal principle that you have to keep in mind is the one that Judge Everingham gave you at the start, and he'll give it to you again, and that is to prove infringement, the burden of proof on us is by a preponderance of the evidence. That means more likely than not.

1      And I asked you in voir dire, if anybody

2  thought that was unfair, because that is the law, and

3  everyone agreed that they could and would follow the

4  law.

5      The second issue that you'll be asked to

6  decide in this case are the questions regarding validity

7  of the patent.  That's defensive issues that the Cisco

8  lawyers have the burden of proof on.  And there's a very

9  helpful instruction on the law that will help you there.

10      First, a patent has a presumption of

11  validity, a legal presumption of validity, and it

12  applies to the factors that can be brought out to try to

13  defeat that patent, including enablement, including

14  written description.

15      And the Patent Office deemed this patent

16  sufficient to issue the claims that it issued, and it

17  enjoys a legal presumption of validity.

18      Now, the next legal principle that you

19  have to apply here is the burden of proof to overcome

20  that presumption.  And it's a higher burden of proof,

21  and the Judge said this in the beginning:  It's clear

22  and convincing evidence.

23      And I'm going to show you the words for

24  clear and convincing evidence in a few minutes, because

25  it's so important.  But clear and convincing evidence

means that you have to be convinced that what is claimed
is highly probable, meaning you might -- you can even
think that, well, maybe it was.  That's not enough.
Highly probable.

Because if you're going to tear up and
throw away a patent issued by the United States
government, you have to meet that high burden.  That's
applying the law to the facts.

Now, I want to show you the verdict form
very quickly.  You'll receive a verdict form, and you'll
take it back into the jury room, and let's look at the
first issue.

I'm going to ask and suggest to you that
there is one way to answer the questions, please, on the
first question which has to do with direct infringement.

Based on the evidence, the answer to the
three questions, and you're being asked about three
claims:  1, 4, and 6.  That's all you're being asked
about.

The answer is yes, and on this question,
the burden of proof is that preponderance of the
evidence that I told you about.

Let's look at Question 2.  Question 2 is
the question about inducing infringement, and you'll
receive instructions on inducement.  And with those

instructions and the evidence that you heard, the answer

to Question No. 2 is yes for each of the three claims.

The next question in the charge is the

one upon which Cisco bears the burden of proof.  And you

have to watch the phrasing here, and it says:  Did you

find that Cisco has proven, you see at the top.  It is

their burden.  And this is where that burden of clear

and convincing evidence applies.

And so the answer on whether this patent

is not enabled -- enabled is no, and whether it lacks a

sufficient written description is no.

If you correctly apply the burden of

proof, there is no way that you can answer this

otherwise.  The -- the Defendant's own expert went both

ways on that issue.  Yes, it's valid.  No, it isn't

valid.

And then the next question that you'll be

asked to address is a question of a reasonable royalty,

and based on the evidence -- and I'm going to discuss it

in more detail in a moment -- the damages that you

should return are a reasonable royalty of $56,184,916.

All right, that's what the evidence

supports.

Now, I'm going to go through some factors

that I think will help you determine infringement.

1    First of all, you know from the Judge's

2 instructions that to determine infringement, you compare

3 the claims of the patent to the accused products.  You

4 don't compare Commil Limited in Israel's business, their

5 attempts to make a Wi-Fi product.  That has nothing to

6 do with infringement.

7    You look at the patent and its claims in

8 the accused products.  And, in fact, here is the Court's

9 instruction:  To determine whether there is an

10 infringement, you must compare the allegedly infringing

11 product with the scope of the claims as I have defined

12 them for you.  That will be in Judge Everingham's

13 instruction.  That's the law.

14    You know the significant dates, and I'm

15 just going to touch on these briefly.  The inventors

16 drafted their patent application in March of 2000, and

17 they filed their patent application in April of 2000,

18 and the patent was issued in August of 2002.

19    Now, that's important for -- for --

20 mainly for one reason.  You heard evidence about the

21 fact that Cisco has a stack of patents that are up

22 there.  None of them predate the Commil patent

23 application.  It wasn't even claimed.  They couldn't

24 attempt to claim it, because it wouldn't have been true.

25    And the idea behind this patent is to

split the media access control architecture, and it is a

method patent. And the way you place it makes mobility

more seamless, more useful. That's what the patent was.

Then there have been numerous efforts to

limit this patent in some way to Bluetooth, and I think

you've heard over and over from the lawyers and from the

Court that this patent is not limited by the preferred

embodiment. And, in fact, the technical field of

invention, described in the words of the patent, is

wireless communication systems.

The scope of the invention described in

the patent itself describes telephone handsets, cordless

telephones, cellular telephones, personal data devices,

personal digital assistants, computers, laptops, e-mail

servers, and other things. Clearly, the words of the

patent, in describing the scope of the invention, are

much broader than Cisco would have you believe, and it's

right there in the patent.

Following the issuance of this patent,

what happened?

Well, Airespace made their breakthrough

with the split-MAC architecture already invented in the

patent, and they did that in February of 2004.

How did that describe that?

They described that new architecture,

which is a method already embodied in the Commil patent,

as changing the game for wireless local area networks,

Airespace's breakthrough split-MAC architecture.  That's

their description of what they had.

And then Cisco -- of course, you heard

all about this and I'll only mention it briefly.  Cisco

bought Airespace for $450 million, and that time happens

to be the time of the hypothetical negotiation that we

get to to determine damages.

Now, was this split-MAC architecture and

what's embodied in the patent valuable at that time?

Let's look at Cisco's own press release

when they said how they felt about their acquisition of

Airespace.  This is at the time these two parties,

Commil and Cisco, would have sat down at the bargaining

table.  They say, once they reached a definitive

agreement on purchasing the award-winning product

portfolio, it would expand Cisco's structured wireless

area network solution, accelerating the delivery of key

WLAN capabilities and features for Cisco's entire

customer base.

Now, folks, this is not just some trivial

little thing that they've acquired here.  They're saying

in a press release that it will enhance their

capabilities for their entire customer base.  This is

Cisco's words, and they say that with this, they are

uniquely positioned to take advantage of a rapidly

growing enterprise.

So don't you know, when they sit down at

the bargaining table when we talk about this reasonable

royalty in a few minutes, that they would have had this

in mind.  They're saying it to the public in press

releases that this is a growing enterprise.  It was

highly important to them.

And, of course, you know that from the

time of the acquisition of Airespace to the last quarter

for which we had data in this case, the sales of the

accused products exceeded $1.1 billion.

THE COURT:  You've used 15 minutes.

MR. SAYLES:  All right.

Whether the Cisco products use the

split-MAC architecture, you don't have to take our word

for it.  You can look at their own documents, and I'm

just going to go through a few.

Here is a document from Cisco that shows

indeed that the access points are being accessed by

various wireless devices and going to a controller.

Their own documents say that they -- you

know, there's also this argument today as a matter of

fact and throughout this trial about whether they really

1  split the MAC function on a real-time basis or not.

2  Cisco's document says they do.  It says the real-time

3  function and the non-real-time functions are split, just

4  like we say they are in this lawsuit.

5             Should you believe what they say now that

6  they'd like to rewrite the documents, or should you

7  believe what their documents said when their guard was

8  down and the truth came out?

9             This is simply another document -- I

10 can't go through them all -- where Cisco itself talks

11 about the time split and the real-time functionality and

12 the non-real-time functionality being split, just as we

13 say it is, and that's one of the elements of the claim.

14 Here's a drawing where the wireless LAN controller shows

15 non-real-time, and the lightweight access point shows

16 real-time, a Cisco document.

17            As I mentioned, the preponderance of the

18 evidence is what is more likely true than not true, just

19 barely tip the scales.  That's what it takes for

20 infringement.

21            The Claim 1, we've been through all the

22 elements.  They're all there.  You heard from Joe

23 McAlexander, and you saw the documents of Cisco.  There

24 was infringement here, certainly by a preponderance of

25 the evidence.

1                    The term switch, we heard throughout this

2    case that somehow this case is just about phone calls.

3    This case is limited to telephone calls.  Heard that in

4    opening statement.  The term switch means an apparatus

5    for routing telephone calls.  That is the definition in

6    your book.

7                    But listen carefully when Judge

8    Everingham gives his instructions.  He will instruct you

9    that the invention is not limited to making telephone

10   calls.  That's the law.  And you're going to hear that.

11   Claim 4 simply adds switch handling routing of data.  It

12   does; it's infringed.

13                   Claim 6 has the mobile units being

14   selected from a group, whether it's a handset or a

15   personal digital assistant and the like, a laptop, a

16   computer, easily met.  So that's infringed.

17                   There was a claim by Bob O'Hara that when

18   he testified in Court that mobility was solved by

19   802.11.  That wasn't any big deal, but when his

20   deposition was taken, he said that improvement of

21   mobility was a necessity.

22                   So what's invented in this patent is

23   important.  He said one thing in deposition, said

24   another thing in the courtroom.

25                   Intent is not required for direct

infringement.  You'll hear this instruction from Judge

Everingham in a few minutes.  Cisco did not have to know

what it was doing was infringing to be guilty of direct

infringement.

