UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| COMMIL USA, LLC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 2:07-cv-341-CE |
| | § | |
| CISCO SYSTEMS, INC. | § | |
| | § | |
| Defendant. | § | |
| | § | |

**PLAINTIFF'S MOTION FOR NEW TRIAL
ON ISSUES OF INDIRECT INFRINGEMENT & DAMAGES**

**Richard A. Sayles**
State Bar No. 17697500
**Mark S. Werbner**
State Bar No. 21179700
**Eve L. Henson**
State Bar No. 00791462
**Mark D. Strachan**
State Bar No. 19351500

**SAYLES WERBNER**
4400 Renaissance Tower
1201 Elm Street
Dallas, Texas 75270
(214) 939-8700 (Telephone)
(214) 939-8787 (Facsimile)

**ATTORNEYS FOR PLAINTIFF
COMMIL USA, LLC**

**TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................................................... 1

II.   FACTUAL BACKGROUND .................................................................................. 2

      A.   Cisco's Inappropriate Trial Conduct Prejudiced Plaintiff's Right to a Fair Trial ...... 2

           1.   Counsel's reference to pork .................................................................... 2

           2.   Cisco's counsel made numerous religious references ........................... 3

           3.   Cisco employed 'us versus them' cards .................................................. 4

           4.   Cisco's counsel employed other stereotypes to inflame the jury .......... 6

                a.   Mr. David's procurement of the patent was compared to predatory practices associated with current mortgage crisis ........................................... 6

                b.   Cisco's counsel also played the greedy lawyer card ..................... 9

III.  ARGUMENT & AUTHORITIES ......................................................................... 10

      A.   Standard for Review ........................................................................................ 11

      B.   The Court Should Grant A New Trial ............................................................. 12

           1.   Cisco's counsel's trial tactics constituted plain error .......................... 12

           2.   Damage award is evidence of manifest injustice ................................ 14

IV.   CONCLUSION ..................................................................................................... 14

# TABLE OF AUTHORITIES

**Federal Cases**

*Allied Chem. Corp. v. Daiflon,* 449 U.S. 33, 36 (1980)..................................................................10

*Alaniz v. Zamora-Quezada,* 591 F.3d 761, 776 (5th Cir. 2009) ......................................................12

*Bird v. Glacier Elec. Coop., Inc.,* 255 F.3d 1136, 1147 (9th Cir. 2001) ........................................11

*Gautreaux v. Scurlock Marine, Inc.,* 84 F.3d 776, 783 (5th Cir. 1996).........................................11

*Hall v. Freese,* 735 F.2d 956, 962 (5th Cir. 1984)..........................................................................11

*Irvan v. Frozen Food Exp., Inc.,* 780 F.2d 1228, 1231 (5th Cir. 1986).........................................12

*Johnson v. Ford Motor Co.,* 988 F.2d 573, 582 (5th Cir. 1993).....................................................11

*Rojas v. Richardson,* 703 F.2d 186, 190 (5th Cir. 1983) ...............................................................11

*Sasaki v. Class*, 92 F.3d 232, 237 (4th Cir. 1966) ...........................................................................6

*Smith v. Transworld Drilling Co.,* 773 F.2d 610, 612-13 (5th Cir. 1985).....................................11

*Westbrook v. General Tire and Rubber Co.,* 754 F.2d 1233, 1240 (5th Cir. 1985) ......................14

*Whitehead v. Food Max of Miss., Inc.,* 163 F.3d 265, 276 (5th Cir. 1998) ...................................11

**Statutes**

Federal Rule of Civil Procedure 59 .................................................................................................10

Federal Rule of Civil Procedure 61 .................................................................................................12

## **INDEX TO EXHIBITS**

| **EX.** | **DESCRIPTION** |
|---|---|
| **1** | Declaration of Eve L. Henson |
| **1A** | Defendant's Damages Slide No. 4 |

Pursuant to Federal Rule of Civil Procedure 59, Plaintiff Commil USA, LLC, ("Commil") moves for a New Trial on the Issues of Indirect Infringement and Damages and would respectfully show the Court as follows:

## I.   INTRODUCTION

On May 11, 2010, a jury trial commenced in this case. On May 17, 2010, the case was submitted to the jury. A couple of hours later, the jury returned a verdict finding U.S. Patent No. 6,430,395 ("'395 patent") valid and directly infringed by Defendant Cisco. The jury awarded Commil $3,726,207 to compensate for Cisco's infringement; however, the amount of damages cannot be reconciled with the verdict, which found direct infringement, but not indirect infringement.[1] This verdict plainly demonstrates the prejudicial effect that the defense's trial tactics had upon the jury's verdict.

