IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| COMMIL USA, LLC, | | |
| | Plaintiff, | |
| v. | | CIVIL ACTION NO. 2:07-cv-341-DF-CE |
| CISCO SYSTEMS, INC., | | |
| | Defendant. | |

**PLAINTIFF COMMIL USA, LLC'S RESPONSE TO CISCO'S MOTION
FOR JUDGMENT AS A MATTER OF LAW ON DAMAGES**

Plaintiff Commil USA, LLC ("Commil") respectfully requests that the Court deny Cisco

Systems, Inc.'s ("Cisco") Motion for Judgment as a Matter of Law on Damages ("JMOL").

**LEGAL STANDARD**

In considering a Rule 50(a) challenge to the legal sufficiency of the evidence, the Court

should be "especially deferential" to the jury's findings.[1] The Court draws all reasonable

inferences and resolves all credibility determinations in the light most favorable to the

nonmoving party.[2] A jury verdict will be upheld unless "there is no legally sufficient evidentiary

basis for a reasonable jury to find" as the jury did.[3] A Rule 50(a) motion should be granted only

if the evidence points so strongly and so overwhelmingly in favor of the nonmoving party that no

---

[1] *Argo v. Woods*, 399 Fed. Appx. 1, at *2 (Fed. Appx. 2010) (citing *Brown v. Bryan County, OK*, 219 F.3d 450, 456 (5th Cir. 2000)); *see also Lucent Technologies, Inc. v. Gateway, Inc.,* 580 F.3d 1301, 1338 (Fed. Cir. 2009) (quoting *State Contracting & Eng'g Corp. v. Condotte Am., Inc.*, 346 F.3d 1057, 1072 (Fed. Cir. 2003)) ("A jury's decision with respect to an award of damages 'must be upheld unless the amount is grossly excessive or monstrous, clearly not supported by the evidence, or based only on speculation or guesswork.'").

[2] *Int'l Ins. Co. v. RSR Corp.*, 426 F.3d 281, 296 (5th Cir. 2005) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)). *See Aetna Cas. & Sur. Co. v. Pendleton Detectives, Inc.*, 182 F.3d 376, 378 (5th Cir. 1999) (providing that the record should be viewed "in the light most favorable to the non-movant, drawing all factual inferences in favor of the non-moving party, and 'leaving credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts to the jury'") (internal citations omitted)).

[3] *Int'l Ins. Co.*, 426 F.3d at 296-97 (citing FED. R. CIV. P. 50(a)(1) and *Hiltgen v. Sumrall*, 47 F.3d 695, 700 (5th Cir. 1995)).

reasonable juror could return a contrary verdict.[4]

## ARGUMENT

### I.    Commil Presented Legally Sufficient Evidence to Support an Award Of Pre-Suit Damages.

Cisco asserts that Commil failed to offer sufficient evidence to support an award of pre-suit damages. The evidence, however, demonstrated that Cisco knew of the '395 patent as early as December 2004 and certainly by the spring of 2005. In particular, the testimony of Yuval Dovev and Bob O'Hara, coupled with notice provided by the United States Patent Office ("PTO"), establishes the requisite knowledge in 2005. Other than Bob O'Hara changing his testimony at trial (which the Court already has recognized as such), Cisco presented no contrary evidence.

Mr. Dovev, the CEO of Commil, testified that he approached Cisco in "late 2004" and had several conversations with one or two Cisco representatives, including someone in mergers and acquisitions.[5] These communications focused, in part, on Commil's patents and Cisco's potential infringement.[6] For example, Mr. Dovev testified that he "described to [Cisco] Commil's solution and Commil's core technology **including its patents**."[7] He further testified that he likely sent Cisco, in accordance with his customary practice, a prospectus giving "a top-level description of how our **patent** worked, and it had a -- and it had references to the **patent numbers** and to the major claims."[8]

---

[4] *Id.* at 296 (citing *Cousin v. Trans Union Corp.*, 246 F.3d 359, 366 (5th Cir. 2001)).

[5] Testimony of Mr. Dovev 4/06/2011 (afternoon session) p. 3:2-5:5.

[6] *Id.* at 6-10

[7] *Id.* at 6:4-10 (emphasis added).