And when they bought Airespace and

started putting out products, they didn't have to know

to infringe the patent or that they were infringing.

They could even believe in good faith that they weren't.

That's the law.  Judge Everingham will give it to you.

The fact that there are other patents.  You've been

instructed a couple of times, and I know that's hard to

understand.  Well, gosh, if Airespace and Cisco have a

number of patents, what's this all about?

It's no defense in a patent infringement

case that other patents may cover some aspect of the

invention.  That's the law.

THE COURT:  You've used 19 minutes.

MR. SAYLES:  The patent is presumed

valid.  I've mentioned that to you.  That will come from

Judge Everingham in a few minutes.

Clear and convincing evidence is highly

probable, the facts are, as a party contends.

I want to talk to you about Dr. Becker,

the damages expert.  The damages experts really don't

disagree that much, and I'm going to tell you why.  Dr.

Becker mentioned a license for 5.75 percent, the

Qualcomm license.

    But you know what he did to get his

percentage down to .6?

    He -- he said that the Qualcomm license

had a batch of patents in it, and he divided by the

number of patents in it in order to get that number down

to .6.  But he admitted on cross-examination that if

someone violates even one patent in that portfolio, just

one, they pay 5.75 percent.

    Now, we heard which one doesn't belong.

The .6 doesn't belong.  5.75 percent in Qualcomm was

used by both experts, but Mr. Becker just tried to

explain it away.

    So if you take the 5-percent royalty,

which is reasonable, and you heard the analysis of

Mr. Carlile.  And then consider Mr. Becker the way he

tried to get rid of the 5.75-percent Qualcomm license, I

think you'll conclude that the reasonable royalty is

$56,184,916.

    We'll reserve the balance, Your Honor.

    THE COURT:  19 minutes remaining.

    MR. CARROLL:  If the Court please, Your

Honor.

    THE COURT:  Mr. Carroll.

1    MR. CARROLL:  Ladies and Gentlemen of the

2  Jury, you are, in this case, truth-seekers.  You are

3  charged with the most important job in this courtroom,

4  and that's determining the truth.

5    And when you figure out what the truth

6  is, all of those burdens, preponderance of the evidence,

7  clear and convincing evidence, they'll all take care of

8  themselves when you find out what the truth is.

9    When you find out what the truth is,

10  you'll know exactly what to make of some very

11  complicated evidence.  You'll know how to deal with it.

12  And when you figure out what the truth is, you'll know

13  how to answer that verdict form.

14    You remember the most important trial in

15  history, which we all read about as kids, in the Bible

16  had that very question from the judge.  What is truth?

17  What is truth?

18    It will be your time to answer that based

19  on the evidence that you heard.  And you know what the

20  truth is in this case.  You saw it on the second day

21  when Mr. David testified, the very smart lawyer, the

22  very successful lawyer, who bought these patents from

23  essentially a foreclosure, when a bank shut the doors on

24  this company over in Israel.  You remember Mr. David got

25  the inside word from his cousin, who works with the bank

that forecloses on people over there and kicks them out
of their businesses.  And then he bought that patent
for -- from -- through that process.  That's the truth.
He told you that he hadn't even bothered to read the
patent.  That's the truth.

He told you that he never ever paid any
attention to whether Commil, the inventors, could or
couldn't, did or didn't apply their patent to Wi-Fi.
That's the product that they're suing us for.  And
that's the truth.

And maybe most importantly on that day --
I think it was Wednesday last -- you learned something
else that to me is a powerful true fact.  And that is
that they brought -- folks right over here, they
bought -- brought the inventor, whose name is on this
patent.  You know, they -- they have the patent up and
had it up the whole trial like a little shrine.

In fact, I could barely see some of you,
because the thing was there like, you know, we were all
supposed to, you know, do obeisance to the shrine, to
the patent, to the famous Arazi patent.  There it is.
And what did you learn on Wednesday?

And you don't have to be a scientist or
you don't have to be an engineer or you don't have to be
an economist to know the significance of this.  They

1  brought Mr. Arazi, whose name is on the little shrine

2  there, as the primary inventor of this patent that they

3  want $56 million of Cisco's money for.  They brought him

4  all the way around the world from Israel, and they

5  brought him here and told us they were going to have him

6  available for us to put on that stand so that we could

7  question him in front of you, so that you-all could

8  learn what the truth is by listening to what he said.

9               And what did we learn?

10              They sent him home.  They sent him home.

11              What does your common sense tell you

12  about that?

13              It tells you that they were afraid of

14  what the inventor of the little shrine over here would

15  say, when he was asked the most important question in

16  the case.  And that is:  Mr. Arazi, does that patent

17  teach -- does that patent teach a person like you how to

18  apply it to Wi-Fi?

19              Because they knew what his answer would

20  be.  They knew what his answer would be.  And the answer

21  would be no.

22              MR. WERBNER:  Your Honor, I'm going to

23  object to counsel -- there's no evidence.  There's a

24  deposition.  There's no evidence.

25              THE COURT:  Overruled.

1          MR. CARROLL:  So -- and by the way,
2    that's Exhibit 1.  They squeal loudest when you poke at
3    it, and they can't explain that away.  They wish they
4    had that back, but they don't.  They sent him home,
5    because they were afraid of what he would say.
6          Now, Mr. Werbner, you just heard what he
7    did.  That hurts them bad, and it should.  And he's
8    going to stand up here in a little bit and he's going to
9    say, well, you know what; they took his deposition, and
10   that's just as good.
11          Well, forgetting for a minute the fact
12   that they told us that they were going to bring him
13   live, and we could rely on this.  Forgetting about that
14   for a minute.  That is where the truth comes out.
15          When you can see it, when you can watch
16   him, because you know what?  It's -- they're going to --
17   Mr. Werbner is going to make a big point of skewering
18   poor, old Dr. Lansford.
19          Do you remember, Dr. Lansford was the
20   fellow we put up here who was very involved in some of
21   those Wi-Fi standards.  And sure enough -- sure enough,
22   they had him going both ways.  They had him saying it's
23   valid and it's invalid.  But what they never got him to
24   back off on or back up on is the fact that he said
25   consistently that this patent won't work; it doesn't

teach; you can't understand Wi-Fi from this patent.

But you know what?  He took his shots. He sat right up there and took his shots.  Arazi didn't, because they didn't want him to.

Bob O'Hara.  Bob O'Hara comes here from California.  He is the inventor, the father or the uncle, or whatever we came down with, with Wi-Fi.  Bob O'Hara not getting paid a dime.  Every one of the witnesses that they brought to you are paid one way or the other.  They're paid by the hour, or they're paid on the basis of what they get, if you give them money. Every one of them.  Every one of them.

Bob O'Hara was not.  He doesn't even work for Cisco anymore.  And he sat right up there on that stand where you could watch him, and he answered every question and tried his hardest to tell you what the truth was, and he did.

And the truth is that what he invented, and is today Wi-Fi, has nothing to do with the little Arazi shrine.  Nothing.

Now, what's the best proof of what I'm just telling you?  What's the best proof of the fact that the Arazi patent doesn't reach Wi-Fi?

They couldn't make it reach Wi-Fi.  They couldn't build a Wi-Fi product.  Now, let me warn you

right now about where the battle lines are going to be

drawn, because you saw it about two hours ago when Joe

McAlexander sat up there on that stand and Mr. Frahn

said:  Well, don't you agree, Mr. McAlexander, that

because the inventors of this patent never achieved a

concept of Wi-Fi on this patent, that that makes it

invalid?

And he said:  Oh, no, I don't agree with

that, because you're talking about a product.  That's

where -- that's how fine they're slicing the onion.

That's how fine they're slicing the onion.

But when you look at the exhibits, and

I'm going to give you some numbers of exhibits, which

Judge Everingham will send back in that jury room with

you.  If you want them, you can call for them.  And I

promise you that the truth is that they will prove

exactly what Mr. Soffer, the one -- you remember

Mr. Soffer, the Israeli ex-Army officer who testified?

You remember what he said?

Tracy, will you put that up there,

Mr. Soffer, please?

Now, that's what he told you either

Tuesday afternoon or Wednesday morning.  Never got to a

proof of concept.

Now, why is that important?

It's important because that testimony alone invalidates the patent. That testimony alone invalidates the patent. But let me tell you where they're going to quibble, and Mr. Werbner is going to talk a lot about the qualifier, he says, of the term product.

But when you look at the evidence, when you look at their own words, not in Court, but back in 2005 when they were struggling to survive, you will see that they weren't talking about what Mr. McAlexander now says they were. And that is, how to build something. They were talking about trying to stretch this idea in this Arazi patent to fit something that it never was intended to fit. It never was intended to fit.

Let me remind you of a couple of things that will show you why that's true. You remember all those questions this morning that Mr. Frahn asked Mr. McAlexander about all of the references in all of the patent -- information in the patent, what they call the file wrapper, about all of these other standards. And there was never one mention of Wi-Fi.