During the trial, Cisco's counsel made numerous overt and veiled sidebar comments that served to engender prejudice against Plaintiff's owner, Jonathan David, and the named inventors of the patented technology. Cisco's inappropriate and repeated comments pervaded the trial, playing into known stereotypes of Jews, foreigners, and Plaintiff's Personal Injury lawyers. Of course, none of these facts were relevant to the case; and yet, the remarks undoubtedly impacted, consciously or unconsciously, the jurors' ability to discharge their duty to deliver a fair and impartial verdict. Justice requires that the Court grant a new trial on the affected issues of indirect infringement and damages. It cannot be said with reasonable confidence that the improper comments

---

[1] The actual damage award correlated to the allegedly 'proper' amount of damages available for compensating Plaintiff for any indirect infringement found by the jury as offered by Defendant Cisco's damages expert Dr. Stephen Becker. *See Defendant's Damages Slide No. 4,* attached hereto as Exhibit "1A," and *Trial Transcript*, May 13, 2010 (afternoon session), at p. 148:3-16.

did not harm the Plaintiff's right to a fair trial. As shown below, the prejudicial comments affected the Plaintiff's substantial rights.

## II.   FACTUAL BACKGROUND

**A.   Cisco's Inappropriate Trial Conduct Prejudiced Plaintiff's Right to a Fair Trial.**

*1.   Counsel's reference to pork.*

One of the most glaringly inappropriate comments made by Cisco during the trial occurred when Cisco's counsel was cross-examing Mr. David, principal of Plaintiff Commil[2] and resident of Israel. Cisco's counsel inquired whether Mr. David had met with Mr. Arazi, a named inventor on the '395 patent, while in Marshall for the trial: "Well, did you eat dinner with him? Did you talk to him? Did you say hi to him?"[3] Mr. David responded affirmatively, stating they had had dinner at Bodacious Barbeque, to which Cisco's counsel responded: "I bet not pork."[4] This comment had no relevance to any issue in the case. It could only have been a sarcastic means of informing the jury that the Plaintiff and one of the named inventors—both of whom live in Israel—were Jewish.

This sidebar comment prompted the Court to inquire about the relevance of their meat choice had to the merits of the case.[5] Cisco's counsel admitted that it had no relevance.[6] The Court admonished counsel in the presence of the jury. The inappropriate

---

[2] *Trial Transcript,* May 11, 2010 (morning session), at p. 24:18-22; *Trial Transcript,* May 12, 2010 (morning session), at p. 133:5-8.

[3] *Trial Transcript,* May 12, 2010 (morning session), at p. 146:20-22.

[4] *Id.* at p. l46:23.

[5] *Id.* at p. 158:2-4.

[6] *Id.* at p. 158:5-6.

pork comment was not the sum of the inappropriate and prejudicial remarks. It merely highlights the strategy waged by Cisco to prejudice the jury against the Plaintiff.

   2.   *Cisco's counsel made numerous religious references.*

Despite acknowledging that his pork comment was in "poor taste,"[7] Cisco's counsel nevertheless made several other remarks aimed at triggering any latent religious prejudice held by the jurors. For instance, his closing began:

> "Ladies and Gentlemen of the Jury, you are, in this case, truth-seekers. You are charged with the most important job in this courtroom, and that's determining the truth"[8]
> . . .
> "And when you figure out what the truth is, you'll know how to answer that verdict form. You remember the most important trial in history, which *we all read about as kids,* in the Bible had that very question from the judge. What is truth?"[9]

This reference to the trial of Jesus presided over by Pontius Pilate[10] is seemingly innocuous. In this case, however, the reference to the story as one "we all read about as kids in the Bible" implicitly aligns his religious affiliation with that of the jurors – "we are Christian." By contrast, Cisco repeatedly identified Mr. David and the inventors as Israelis, presumably Jewish, especially after the inappropriate pork comment In short, Cisco improperly engaged the 'us versus them' mentality[11] as a defensive trial tactic in an attempt to respond to Plaintiff's claims.