[8] *Id.* at 10:5-8 (emphasis added); *see also Id*. at 10:11-17 ("It said patent number, the major claims, and there was like a diagram kind of -- of our system that -- that related more to the implementation of the patents. The patents themselves were just mentioned in -- in Word format saying, okay, we have U.S. Patent No. whatever, and then the three main claims or four of that patent.").

Mr. Dovev also informed Cisco around the time that it was acquiring the infringing products from Airespace, that "[Commil] could be interesting for Cisco, because we had what -- what we believed to be the core technology and the underlying technology of what they're using after their Airespace acquisition."[9] Mr. Dovev testified unequivocally that "I remember telling [Cisco] that we had the **patent** that we think line the core of the Airespace system."[10] In fact, Commil analyzed the Airespace technology acquired by Cisco during that timeframe and didn't "see any other way that it could be done, other than the way that we described in our **patents**."[11]

Mr. Dovev's testimony, certainly when viewed in the light most favorable to Commil, is direct evidence that Cisco knew about the '395 patent around the time it acquired Airespace in early 2005. At the very least, a jury could reasonably infer from his testimony that by early 2005, Cisco was on notice of the '395 patent, which of course is the patent that "line[s] the core of the Airespace system."[12]

While Mr. Dovev's testimony carries the day, there is additional sufficient evidence. Commil produced evidence at trial that Cisco received notice of the '395 patent from the PTO as part of Cisco's prosecution of the 6,975,877 patent ("the '877 patent").[13] This notice came on December 15, 2004, during the same period that Cisco was negotiating to acquire the infringing technology.[14] A reasonable jury could infer that this letter from the PTO provided notice of the

---

[9] *Id.* at 6:11-25.

[10] *Id.* at 8:7-13.

[11] *Id.* at 7:3-19.

[12] *Id.* at 8:7-13.

[13] *See* PTX 332 and 333.

[14] *See* PTX 332-0047.

'395 Patent, especially because it explicitly mentioned the '395 as prior art pertinent to the application's disclosure.[15]

About a year later on December 13, 2005, the Cisco '877 patent issued with the full '395 patent number prominently displayed on its face.[16] This sequence of events concerning the Cisco '877 patent led Bob O'Hara to admit that Cisco and its lawyers were "on notice of the '395 patent sometime between 2001 and the ['877 patent] issuance in '05."[17] After the jury heard this testimony, which was originally given in the May 2010 trial, Mr. O'Hara conveniently changed his answer.[18] His open willingness to change sworn testimony in a way that helps Cisco casts aspersions on all of his testimony.

This evidence, particularly when viewed in the light most favorable to Commil, establishes that reasonable and impartial minds could conclude that Cisco knew of the '395 patent as of December 2004 or early 2005, and, consequently, that Commil's damages for Cisco's induced infringement commenced, as the jury found, in March 2005 when Cisco began to sell the accused products. Accordingly, Cisco's motion on this issue should be denied.

## II.     Cisco's Entire Market Value Rule Challenge is Misplaced

Commil did not need to invoke the entire market value rule for its damage model, which is based on the two smallest saleable items, *i.e.*, the lightweight access points and controllers, covered by the '395 patent. This notwithstanding, Cisco argues that Commil must satisfy the entire market value rule, citing *Lucent*, *Uniloc* and *MirrorWorlds*. In contrast to these cases, Commil expressly did not use as its royalty base Cisco's entire system, which includes products

---

[15] *See id.*

[16] *See* PTX 333.

[17] Testimony of Mr. O'Hara 4/06/2011 (morning session) p. 104:14-18.

[18] Testimony of Mr. O'Hara 4/07/2011 (afternoon session) p. 36:22-40:11.

such as antennas, cables, Ethernet switches, software, and support,[19] or the mobile devices that communicate with Cisco's system. Commil's patent covers, in part, Split MAC architecture as described in the asserted claims,[20] and Commil narrowly tailored its royalty base to encompass the two Cisco products that embody this infringing architecture: controllers and lightweight access points.[21]

In fact, the language of claim 1 of the '395 patent makes clear what the patented invention covers, namely, "a wireless communication system comprising at least two base stations, at least one switch in communication with the base stations."[22] The body of the claim refers to the base stations and switches. Based on this claim language, Commil properly focused its damage model on the lightweight access points and controllers, which respectively are the "base stations" and "switches" in claim parlance. Commil, therefore, proffered a conservative damage model that, as mentioned above, does not extend to unpatented components of Cisco's overall system.