Now, they try to weasel out of that. They try to weasel out of that by saying, oh, well, we were just talking about one way of doing it. They weren't. They were talking about a bunch of different

1  ways, except the most important, Wi-Fi.

2                    What do you make of that?

3                    Let's go to -- let me show you what I

4  mean.

5                    Let's go to -- let's go to that -- that

6  first slide, DTX1138.

7                    Now, this is an e-mail to Mr. Arazi.  See

8  his name up there?  And this is Defendant's

9  Exhibit 1138.  If you want to write the number down so

10 you can take it -- ask for it and take it back into the

11 jury room if you -- if you don't believe what I'm

12 telling you.

13                    But look what it says.  Look what it

14 says.  It says, brand new CAPWAP handover protocol

15 draft.  Now, you remember CAPWAP, for the purpose of our

16 product, is Wi-Fi.

17                    What's the date?

18                    2005, just before they finally gave it up

19 and said calf rope, we can't exist anymore.

20                    What do they say?

21                    This baby is not ours.

22                    How could it be any plainer than that?

23                    The people who invented the patent that

24 Mr. David bought, that he wants $56 million from Cisco

25 from, were products, in their words, weren't their baby.

1 And look what else they say:  But we can try to extend

2 it for our distributed mobility.

3                    What does that mean?

4                    That means maybe we can figure out a way

5 to make it work for what we do, in fact, teach.  But

6 they never did.

7                    Now, Dick Sayles told you that you can --

8 the law says that a person can accidentally infringe a

9 patent.  And believe it or not, that's true.  Just like

10 you can accidentally trespass.  I could come on to your

11 place and you might not have it fenced, and I might not

12 know it, but it would be a trespass.

13                    But guess what you can't do accidentally?

14                    You can't invent something accidentally.

15 You can't invent something that goes to one technology,

16 see it fail, spend millions of dollars trying to make it

17 work for another technology, and then say, oh, we

18 invented that, too.  And that's what this case is about.

19                    That's the truth.

20                    You remember I asked Mr. David up there

21 on the stand on Wednesday if he had one piece of paper,

22 one piece of paper that he could show you where before

23 he took over the patent, before he bought the little

24 shrine here, that said we, the inventors, think Cisco is

25 infringing.  Do you remember that?

1          And he said no.  He said, well, it's in
2  the patent.  Of course, he hadn't read it.  But you
3  haven't seen one piece of paper from them that will --
4  that was written back at the time the inventors owned
5  the patent that say what is they say today.  Not one.
6  So what are you supposed to make of that?  What are you
7  supposed to make of that?

8          Does that suggest that they have carried
9  their burden of proof, when they can't show you one
10  thing, one piece of paper to say, yeah, oh, by the way,
11  it works for Wi-Fi, too; we intended it to work for
12  Wi-Fi, too?

13          It's just not there.  It's just not
14  there.

15          And by the way, you know, this is like
16  when you were a kid playing baseball.  You know,
17  Mr. Sayles told you about tipping the scale, but guess
18  what?  The tie doesn't go to the runner.  If they don't
19  answer questions for you, if they don't tie up loose
20  ends for you, then they lose.  They don't get to the pay
21  window.

22          And let me tell you what -- what -- what
23  I'm talking about there.

24          Tracy, if you would, flip over to -- flip
25  over to Slide 10.  Slide 10.

1          Oh, I'm sorry.  Okay.

2          You-all remember that there was a lot of

3 discussion as late as this morning about this real-time

4 versus non-real-time distinction, and Mr. Frahn and

5 Mr. McAlexander agreed on one thing, and that is that in

6 our products, in the products Bob O'Hara invented, that

7 this step called authentication happens in a place in

8 our product where it's different from what their patent

9 says it must for them to win.

10          Got me there?

11          Very important.  I want you to bear with

12 me to go through this one more time.  One of the few

13 things that Joe McAlexander agreed with us on, on the

14 stand, was that this step, this authentication, happens

15 in our product at a place where it can't, if they're to

16 win.

17          Got me thus far?

18          So, logically, you'd expect him to say,

19 okay, you're right.  You know, I'm wrong; we lose.

20 But he said that's not real-time.  Remember what he

21 said?  He argued about that's not real-time.  And he

22 said the very same thing that Mr. Sayles just said.

23 Well, all I know is that they say it in all their

24 documents.  But he also admitted -- and bear with me now

25 just a little bit, because it's a little technical.

But he also admitted that Bob O'Hara, the nice guy with the crew cut who invented all this stuff, was right when he said this takes place in 9 milliseconds. Nine milliseconds.

And the point of that is that everybody had already agreed, including Joe McAlexander, that that was fast enough, that that was fast enough to qualify as real-time. So instead of accepting that, accepting his own limits, he says, no, the documents say something different.

Well, guess what he also told you? And you'll remember this. Remember, he made a big deal about all these tests that he says he did, that he tested all of our products.

Mr. Werbner asked him: Did you test them?

Oh, yeah.

Did you look at all of the secret components?

Oh, yeah.

Did they all work exactly like the Arazi patent?

Oh, yeah.

What proof of that did you see? Other than his word, what proof?

1          Let me tell you why that says that you

2    shouldn't believe that, is the very thing I just told

3    you about this little piece of authentication.  When he

4    admits that it's fast enough to be real-time and admits

5    that because it's -- if it's real-time where it occurs,

6    they lose.  But then says, but I still don't agree it's

7    real-time.

8          What if he had said:  And I tested it,

9    and Bob O'Hara is wrong?  Or what if he had said:  And I

10   tested it and it doesn't happen at 9 milliseconds; and I

11   tested all the other steps, all these other steps, and

12   they happened faster than this, so I know it's not

13   real-time?

14         He didn't do any of that.  He didn't tell

15   you one thing about that.  And, again, a tie doesn't go

16   to the runner.  A tie doesn't go to the runner.

17         If he really tested that product, our

18   product, the way he says, there's only one of two

19   conclusions that you can draw.  It doesn't work the way

20   they say, or he didn't test it.  Because don't you know,

21   if he had and it supported what they said and needed to

22   prove to you, as the truth, to get $56 million, you

23   would have heard about it.

24         But you didn't.  But you didn't.

25         So all you have for that point as well as

every other point on infringement is Joe McAlexander's

paid word.  Joe McAlexander's paid word.

So, to me, the truth is what you've known

and what you've seen from the first, from the second day

of the trial until today.  And this -- and that is -- as

plainly as it said in that document that I showed you

just a second ago, and that is Wi-Fi is not, was not,

and will never be the baby of that patent, that Arazi

patent.

So in my opinion -- may I have -- is the

ELMO on?

THE CLERK:  Yes.

MR. CARROLL:  Thank you.

In my opinion, that one point alone

justifies those three nos.  Have they proved to you the

truth of what they're saying?

And you and I know what the answer is,

and the answer is no.  And if you put those three nos

down, the one thing that won't happen is that Mr. David

won't fly back home later this week with a sack full of

Cisco's money that belongs to Cisco and its employees

here in Texas and its shareholders.

One of the things that you're going to

see when you look at Judge Everingham's verdict form is

that there are two infringement questions.  The first is

direct infringement, and that's the one I just showed

you.  And that is, did Cisco itself infringe?

Well, that depends upon whether the truth

is that the patent, the Arazi patent, is or is not the

baby -- or Wi-Fi -- excuse me -- is or is not the baby

of this Arazi patent.  So they're asking you two

different pieces to infringement.

One is, did Cisco itself infringe?  And

the other is, did Cisco induce, and that means cause its

customers to infringe?

And they're -- they're going to suggest

to you that that's a no-brainer.  But you see my little

reference there to wire cutters that I wrote down there?

All of us have been to hardware stores

and all of us have seen in the hardware store section

where you can buy a pair of wire cutters.

And if I buy a pair of wire cutters from

the hardware store and I come out to your place and I

cut your fence and I trespass and run off your cattle,

you can get me sure enough, but can you sue the hardware

store because they sold me the wire cutters?

You can if the old boy at the hardware

store said, you know what?  I know what you're fixing to

do.  I know you're going out there to cut Dick Sayles's

fence and to get his cows, and I also know that he's got

a six-strand barbed wire fence and that those wire

cutters that you're handling right now won't do the job.

Let me show you something that you really need.

That's what they need. That's what they

need to prove that we induced our customers to infringe

this patent that we didn't even know about. So think

about that. And when you do, you'll know that the truth

is that they get three nos there.

Let me talk to you about the next set of

questions.

How much time have I used, Judge?

THE COURT: You've got --

MR. CARROLL: 12 minutes?

THE COURT: You've got about 12 minutes

left.

MR. CARROLL: Okay. Thank you.

Now, these are the invalidity issues.

Now, these are the issues you heard a lot of talk about

this morning as to whether this patent, this Arazi

patent, fairly captures Wi-Fi, whether Wi-Fi really is

its baby, different from what that document I showed you

a minute ago said.

And Mr. Sayles told you that we had a

bunch of patents that are in evidence, and that's the

truth. And he told you that Judge Everingham has and

will tell you that the law is that that's not in -- in

and of itself evidence of non-infringement.