---

[7] *Trial Transcript,* May 12, 2010 (afternoon session),. at p. 2:21.

[8] *Trial Transcript,* May 17, 2010 (afternoon session), at p. 16:1-4.

[9] *Id.* at p. 16:12-16.

[10] A recounting of the trial of Jesus is found in John 18:28 - 19:16. In this account, it is said that Pilate inquired of Jesus: "What is truth?" John 18:38.

[11] *See generally "The Changing Face of Anti-Semitism: From Ancient Times to the Present Day,"* Walter Laquer, Oxford University Press (2008) (discussing the evolution of anti-Semitism from European origins based on belief that Jews were "Christ-Killers" to its more modern form derived from perception that Jews enjoy unfair economic advantages).

Additionally, moments after referencing the 'most important trial in history', Cisco's counsel again framed the trial in religious terms:

> "They have the patent up and had it up the whole trial like a little shrine. In fact, I could barely see some of you, because the thing was there like, you know, we were all supposed to, you know, do obeisance to the shrine, to the patent, to the famous Arazi patent. There it is."[12]

While making these comments, Cisco's counsel walked to Plaintiff's table and engaged in exaggerated praying and bowing gestures while making, at least, three more references to the 'little shrine' or 'little Arazi shrine.'[13]

Shortly thereafter, when the Court overruled an objection made by Mr. Werbner to Mr. Carroll's argument, Cisco's counsel turned, pointed to Plaintiff's table, and improperly commented: "They squeal the loudest when you poke at it, and they can't explain that away." This was a highly improper personal attack reaching over counsel's shoulder to again malign the Plaintiff. Was the out-of-line behavior a veiled way of calling the Plaintiff a pig? Was the insinuation that Plaintiff is greedy, or dirty?

   3.    *Cisco employed 'us versus them' cards.*

During jury selection, Cisco's counsel set the stage for another 'us versus them' theme (American vs. Israeli) when he painted Cisco red, white, and blue:

> "Cisco is an American company started in the United States that is operating worldwide. It *employs thousands of Americans* right here *in Texas in this judicial district*. And Cisco has never taken one penny of government bailout money. Not one penny."[14]

---

[12] *Trial Transcript,* May 17, 2010 (afternoon session), at p. 17:16-22.

[13] *Id.* at p. 18:14; 20:19-20; & 24:23-24.

[14] *Trial Transcript,* May 10, 2010 (Voire Dire), at p. 59:15-20 (emphasis added).

Cisco's American roots and employment of the good people of East Texas, was repeated in Opening:

> "Cisco is one of American's leading innovative technology companies. It was founded 25 years ago by just a couple of people out in the Silicon Valley of California, the heartland of America's technology innovation. And it has grown since that time to have tens of thousands of employees all over the world and many thousands in the United States, *including several thousand folks who have jobs in this very judicial district right here in Texas*."[15]

Throughout the trial, Cisco's counsel played up the fact that Mr. David and the named inventors were from Israel.

In his Closing, Cisco's counsel made repeated reference to the Israeli origins of Plaintiff's key witnesses:

> "They brought *Mr. Arazi, whose name is on the little shrine there*, as the primary inventor of this patent that *they want $56 million of Cisco's money* for. *They brought him all the way around the world from **Israel**.*"[16]

After noting Plaintiff's other inventor Mr. Soffer was an "ex-Israeli army officer,"[17] Cisco's counsel referred to its lead witness Mr. O'Hara as the "nice guy with the crew cut who invented all this stuff."[18]  The culmination of this tactic occurred when Cisco's counsel advised the jury to return a verdict which would prevent American, possibly East Texas, money from being taken to Israel:

---

[15] *Trial Transcript,* May 11, 2010 (morning session), at p. 53:18 - 54:2.

[16] *Trial Transcript,* May 17, 2010 (afternoon session), at p. 17:23 - 18:4 (emphasis added).

[17] *Id.* at p. 21:18.

[18] *Id.* at p. 27:1-2.