For this reason, Commil's damages expert expressly testified that the entire market value rule does not apply.[23] Simply put, the claimed invention is not merely the component that drives the consumer demand for the infringing products, but rather the infringing products are the

---

[19] "And I think it's also important to understand that those revenues are not the total system. . . . But we're only focused on the two products that have the Split MAC architecture. So we're not talking about the antennas, the cables, the ethernet switches that we heard Mr. O'Hara talk about, the soft -- other software that's sold, the support around that." Testimony of Mr. Carlile, 4/06/2011 (afternoon session) pp. 32:18-33:3.

[20] Testimony of Mr. McAlexander 4/05/2011 (morning session) p. 105:3-25.

[21] "We're talking about just the two discrete products that have the Split MAC architecture." Testimony of Mr. Carlile, 4/06/2011 (afternoon session) p. 33:4-5; pp. 31:25-32:7.

[22] '395 Patent, Col. 39 ll. 15-17.

[23] "I don't agree the entire market value rule applies." Testimony of Mr. Carlile, 4/06/2011 (afternoon session) p. 131:22-23.

embodiment of the claimed invention.[24] Before Cisco adopted the infringing architecture, there were no controllers,[25] and, consequently, there were no controller sales. The claimed invention created the need for these products, enabled the creation of lightweight access points, and opened an entirely new product market for Cisco,[26] which Cisco's own witnesses do not dispute.[27] In fact, Cisco's own witness agreed that absent Cisco's adoption of the infringing architecture, Cisco would not have made any controller sales.[28]

Given these facts, to require Commil to satisfy the entire market value rule—or, as Cisco urges, to accept zero damages[29]—because Cisco contributed a metal housing or other trappings is an absurd and superficial application of the entire market value rule, entirely inconsistent with its purpose, and divorced from the evidence presented at trial. Where, as here, the infringing products are the direct result of the implementation of the patented invention, a patent owner should be entitled to use a royalty base that considers the total sales revenues of those products. If Cisco's interpretation of the entire market value rule is accepted, every case would implicate the entire market value rule. Because this cannot be correct, Cisco's interpretation must be

---

[24] "I don't believe the entire market value rule applies, and I've already excluded all of the revenue streams that aren't associated with the patented product." Testimony of Mr. Carlile, 4/06/2011 (afternoon session) p. 132:7-10.

[25] "That particular device would not exist but for Split MAC architecture." Testimony of Mr. Carlile, 4/06/2011 (afternoon session) p. 132:14-15. "In the older architecture where the access point had all of the protocol and processed it, it did not need a controller. . . . It's only in the new architecture that the controller is required." Testimony of Mr. McAlexander 4/05/2011 (afternoon session) p. 32:10-12; 32:14-15.

[26] "And Aironet equipment, as you rightly corrected me before, is the old, you know, fat access point architecture, not Split MAC architecture products in favor of an Airespace system, which is the new lightweight access point or Split MAC architecture system so that what this comment was talking about, how people are -- you know, the trend is to move away from the fat access points to the lightweight access points." Testimony of Mr. Carlile, 4/06/2011 (afternoon session) p. 69:14-21.

[27] "Q. And in the old products, there wasn't a controller at all; isn't that true? A: That's correct." Testimony of Mr. O'Hara 4/07/2011 (morning session) p. 139:9-11; 140:1-5 ("[I]f there were no sales of these wireless controllers until the architecture, it goes from zero to over a half billion dollars because of this architecture, correct? A. If your representation is correct, yes."). See also Testimony of Dr. Becker, 4/08/2011 (morning session) p. 52:5-15; 57:10-17; 58:2-5.

[28] Testimony of Mr. O'Hara 4/07/2011 (morning session) p. 140:1-5

[29] Cisco's Mtn. for Judgment as a Matter of Law on Damages ("Cisco JMOL.") at 4.

denied.