But let me tell you what it is evidence

of.  It's evidence, again, of what may be the most

important question in this case for you to come to the

truth on, and that is, did the inventors, when they

staked out their claim with the Patent Office, have an

idea that became the patent that fairly described Wi-Fi?

That's what invalidity is.  That's -- that's what

enablement is.

Can you take that Arazi patent and figure

out how to do what they failed to do?

And Mr. Frahn asked a bunch of questions

this morning of Joe McAlexander, and he said, well, gee,

which was it?  It's got to be one of two things.  Either

those people who came up with this patent, for whatever

reason, were too dense to be taught from their own

patent, or else maybe it didn't teach it in the first

place.

And, of course, their -- their response

is no, no, no, that's talking about a product.  That's

not talking about the patent.  That's talking about a

product.

Well, let's see.  Let me show you some of

these patents, and I'm not going to talk long at all

about these.

Pull up Plaintiff's 2, if you would -- I mean, Slide 2 -- not Plaintiff's 2, our Slide 2. You got that one?

Okay.  No, Slide 2.  The one -- the side-by-side of the patents.  Wait.  Hold on just a minute.

I'm going to show it to you now while I've got it up there.  I think it's great.

I'm sure you heard this, and I'm sure you understood what it meant.  This is a comparison.  This is a comparison between what Joe McAlexander, their witness, their professional witness, said over here that it should take somebody -- what it should take somebody to be able to apply the teachings of this patent to Wi-Fi without going over the top.

Remember, he said whatever it is, it can't be over the top.  And here's where it actually took them.  But they never even got it done with all of that.

So the significance of this is that even Joe McAlexander, their paid witness, his standard, this standard, they busted it.  They busted it.  So that means that the patent -- that patent didn't, doesn't, never will fairly teach Wi-Fi, unless you reinvent it.

1 That's the whole idea of this undue experimentation.

2 You know, since -- since I was six years

3 old, I have had an idea for time travel, and it's a

4 great idea.  But I haven't made it work yet.  I just

5 haven't worked out all the bugs.  You think I could get

6 a patent on that?  And you think I could teach you how

7 to do time travel?

8 That's what they're saying.  They're

9 saying this is the same kind of thing that they can

10 stretch that patent wherever they want it to go.  That's

11 not the truth.

12 Let me show you another thing.  Let's

13 call up -- ELMO?  Oh, here we go.

14 Now, Tracy, would you please highlight

15 those cited references?

16 You heard a lot of talk this morning

17 about these cited references.  Let me tell you why

18 that's important for the validity question.

19 Remember, Mr. McAlexander said that the

20 Patent Office sorts ideas into buckets or slots, and he

21 said that the -- that the patent fit a particular slot

22 that he wanted to talk to you about.  Here's something

23 that he didn't tell you, but you can see with your own

24 eyes when you get back in that jury room.

25 On the -- on the left is the Arazi

patent, the patent they're suing over.  On the right is
Bob O'Hara's Wi-Fi patent that he got when he and Pat
Calhoun started Airespace.  You'll see that there's no
overlap between the areas that the Patent Office said
they belonged in.

You see what I'm saying?  There's no
overlap in the areas that the Patent Office assigned.
Not us, not Bob O'Hara, not Mr. Arazi.  The Patent
Office.  They were different things.  They were
different things.

Let me tell you another thing.

Do we have this Plaintiff's 033 on the --
yeah, 333.

Now, you remember one of the things
they're most proud about here is how many times this
Arazi patent has been cited that is pointed out to other
inventors by the Patent Office, and they said, oh, the
Patent Office told Cisco about this famous, important
patent.  And sure enough, they did.  They told Cisco
about this Arazi patent, but not in connection with
anything that smelled like, looked like, or tasted like
Wi-Fi.

It was about cell phones.  And Cisco went
down there to get a cell phone patent, and the Patent
Office said, you know what?  You need to know about this

Arazi patent, because it has something to do with what
you're looking at now, cell phones.

THE COURT: You've got five minutes
remaining.

MR. CARROLL: Thank you, Your Honor.

And you know what else? When Bob O'Hara
and Pat Calhoun went down there to get their Wi-Fi
patents -- their Wi-Fi patents, the Patent Office didn't
say one thing about that Arazi patent.

Don't you know they would have if it had
had anything to do with Wi-Fi.

Now, let me talk to you real quickly
about damages. And by the way, you don't even get to
damages -- you don't even get to damages if you believe
the truth is that this patent has nothing to do with the
way Cisco and Airespace do Wi-Fi. You don't even get to
damages if you believe that the truth is that these
patent -- that this patent was never intended to teach
Wi-Fi and can't teach Wi-Fi. You don't even get there.

But if you want to pay them something,
and I hope you don't, I want you to look at the truth of
the damage evidence, because it's pretty -- pretty
stout.

Let's look at -- look at Slide -- let's
see, Tracy, give me -- yeah, let's look at Slide 6.

Now, you remember Mr. Becker.  Mr. Becker was the witness I put on.  He's a Ph.D.  He's an engineer and he is a paid witness.  We paid him to come down here and give you his opinion.

And one of the most important things that he told you -- and it's another thing that they're trying to run away from, because it kills them; it just murders them.  And that is that there is a very important series of business transactions that tell you exactly what people were buying and selling licenses for Wi-Fi, because that's what it was all about.

That's this 802.11.  That's the same as Wi-Fi.  And what Becker told you and what the truth is, is that people who invent Wi-Fi technology -- and there is a ton of them, hundreds of Wi-Fi inventions, not just one, not just ours, certainly not that one.

And those people got together and they figured out what a fair royalty rate would be for people buying and selling and renting Wi-Fi technology, and this is what it is.

You remember I drew this the other day when he was testifying, .12 percent.  The people who do Wi-Fi, that's how they deal with their product.  So Mr. -- or Dr. Becker came up with .5 percent, because he didn't -- he didn't want to accept this on its face,

because he said it wouldn't be reasonable because Commil

wasn't in that business, or actually Mr. David.

So he said, I'm going to give them a

little bit more, and he did.  But guess what?  It is not

the 10 times -- the 10 times that their fellow,

Mr. Carlile, wants.  And let's talk real quickly about

Mr. Carlile.

Bring up, Tracy, that piece of

Mr. Carlile's transcript.

You know, Mr. Carlile is a CPA.  And you

remember one of the things that we caught him on, and I

called him out on, was the fact that what he told you

was half of the truth.  Was half of the truth.

And Becker told you what the full truth

was, and I asked him, I said, does that embarrass you as

a CPA that you didn't have all the information and that

we pointed it out to the jury?  What was his answer?

It happens all the time.  It happens all the time.

Is that the kind of attitude that you're

going to base a 56-million-dollar jackpot on?

THE COURT:  You've used your time,

Mr. Carroll.

MR. CARROLL:  Thank you, Your Honor.

Thank you, Your Honor.

So we suggest 3 to $5 million, if you get

to damages.

Thank you, Your Honor.

MR. WERBNER:  May I move this before --

MR. CARROLL:  Yeah, I'll be glad to move it.

MR. WERBNER:  And there's a few slides.

That won't come off my time, Your Honor, or I'll start -- there's a few things here that --

MR. CARROLL:  I'll be glad to.

MR. WERBNER:  Okay.  Thank you.

MR. CARROLL:  You're welcome.  Thank you. Those aren't mine.

MR. WERBNER:  Oh.  Not mine.

May it please the Court, Your Honor.

THE COURT:  Mr. Werbner.

MR. WERBNER:  Good afternoon.

Cisco put all their eggs in one basket. They called one technical expert, Dr. Lansford.  They put all their eggs in that basket, and it turned out he gutted their case.

We'll look at the slide -- he said a bunch of things, but I'm going to move quickly here.  He ended up on cross-examination saying:  This patent is not limited to telephony.

You'll see that in the Court's

1  instructions in a few minutes.

2              He said:  This patent isn't really

3  limited to Bluetooth.  It's just a preferred embodiment.

4  You have to look and see if it's a short-range

5  communication protocol.

6              And he said:  No, I'm not saying that

7  this patent isn't valid.  I'm not saying that.  I assume

8  that it is valid.

9              QUESTION:  Are you going to argue with

10  the U.S. Patent Office who said it was valid?

11              ANSWER:  No, I'm not.

12              And, folks, when Mr. Carroll says:  Look

13  through that patent.  You'll look and look.  Is the word

14  Wi-Fi anywhere in there?

15              It doesn't have to be in there.  The

16  Judge isn't going to tell you that.  We wouldn't have

17  needed a trial if it turned around that.

18              The simple question on that issue is, and

19  it has been -- unless Mr. Carroll gets successful at his

20  efforts to distract you through the smoke and mirrors,

21  is simply this:  Is Wi-Fi a short-range communication

22  protocol?

23              The patent says on its face that it is

24  applicable to short-range communication protocols.  And

25  the clear evidence is that it is.  Even Dr. Lansford,

again, guts their case and says: Yeah, under Part 15 of

the FCC regulations, the Federal Communication

Commission, what's right in there together under

short-range communication protocol? Bluetooth and

Wi-Fi.