> "And if you put those three no's down, the one thing that won't happen is that Mr. David won't fly back home later this week with a sack full of Cisco's *money that belongs* to Cisco and its employees *here in Texas* and its shareholders."[19]

   4.   *Cisco's counsel employed other stereotypes to inflame the jury.*

Another long-standing stereotype holds that Jews are unscrupulous, shady, and greedy.[20] Cisco's counsel repeatedly fostered this perception as it related to Mr. David's procurement of the '395 patent as well as his enforcement of the '395 patent in Court. From the outset, Cisco's counsel made remarks laced with inappropriate innuendo about Mr. David and how he acquired the '395 Patent at issue. These pervasive comments were intended to portray Mr. David's enforcement of it as further evidence of his greed.

   a.   <u>Mr. David's procurement of the patent was compared to predatory practices associated with current mortgage crisis.</u>

During Cisco's cross-examination of Mr. David—the third question—Cisco's counsel made the following sidebar comment:

> "We all read in the paper or have read in the paper about the -- about the subprime housing mess and everybody getting foreclosed on from their houses."[21]

Cisco's counsel then equated Mr. David's procurement of the '395 Patent to the types of unscrupulous business practices that led to the mortgage crisis:

> "You've heard in this whole -- whole subprime mortgage catastrophe, these people they call *bottom-feeders* who swim around on the bottom buying people's houses that they got kicked out of for next to nothing.

---

[19] *Id.* at p. 29:18-22. Although the basis for the jury's decision can....never be known to a certainty, when a jury's damages award itself indicates so strongly that the error substantially influenced the jury's verdict, the error cannot be dismissed as harmless." See *Sasaki v. Class*, 92 F.3d 232, 237 (4th Cir. 1966).

[20] *See* Findings and Recommendations of the United States Commission on Civil Rights Regarding Campus Anti-Semitism, April 3, 2006 (finding that anti-Israeli propaganda was being disseminated on college campuses and that the material "exploits ancient stereotypes of Jews as greedy, aggressive, overly powerful, or conspiratorial").

[21] *Trial Transcript,* May 12, 2010 (morning session), at p. 136:20-23.

**Plaintiff's Motion for New Trial**                                                                                        **Page 6**
*#142147.3*

> Is that what your cousin does?"[22]
>
> "So the bank and your cousin foreclosed on poor old Mr. Soffer and his company, and he was out, right?"[23]
>
> "Somebody -- somebody loaned this company, ***this bunch of Israeli investors,*** . . . and then somebody foreclosed on them, and your cousin got the heads up on it and called you and said: I've got a heck of a fire sale for you.
>
> Is that what happened?"[24]

Likening Mr. David and his cousin to opportunistic "bottom-feeders", Cisco's counsel sought to inflame the prejudices of the jury by tainting them with allegedly sinister businesses practices. In overruling Plaintiff's objection to the admission of evidence concerning the prices Plaintiff paid for the patent and the negotiations leading up to it, the Court placed limits on the admissibility of such evidence. The Court stated the evidence was probative of a reasonable royalty rate. Clearly, Cisco abused this purpose and expanded it to smear the Plaintiff as greedy and unscrupulous. The effect was pernicious.

Cisco's selection of deposition testimony to play for the jury also highlighted their theme. From the deposition of Mr. David Cohen, one of the investors in Commil Limited (the Israeli company), Cisco played only his testimony about the sale of the underlying intellectual property to Mr. David.

Even though the record already established the facts necessary to support the price and arms length negotiation of the IP's purchase, Cisco nevertheless played a short clip from Mr. Cohen where he testified:

---

[22] *Id.* at p. 139:20-24 (emphasis added).

[23] *Id.* at p. 138:2-4.

[24] *Id.* at p. 138:16-23 (emphasis added to highlight reference to foreign nature of the deal).