The direct relationship between the claimed invention and the infringing products comprising the royalty base is not found in any of the cases requiring the satisfaction of the entire market value rule cited by Cisco. For example, while the patent in *Lucent* covered only a date-picker feature, the royalty base encompassed all sales of Microsoft Outlook, yielding a $358 million damages award.[30] Similarly, while the patent in *Uniloc* covered only a product activation feature, the royalty base encompassed all sales of Microsoft Office and Windows, yielding a $388 million damages award.[31] Lastly, while the patents in *MirrorWorlds* covered only a document organization feature, the royalty base encompassed all sales of Apple products using Mac OS X, resulting in a requested $625 million damages award.[32] The jury's award of a reasonable royalty of $63 million in the present case is supported by Commil's properly defined royalty base.

**III.    The Jury's Inclusion Of The Full Value of Cisco's Infringing Products In The Royalty Base Is Supported By Substantial Evidence.**

Even if the entire market value rule must be satisfied, which Commil disputes, substantial evidence supports the application of the rule because the patented features "substantially created" the value of the infringing products. As an initial matter, it should be acknowledged that while Cisco argues that the royalty base used by Commil's expert is improper, Cisco's own damages expert used the exact same royalty base,[33] and Cisco never proposed a different royalty base. Cisco should not be permitted to urge the jury to adopt the challenged royalty base on one hand, and on the other hand argue that the jury's use of the royalty base is improper. This situation is

---

[30] *Lucent Technologies, Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1338 (Fed. Cir. 2009).

[31] *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292 (Fed. Cir. 2011).

[32] *MirrorWorlds, LLC v. Apple, Inc.*, Case No. 6:08-cv-88-LED (E.D. Tex. Apr. 4, 2011).

[33] Testimony of Stephen Becker, 04/08/2011 (morning session), pp. 32:19 – 33:2.

contemplated in *Lucent*, wherein "the base used in a running royalty calculation can always be the value of the entire commercial embodiment, as long as the magnitude of the rate is within an acceptable range."[34] The magnitude of the royalty rate, however, is a separate question addressed below. In effect, Cisco conceded that the jury could include in the royalty base the total value of its products, thereby inviting what it now labels as "improper."

The reason that no other royalty base was proposed is simple: Commil identified the smallest saleable unit as its royalty base.[35] Cisco now contends that the law requires something further, but cites no case rejecting the application of the entire market value rule in circumstances remotely similar to this case. To the contrary, the entire market value rule has applied where, as here, the patented invention "contributed substantially to the increased demand for the products in which it was incorporated."[36]

In discussing the applicability of the entire market value rule, Cisco attempts to diminish the value of the claimed invention by attributing to the claimed invention much less than what is claimed.[37] Cisco contends the claimed invention's value is limited to making telephone calls and suggests that the claimed invention was already known, *i.e.*, "the logical split of the MAC" was "in the 802.11 standard itself before the filing of the '395 patent."[38] Substantial evidence to the contrary was presented at trial. In fact, Cisco's own witness agreed that the split MAC architecture was "a big deal."[39] Further, Mr. McAlexander testified that the claimed invention

---

[34] *Lucent,* 580 F.3d at 1338-39.

[35] "Remember, we've already apportioned. We've come down to the smallest salable [sic] unit that embodies the technology." Testimony of Mr. Carlile, 4/06/2011 (afternoon session) p. 130:15-16.

[36] *Bose Corp. v. JBL, Inc.*, 274 F.3d 1354, 1361 (Fed. Cir. 2001); *see also Tec Air, Inc. v. Denso Mfg. Mich. Inc.*, 192 F.3d 1353, 1362 (Fed. Cir. 1999) (upholding application of entire market value rule based on evidence that "one customer" complained after patented invention was removed from the accused product).

[37] Cisco JMOL at 7.

[38] *Id.*

[39] Testimony of Mr. O'Hara 4/07/2011 (afternoon session) p. 34:4-8 ("Q. So having a new architecture that avoids these clicks and gaps when you would move from other access points to other ones, that's a big deal and we agree,

had an impact on data transfer as well as voice communication.[40] In addition, Dr. Becker acknowledged that data transfer can be impacted by gaps,[41] thereby undercutting Cisco's contention that the value of the claimed invention should be limited to telephony. Lastly, Cisco does not contend that the split MAC architecture, as described in the '395 patent, previously existed in the 802.11 standard.