The Judge told you over and over, as they

attempted to put smoke and mirrors in front of you, that

the preferred embodiment, the Bluetooth, does not limit

the scope of the patent.

So the question is simple: Is Wi-Fi a

short-range communication protocol?

That's why they tried to say: Oh, it can

go a thousand miles to Memphis until we pointed out the

only way you can do that is with a wire; until we

pointed out that the patent talks about the short-range

communication being between the user and the access

point, not between the switch and some other place.

If you'll watch all the smoke and mirrors

and blow it away, this case becomes simple. All the

name calling, all the finger pointing is intended to

take your eye off the ball.

And let me tell you about Mr. Arazi.

They spent 15 minutes on that. And they say: Oh, we

misled them, and Mr. Sayles or Mr. Werbner promised us

that we could count on them.

1                    That's just not true.  You have to trust

2   me on this.  You've seen this for a week.  Do you think

3   Mr. Sayles or I would mislead, misrepresent, as officers

4   of this Court?

5                    They had three volumes of his videotaped

6   deposition.  They didn't play a word of it.  And

7   Mr. Carroll says:  Well, that's because he would have

8   said something bad.  That's ridiculous.  That's the

9   strength of their case.

10                   They could have played that deposition,

11  three volumes.  And he says:  Well, no.  It's the

12  witness stand here that's important to you folks.

13                   We brought you plenty of those.  They

14  played depositions of Mr. Cohen, of Mr. Barak.  They

15  know how to push the button with their high-tech people

16  and turn on Mr. Arazi's video, if they want.

17                   Again, smoke and mirrors.  Don't be

18  distracted.

19                   Now, this case, from day one, has been

20  about damage control by Cisco.  They know they're guilty

21  of infringement.  They know they violated this patent.

22  They're arrogant about it.

23                   You can see here at the very end, what do

24  they do?  I don't even -- 3 million, 5 million.  They

25  know they're guilty.  It's been about damages.

1          Y'all have sat here for a week and a day

2 because they want to take a chance and see if maybe they

3 can save themselves a few million dollars.  Maybe they

4 can get it down to 40 or 30 or 20.

5          That's what this case has all been about,

6 and I ask you not to reward their smoke and mirrors by

7 taking anything less than what you believed to be a

8 reasonable royalty.

9          And Roger Carlile, despite how they like

10 to take things out of context, pull out one sentence out

11 of two hours of testimony, and try to, again, pull the

12 wool over your eye, you know he was a solid,

13 professional, experienced CPA who studied everything,

14 had plenty of comparables, and came up with a reasonable

15 rate of 5 percent.

16          Their Dr. Becker, he spent the first 30

17 minutes pushing the figures down to a tenth of that.

18 How?  By telling you that it didn't apply to telephony.

19 He went for almost an hour justifying the .5 percent

20 because he said:  Well, if you look at the sales and the

21 rates, only 5 percent of the customers buy this device

22 or use it for telephones.

23          Well, you're going to see the Judge give

24 you a very clear instruction.  After he talks about

25 switches and apparatus to route telephone calls, he

1  says -- he's going to say to you very clearly:  It is

2  not limited to telephone calls.  That's what

3  Dr. Lansford has said.

4  So then what does Dr. Becker do?  He

5  says:  Well, I've got some comps.  But the first one he

6  starts with, Qualcomm, though there were 346 patents,

7  each and every one of them called for a royalty of 5.75

8  percent.

9  So Becker, who's working for these folks,

10  says:  Oops, that's not going to work.  The telephone

11  thing may not sell if the Judge instructs the jury the

12  way that he is.  Whoops, 5.75 percent.

13  He starts and plays some dishonest math

14  and divides it by 350 without any explanation.  And then

15  he has the gall to come in and say, when it comes out .6

16  percent:  Oh, generously, I'm going to put that at the

17  top.

18  That is just dishonest math, and it's a

19  shame that a CPA would do that.  That 5.75 supports it.

20  And another reason, as credible -- you are the judge of

21  the honesty of these witnesses and the persuasiveness of

22  these witnesses.  You know, what else did he do?  What

23  else did he do?

24  He says that when we -- he was asked in

25  his deposition:  Did you go into the Royal Source -- the

1  Royalty Source book like Dr. -- like Mr. Carlile?

2              In his deposition, when he was asked:

3  Did you search that?  Because Roger Carlile knew it

4  would be full of other licenses to support the 5

5  percent.

6              And Mr. Becker says:  No, I didn't search

7  through there.

8              But then we find out that he has the 5.75

9  percent Qualcomm license, and he goes:  Whoops.  Because

10 that's the one that he had to somehow get rid of to

11 justify pushing this down below 5 percent, and he tried

12 to explain that in front of -- to you.  Well, I just

13 didn't search that database.  I made a request of the

14 database.

15             Now, talk about word games and dishonesty

16 and who's advocating for who, you can see right there

17 why their damages are not reliable.

18             Let's talk about that hypothetical

19 negotiation.  That is in the context, in March of '05,

20 that Cisco and Commil are in a room negotiating under

21 what circumstances per the law?  They have to reach an

22 agreement.  Nobody can walk out.  They have to reach a

23 royalty agreement, and they have to assume that they are

24 infringing a valid patent.

25             At that point in time, having sunk $450

million into Airespace and foreseeing billions of
dollars of sales, do you think Cisco was going to walk
out of that room caught in that situation, infringing a
valid patent and -- because they wouldn't pay 5 percent;
they weren't going to say a nickel on the dollar?

You think they would have walked out of
the room and stopped their sales of these products
because they couldn't get it for 1 percent or 2 percent
or 3 percent?  Ridiculous.

They happily would have paid 5 percent or
more having sunk the 450 million into a market that they
knew was going to explode, and the documents support
that.

You know, the choice is simple.  You can
go on what Cisco's documents say the design and
architecture of the product is, or you can go with what
sort of their evasive, change their testimony, one thing
before the break, one thing after the break.

Use your common sense.  I trust you.  I
know what you're going to do.  You're going to hold them
to what their documents say.  Some of this is technical,
you know.  And it can be -- somebody can pull out
Table 2 or somebody can pull out a word here.

Not just one, but document after document
shows that this split-MAC architecture, the way it was

divided on the real-time, all the real-time in one place, the other in the other is -- is done just the way the patent calls for.

Earlier I mentioned that there was a place in the patent that I didn't have the citation to -- that was this morning -- that allows some of the functions to be in the other place, and I want to give you that citation.

I think that I -- I have it here. I'll come back to it, if I don't. No. It's Column 16, Line 11. That's an important one. That one actually says that, yes, the instances are created as necessary on an as-needed basis.

And I wanted you to have that in your notes; otherwise, you can look through all of it.

I want to turn from the damages to this issue of -- and let's do 1904 -- inducement.

Obviously, the answer is, they directly infringe. They use it in their corporate headquarters. They test it. They turn it on. They go out to places like Berkeley -- that is, Cisco -- and they help the customer.

And the question is: Do they, as part of that, know or should have known of the infringing use? Let's also look at 1905.

1           Of course they knew or should have known.

2  The Patent Office cited the '395 patent to them in 2004,

3  and what did they do?  Did one witness come up here and

4  explain to you what -- did they read it?  Did they

5  search it?  Did they pay any attention?

6           At best case, they ignored the '395

7  patent that the Patent Office cited to them.  And here

8  on inducement, Mr. O'Hara himself -- this is a direct

9  quote from the transcript.

10           QUESTION:  With the sales effort that

11  y'all were engaged in, did you do all this to your

12  customers to induce them to purchase it?

13           ANSWER:  Yes.

14           QUESTION:  And you were doing that to

15  make these sales.

16           And they did it at a time that they had

17  the patent.  And we're not like a hardware store.

18  That's a ridiculous example.  We're not suing anybody

19  but Cisco.  We're not suing these customers.

20           It was Cisco that induced them.  It was

21  Cisco that touted the features of this split-MAC

22  architecture.  It was Cisco that told them:  Use it this

23  way.  This is the preferred way.  We've got it divided.

24  We've eliminated the gaps.  There's no mobility.  You

25  can control it.  You want to have a switch in your

1   system.

2                   Of course they induced it.

3                   You know, this idea that a copy running

4   an instance, it's really, really silly, and your common

5   sense will tell you this, that this patent does not

6   require for 200 people that are connected or 20 people

7   that are connected, that you have to have 20 copies of

8   the software.  This patent doesn't say that.

9                   One word in that last paragraph they

10  never mention is running an instance, running a copy.

11                  And you'll see that in that paragraph

12  there, if they had to have -- no skilled artisan would

13  read this patent to say you have to have a hundred

14  processors in there all running at the same time.

15                  This access point would have been the

16  size of a beach ball.  And because it would have been

17  consuming so much power, people would have had to drag

18  it along, something the size of -- well, less than this

19  podium to power up that huge access point.

20                  That's not reasonable.  You were told

21  what a reasonable interpretation is, and they created

22  instances as necessary.  They ran the processor, when it

23  was needed, one at a time for each connection.