> "Q:   And how did you, between the three of you, reach that conclusion that $400,00 was acceptable to Commil Limited?
>
> A:   I didn't really have an idea how much money, if at all, this IP was, okay?  All I had is if someone is interested, *try to push him to the maximum amount that you can before he said no.  It's a simple business approach.*  And this is what I used.
>
> So I think they came with 300, and they said let's get 500, and they with 400, and mainly -- they were my -- my main interface to the buyer.  So I didn't talk to the buyer ever.  I didn't know about the buyer.
>
> And -- but they -- I trust them.  They -- I hired them.  And they were my agent." [25]

Cisco surely played the clip merely to cast the transaction in a questionable light.  Mr. Cohen is an Israeli, who spoke with a heavy accent, and who admitted his sole objective was to squeeze the buyer and obtain the maximum purchase price for the IP. Additionally, his comments about trusting his agent, Mr. David's cousin, whom Cisco's counsel repeatedly implied was a "bottom feeder," were included to further paint the deal as conspiratorial or back-alley. Undoubtedly, the Court's admissibility ruling did not foresee or condone the "bottom-feeding, foreclosing, back-alley business practice analogy," which was wholly improper and offered solely to prejudice the jury against Mr. David.

Cisco's counsel repeated this inflammatory analogy in his closing argument. After referencing the "the most important trial in history"[26] Cisco's counsel argued:

> "And you know what the truth is in this case.  You saw it on the second day when Mr. David testified, the very smart lawyer, the very successful lawyer, who bought these patents from essentially foreclosure, when a bank shut the doors on this company over in Israel.  You remember Mr. David got the *inside word from his cousin, who works with the bank that forecloses on*

---

[25] *Trial Transcript,* May 13, 2010 (afternoon session), at p. 37:23 - 38:12.

[26] *See infra* Section II(A)(2).

> *people over there and kicks them out of their businesses.  And then he bought that patent for -- from -- through that process.*  That's the truth."[27]

These arguments were designed to portray Mr. David's purchase of the intellectual property, including the '395 Patent, as a shady, greedy, opportunistic, and a crooked business transaction.

### b. Cisco's counsel also played the greedy lawyer card.

Cisco's counsel also placed great emphasis on Mr. David's occupation:  "the very smart lawyer, the very successful lawyer."[28]  Cisco sounded this theme early in the case.  In questioning the jury panel, Cisco's counsel stated "the law is that they have to prove to you that we owe them something before they can go to the pay window."[29]  The pay window analogy sought to prime jurors that the case was just about money, not merits.  To further this theme, Cisco's opening statement highlighted that Mr. David was a 'personal injury' lawyer, a section of the bar that has often been stereotyped as greedy and opportunistic:

> "***Mr. Jonathan David is a -- is a personal injury lawyer by training***.  You'll hear he doesn't have a background in technology.  He hasn't done a lot of things in the patent world.
> . . .
> By the way, Ladies and Gentlemen, he paid $400,000.  He's now asking you to give him 150 times that amount in damages in this case."[30]

During Cisco's questioning of Plaintiff's damage expert he stated that a royalty that would yield an award of about three million dollars would work out to an award of a

---

[27] *Trial Transcript,* May 17, 2010 (afternoon session), at p. 16:19 - 17:3.

[28] *Id.* at p. 16:21-22.

[29] *Trial Transcript,* May 10, 2010 (morning session), at p. 57:2-4.

[30] *Trial Transcript,* May 11, 2010 (morning session), at p. 72:1-16 (emphasis added).

"little shy of $3 million"[31] which he said at sidebar "gives Mr. David over here a pretty good day at the track, doesn't it? Six times his money."[32] In closing argument, Cisco's counsel looped back to his initial pay window argument: "If they don't answer questions for you, if they don't tie up loose ends for you, then they lose. They don't get to go to the pay window."[33] Having teed up his big gamble theme, Cisco's counsel hammered home his point with his final closing comment: "Is that the kind of attitude that you're going to base a 56-million-dollar jackpot on? [Court interjects that he's used his time and he thanks Court]. So we suggest 3 to $5 million, if you get to damages."[34] Cisco's unrelenting focus on the propriety of Mr. David's potential return on his initial investment ($400,000 purchase price of IP), had absolutely no bearing on the issue of a reasonable royalty, the true measure for damages.

The comments noted above, individually and collectively, demonstrate that there is a high likelihood, if not an absolute certainty, that Cisco's tactics succeeded in leading to a verdict that was not based on proper evidence. Therefore, Plaintiff respectfully moves this Court for a new trial on the affected issues of indirect infringement and damages.