Cisco's documents and actions reflect its belief that the split MAC architecture would help expand its customer base and sell other products and services. The evidence showed that Cisco recognized as early as 2005 that the infringing architecture was a key trend in the industry, acquiring Airespace products for $450 million because it "will allow Cisco to address a broader set of market segments and integrate advanced capabilities."[42] Further, the claimed invention allowed Cisco to create a new product market, as the claimed invention allowed a single product to be replaced by two discrete products: a controller and a lightweight access point.[43] In fact, after Cisco's implementation of the infringing technology it acquired from Airespace, it

---

right? A. Yes, we agree on that.").

[40] Testimony of Mr. McAlexander, 4/05/2011 (afternoon session) p.13:19-14:10. Further, Cisco's description of his later testimony, *i.e.*, 4/06/2011 (morning session) testimony p. 27:20-28:15, regarding whether 802.11 provided for some type of mobility as "contradictory" to this statement is unsupported. Further, to the extent that Mr. Arazi testified that disruptions in data sessions would be "tolerable," such testimony does not "confirm the conclusion of Cisco's damages expert" that the claimed invention's "value, if any, is to telephony." JMOL at 7.

[41] "While we're watching, it's – it's bringing down more of the movie, but by buffering that, it can have gaps in that download. As long as the gap doesn't get -- let's say it's buffered five minutes. As long as the gap doesn't get any longer than five minutes, it can keep up with what we're doing in terms of watching." Testimony of Dr. Becker, 4/07/2011 (afternoon session) p.129:17-23.

[42] Testimony of Mr. Carlile, 4/06/2011 (afternoon session) p. 69:5-6; "The mobility as it existed prior to the introduction of our system was inadequate to meet the needs of our customers. That goes really directly to how the Split MAC was necessary to serve customers' needs and the value of the technology to the customer." *Id.* at 35:23-36:3

[43] "That particular device would not exist but for Split MAC architecture." Testimony of Mr. Carlile, 4/06/2011 (afternoon session) p. 132:14-15.

experienced a large jump in sales.[44]

In addition, the developer of the accused products for Cisco, Bob O'Hara, admitted that

the split MAC architecture—*i.e.* the patented invention—was the driver of sales for the accused

products:

> Q.    This architecture opened up an entire new market with the large
>       business enterprises, didn't it?
>
> A.    Yes.
>
> Q.    This architecture, in your own words, was revolutionary, wasn't it?
>
> A.    Yes.
>
> Q.    This architecture was a driving force behind the 100 million dollars'
>       worth of sales that you mentioned, correct?
>
> A.    Oh, yes, absolutely.
>
> Q.    And this architecture was a driving force in the billion dollars of sales
>       that Cisco made, correct?
>
> A.    I don't know about the amount of sales, but it certainly drove sales.
>
> Q.    Assume that it's over $1.2 billion since the first sales up through a
>       month or two ago. Would you agree that that kind of phenomenal
>       success is, in large part, driven by these new products?
>
> A.    Yes, absolutely.[45]

The witness testimony in this case confirms that, but for the use of the infringing Split

MAC architecture in the accused products, none of the revolutionary and touted features of the

accused products could have been implemented. Cisco's witness, Bob O'Hara, agreed that it was

the enhanced features offered by the infringing architecture that drove Cisco's sales:

> Q.    Okay. You talked about the drivers and the demands for the product. Do
>       you recall that?

---

[44] "[F]rom the day of the acquisition, you have 4.2 million in those Airespace-related product sales, and in the second quarter, you know, you've over doubled that to 10 million just in one quarter." Testimony of Roger Carlile, 04/06/2011 (afternoon session), p. 70:7-11.

[45] Testimony of Bob O'Hara, 04/07/2011 (morning session), pp. 138:15 – 139:8.

A.      Yes.

Q.      And you went through the datasheets?

A.      Yes.

Q.      And you said about security and the form and these other things, that those products wouldn't be sold without those things, right?

A.      That's correct.

Q.      But those features and benefits exist in the old autonomous fat standalone access points as well, don't they?

A.      Yes, they do.

Q.      So none of these access points will -- will sell without security and the power and the antennas and the other things, right?

A.      That's correct.

Q.      But the new system, the thin access points, when they come out, even though they have these same benefits and features, these thin ones, the sales go up 125 percent, and the fat ones immediately start to decline by 25 percent. And maybe those figures aren't exactly right, but that's what we heard from Mr. Carlile yesterday. Doesn't that make it pretty clear that the driving force is the Split MAC architecture that enables certain key functions, not these other things that they both have?