24                  And I think all you have to do is ask

25  yourself:  Is what they're saying that you have to have

200 copies of something like we explained with the

Internet Explorer or something else?  It just doesn't

make sense.

And a credible witness, Mr. McAlexander,

took you step by step, talked about the state tables,

talked about the parameters and the other things to show

you that that's what someone that was skilled in network

communications would certainly understand that to be.

You know, there was talk about the wire cutters and

everything else.  I think, though, that in all this

noise, there's been some deafening silence, and that is

any explanation about Plaintiff's 333.

How come they had in their files a

patent, before all of this started, that directs them

right to this patent?  How come?

THE COURT:  You've got five minutes.

MR. WERBNER:  Thank you, Your Honor.

Not a word of explanation.  Not one

witness that got up there to explain that.  And you

remember that 333 patent.

If we can blow up the abstract.

Mr. Carroll says:  Oh, that's -- you

know, that's unrelated.

Well, the lawyers' comments aren't

testimony.  Where's their witness that says it isn't

1 related?

2          What I heard from their employee is that

3 you see the words base stations; you see the word

4 wireless communications; you see the word clock; you see

5 synchronization; you see all those kind of words.

6 And their witness admitted, yeah, there are a lot of

7 similarities between that.  Certainly, enough

8 similarities for a company the size of Cisco to at least

9 read it and understand if that limited them in any way.

10 But what this company decided to do is either ignore it

11 or just brush it aside like they've tried to brush away

12 other people when they stand between them and their

13 billion dollars.

14          They brush this aside, and they went

15 ahead, and they went right through that fence, and they

16 trespassed on the property of others.

17          And then they figured, if we get caught,

18 maybe they didn't think this little company in Israel,

19 once they looked into it, would have the wherewithal to

20 come over here.

21          But, fortunately, those inventors had an

22 advocate who believed in them and who believed in the

23 patent and who put his money behind it and would enforce

24 it, and so now they're caught here redhanded, and they

25 just want to see if they can walk out of here with

something less than a fair reasonable royalty of 5
percent.

　　　　　　　And if you -- they're going to want you
to split the baby.  They know that -- well, let's see if
we can go here.  That's why they pushed down so
artificially the number.  Well, maybe the jury will
split the baby.

　　　　　　　You know, that wasn't wise at the time of
King Solomon.  It's not wise today.  And if you cut
these damages when you understand that 5 percent, in
this hypothetical negotiation, is fair and reasonable,
they will be doing high fives on their corporate jet all
the way back to the Silicon Valley.

　　　　　　　And I don't think you want to do that.  I
think you want to send them a different message.  I
think you want to send them a message that people's
property rights are important.

　　　　　　　And when the Patent Office issues a
patent, he can make all kinds of fun of it; he can come
over here and bow down and call it a shrine; but it's
been issued for 10 years.  Not once has it been
challenged, not once has the -- even Cisco gone to the
Patent Office and said it's invalid.

　　　　　　　It's been cited 50 or 60 times, but they
hope that some smoke and mirrors will cause you to do

differently.

You know, the problem is, they just won't accept responsibility. They won't accept responsibility. But I ask you to require them, require them to pay what the law says: No less than a reasonable royalty.

If you will do that, we will be grateful, and that will be fair, and you can go home knowing that you did what was right, and you can feel good about what you did.

No one's here to win a jackpot. No one's here to go do the other mischaracterizations that Mr. Carroll said. We're here for the inventors, with the inventors, with the investor, with the company to ask you to do what the law allows a property owner to do and have a fair and reasonable royalty.

You know, Mr. Sayles and I have spent a lot of time bringing you this. If we hadn't been here to cross-examine these witnesses, you wouldn't have gotten the whole story.

THE COURT: You've got one minute.

MR. WERBNER: Thank you.

They were coached. They all sounded alike. And only on cross-examination did the whole story come out.

1          Someone's trying to pull the wool over

2  your eyes.  We can't do any more.  It's your time to go

3  back into the jury room and send a message by answering

4  these questions:  Yes, it was infringed directly and

5  through inducement.

6          And no, this isn't an invalid patent.  It

7  was enabled.  There was a written description.  That's

8  what the Patent Office determined, and that's even what

9  one of their witnesses acknowledged.

10          And the damages should be 5 percent which

11  translates into $56,184,000.

12          Thank you very much.

13          THE COURT:  Ladies and Gentlemen of the

14  Jury, you have heard the evidence presented by the

15  parties to this suit and the argument of the respective

16  attorneys in support of their positions.

17          It is now my duty to give you the charge

18  in this case.  It will be an oral charge and is given in

19  an effort to assist you in your deliberation in deciding

20  the issues which you must decide in order to reach a

21  fair and impartial verdict in this case.

22          Perhaps this function of the Court is the

23  most important one that the Court performs in the trial

24  of a case, so I ask you to pay close attention to my

25  remarks.

1            You will remember that at the beginning

2   of the trial, I gave you some general instructions and

3   definitions.  Rather than repeat them, I ask you to

4   recall them now in deciding the facts and issues which

5   you are to decide.

6            As I instructed you at the beginning of

7   the trial, you are the exclusive judges of the facts,

8   the credibility of the evidence, and the weight to be

9   given the testimony of the witnesses.

10           You are to perform your duty without bias

11  or prejudice to any party.  The law does not permit

12  jurors to be governed by sympathy or prejudice.

13           A corporation and all other persons are

14  equal before the law and must be treated as equals in a

15  court of justice.

16           The Court and the parties expect that you

17  will carefully and impartially consider all of the

18  evidence, follow the law, as I will give it to you, and

19  reach a just verdict.

20           You are instructed that all persons,

21  including the Plaintiff and the Defendant in this case,

22  stand equal before the law and are to be dealt with

23  equal in this Court.  The law is no respecter as

24  persons.

25           I will now briefly review the contentions

of the parties and give you some additional instructions and definitions that will guide you in deciding the issues or facts that you must resolve in this case.

With respect to the Plaintiff's claims and the Defendant's defenses, the Plaintiff, Commil USA, LLC (or Commil) alleges that the Defendant, Cisco Systems, Inc. (Cisco) infringes certain claims of its United States Patent No. 6,430,395. We've referred to it as the '395 patent.

Specifically, Commil contends that Cisco infringes Claims 1, 4, and 6 of the '395 patent by making, using, selling, or offering to sell the following:

Cisco's 500 Series Wireless Mobility Express Controller; 2000 Series WLAN Controller; 2100 Series WLAN Controller; 3750 Series WLAN Controller; 4400 Series WLAN Controller; 6500 and 7500 Series Wireless Service Module; Wireless LAN Controller Module; 500 Series Express Mobility LAP; 1000 Series LAPs; 1100 Series LAPs; 1130 G Series LAPs; 1130 AG Series LAPs; 1200 Series LAPs; 1230 AG Series LAPs; 1240 AG Series LAPs; 1250 Series LAPs; 1300 Series LAPs; and 1500 Series LAPs.

Commil alleges that Cisco directly infringes Claims 1, 4, and 6 by using the patented

methods.

Commil also alleges that Cisco induces infringement of Claims 1, 4, and 6 of the '395 patent by encouraging others to use the accused products in an infringing manner.

Commil seeks damages in the form of a reasonable royalty to compensate it for the alleged infringement.

Now, Cisco denies Commil's allegations of infringement. Specifically, Cisco denies that it directly infringes the asserted claims of the patent. Next, Cisco denies that it induces infringement of the asserted claims.

Finally, Cisco contends that Claims 1, 4, and 6 of the '395 patent are invalid for failure to satisfy the written description requirement and for lack of enablement.

Commil bears the burden of proof by a preponderance of the evidence that Cisco directly infringes or induces the infringement of the asserted claims of the '395 patent.

Commil also has the burden of proving by a preponderance of the evidence the amount of damages caused by Cisco's alleged infringement.

Cisco bears the burden of proof by clear

and convincing evidence that the claims of the patent-in-suit are invalid.

I'll now give you some instructions and definitions to help you in answering the questions to follow.

With respect to claim interpretation, to decide the questions of infringement and invalidity, you must first understand what the claims of the patent cover; that is, what they prevent anyone else from doing. This is called claim interpretation.

It is my duty under the law to interpret what the words used in the claims of the '395 patent mean. I have made my determination, and I will instruct you accordingly. You must apply the meaning I give the patent claims to your decision on infringement and invalidity.

I'll now instruct you how those words are to be construed and understood when deciding the issues of infringement and invalidity.

Now, the term mobile unit means a wireless communication device.

The term base station means transmitting/receiving station in a wireless local network that is fixed in location.

The term switch means an apparatus for

routing telephone calls. You are instructed, however, that the invention is not limited to making telephone calls.

What the claims require is the performance of the steps in the method in a wireless communication system having at least two base stations in communication with at least one switch as these terms have been defined by the Court.

The term communication protocol means a set of procedures required to initiate and maintain communication between two or more devices.

The term a short-range communication protocol means a set of procedures required to initiate and maintain short-range communication between two or more devices.

The term accurate time synchronization means the state of two devices, each having an internal clock, wherein the calculated time of one clock is equivalent to the other clock's time with a precision commonly found in such devices.