### III.   ARGUMENT & AUTHORITIES

Courts have broad discretion in granting new trials.[35] Federal Rule of Civil Procedure 59 provides that after a jury trial, a court can grant a new trial on all or some of

---

[31] *Trial Transcript,* May 12, 2010 (afternoon session) at p. 68:18-19.

[32] *Id.* at p. 68:21-23.

[33] *Trial Transcript,* May 17, 2010 (afternoon session), at p. 25:18-21.

[34] *Id.* at p. 38:19 - 39:1.

[35] *Allied Chem. Corp. v. Daiflon,* 449 U.S. 33, 36 (1980).

the issues for any reason for which a new trial has previously been granted in a federal action. The Court has the power to grant a new trial based on its appraisal of the fairness of the initial trial and the reliability of the jury's verdict.[36] A review of the trial transcript demonstrates the pervasive nature of the prejudicial remarks.

A.   **Standard for Review**.

The Fifth Circuit has held "awards influenced by passion and prejudice are the antithesis of a fair trial."[37] As noted by the Fifth Circuit, the district court is in the best position to evaluate any prejudice flowing from improper comments during trial.[38] Whether a new trial is warranted is determined by reviewing the facts specific to each case.[39] The Court should read the record, evaluate the evidence, review the tactics of counsel, consider any unfair or prejudicial argument of counsel, and evaluate the consistency of the ultimate jury verdict.[40] The Court need not find that each individual statement was so improper as to justify a new trial, but only that the totality of the remarks prejudiced the jury's findings.[41] Indeed, where the jury verdict is inconsistent with the evidence, courts have held the verdict itself provides compelling evidence that

---

[36] *Smith v. Transworld Drilling Co.,* 773 F.2d 610, 612-13 (5th Cir. 1985).

[37] *Whitehead v. Food Max of Miss., Inc.,* 163 F.3d 265, 276 (5th Cir. 1998).

[38] *Gautreaux v. Scurlock Marine, Inc.,* 84 F.3d 776, 783 (5th Cir. 1996) (citing *Johnson v. Ford Motor Co.,* 988 F.2d 573, 582 (5th Cir. 1993).

[39] *Bird v. Glacier Elec. Coop., Inc.,* 255 F.3d 1136, 1147 (9th Cir. 2001) (citing *Rojas v. Richardson,* 703 F.2d 186, 190 (5th Cir. 1983).

[40] *Hall v. Freese,* 735 F.2d 956, 962 (5th Cir. 1984).

[41] *Whitehead,* 163 F.3d at 278.

the erroneous comment(s) substantially influenced the jury's verdict, and thus, cannot be dismissed as harmless under Federal Rule of Civil Procedure 61.[42]

In this context, error requiring a new trial is that which is plain, affects the other party's substantial rights, and seriously affects the fairness, integrity, or public reputation of judicial proceedings.[43] The jury's damage award is inconsistent with the findings of infringement and the great weight of the evidence. A new trial may be limited to the issues affected.[44] Accordingly, to prevent manifest injustice and preserve the integrity of our judicial system, Commil should be given a new trial on the affected issues of indirect infringement and damages.

**B.    The Court Should Grant A New Trial**.

*1.    Cisco's counsel's trial tactics constituted plain error.*

In a similar case, defense counsel made various inappropriate allegations throughout the trial: plaintiff was involved with a married man; plaintiff used illegal drugs; plaintiff's attorney purchased large quantities of prescription drugs for her; and plaintiff had flown to Mississippi from New Orleans in a private plane.[45] The court noted that the record was devoid of any evidence that her lover was married or that she had flown in a private plane, and showed only that plaintiff admitted taking a Valium that had not been prescribed for her on one occasion even though she stipulated to taking large

---

[42] *Sasaki v. Class,* 92 F.3d 232, 237 (4th Cir. 1996). *See also Hall,* 735 F.2d at 962; *Irvan v. Frozen Food Exp., Inc.,* 780 F.2d 1228, 1231 (5th Cir. 1986).

[43] *Alaniz v. Zamora-Quezada,* 591 F.3d 761, 776 (5th Cir. 2009).

[44] *Whitehead,* 163 F.3d at 278 (holding where damage award was improperly influenced by prejudice, the new trial need be only on affected issue of damages).