A.      No. What enabled us to increase our sales was that we solved the customer's problems.

Q.      And it was the architecture that enabled those enhanced features, correct?

A.      Yes.[46]

Roger Carlile, Commil's damages expert, also testified consistently that the patented

technology is the driver of sales for the accused products:

Q.      And based upon all of that and the testimony you've referenced, do you have an opinion as to whether the patented features substantially create the value of component parts for which we have the sales data up on this board?

A.      Yes. It's my opinion that the -- the Split MAC architecture, the '395

---

[46] Testimony of Bob O'Hara, 04/07/2011 (morning session), pp. 136:2 -137:9.

patented technology, is -- is what drives the sales of the controllers and access points that are included in those sales numbers.[47]

Given the facts of this case, Commil has met its burden under the "entire market value rule" with evidence solidly grounded in reliable economic principles and methods. As much as Cisco tried to imply that the value of the patented technology was limited solely to telephony applications, the jury reasonably chose to believe the overwhelming evidence showing that the patented technology substantially created the value of the infringing products. It is irrefutably the driver of sales for each of the accused products. Consequently, Cisco's motion to disregard the jury's damages verdict on this basis should be denied.

**IV.     Substantial Evidence Supports the Jury's Application Of a 5% Royalty Rate.**

Cisco's latest attack on the comparable licenses, on which Commil's expert relied and which support Commil's reasonable royalty rate, is but one in a long line of attacks aimed at eviscerating the applicable 5% royalty rate to which Commil has proven its entitlement as damages. During the first trial, outside the presence of the jury, Commil proffered Mr. Carlile's testimony regarding the comparables he used to determine a reasonable royalty rate to allow the Court to determine the admissibility of the comparables under the requirements of *ResQNet*.[48] Following questions by the Court and cross-examination by Cisco's counsel, the Court overruled Cisco's objections as to four of the licenses relied upon by Mr. Carlile and excluded three.[49]

In the second trial, Cisco renewed its objections to the four previously admitted comparable licenses on grounds identical to those now lodged by Cisco in the instant JMOL.[50] The Court held a hearing at which the Court took judicial notice of the predicate that was laid at

---

[47] Testimony of Roger Carlile, 04/06/2011 (afternoon session), p. 37:7-15.

[48] Trial Tr. (05/12/2010) (morning session), pp. 159-189.

[49] *See id.* at pp. 188-189.

[50] *See* Defendant Cisco Systems, Inc.'s Opposed Motions in Limine at pp. 12-14; JMOL at pp. 12-16.

**PLAINTIFF COMMIL USA, LLC'S RESPONSE TO CISCO'S MOTION**
**FOR JUDGMENT AS A MATTER OF LAW ON DAMAGES**                                    **PAGE 12**

the first trial in support of the four licenses and overruled Cisco's objections to them.[51]

Therefore, this Court has twice considered – and has twice rejected – the very arguments that

Cisco urges now.

Cisco's motion adds nothing new—legally or factually—that should prompt the Court to

revisit or alter its two prior rulings on the permitted licenses in any way. The gist of Cisco's

argument, once again, is that the licenses upon which Commil's expert relied are not sufficiently

factually comparable to support the royalty awarded for the hypothetical license for the patent-

in-suit. Cisco's JMOL attacks Mr. Carlile's testimony based on suggestions for which there is no

evidence.[52] In particular, there is no evidence (and Cisco cites none) to show that the Repeater

and Hyundai licenses were exclusive. There is no proof (and Cisco cites none) that Zingerang

was a related-party transaction and was for the purchase of an entire product line.[53] There is no

proof (and Cisco cites none) that the Zingerang license was capped at $500,000. There is no

proof (and Cisco cites none) that Redox was a related-party transaction. There is no proof (and

Cisco cites none) that the Repeater license had a compensation cap. There is no proof (and Cisco

cites none) that the Repeater license included antenna technology. Absent such proof, Cisco's

attempt to discredit Mr. Carlile's testimony offers no basis on which to disturb the jury's

damages award.

This Court has twice considered the evidence supporting the four licenses that support the

applicable 5% royalty rate and has twice determined that they are sufficiently comparable.

Contrary to Cisco's continued assertions, the applicable law fully supports Commil's reliance on

---

[51] Trial Tr. (04/05/2011) (morning session), pp. 113:2 – 114:1.