The term low-level protocol for performing tasks that require accurate time synchronization means a protocol for performing tasks that require accurate time synchronization or real-time capabilities.

1             The term high-level protocol, which does

2 not require accurate time synchronization, means a

3 protocol for performing tasks that do not require

4 accurate time synchronization or real-time capabilities.

5             The term connected means in wireless

6 communication with.

7             The term for each connection of a mobile

8 unit with a base station running an instance of the

9 low-level protocol at the base station connected with a

10 mobility unit and running an instance of the high-level

11 protocol at the switch means for each connection of a

12 mobile unit with a base station running at the base

13 station a copy of the low-level protocol supporting only

14 that connection and running at the switch a

15 corresponding separate copy of the high-level protocol

16 supporting only that connection.

17             Now, I have previously provided you with

18 a copy of these definitions, and you can use them during

19 your deliberations.

20             With respect to determining infringement,

21 once the patent is issued, the owner of a patent has the

22 right to exclude others from making, using, offering to

23 sell, or selling the patented invention throughout the

24 United States or importing the patented invention into

25 the United States for a term of 20 years.

Thus, infringement occurs when a person, without the owner's permission, makes, uses, offers to sell, or sells the patented invention anywhere in the United States or imports the patented invention into the United States while the patent is in force.

To determine whether there is an infringement, you must compare the allegedly infringing product with the scope of the patent claims as I have defined them for you.

In order to infringe a patent -- patent claim covering a method, a person must perform each and every step of the method.

In determining whether Cisco infringes Commil's asserted claims, you must determine whether Cisco's accused products or their methods of use perform each and every limitation recited in a claim.

To prove direct infringement of a patent claim, Commil must prove by a preponderance of the evidence that Cisco performed every step in that claim.

A claim limitation is present if it exists in the accused method practiced by Cisco just as it is described in the claim language, either as I have explained that language to you, or if I did not explain it, as it would be understood by one of ordinary skill in the art.

If the accused methods omit even a single limitation, then you must find that the claim is not infringed.

You must consider each of the patent claims separately. If you find that each and every limitation of a patented claim is performed, then the claim is infringed, even if the accused methods of use may be more or less frequent or may include additional features or functions not found in the claims.

Whether or not Cisco knew that what it was doing was an infringement does not matter for direct infringement. A person may be found to be a direct infringer of a patent even if he or she believed in good faith that what he or she was doing was not an infringement of any patent and even if he or she did not even know of the patent.

Let's talk about joint infringement.

Direct infringement requires a single party to perform each and every step of a claimed method.

Where no single party performs each and every step of a claimed method but multiple parties combine to perform all steps of a method, that claim will be directly infringed if one party exercises control or direction over the entire method so that

every step is attributable to the controlling party.

With respect to induced infringement, Commil asserts that Cisco has induced infringement of the asserted claims.

To show inducement, Commil must prove by a preponderance of the evidence that a third party has directly infringed the patent. If there is no direct infringement by a third party, Cisco has not induced infringement.

If you find that a third party has directly infringed Claims 1, 4, or 6 of the '395 patent, it is not necessary to show that Cisco itself has directly infringed, if Commil proves by a preponderance of the evidence that Cisco actively and knowingly aided and abetted that direct infringement.

Furthermore, Commil must show that Cisco actually intended to cause the acts that constitute direct infringement and that Cisco knew or should have known that its actions would induce actual infringement. Inducing third-party infringement cannot occur unintentionally. This is different from direct infringement, which can occur unintentionally.

Cisco also cannot be liable for inducing infringement if it had no reason to be aware of the existence of the patent.

1           If you find that a third party has

2  directly infringed Claims 1, 4, or 6 of the '395 patent

3  and that Cisco knew or should have known that its

4  actions would induce direct infringement, you may find

5  that Cisco induced another to infringe Commil's patents,

6  if it provided instructions and directions to perform

7  the infringing act through labels, advertising, or other

8  sales methods.

9           You may also find that Cisco induced

10 infringement by supplying the components that are used

11 in an infringing manner with the knowledge and intent

12 that its customer would directly infringe by using the

13 components to make, use, or sell the patented invention.

14 The asserted claims use the word comprising.  When a

15 claim uses the word comprising, comprising means

16 including or containing.

17           A claim that uses the word comprising or

18 comprises is not limited to products or methods having

19 only the elements that are recited in the claim but also

20 covers products or methods that add additional elements.

21           Let's take an example of a claim that

22 covers a table.  If the claim recites a table comprising

23 a tabletop, legs, and glue, the claim will cover any

24 table that contains these structures, even if the table

25 also contains other structures, such as a leaf or wheels

on the legs.

With respect to dependent claims, my instructions on infringement so far have related to independent claims. Patent claims may exist in two forms referred to as independent claims and dependent claims.

An independent claim does not refer to any other claim of the patent. Thus, it is not necessary to look at any other claim to determine what an independent claim covers. Claim 1 of the '395 patent is an independent claim.

A dependent claim refers to at least one other claim in the patent. A dependent claim includes each of the elements of the other claims to which it refers, plus additional elements recited in the dependent claim itself.

Claims 4 and 6 of the '395 patent are dependent claims that depend on Claim 1. In order for you to find that Claims 4 or 6 of the '395 patent are infringed, you must first find that Claim 1 is infringed.

If you find that independent Claim 1 of the '395 patent is not infringed, you must also find that dependent Claims 4 and 6 are not infringed.

Now, with respect to validity, Cisco

contends that the asserted claims of Commil's '395 patent are not valid.

A patent issued by the United States Patent Office is presumed to be valid.  In order to rebut this presumption, the Defendant must establish by clear and convincing evidence that the Plaintiff's patent or any claim in the patent is not valid.

As I have instructed you earlier, clear and convincing evidence is a more exacting standard of proof than proof by a preponderance of the evidence, which only requires that the parties' claim be more likely true than not true.

Nevertheless, the clear and convincing standard is not as high as the burden of proof applied in a criminal case, which is beyond a reasonable doubt. Each claim of the patent is presumed valid regardless of the status of any other claim in the patent. Cisco contends that the asserted claims are invalid because they do not meet the enablement and written description requirements.

You should analyze each claim separately. If you find by clear and convincing evidence that a claim is not enabled or lacks a sufficient written description, then you should find that claim invalid and render a verdict for Cisco on that claim.

1                    With respect to enablement, Cisco

2    contends that the asserted claims are not enabled.

3                    The specification set forth in a patent

4    must disclose sufficient information to enable one of

5    ordinary skill in the field of the invention, at the

6    time the patent application was filed, to make and use

7    the full scope of the claimed invention.

8                    This requirement is known as the

9    enablement requirement.  If a patent claim is not

10   enabled, it is invalid.

11                   In considering whether the specification

12   of a patent satisfies the enablement requirement, you

13   must keep in mind that patents are written for persons

14   of skill in the field of the invention.

15                   Thus, a patent need not expressly state

16   information that skilled persons would -- would be

17   likely to know or could obtain.

18                   The Defendant bears the burden of

19   establishing lack of enablement by clear and convincing

20   evidence.  The specification is enabling so long as

21   undue experimentation is not needed to make or use the

22   invention.

23                   The fact that some experimentation may be

24   required for a skilled person to make or use the claimed

25   invention does not mean that a patent's specification

1 fails to meet the enablement requirement.

2 Factors that you may consider in
3 determining whether the specification would require
4 undue experimentation include:

5 (1) the quantity of experimentation
6 necessary;

7 (2) the amount of direction or guidance
8 disclosed in the patent;

9 (3) the presence or absence of working
10 examples in the patent;

11 (4) the nature of the invention;

12 (5) the state of the prior art;

13 (6) the relative skill of those in the
14 art;

15 (7) the predictability of the art;

16 And (8) the breadth of the claims.

17 With respect to the written description,
18 Cisco also contends that the patent does not contain an
19 adequate written description of the claimed invention.
20 The purpose of this written description requirement is
21 to make sure that a patent describes the technology it
22 seeks to claim as an invention and to demonstrate that
23 the inventor was in possession of the invention at the
24 time the application for the patent was filed, even
25 though the claims may have changed or new claims added

1   during the prosecution of the application.

2                   The written description requirement is

3   satisfied if a person of ordinary skill in the field

4   reading the patent application, as originally filed,

5   would recognize that the patent application described

6   the invention as claimed, even though the description

7   may not use the exact words found in the claim.

8                   It is not necessary that each and every

9   aspect of the claim be discussed, as long as a person of

10  ordinary skill would understand that the missing aspect

11  is necessarily implied in the patent application as

12  originally filed.

13                  If you find by clear and convincing

14  evidence that the patent does not contain an adequate

15  written description of the claimed invention, then you

16  should render a verdict for Cisco.

17                  With respect to damages, I will now

18  instruct you as to the calculation of damages should you

19  find that Commil has met its burden on any of its

20  claims.

21                  If you find that Cisco has infringed any

22  of the asserted claims of Commil's patent and that these

23  claims are valid, then you should consider the amount of

24  money Commil should receive as damages.