[45] *Hall,* 735 F.2d at p. 960.

quantities of prescription drugs (presumably because of her injury).[46]  In addition to these unsupported arguments, the court's concern focused on two prejudicial comments that the defense counsel made in close: "This isn't New Orleans. This isn't San Francisco or Chicago or New York or Miami.... This is Oxford, Mississippi, on a March morning, and we didn't leave our brains at home when we left this morning"; and "It's a wonder that she's not pickled with the amount of drugs that they gave her."[47]

On appeal, plaintiff's counsel argued these comments sought to appeal to the racial prejudices of the jurors and to place into their minds certain unfavorable stereotypes of black people.  While the court could not say the remarks were made to invoke racial prejudice, it nevertheless found that they undoubtedly prejudiced the jury against the plaintiff:  "[t]he strategy of the defense was to characterize Hall as a woman who flouted respect for marriage vows, who had used illegal drugs, and who was trying to take advantage of the good people of rural northern Mississippi."[48]  When the Court considered these improper comments in conjunction with the abnormally low jury verdict given the obvious extent of her injuries, the court concluded that substantial injustice had been done, warranting a new trial.[49]

As in *Hall,* when the repeated comments and innuendo of Cisco's counsel are considered as a whole and viewed in connection with the inconsistent verdict rendered, it is clear that the remarks of Cisco's counsel swayed the jury to the detriment of Plaintiff.

---

[46] *Id.*

[47] *Id.*

[48] *Id.* ("the misconduct of the defense attorneys in this case seems to us especially serious and unfair.  It has no place in a federal court.").

[49] *Id.* at p. 961-62.

In order to preserve the integrity of our justice system, all litigants must be guaranteed a fair trial where decisions are rendered according to the law without regard to personal or public prejudices. Cisco's improper trial tactics constituted plain and reversible error mandating a new trial.

    *2.    Damage award is evidence of manifest injustice.*

The amount awarded by the jury is the exact amount Dr. Becker testified would be appropriate to compensate for a finding of indirect infringement, but there was no such finding by the jury. Where counsel has employed improper arguments and the resultant damage award is abnormally high or low, courts have held that the incongruity of the award itself is compelling evidence to show the verdict was improperly influenced by prejudice so as to require a new trial to prevent manifest injustice.[50]

Given the inconsistency of the damage award, it is clear that Cisco was successful in prejudicing the jury. To let the verdict stand would deprive Commil of substantial justice. If the verdict in this case is allowed to stand, it will effectively condone the prejudicial actions of Cisco's counsel and deprive Plaintiff Commil, its owner Mr. David, and the named inventors of their right to substantial justice in our courts, thereby calling into question the fairness, integrity, and public perception of our highly regarded Eastern District of Texas courts.

## IV.  CONCLUSION

Plaintiff Commil prays that the Court order a new trial on the issues of Indirect Infringement and Damages to prevent manifest injustice.

---

[50] *Sasaki v. Class,* 92 F.3d 232, 237 (4th Cir. 1996).  See also *Hall,* 735 F.2d at 962; *Irvan v. Frozen Food Exp., Inc.,* 780 F.2d 1228, 1231 (5th Cir. 1986); *Westbrook v. General Tire and Rubber Co.,* 754 F.2d 1233, 1240 (5th Cir. 1985).

Dated: June 21, 2010

Respectfully submitted,

/s/ Richard A. Sayles
**Richard A. Sayles**
State Bar No. 17697500
**Mark S. Werbner**
State Bar No. 21179700
**Eve L. Henson**
State Bar No. 00791462
**Mark D. Strachan**
State Bar No. 19351500
**Christopher W. Hogue**
State Bar No. 24050773
**SAYLES WERBNER**
4400 Renaissance Tower
1201 Elm Street
Dallas, Texas 75270
(214) 939-8700 (Telephone)
(214) 939-8787 (Facsimile)

**ATTORNEYS FOR PLAINTIFF COMMIL USA, LLC**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on June 21, 2010, a copy of the foregoing document was filed electronically in compliance with Local Rule CV-5(a) as well as served electronically. As such, this document was served on all counsel who are deemed to have consented to electronic service.

/s/ Richard A. Sayles
Richard A. Sayles