[52] Cisco's cites are to questions of Carlile suggested by documents that Cisco planned to offer through its expert, Dr. Becker, but that the Court excluded as not timely produced by Cisco, noting Cisco's intentional attempt at "trial by ambush." *See* JMOL at pp. 13-15; Trial Tr. (04/07/2011) (morning session), pp. 140:15- 146:3.

[53] Cisco's insistence that Mr. Carlile did not consider and disclose whether the Zingerang license was a related party transaction is flatly contradicted by Mr. Carlile's testimony that he addressed the Zingerang stock transaction before the jury. *See* Testimony of Roger Carlile, 04/06/2011 (afternoon session), pp. 143:23-25 – 144:1-19.

these licenses and the jury's damages award. *Lucent* requires that the evidence demonstrate the subject matter of the proffered licenses, so that the jury can adequately evaluate the probative value of those agreements.[54] Commil met that burden both through testimony and documentary evidence.[55] The evidence establishes that Commil has demonstrated a solid "basis in fact to associate the royalty rates used in prior licenses to the particular hypothetical negotiation at issue in the case"[56] and that the damages award is not based "mainly on speculation and guesswork,"[57] in full compliance with applicable law.

Contrary to Cisco's assertion, *Lucent* does not require rejection of the jury's damages award. In *Lucent*, the patentee's expert relied in large part on "eight varied license agreements," four of which involved "PC-related patents" (but either the specific subject matter of the patents was not explained or the license was "directed to a vastly different situation than the hypothetical licensing scenario of the present case") and four of which Lucent did not describe the relationship between the patented technology licensed therein and the licensee's products.[58] These facts are entirely distinguishable from the instant case. Specifically, Commil offered, through its damages expert, Roger Carlile, evidence of four comparable licenses from the wireless communications field. At Mr. Carlile's request, each of these license agreement summaries was reviewed by Commil's technical expert, Joseph McAlexander, to ensure that the technology at issue in the license agreement was sufficiently comparable to the technology at issue in the patent-in suit.[59] According to Mr. Carlile's analysis, the royalty rates disclosed in these four agreements set the range of the rates that would be considered in the hypothetical

---

[54] *Lucent*, 580 F.3d at 1327-28.

[55] *See* PTX 0005A.

[56] *See Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1317 (Fed. Cir. 2011).

[57] *See Lucent,* 580 F.3d at 1335.

[58] *Id*. at 1328-31.

[59] *See* Testimony of Roger Carlile, 04/06/2011 (afternoon session), pp. 46:19-25; 51:17 – 52:16.

negotiation as falling between 1% and 5%.[60] Through the proffer of his testimony, this Court had

the opportunity to inquire about the comparability of these very license agreements, and consider

them in light of *Lucent* and *ResQNet*.[61] This Court approved the use of the four license

agreements that Cisco again challenged in the second trial, and has again challenged in the

instant JMOL.[62]

As this Court has recognized, *ResQNet* does not compel the conclusion that the licenses

at issue are not sufficiently comparable to support the jury's award. *ResQNet* is factually

inapposite because, there, the patentee's expert "used licenses with no relationship to the claimed

invention to drive the royalty rate up to unjustified double-digit levels" and relied on licenses

that had no discernible link to the claimed technology.[63] In the instant case, the evidence,

particularly when viewed under the applicable Rule 50(a) standard in the light most favorable to

Commil, demonstrates that Commil proved that the comparable licenses were related to the

accused technology and fully support the application of the 5% royalty rate. Accordingly,

Cisco's JMOL on this issue should be denied.

Likewise, Cisco's argument that Mr. Carlile "failed to take into account key evidence"

purportedly showing a very low value of the '395 patent (that Commil tried to sell its patent

portfolio for $1.2 million and could not, that Commil went out of business, and that the '395

patent later sold for $400,000) is also belied by credible evidence.[64] Contrary to Cisco's

characterization, Mr. Carlile testified that he did account for such evidence in performing his

damages analysis as follows:

---

[60] *See id.* pp. 52:17 – 57:2.

[61] Trial Tr. (05/12/2010) (morning session), pp. 158 -189.

[62] *See id.*; *see also* Trial Tr. (04/05/2011) (morning session), pp. 113:2 – 114:1.