25                  Commil has the burden of proof by proving

1  by a preponderance of the evidence the amount of damages

2  caused by Cisco's conduct.  The owner of a patent is

3  entitled an award of damages adequate to compensate for

4  the infringement, but in no event less than a reasonable

5  royalty for the use Cisco made of the invention.

6           Commil is asking for damages in the

7  amount of a reasonable royalty.  Generally, a reasonable

8  royalty is defined by the patent laws as the reasonable

9  amount that someone wanting to use the patented

10 invention should expect to pay to the patent owner and

11 the owner should expect to receive.

12           A royalty is the amount of money a

13 licensee pays to a patent owner for each article the

14 licensee makes or uses or sells or offers to sell under

15 the patent or for the right to used the claimed method.

16           A reasonable royalty is the amount of

17 money a willing patent owner and a willing prospective

18 licensee would have agreed upon at the time of the

19 infringement for a license to make, use, sell, or offer

20 to sell the claimed invention.

21           In making your determination of the

22 amount of a reasonable royalty, it is important that you

23 focus on the time period when the infringer first

24 infringed the patent and the facts that existed at that

25 time.

1    Your determination does not depend on the

2 actual willingness of the parties to this lawsuit to

3 engage in such negotiations.  Your focus should be on

4 what the parties' expectations would have been had they

5 entered negotiations for royalties at the time of the

6 infringing activity.

7    It is the royalty that would have

8 resulted from an arm's-length negotiation between a

9 willing licensor and a willing licensee, assuming both

10 parties believe the patent claim in question to be valid

11 and infringed.

12    In determining the reasonable royalty,

13 you should consider all of the facts known and available

14 to the parties at the time the infringement began.

15 Some of the kinds of factors that you may consider in

16 making your determination are:

17    (1) whether the patent-holder had an

18 established royalty for the invention; in the absence of

19 such a licensing history, any royalty arrangements that

20 were generally used and recognized in the particular

21 industry at that time;

22    (2) the nature of the commercial

23 relationship between the patent owner and the licensee,

24 such as whether they were competitors or whether their

25 relationship was that of an inventor and a promoter;

1                    (3) the established profitability of the

2     patented product, its commercial success, and its

3     popularity at the time;

4                    (4) whether the patent owner had an

5     established policy of granting licenses or retaining the

6     patented invention as its exclusive right or whether the

7     patent-holder had a policy of granting licenses under

8     special conditions designed to preserve its monopoly;

9                    (5) the size of the anticipated market

10    for the invention at the time the infringement began;

11                    (6) the duration of the patent and of the

12    license, as well as the terms and scope of the license,

13    such as whether it's exclusive or nonexclusive or

14    subject to territorial restrictions;

15                    (7) the rates paid by the licensee for

16    the use of other patents comparable to Commil's patent;

17                    (8) whether the licensee's sales of the

18    patented invention promotes sales of its other products

19    and whether the invention generates sales to the

20    inventor of its nonpatented items;

21                    (9) the utility and advantages of the

22    patent property over the old modes or devices, if any,

23    that had been used for working out similar results;

24                    (10) the extent to which the infringer

25    used the invention and any evidence probative of the

value of such use;

(11) the portion of the profits in the particular business that are customarily attributable to the use of the invention or analogous inventions;

(12) the portion of the profits that should be credited to the invention as distinguished from nonpatented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer;

(13) the opinion and testimony of qualified experts and of the patent-holder;

And finally (14) any other factors which, in your mind, would have increased or decreased the royalty the infringer would have been willing to pay and the patent owner would have been willing to accept acting as normally prudent business people.

If you find that Cisco has directly infringed the '395 patent, you should award Commil damages for those acts of infringement that occurred after Cisco acquired Airespace in March 2005.

As I explained earlier, a defendant may be liable for indirectly -- for indirectly infringing a patent claim by inducing the direct infringement of another.

Damages for induced infringement are

1  limited to the extent of direct infringement you have

2  found.  Damages for inducing infringement should be

3  calculated only as of the date you determine Cisco

4  actually knew of the '395 patent.

5              You must not award Commil more damages

6  than are adequate to compensate for the infringement nor

7  shall you include any additional amount for the purpose

8  of punishing Cisco or setting an example.

9              You may not include damages that are

10  speculative, damages that are only possible, or damages

11  that are based on guesswork.

12              I've got some final instruction now.

13              Nothing that I may have said or done

14  during the course of this trial is indicated -- or is

15  intended to indicate any view of mine as to which party

16  should or should not win this case.

17              As I instructed you previously, the jury

18  is the sole judge of the extent of the testimony and the

19  weight to be given the evidence.

20              These instructions are given to you as a

21  whole, and you are not to single out one instruction

22  alone as stating the law but must consider the

23  instructions as a whole.

24              You have heard all of the evidence in the

25  case, and you have heard the argument of counsel.  The

1  Court has given you the charge in this case, and in a

2  few moments, you'll retire to the jury room, select one

3  of your members to act as foreperson, and begin

4  performing the function for which you have been chosen

5  and for which you have been empaneled in accordance with

6  the oath you took as jurors.

7                You'll remember that at the beginning of

8  the trial and throughout the trial, the Court admonished

9  you not to discuss the case with each other until it was

10  submitted to you.

11                Well, now is the time for you to begin

12  your discussion, and you certainly may express an

13  opinion from the evidence that you have heard and use

14  any reasonable means to persuade any other members of

15  the jury to your convictions and to your honest opinion.

16                You are to reach a verdict which speaks

17  the truth and which does justice to all parties without

18  favor, bias, or prejudice in any particular way, either

19  for or against any party to this lawsuit.

20                In the course of your deliberations, do

21  not hesitate to re-examine your own views and change

22  your opinion, if convinced it is erroneous, but do not

23  surrender your honest conviction as to the weight or

24  effect of the evidence solely because of the opinions of

25  your fellow jurors or for the mere purpose of returning

a verdict.

The verdict must represent the considered judgment of each juror.  In order to return a verdict, it is necessary that each juror agree thereto.  Your verdict must be unanimous.

As soon as you have reached a verdict, you will let this fact be known to the officer who will be waiting upon -- or he'll be waiting on you, and he'll report that to the Court.

Your verdict will be in the form of questions for you to answer.  You'll take the questions to the jury room, and when you have reached a unanimous agreement as to your verdict, you'll have your foreperson fill in, date, and sign the form and then advise the court security officer that you have reached a verdict.

During your deliberations, you may have any of the exhibits that have been offered into evidence, and the Court will send them to you upon written request.  If you desire further instructions, your foreperson may make this known in writing, and I'll try to comply with your wishes.

All communications with the Court must be in writing, but at no time should you indicate to the Court or to anyone else how the jury is divided in

1    answering any particular question.

2              Any notes that you've taken during this

3    trial are only aids to your memory.  If your memory

4    should differ from your notes, then you should rely on

5    your memory and not on the notes.  The notes are not

6    evidence.

7              A juror who has not taken notes should

8    rely on his or her independent recollection of the

9    evidence and should not be unduly influenced by the

10   notes of other jurors.  Notes are not entitled to any

11   greater weight than the recollection or impression of

12   each juror concerning the testimony.

13             I'm going to hand the questions to my

14   briefing attorney.  If you'll follow him to the jury

15   room, select one of your members as foreperson, and

16   begin your deliberations.

17             Now, one last instruction.  You are now

18   in charge of your schedule.  You can break whenever

19   you'd like to break.  You can -- you know, I can work

20   with you as late as 6:30, 7:00 o'clock tonight, if you

21   desire to work that long, or if you -- if you decide to

22   go home at 5:00 o'clock or 5:30 and come back in the

23   morning, we can do that as well.

24             But I'm just -- I've set the schedule so

25   far, but what I'm trying to impress upon you is you're

1  in charge of setting the schedule at this stage of the

2  case.  I just -- I do have something I need to take care

3  of this evening, but I'll be willing to work with you

4  until 6:30 or 7:00 o'clock, if you think that time is

5  necessary to reach a verdict today.

6              So with that, if you'll follow

7  Mr. Warriner to the jury room.  Y'all are excused to

8  begin your deliberations.

9              LAW CLERK:  All rise for the jury.

10             (Jury out.)

11             THE COURT:  All right.  We're in recess

12 pending communications from the jury.

13             (Jury deliberations.)

14             *      *      *      *

15

16

17

18

19

20

21

22

23

24

25

1

2

3                         <u>CERTIFICATION</u>

4

5            I HEREBY CERTIFY that the foregoing is a

6 true and correct transcript from the stenographic notes

7 of the proceedings in the above-entitled matter to the

8 best of my ability.

9

10

11

12 /s/_____            _____
   SUSAN SIMMONS, CSR                    Date
13 Official Court Reporter
   State of Texas No.:  267
14 Expiration Date:  12/31/10

15

16

17 /s_____                  _____
   SHELLY HOLMES, CSR                    Date
18 Deputy Official Court Reporter
   State of Texas No.:  7804
19 Expiration Date  12/31/10

20

21

22

23

24

25