[63] *ResQNet.Com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 870-72 (Fed. Cir. 2010).

[64] JMOL at p. 16.

Q.      (By Mr. Carroll) Mr. Carlile, before our break, we were talking about the offer to sell that patent and others before the hypothetical negotiation and you and I talked about that.

A.      Yes.

Q.      Now, that's actually -- and we've talked about the -- their inability to make a go of it as a company.

A.      Yes.

Q.      Now, that's actually one area that one of those Georgia-Pacific Factors specifically addresses, Factor 10, does it not?

A.      Yes.

Q.      **Okay. But you didn't even consider that, did you?**

A.      **No, that's not true.**

Q.      It's not – you did consider it, but I believe maybe you told us before that you thought it was neutral?

A.      I think all the evidence that I considered in that factor, I actually think, was an increasing factor, because you also have, as you mentioned there, the 450 million that Cisco had paid.[65]

Cisco distorts the facts in an attempt to bolster its JMOL. Comparable licenses were simply one of the 15 factors that the jury could consider in determining a reasonable royalty. Commil also presented substantial evidence on the other *Georgia-Pacific* factors. For example, Mr. Carlile testified that at the time of the hypothetical negotiation the profit margin on the infringing products was 55%,[66] which relates to *Georgia-Pacific* factor 8. Moreover, as has been discussed in other sections, Commil presented evidence of the infringing products' commercial success, the duration and term of the license, the advantages of the split MAC architecture products over the prior fat access points, the extent to which Cisco made use of the claimed invention, and the value of such use as demonstrated by increased sales, among other things.

---

[65] Trial Tr. (04/06/2011) (afternoon session), pp. 90:5-25 – 91:1 (emphasis added).

[66] Testimony of Roger Carlile, 04/06/2011 (afternoon session), p. 70:19-20 ("The Airespace products in 2005 had -- 2005 had a 55-percent gross margin.").

The jury was free to consider evidence regarding the sale of the patent portfolio, the eventual sale of the patent, and the cessation of Commil Ltd.'s business and accord it the weight it saw fit in light of the abundance of other evidence supporting the 5% royalty rate. Cisco has failed (even with its mischaracterization of Mr. Carlile's testimony) to establish that the 5% royalty rate is not supported by substantial evidence. Therefore, Cisco's motion to exclude the applicable 5% royalty rate and to enter a judgment of no damages is ill-founded and should be denied in its entirety.

## V.      Damages for Cisco's Direct Infringement

Finally, Cisco's argument that there is no evidentiary basis for awarding damages for Cisco's direct infringement is a straw-man argument. It is undisputed that the jury in the first trial determined that Cisco was liable for direct infringement.[67] This Court ordered a new trial only on Commil's claim for Cisco's induced infringement and on damages.[68] The Verdict Form in the second trial states clearly that the jury considered only Commil's induced infringement claim and the damages relating to that claim.[69] Therefore, damages for Cisco's direct infringement are not at issue, and Cisco's JMOL on this point presents no viable basis for any relief.

### CONCLUSION

Commil has presented legally sufficient evidence to support the jury's verdict and damages award. Therefore, Commil respectfully requests that the Court deny Cisco's Motion for Judgment as a Matter of Law on Damages.

---

[67] *See* Dkt. No. 335 at p. 2; Dkt. No. 361 at p. 1.

[68] *See* Dkt. No. 361 at pp. 1, 4.

[69] *See* Dkt. No. 422 at pp. 2-3.

Dated: April 29, 2011

Respectfully submitted,

/s/ Mark S. Werbner
**Mark S. Werbner**
State Bar No. 21179700
**Richard A. Sayles**
State Bar No. 17697500
**Mark D. Strachan**
State Bar No. 19351500
**SAYLES WERBNER**
4400 Renaissance Tower
1201 Elm Street
Dallas, Texas 75270
(214) 939-8700 (Telephone)
(214) 939-8787 (Facsimile)

**ATTORNEYS FOR PLAINTIFF**
**COMMIL USA, LLC**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on April 29, 2011, a copy of the foregoing document was filed electronically in compliance with Local Rule CV-5(a) as well as served electronically. As such, this document was served on all counsel who are deemed to have consented to electronic service.

/s/ Mark S. Werbner
Mark S. Werbner