```
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE EASTERN DISTRICT OF TEXAS
 2                       MARSHALL DIVISION

 3   COMMIL USA                *    Civil Docket No.
                               *    2:07-CV-341
 4   VS.                       *    Marshall, Texas
                               *
 5                             *    April 5, 2011
     CISCO SYSTEMS, INC., ET AL *   9:00 A.M.
 6

 7                    TRANSCRIPT OF JURY TRIAL
                BEFORE THE HONORABLE CHAD EVERINGHAM
 8                 UNITED STATES MAGISTRATE JUDGE

 9   APPEARANCES:

10   FOR THE PLAINTIFFS:        MR. MARK S. WERBNER
                                MR. RICHARD A. SAYLES
11                              MR. MARK D. STRACHAN
                                Sayles Werbner
12                              1201 Elm Street
                                4400 Renaissance Tower
13                              Dallas, TX   75270

14

15   FOR THE DEFENDANTS:        MR. HENRY B. GUTMAN
     (CISCO)                    MR. JEFFREY E. OSTROW
16                              MR. HARRISON J. FRAHN, IV
                                MR. JONATHAN SANDERS
17                              Simpson Thacher & Bartlett
                                2550 Hanover St.
18                              Palo Alto, CA   94304

19

20   APPEARANCES CONTINUED ON NEXT PAGE:

21   COURT REPORTERS:           MS. SUSAN SIMMONS, CSR
                                MS. SHELLY HOLMES, CSR
22                              Official Court Reporters
                                100 East Houston, Suite 125
23                              Marshall, TX   75670
                                903/935-3868
24   (Proceedings recorded by mechanical stenography,
     transcript produced on CAT system.)
25
     APPEARANCES CONTINUED:
```

```
 1
 2  FOR THE DEFENDANTS:        MR. OTIS CARROLL
    (CISCO)                    Ireland Carroll & Kelley
 3                             6101 South Broadway
                               Suite 500
 4                             Tyler, TX   75703

 5                             MR. MICHAEL E. JONES
                               Potter Minton
 6                             110 North College
                               Suite 500
 7                             Tyler, TX   75702

 8
                    *      *      *      *      *      *
 9

10

11                        P R O C E E D I N G S

12              LAW CLERK:  All rise.

13              (Jury in.)

14              THE COURT:  All right.  Please be seated.

15              Morning, Ladies and Gentlemen.  I

16  apologize for the delay.  We had a slight technical

17  difficulty getting copies prepared for your juror

18  notebooks.

19              But I think that if you have juror

20  notebooks during the course of the trial, it will enable

21  you to follow the evidence more easily.  So that's why

22  we prepare them and give them to you.  I'll go through

23  them later on with you, but I think in the long run,

24  you'll be glad that you have them.

25              Again, thank you for being here timely.
```

1  The process this morning is going to proceed like this:

2  I'm going to give you some preliminary jury

3  instructions, and then we're going to get right to the

4  opening statements of the attorneys.

5           After opening statements have been

6  delivered, we'll take our morning recess and we'll come

7  right back after the morning recess and get into the

8  evidence.  So that's where we're headed this morning.

9           And as I said yesterday, we'll have our

10 lunch recess around noon and start up again this

11 afternoon.

12          Members of the Jury, you have previously

13 been sworn as the jury to try this case.  As the jury,

14 you will decide the disputed questions of fact.  As the

15 Judge, I will decide all questions of law and procedure.

16          From time to time during the trial and at

17 the end of the trial, I will instruct you on the rules

18 of law that you must follow in making your decision.

19          This case involves a dispute relating to

20 a United States patent.  Before summarizing the

21 positions of the parties on the legal issues involved in

22 the dispute, let me take a moment to explain what a

23 patent is and how one is obtained.

24          The United States Constitution grants

25 Congress the powers to enact laws to promote the

1    progress of science and useful arts by securing, for

2    limited times to authors and inventors, the exclusive

3    right to their respective writings and discoveries.

4                    With this power, Congress enacted the

5    patent laws.

6                    Patents are granted by the U.S. Patent &

7    Trademark Office, sometimes called the PTO.  The process

8    of obtaining a patent is called patent prosecution.  A

9    valid United States patent gives the patent owner the

10   right, for up to 20 years, from the date the patent

11   application was filed to prevent others from making,

12   using, offering to sell, or selling the patented

13   invention within the United States or from importing it

14   into the United States without the patent holder's

15   permission.

16                    A violation of the patent owner's rights

17   is called infringement.  The patent owner may try to

18   enforce a patent against persons believed to be

19   infringers by a lawsuit filed in Federal Court.

20                    Now, to obtain a patent, one must file an

21   application with the PTO.  The PTO is an agency of the

22   Federal Government and employs trained examiners who

23   review applications for patents.

24                    The application includes what is called a

25   specification, which must contain a written description

1 of the claimed invention telling what the invention is,

2 how it works, how to make it, and how to use it so

3 others skilled in the field will know how to make and

4 use it.

5          The specification concludes with one or

6 more numbered sentences.  These are the patent claims.

7 When the patent is eventually granted by the PTO, the

8 claims define the boundaries of its protection and give

9 notice to the public of those boundaries.

10          After the applicant files a patent

11 application, a PTO Patent Examiner reviews the patent

12 application to determine whether the claims are

13 patentable and whether the specification adequately

14 describes the invention claimed.

15          In examining a patent application, the

16 Patent Examiner reviews records available to the PTO for

17 what is referred to as prior art.  The Examiner also

18 will review prior art, if it is submitted to the PTO by

19 the applicant.  In general, prior art includes things

20 that existed before the claimed invention that were

21 publicly known or used in a publicly accessible way in

22 this country or that were patented or described in a

23 publication in any country.

24          The Examiner considers, among other

25 things, whether each claim defines an invention that is

1 new, useful, and not obvious in view of the prior art.

2          A patent lists the prior art that the

3 Examiner considered.  This list is called the cited

4 references.

5          After the prior art search and

6 examination of the application, the Patent Examiner then

7 informs the applicant in writing what the Examiner has

8 found and whether any claim is patentable and thus will

9 be allowed.  This writing from the Patent Examiner is

10 called an office action.

11          If the Examiner rejects the claims, the

12 applicant then responds and sometimes changes the claims

13 or submits new claims.  This process which takes place

14 only between the Examiner and the patent applicant may

15 go back and forth for some time until the Examiner is

16 satisfied that the application and claims meet the

17 requirement for a patent.

18          The papers generated during this time of

19 communicating back and forth between the Patent Examiner

20 and the applicant make up what is called the prosecution

21 history.  All of this material becomes available to the

22 public no later than the date when the patent issues.

23          Now, let's take a moment to look at the

24 patent that's at issue in this case.

25          If you'll open up your notebooks, you

1   should have a copy of United States Patent 6,430,395.

2   The cover page of the patent provides identifying

3   information, including the date the patent issued and

4   the patent number along the top as well as the

5   inventors' names, the filing date, and a list of the

6   cited references considered by the PTO.

7            You see up at the top right-hand corner,

8   there's the patent number.  The date the patent issued

9   is directly below it.  The inventors are listed over --

10  are listed over in the left-hand column.  And then down

11  below the application filing date is a heading that's

12  entitled References Cited, and then there's a list of

13  references that the PTO considered in the examination of

14  this patent.

15           The specification of the patent begins

16  with an abstract, and that's also found on the cover

17  page.  It's over in the right-hand column toward the

18  middle of the column.  The abstract is a brief statement

19  about the subject matter of the invention.

20           Next come the drawings.  You can flip

21  over -- there are several pages of drawings and

22  flowcharts in this patent.  The drawings illustrate

23  various aspects or features of the invention.

24           After the drawings, you will find text

25  that is organized into two columns.  That text is the

 1   written description of the invention.  It appears next

 2   and is organized into two columns on each page.  You'll

 3   see the columns are numbered up at the top, 1 and 2, 3,

 4   4.  And they go through the various pages of the patent.

 5                   And then all the way toward the end of

 6   the text in Columns 39 and 40 on the last page, I

 7   believe of your copy, the specification ends with

 8   numbered paragraphs.  These are the patent claims.  The

 9   patent claims determine the scope of the invention.

10                   Now, with respect to the positions of the

11   parties in this case and to help you follow the

12   evidence, I'm going to give you a summary of the

13   positions that each party is taking in this case.

14                   The Plaintiff in this case is Commil USA,

15   LLC.  The Defendant in the case is Cisco Systems,

16   Incorporated.  And the patent involved is U.S. Patent

17   No. 4 -- excuse me -- U.S. Patent No. 6,430,395.  For

18   convenience, the parties and I will often refer to the

19   patent by the last three digits of the patent number.

20                   So in other words, this case involves the

21   '395 patent.

22                   The Plaintiff filed suit in this Court

23   seeking money damages from the Defendant for allegedly

24   inducing infringement of Claims 1, 4, and 6 of the '395

25   patent.

1          Now, the Defendant denies that it has

2 induced the infringement of the asserted claims of the

3 '395 patent and further denies that the Plaintiff is

4 entitled to the money damages that the Plaintiff is

5 seeking.  Your job will be to decide whether the

6 Defendant has induced infringement of the asserted

7 claims of the '395 patent.

8          If you decide that the Defendant has

9 induced infringement of the asserted claims, you must

10 then determine any money damages to be awarded to the

11 Plaintiff to compensate it for the induced infringement.

12          Now, it's my job as the Judge to

13 determine the meaning of any claim language that needs

14 interpretation.  You must accept the meanings I give you

15 and use them when you decide whether any claim of the

16 patent has been infringed.

17          And you've also been provided with a copy

18 of the meanings that I have adopted for certain claim

19 terms.  I believe that there is a claim construction

20 chart behind Tab 2 of your notebooks, and you will find,

21 as you follow the evidence, that the -- when the parties

22 get into the claims of the patent, that there -- the

23 claims use certain terms, and the Court has defined

24 certain terms in the claim construction chart.  Those

25 are the constructions or the definitions of the terms

1  that you need to use in deciding this case.

2          I'm going to give you a brief outline of

3  the trial now.  Soon the lawyers for the parties will

4  make what is called an opening statement.  Opening

5  statements are intended to assist you in understanding

6  the evidence.  What the lawyers say is not evidence.

7          After the opening statements, the parties

8  will present their evidence.  After all the evidence is

9  presented, the lawyers will again address you to make

10  final arguments.  Then I will instruct you on the

11  applicable law.  You'll then retire to deliberate on a

12  verdict.

13          I need to say a few words now about your

14  conduct as jurors.  First, you're not to discuss this

15  case with anyone, including your fellow jurors, members

16  of your family, people involved in the trial, or anyone

17  else, nor are you allowed to permit others to discuss

18  the case with you.  If anyone approaches you and tries

19  to talk to you about the case, please let me know about

20  it immediately.

21          Now, along the same lines, you need to

22  avoid posting anything about the trial or your

23  participation in the trial as jurors on any type of

24  Facebook account or MySpace or any other type of social

25  media website, okay?  It's very important.  There have

1  been cases that have had to be retried around the

2  country because jurors have posted things on the

3  internet.

4          So please -- I don't know the extent to

5  which y'all use Facebook.  It's very popular now, but do

6  not post anything on a Facebook or MySpace account or

7  any other type of social media site.

8          Second, do not read any news stories or

9  articles or listen to any radio or television reports

10  about the case or anyone who has anything to do with it.

11  If there's -- if you take the newspaper and you see a

12  story in the newspaper that concerns the trial, I'm

13  instructing you not to read it.  Same with respect to

14  going on Yahoo!.  If it has local news that you usually

15  read, you should not read any news accounts of the

16  trial.

17          Third, do not do any research, such as

18  consulting dictionaries, searching the internet, or

19  using other reference materials.  And do not make any

20  investigation about the case on your own.

21          Fourth, if you need to communicate with

22  me, simply give a signed note either to one of the court

23  security officers or to my clerk, and they will give it

24  to me.

25          Fifth, do not make up your mind about

1 what the verdict should be until after you've gone to

2 the jury room to decide the case and you and your fellow

3 jurors have discussed the evidence.  You need to keep an

4 open mind until then.

5          During the trial, it may be necessary for

6 me to confer with the lawyers out of your hearing or to

7 conduct a part of the trial out of your presence.  I'll

8 handle these matters as briefly and as conveniently for

9 you as I can, but you should remember that they're a

10 necessary part of any trial.

11          Now, I'll take a moment to compliment the

12 lawyers that are involved in the case, because they have

13 done a splendid job of narrowing down their -- any

14 issues that they had about the conduct of the trial.  So

15 I don't anticipate having to take a lot of breaks in the

16 case to sort the evidence out or anything like that,

17 because they've done a good job of streamlining their

18 presentations.

19          Now, I need to instruct you on what

20 constitutes evidence.  The evidence you are to consider

21 in deciding what the facts are consists of, one, the

22 sworn testimony of any witness; two, the exhibits which

23 are received into evidence; and, three, any facts to

24 which the lawyers stipulate.

25          Now, what is not evidence?

1              The following things are not evidence,

2  and you must not consider them as evidence in deciding

3  the facts of this case:

4              One, statements and arguments of the

5  attorneys; two, questions and objections of the

6  attorneys; three, testimony that I instruct you to

7  disregard; and, four, anything you may see or hear when

8  the Court is not in session, even if what you see or

9  hear is done or said by one of the parties or by one of

10  the witnesses.

11              Let's talk about direct and

12  circumstantial evidence.

13              Evidence may be direct or circumstantial.

14  Direct evidence is direct proof of a fact, such as

15  testimony by a witness about what that witness

16  personally saw or heard or did.  Circumstantial evidence

17  is proof of one or more facts from which can find

18  another fact.

19              Now, I'm going to give you an example of

20  the -- the difference or the distinction between direct

21  and circumstantial evidence.  And before I get started,

22  I'll confess I probably need some new material, because

23  when I started giving this example, the -- the main

24  character in it was a six-year-old little boy, and he'll

25  turn ten tomorrow -- rather on the 11th so -- sorry.

He's going to -- I've used this several times with other
juries, and it seems to illustrate the difference pretty
well between direct and circumstantial evidence.

I have a young child and he really likes
cake, the little boy, and occasionally on Sunday
afternoons, my wife will bake a sheet cake for -- it's
intended purpose is dessert after supper on Sunday
evening.  And his favorite kind of cake is a yellow
sheet cake with chocolate frosting.

Now, Wendi will bake a cake.  She'll put
it out in the kitchen to cool, and when it's cooled
she'll frost it, and it will set on the counter until
dinnertime.

I might walk into the kitchen and see a
corner cut off that cake, and if I followed those crumbs
across the kitchen floor and dining room floor into my
son's bedroom, I might find him in his bedroom with
chocolate frosting on his cheeks and a big grin on his
face.  And I might say:  Son, did you eat that piece of
cake?  And he might tell me no.

Now that would be direct evidence of a
person -- of a witness who was personally present at an
event that either saw or did or didn't do anything.

Now, as a parent, I might choose to
disbelieve that direct evidence in favor of the

1  circumstantial evidence of the missing piece of cake and

2  the crumbs across the floor and the frosting on his

3  cheek and draw a different conclusion from the

4  circumstantial evidence than what the direct evidence

5  would have led me to draw.

6          So you should consider both kinds of

7  evidence in this case, and that's why the law makes no

8  distinction between the weight to be given to either

9  direct or circumstantial evidence.  It's for you to

10  determine how much weight to give to any evidence.

11          In deciding the facts of this case, you

12  may have to decide which testimony to believe and which

13  testimony not to believe.  You may believe everything a

14  witness says, part of it, or none of it.

15          In considering the testimony of any

16  witness, you may take into account, one, the opportunity

17  and ability of the witness to see, hear, or know the

18  things testified to; two, the witness' memory; three,

19  the witness' manner while testifying; four, the witness'

20  interest in the outcome of the case and any bias or

21  prejudice; five, whether other evidence contradicted the

22  witness' testimony; six, the reasonableness of the

23  witness' testimony in light of all the evidence; and,

24  seven, any other factors that bear on believability.

25          Now, the weight of the evidence as to a

1  fact does not necessarily depend on the number of

2  witnesses who testify.  You must consider only the

3  evidence in this case.  However, you may draw such

4  reasonable inferences from the testimony and exhibits as

5  you feel are justified in the light of common

6  experience.

7             You may make deductions and reach

8  conclusions that reason and common sense lead you to

9  make from the testimony and evidence.  The testimony of

10 a single witness may be sufficient to prove any fact,

11 even if a greater number of witnesses may have testified

12 to the contrary, if, after considering all the other

13 evidence, you believe that single witness.

14            When a party has the burden of proof on

15 any claim or defense by a preponderance of the evidence,

16 it means you must be persuaded by the evidence that the

17 claim or affirmative defense is more likely true than

18 not true.  You should base your decision on all of the

19 evidence, regardless of which party presented it.

20            Now, with respect to expert witnesses,

21 when knowledge of a technical subject matter may be

22 helpful to a -- to the jury, a person who has special

23 training or experience in that technical field, called

24 an expert witness, is permitted to state his or her

25 opinion on those technical matters.

1            However, you are not required to accept

2  that opinion.  As with any other witness, it is up to

3  you to decide whether to rely upon it.

4            Now, during the trial of this case,

5  certain testimony may be presented to you by way of

6  deposition.  The testimony of a witness who for some

7  reason cannot be present to testify from the witness

8  stand is usually presented either in writing or by way

9  of video under oath in the form of a deposition.

10           Such testimony is entitled to the same

11 consideration, and insofar as possible, is to be judged

12 as to credibility, weighed, and otherwise considered by

13 the jury in the same way as if the witness had been

14 present and had given from the witness stand the

15 testimony that's read or shown to you from the

16 deposition.

17           Now, it's the duty of the attorney on

18 each side of a case to object when the other side offers

19 testimony or other evidence which the attorney believes

20 is not properly admissible.

21           Upon allowing testimony or other evidence

22 to be introduced over the objection of an attorney, the

23 Court does not, unless expressly stated, indicate any

24 opinion as to the weight or effect of such evidence.

25           As stated before, the jurors are the sole

1    judges of the credibility of all witnesses and the

2    weight and effect of all the evidence.

3            When the Court has sustained an objection

4    to a question addressed to a witness, the jury must

5    disregard the question entirely and may draw no

6    inference from the wording of it or speculate as to what

7    the witness would have said if permitted to consider any

8    question.

9            Now, the law of the United States permits

10   the Judge to comment to the jury on the evidence in the

11   case.  Such comments are only expressions of the Judge's

12   opinion as to the facts, and the jury may disregard them

13   entirely since the jurors are the sole judges of the

14   facts.

15           My first boss out of law school was a

16   District Judge in Beaumont, and he told every jury that

17   sat in his courtroom that the jury was the Supreme Court

18   of the facts.  No court will ever re-examine your

19   decision as to the facts.  So you should consider

20   yourselves to be the Supreme Courts of the facts in this

21   case.

22           With that, Mr. Werbner, you may address

23   the jury.

24           MR. WERBNER:  May it please the Court and

25   may --

 1                    THE COURT:  Before you get started, is

 2  the Rule going to be invoked?

 3                    MR. WERBNER:  Yes, Your Honor.

 4                    THE COURT:  Okay.  Are there witnesses

 5  who could be sworn at this time that are in the

 6  courtroom?

 7                    MR. WERBNER:  We have one witness,

 8  Mr. Joe McAlexander, and Mr. Roger Carlile, actually two

 9  gentlemen.

10                    THE COURT:  Okay.  Does the Defendant

11  have witnesses in the courtroom at this time that can be

12  sworn?

13                    MR. FRAHN:  Your Honor, we have Dr. Jim

14  Lansford who can be sworn in.

15                    THE COURT:  Okay.  If they'll come inside

16  the bar, I'll go ahead and swear them in at this time.

17                    All right.  If y'all will come around and

18  let Ms. Lockhart administer the oath.

19                    (Witnesses sworn.)

20                    THE COURT:  Okay.  I need to give you

21  some brief instructions.

22                    Each of you have been designated as

23  witnesses in the case, and you've been placed under the

24  Rule of the Court.  That means you need to retire from

25  the courtroom and remain outside the presence during the

1   proceedings here in Court.

2               During the course of the trial, do not

3   discuss the case among yourselves, and do not discuss

4   the case with anyone else.  Do not permit it to be

5   discussed in your presence.

6               Now, there's an exception to that.  You

7   can discuss the case with the lawyers.  Now, there are

8   further exceptions to that for expert witnesses and

9   party representatives.

10              To the extent that you are designated as

11  an expert witness in the case, I'll allow you to remain

12  in the courtroom during the evidence.  And to the extent

13  you are a party representative, you're likewise going to

14  be permitted to remain in the courtroom and consider the

15  evidence.

16              Now, the lawyers for both parties bear

17  the responsibility for ensuring that the Rule is

18  enforced.  And to the extent you're neither an expert or

19  party representative, I'll also allow you to remain in

20  the courtroom for purposes of listening to the opening

21  statements, okay?

22              You can step back outside the bar.

23              Mr. Werbner.

24              MR. WERBNER:  May it please the Court.

25              May I have five minutes -- a warning when

1  it's remaining?

2          THE COURT:  Yes, sir.

3          MR. WERBNER:  We are here, because this

4  Defendant violated a patent which was with full

5  knowledge that it had been granted violating the

6  property rights that the United States government gave

7  to the patent holder.

8          Good morning, Ladies and Gentlemen.  My

9  name is Mark Werbner.  Along with my partner, Dick

10 Sayles, we will bring you the evidence to show you that

11 this Defendant has caused its customers to infringe this

12 patent, when they knew of the patent that they gave

13 instructions to those customers on how to use these

14 infringing products in the way that covers that patent.

15         We'll also show you that they did that in

16 order to make hundreds of millions of dollars when they

17 sold over a billion dollars of these infringing products

18 to customers that they knew or should have known would

19 be infringing the patent because of the instructions and

20 the encouragement that they were giving to those

21 customers.

22         And we're going to show you that even

23 after this lawsuit was filed in August of 2007, they

24 continued to make those sales by encouraging these

25 customers to the tune of more than $800 million.

1          May I approach the patent-in-suit, Your

2   Honor?

3          THE COURT:  Yes.

4          MR. WERBNER:  Now, this is the '395

5   patent, which was issued almost a decade ago by the

6   United States Patent Office in the manner which the

7   Judge described to you just a few minutes ago.

8          This was filed by application back in the

9   year 2000, some 11 years ago, and was thoroughly

10  examined by a Patent Examiner from the United States

11  Government working in the Federal Government specialized

12  in patent review, just incidentally, as the Judge said,

13  that these rights were put in the United States

14  Constitution by the founding fathers, devoted to

15  protecting invasion and inventions.

16         And that's why our United States Congress

17  enacted the patent laws.  I just looked up and realized

18  that the first Patent Examiner in the United States was

19  Thomas Jefferson, who went on to become, of course, the

20  President of the United States.

21         But -- you have that copy, but this

22  patent, it states right on the face of it that this

23  United States patent grants to the persons having

24  title -- and I don't believe this -- this cover page is

25  on the one in your book, but this is Plaintiff's

1   Exhibit 1, which you'll have.

2              The United States grants to the person

3   having title to this patent, and undisputably, Commil

4   United States, Commil USA, has title to this patent.

5   They bought this patent from the company in Israel,

6   Commil Limited, that was granted this patent in 2002.

7              It says:  The person who has title to the

8   patent can exclude others from making, using, offering

9   for sale the invention.

10             And you'll see this patent.  After it was

11  examined, it has some 24 different drawings and figures

12  over drawing sheets.  It has 40 columns in it.  It has a

13  number of claims spelled out.  And here's the patent

14  that we're seeking for our property rights to be -- not

15  be ignored and have them trespass against these property

16  rights.

17             Let me give you the essence of the

18  invention that's disclosed in that patent because it's

19  very important.  It's an architecture, a description of

20  how to design a short-range communication system, to do

21  so in a way, in a new architecture, in a new design,

22  that will make it much better for mobile devices, like

23  laptops and PDAs and telephones that are used on the

24  internet, to be able to roam beyond certain limited

25  scopes.

```
 1              There are access points which are needed.

 2  If I'm sitting here with a mobile device, a laptop, and

 3  I want to connect wirelessly, there's a wireless network

 4  that ties back into the wired network that exists in the

 5  building.

 6              So I can, without any connection to

 7  anything, with my wireless device, communicate through

 8  that and off on the internet.  But access points -- and

 9  you'll see them -- sit up and around, but they have a

10  short range of coverage, depending on whether it's a

11  certain protocol; in this case, Wi-Fi, what's called

12  802.11.  You know, they're in the Starbucks and places

13  like that.

14              It's got a limited range, maybe 80, 90, a

15  hundred feet.  You start getting more than a hundred

16  feet away, you go out in the parking lot and then go

17  across the street and you leave that access point that's

18  been hanging at Starbucks, you lose the connection.

19              But if you have in this building 12, 10

20  different access points all connected together, when I

21  leave -- when I'm connected to this one and I go

22  downstairs and around and over to the back office, then

23  I stay connected under this new invention because I'm

24  being passed off or handed off from one access point to

25  the other.
```

1              Now, in the old system before this

2   patent, I had a problem.  When I would leave one access

3   point and move to the next one, it would disconnect

4   and -- and there would be a click or a gap in -- in --

5   in roaming from one access point to the other.

6              So this invention said:  Wait a minute.

7   We can solve that problem.  We can -- instead of just

8   having access points, we can put in a switch or a

9   controller, and now there's a way, by dividing what --

10  dividing what used to be done in that standalone access

11  point.

12             This controller can kind of manage all of

13  this, and you won't have that gap or that click, and you

14  will have centralized control of these 10 or 12 access

15  points from your controller, your switch, and you can,

16  if you do it right, allow a seamless handover like you

17  might have on your cell phone, without any clicks or

18  gap, which would be very important if you want to have

19  people on a telephone that's called voice over internet

20  or VoIP or something.

21             And this was becoming a big thing where

22  you could use actually not a cell phone and the

23  expensive phone calls on your cell phone, but you could

24  use the internet to make free telephone calls if you

25  could wirelessly get on this wireless system.

1                But if you had like the old system with

2    access points only, they were called standalone or

3    autonomous.  They were even called fat because

4    everything that you needed to initiate and maintain

5    communication was in that standalone access point.

6                But in the new invention, this new

7    architecture, this new design, you have a controller

8    there, but the inventors had to decide how do I split or

9    divide what this access point needs to do to keep the

10   communication going?

11               And these inventors said:  You know what?

12   We're going to put the time-critical functions that are

13   performed in the access point, and if you put the

14   non-realtime functions in the controller, now you can

15   have a system where there's no clicks, no gaps, and you

16   have much better mobility.

17               And you have a controller that instead of

18   someone getting up on a ladder in the old days to go up

19   to the standalone number one and go down the hall to

20   standalone number two and do and configure the things

21   that needed to be done, now, with this new design, this

22   new architecture, you could centrally control all of

23   that, and there were other benefits to this design.

24               And so finding this novel and innovative

25   and new, the United States Patent Office examined that

and granted the patent for that design.

Now, there's a number of different patents that are called.  You can have a patent on a product, you know, you can invent the cotton gin and go get a patent, but there's also many, many patents called method patents or utility patents that are for designs and architects and methods of doing things.

Under the law, under the patent law, they're no different.  A method patent, a utility patent, an architectural patent like this is the same as some kind of product patent.  It's just something that, in this instance, describes the method, architecture, and design so that others, if they wish and respect those appropriate rights want to make a product.

Because this patent does not make a novel new product, it says how to design a wireless communication system in this very special way by adding a second piece of equipment, and that's very important, this controller.

In the old system, those standalone access points, the fat ones, where everything was in it, the autonomous ones, you didn't have a controller at all.

But with the new system that was disclosed in this patent, someone making a product would

1  need to make access points and controllers to carry out,

2  if they wanted to use, this superior design for a

3  wireless system.

4              There is no doubt in this case the

5  evidence will show that what was disclosed in this

6  patent and what the United States government issued

7  property rights to was innovative.

8              This Defendant's records, in talking

9  about this design, said it was revolutionary, said it

10 was breakthrough technology, said that it opened up an

11 entire new market, which is the large enterprise

12 customers.

13             You see, there was wireless systems like

14 in the Starbucks, like where people might use it in

15 their home, but big enterprises, like hospitals and

16 college campuses, they still had their wired network.

17 They weren't using a wireless system, because over the

18 big size in their factories and schools and hospitals

19 and businesses, it was too hard to manage 15, 20, a

20 hundred, even a thousand of these access points.

21             And because people were walking in the

22 campuses and people were walking through hospitals --

23 and I'm going to show you a video in a minute -- they'd

24 be getting all these clicks and gaps.  They wouldn't

25 have this mobility.  They wouldn't have this roaming.

1 But this design solved that problem in a very innovative

2 way, and the Defendant saw a company -- they didn't come

3 up with this -- these products, these controllers that

4 they sold a billion dollars worth.

5                    They saw a company called Airespace, who

6 in March of 2005, years after this patent that Commil

7 owns was issued, that had this Split MAC architecture

8 that was using this controller with the access points,

9 splitting them, they called it Split MAC, where the

10 time-critical functions were put in the access point and

11 the noncritical functions were put into the controller.

12                    And Cisco said:  You know, we're the big

13 innovator; we're the big company; we're the leaders in

14 the industry; but all we have are these old autonomous

15 standalone fat ones.

16                    And they could see -- and you'll see it

17 in their documents -- that this was going to be a fast

18 expanding market, that they could target large

19 enterprises, hospitals, campuses, and they can -- and

20 the evidence is, made a 50-percent profit margin on

21 those billion dollars of sales, a 45- to 50-percent

22 profit margin.

23                    So they bought that company when it was

24 in its young infancy to get this new line of products

25 that are covered by this patent.

1        Now, they may say, as I think you heard

2   already, but they're going to say:  Well, this patent

3   isn't that valuable.  But yet there's such a demand

4   among these large enterprises, the whole market that

5   didn't exist before, that they sold over a billion

6   dollars in the last five years at a 50-percent profit

7   margin.

8        But you know what else tells you how

9   valuable the design and the patented architecture is?

10   When they saw this company called Airespace with that

11   new product line, they bought it for $450 million.

12        Now, they kept their old system, but the

13   evidence is going to show you, because now they could

14   sell customers two pieces of equipment, all these access

15   points and the controller, that they had a plan -- and

16   you'll see their internal documents -- that we've got to

17   move our customers from our old access points that only

18   sell for 4 or $500 to this new design where the access

19   points sell for 4 or $500.

20        But some of these customers were buying a

21   thousand of them, 2,000 of them, to hang and use in

22   their system.  But these controllers that they didn't

23   have, that doesn't exist with the old system costs

24   sometimes 5 to $20,000 each.

25        So they wanted to move -- and they used

1  the word migrate.  They want to migrate all these

2  customers to this new, big, expensive system where you

3  now have to have a controller.

4           And they encouraged the customers to make

5  that change, to make that migration.  They pointed out

6  the benefits, just like the patent covered, the seamless

7  handover when you walk through, the greater mobility,

8  the use of a switch or a controller.

9           And that was great.  That's fine.

10  There's nothing wrong with them selling those products.

11  But you have to pay the person, if you're going to use

12  the patented invention, a reasonable royalty.

13           And they got that patent, and they

14  ignored those rights.  And you can decide, after you

15  hear the evidence, why.  Maybe they thought this little

16  company over in Israel wouldn't know about it or this

17  little company over in Israel wouldn't come after them,

18  and they repeatedly ignored those property rights and

19  just kept on selling without stopping.

20           Now, I want to say one more thing.  We're

21  not suing those customers, the people that they sold to,

22  the University of California, some other universities in

23  Texas, Intel, Cigna, and I'm going to show you Purdue.

24  I'm going to show you these customers, because this case

25  is all about what Cisco was doing to induce, to

1   encourage these customers to buy and use.  They were

2   telling the customers how to use the products in a way

3   that they took the splitting or the time-critical bases.

4           And the old customers, where there was no

5   patent, where they were selling just the autonomous

6   standalone, they had internal documents, we'll show you,

7   that said:  Listen, if the customer raises an objection

8   to using it the old way, the non-infringing way, here's

9   how you move them over to this new way.

10          And they had a whole thing -- because

11  these products could be used in a way that didn't

12  infringe on this patent, but Cisco repeatedly told the

13  customers how to use it.  They gave instructions.  They

14  gave encouragement.

15          Because that was the profitable way for

16  them to make the 50-percent profit margin on the

17  millions, the hundreds of millions of dollars they were

18  selling.

19          But there was nothing wrong with the

20  customers using these products.  We're not suing those

21  people, and we don't blame those people.  But when

22  Cisco, this Defendant, knows of the '395 patent and they

23  know or should know -- and that's the key test -- they

24  know, after they get the patent, or should know that

25  through their instructions and their encouragement and

1  their telling the customers how to use it, that it

2  infringes this patent which they have, then they are

3  inducing infringement.  And they are financially

4  responsible, not the customers.

5  Now, a lot in this case is about what did

6  Cisco know and when did they know it, what they knew

7  about this patent.  And we're going to show you long

8  before this lawsuit was filed where they admit they knew

9  of the patent, but yet didn't change in an iota what

10  they were doing.  They knew about it years before.

11  First, there's going to be testimony from

12  Mr. Dovev, the man back in Israel -- and Cisco has a big

13  presence in Israel -- that Commil Israel went to Cisco

14  Israel in late 2004 and told them -- because they wanted

15  to do a deal or be acquired or have a business

16  relationship; they were in the same business; little

17  company going to the large company, Cisco -- and said:

18  We have patents.  We have patented technology.  In fact,

19  your product that you're buying from Airespace is pretty

20  close to, if not exactly what our patent says.

21  Now all of the sudden, Cisco ignored

22  that, and they can't really remember that conversation.

23  But that's the first time they learned of it.

24  And what did they do?  Do they go get a

25  lawyer?  Do they examine the Patent Office?  Do they go

1    through it?  They just blow it off.

2                    Now, the second thing is -- that was in

3    late '04, and that's going to come through a deposition

4    of Mr. Dovev.  One that this Defendant took, they were

5    asking the questions over the telephone -- it sounds a

6    little funny, because Israel is way over there, and

7    Mr. Dovev was sitting in Israel and -- and the Cisco

8    lawyers were in California, but they asked Mr. Dovev

9    those questions, and that's what he testified to, and

10   that's the truth.

11                   Now, December 15th, 2004, right about the

12   same time, it goes on.  What do they know and when do

13   they know it.  They were told specifically of the '395

14   patent.  They were given the number in a written letter.

15   And do you know who, in December 15th of '04, wrote a

16   letter to this Defendant and told them about the '395

17   patent?  The United States Patent Office.  The

18   government of the United States, through the Patent

19   Office, wrote them a letter.  And then -- and that was

20   on December 15 of '04.

21                   The next year, because -- this was Cisco

22   Technologies, their subsidiary.  Now, they say:  We

23   don't know -- our company's so big we can't keep up with

24   all of this, but the patent that was the subject of this

25   Patent Examiner writing the letter, that patent issues.

1              And you remember where Judge Everingham

2  showed you cited references that appear on the front of

3  patents, just like you have on the '395?  Well, on the

4  patent that went to their company, Cisco Technologies,

5  bigger than Dallas, it says, '395 patent right on the

6  face of it.  And that's in '05, right about the time

7  they're buying Airespace.

8              I think you'll infer from the

9  circumstantial evidence that this Defendant -- nothing

10 was going to stop them from acquiring this infringing

11 product line from Airespace, and they ignored the U.S.

12 Patent Office.  And then the lawsuit comes in '07, and

13 they ignore that and keep selling without stopping.

14             Now, they're going to say to you, I

15 believe, that, well, they didn't -- they didn't think

16 that it infringed.

17             What would you expect a company with the

18 vast resources that Cisco has, with the engineers, with

19 the in-house lawyers, with everything else to do, when

20 they were sued, to determine if this patent was

21 something that protected rights that they were

22 infringing?

23             Wouldn't they talk to their legal

24 department?  Would they go to a lawyer and get a legal

25 evaluation?  You're not going to hear anything like

1  that.  They just kept on selling another $800 million

2  dollars of the product, telling Cisco (making gestures).

3  I want to show you something.  Well, why are they

4  fighting so hard to ignore and sweep under the rug the

5  fact that they were told by the man in Israel in late

6  '04?  Why are they coming up with the excuses when the

7  Patent Office wrote them a letter in black and white?

8            Because under the law, you'll later learn

9  that royalties don't have to be paid for inducing

10 customers until they knew of the patent.  So they want

11 to make it as late as possible, late as possible because

12 of the money.

13            We're going to show you that Cisco, from

14 day one, has arrogantly and stubbornly ignored the

15 property rights that the United States Patent Office

16 granted to Commil.

17            And that design, you're going to learn

18 from the experts, it not only, by their own admission,

19 revolutionized the wireless industry, these big

20 companies, this system wouldn't work without this

21 design.

22            This architecture where the splitting

23 occurred and using a controller is what opened up this

24 whole market to large enterprise users.  It would not

25 work.  You'll see in this video that they promoted to

1   their customers, you couldn't walk all over a hospital

2   without getting the clicks and the gaps.

3                   Now, they're also going to tell you that,

4   you know, that wasn't a really big thing.  You know, the

5   ability of customers to be able to roam like that

6   without the clicks and the gaps, you know, not that many

7   people really want the system to use phone calls for.

8   The evidence is completely contrary to that.  And I hope

9   that as judges of the fact, as you evaluate the

10  credibility, you'll make some decisions about whether

11  they're shooting straight with you.

12                  They're going to say, I believe, well,

13  their infringing products, they don't split on a

14  time-critical basis like the patent describes.  I'll

15  show you 15 of their own documents that say they split

16  on that basis.

17                  And you know what?  You'll hear them try

18  to squirm around and say:  Well, I don't know why, but I

19  don't think that's right.  Well, I don't -- can't --

20  well, that's a marketing document.  Well, I'm not

21  really -- another ignoring of black and white documents,

22  which ought to tell you something about who's shooting

23  straight in here with you.

24                  Let's take a look, because Cisco had a

25  plan from the beginning to -- to sell these products and

1    not have to pay any kind of fee to use that.

2              Now, Mr. Carroll said yesterday in the

3    selection of the jury, he said:  Gosh, we don't even

4    understand what they're suing us for.  Induce.  Induce

5    who?  We -- we don't even know.

6              Four years after the lawsuit, they don't

7    know?  That's another example of who's shooting straight

8    and who's sort of trying to ignore things.

9              They have on their website all kind of

10   things that are promoting to the customers.  I'm going

11   to show you 8x10 color glossy customer studies where

12   they tout these products, where they list -- and you'll

13   see the name.  The Controller 6500, you're going to see

14   that in the video.  The Access Point 1250, you'll see

15   that.

16             So they are aggressively encouraging,

17   actively encouraging these customers in this large

18   business to buy these things and telling them how to use

19   it in the way that does exactly what the patent says to

20   do after they knew of the patent.

21             Let's look at the website video they put

22   out because they're trying to get other people -- and

23   look especially, because Cisco is going to say now:  You

24   know, they just get somebody that makes an order, and

25   they just ship it, that they're not really out there

1    showing the customer, testing, installing, configuring.

2    Let's see on their website what they're saying.

3                    (Video advertisement played.)

4                    (Video stopped.)

5                    MR. WERBNER:  Now, there are -- and I

6    hope in the trial, we'll show you more.  There are five,

7    six, seven, eight maybe more of these on their website.

8    And we're going to take a look at one more, because I

9    hope you see they were our partners.  The evidence will

10   show they were with us every step of the way.  They were

11   out here with the site survey setting it up, and their

12   website is full of that.

13                   And these 7920 -- these phones and the

14   voice, they call this system, by the way, just so that

15   it's distinct from the old system, the Cisco Unified

16   Wireless Network, CUWN, the Cisco Unified Wireless

17   Network.  You'll see them talking about that.

18                   When you see them talking about their

19   lightweight access points, their thin access points,

20   those are the new ones where some functionality has been

21   divided out and placed on a controller.

22                   Let's look at Carnival Cruises.  We're

23   not going on a cruise, but let's see how other people

24   do.

25                   (Video advertisement played.)

1                     (Video stopped.)

2                     MR. WERBNER:  I think it will be evident,

3   with these and more evidence, that Cisco, with these

4   customers, are in collaboration about how to use this

5   system, the benefits of using the voice with the Split

6   MAC architecture.  They're joined at the hip in how

7   these products get used by the customers.

8                     THE COURT:  You've got five minute

9   remaining.

10                    MR. WERBNER:  Thank you, Your Honor.

11                    Let me show you an internal tool that

12  they use, Slides 21 and 31.  They have all kind of

13  internal things that are showing how we've got to move

14  the customers into this new architecture.  And you'll

15  see that in the 21, 31 slide.

16                    This is a March of '07.  The title of

17  this Cisco document is:  Overcoming Customer Objections

18  to Migrating to the CUWN.

19                    And then if you go back through it, they

20  write out here how to get their sales force -- here's

21  how you move people to the new products where we have

22  the controller.

23                    And if you'll move through here, they

24  say:  Move all customers, move all customers to the

25  unified architecture as quickly as possible.  Encourage

1  all customers to convert.

2          Let's go a little bit further through

3  this.  And they're showing how to move from the

4  autonomous access points, encourage future migration.

5          You'll hear more about this LWAPP, which

6  is the software that splits and divides, along with some

7  other things.

8          Let's look at the other pages because we

9  have to go quickly through these.

10          Now, if the customer has an objection to

11 going to the new design, here's what you need to show

12 them.  Here's how you would respond to that customer.

13 So they're integrally involved in encouraging, touting,

14 promoting, instructing these customers to come to this

15 new design after they know of the patent, after they

16 know of this patent.

17          So let's -- me also tell you -- here's a

18 quote that you're going to hear in this trial under oath

19 from a Cisco witness who was asked:

20          QUESTION:  Didn't Airespace and then

21 later Cisco encourage customers to use the Split MAC

22 arch. functioning?

23          ANSWER:  Yes.

24          QUESTION:  When there was a choice

25 between using the system as Split MAC, this division

1  that we're talking about, or other options, didn't you

2  recommend Split MAC?

3                     ANSWER:  Yes.

4                     QUESTION:  Because that was a major

5  selling point that was being used to induce customers to

6  purchase it and spend money?

7                     ANSWER:  Yes.

8                     MR. WERBNER:  To induce the customer.

9  That's the testimony from their witness.

10                     And they're going to spend a lot of time

11  talking about Bluetooth, which is another short-range

12  communication protocol.

13                     And they may suggest that, you know,

14  there's something that has to do with that.  That patent

15  will show you -- mentions Bluetooth as what's called the

16  preferred embodiment, but it says it's an example.  It

17  says it's an example.

18                     And you're going to see that this applies

19  to Bluetooth, to Wi-Fi, and other short-range

20  communication protocols.  They may talk about how, you

21  know, Commil in Israel they weren't very successful.

22  They couldn't, you know, make a product that sold like

23  the ones we bought for $450 million.  That's all

24  irrelevant.

25                     The Judge is going to tell you the

infringement involves comparing the patent to the products, and do the products perform all of the steps of the patent.

It has nothing to do with -- there are a lot of reasons why they -- the inventor doesn't have to build or produce anything.  They have the patent and the value of that patent.

But watch for that if they don't try to get your eye off the ball with something like that.

This technology was vital.  The aspects of this patent is what drove the entire market.

I just want to close with this:  You know, there's damages.  I'm not going to talk about that.  You're going to hear from an expert.  The damages are large because the sales are large.

You're going to see that a 5-percent royalty on infringing products that have a 50-percent profit margin, and from an expert who shows you that's quite reasonable, is a very reasonable royalty.

You remember Mr. Carroll said to the gentleman about the wire cutters, if I have the wire cutters, and I go to the hardware store, and I ask the man for wire cutters, and that's it, and I leave, and then they come back to the seller, how wrong that would be.

```
 1              But then his second example was right on
 2  point.  He said, if you come in to buy the wire cutters,
 3  and you say:  I'm going to go trespass, and the seller
 4  at the hardware store says:  You know what?  Let me tell
 5  you how to use these products in a way -- let me tell
 6  you how to use this bigger wire cutter, and then you
 7  could see...
 8              So I think Mr. Carroll gave you an
 9  example you should be thinking about, because Cisco is
10  the hardware store.  They didn't just sell these
11  infringing products and go on about their business.
12  They were out there telling these people how to use it.
13  Take this.  Encouraged them.  Let us help you use this
14  new design.  This is superior.  This is what -- no, no.
15  Don't buy these other products.  We want you to use
16  these things in a way --
17              THE COURT:  Mr. Werbner, you've used your
18  time.
19              MR. WERBNER:  Okay.  Thank you, sir.
20  Appreciate it.
21              THE COURT:  Before you get started,
22  Mr. Gutman, we started off schedule, and we're at the
23  point where I'd ordinarily take a morning recess,
24  thereabouts.
25              If anyone needs one, if you'll raise your
```

1  hand, you want to stretch your legs, I can take one now.

2  But I didn't want to interrupt the Defendant's lawyer

3  during his presentation.  He's got 45 minutes.  So we

4  can take one now or we can go after he's through.

5           Why don't we -- why don't we take 15

6  minutes now, and we'll start back at 10:30.

7           MR. GUTMAN:  Thank you, Your Honor.

8           LAW CLERK:  All rise for the jury.

9           (Jury out.)

10          THE COURT:  We'll start at 10:30.  I

11  didn't want them to be worried about their recess and

12  not about your trial, okay?

13          MR. GUTMAN:  Your Honor, I would have

14  been tempted to raise my own hand, if you hadn't done

15  that, so thank you.

16          THE COURT:  Well, I try to keep them on

17  at least the schedule that I tell them about.  It would

18  have been helpful had the notebooks been properly

19  prepared.

20          MR. STRACHAN:  Yes, Your Honor.

21          THE COURT:  We are where we are.

22          MR. GUTMAN:  Thank you.

23          (Recess.)

24          LAW CLERK:  All rise.

25          (Jury in.)

```
 1                    THE COURT:  Please be seated.

 2                    Mr. Gutman, you may address the jury.

 3                    MR. GUTMAN:  Thank you very much, Your

 4   Honor.

 5                    Can I ask for a 10-minute warning?

 6                    THE COURT:  Certainly.

 7                    MR. GUTMAN:  Set my own little timer

 8   here.

 9                    Good morning, Ladies and Gentlemen of the

10   Jury.  It's a pleasure to have a chance to address you

11   this morning.

12                    My name is Hank Gutman.  My colleague,

13   Mr. Carroll, who was with me yesterday at counsel's

14   table.  Again, yesterday was a busy day.  In case you've

15   forgotten, Buzz Frahn, Marta Beckwith -- she's the

16   client; she's here from Cisco -- and Jeff Ostrow, my

17   partner.

18                    And this is my chance this morning to

19   spend a few minutes to talk with you about what the

20   evidence is going to be in this case, what it's going to

21   show, and as important, what it isn't going to show.

22   And before getting into some of the background stuff, we

23   just want to respond to a couple of things that

24   Plaintiff's counsel said before.  I mean, it was one

25   that was pretty astonishing, and I wrote it down.
```

1           Mr. Werbner said that there's nothing

2  wrong with the customers using our product.  He said

3  that.  Now, he went on to say he wasn't going to sue

4  them.  And I'm sure that must be a great comfort, but

5  under the law, as the Judge is going to tell you at the

6  end of the case, we can't induce anyone to infringe,

7  unless there is direct infringement by those customers.

8  So they are going to have to show you -- and this is

9  their burden -- that our customers directly infringe the

10  patent.  And if he meant what he said about there's

11  nothing wrong with what the customers do, then we can

12  all go home right now, because it's going to be their

13  job to show you -- whether they sue them or they don't

14  sue them, you know, they get to decide that.

15           If they can't show you that the customers

16  directly infringe, then the case is over, and you don't

17  have to reach any of the other issues.

18           Second thing, a lot of the time,

19  including those videotapes, was spent showing that Cisco

20  works hard to make its customers happy, tries to get its

21  customers to buy its new products, tries to meet their

22  needs, tries to cooperate with them, to partner with

23  them, to collaborate with them, and that the customer is

24  apparently the ones who gave those testimonials seem to

25  like it.

1       And the answer is:  Of course.  Of course
2  we do.  Any successful business does that.  I don't care
3  whether your business is a big one or a small one.  If
4  you don't make your customers happy and you don't make
5  them think you care -- that you care and that you're
6  delivering on what they need, you don't do very well in
7  business.
8       And that's all we're doing, but there's a
9  world of difference between that, between wanting our
10 customers to buy our products, to like our products, to
11 use our technology and encouraging them knowingly to
12 infringe somebody else's patent.  And that we don't do,
13 and that there isn't any evidence of, and that's what
14 this case is going to be about.
15      Now, as I said, we're representing Cisco.
16 So could I see Slide 2, please?
17      Let's just talk a little bit about who
18 the parties are.  We did some of this yesterday, but
19 Cisco is not the food service company.  It's the
20 technology company.  70,000 employees worldwide, over
21 3,000 of them right here in Texas where we have major
22 operations.
23      Now, Cisco, again, contrary to what
24 Plaintiff's counsel tried to tell you, Cisco respects
25 intellectual property rights.  We're a technology

1  company.  We innovate.  We have thousands and thousands

2  of patents of our own.  That doesn't affect the question

3  of whether there is or isn't infringement here.  But

4  this is our life blood.

5              So of course we respect patents.  We

6  respect the patent system, and we respect intellectual

7  property rights.  Mr. Werbner said, well, they've sued

8  us and we've ignored it.  I don't think we've ignored

9  it.  I think we're here defending it.  We're in Court.

10  Because you can't just wave around a patent.  Even if

11  you put it in a pretty frame and wrap it in plastic, you

12  can't just wave it around and say write me a check.

13  You've got to prove that you're entitled to it, and they

14  have to prove that our customers infringe.  And we don't

15  think our customers infringe, and so we're defending

16  that, and that's why we're all here.

17              Now, as I said, we've got thousands of

18  patents of our own, but we also respect the rights of

19  others.  And the products that are at issue here, these

20  Wi-Fi products come from a little company that we

21  acquired, that Cisco acquired.  And one of the founders

22  of that company is a guy named Bob O'Hara.  You can see

23  the picture.  There he is.

24              Bob is going to be here tomorrow, and

25  you're going to be able to hear him tell the story in

his own words of what he and his colleagues have done.
How they sat down and they came up with -- before the --
before the Commil -- the patent that Commil's here on
had even issued from the Patent Office, they came up
with a new way to split the MAC and do all those things
that you were hearing about.

And Cisco liked their technology; they
liked the company.  They paid a lot of money for that
technology, and they didn't just buy a patent.  They
bought the whole thing, and the people came to work at
Cisco.

So far from not respecting intellectual
property rights, when Cisco finds the technology that it
likes, that it thinks is an improvement or could help
when put together with the things Cisco already has,
they wrote a check.  In this case, it was 450 -- $450
million to buy this little company and to employ those
people at Cisco.

And Bob came to work as a senior manager
and architect, systems architect at Cisco, and he stayed
there until a couple of years ago when he retired.  And
you're going to hear that whole story from him directly
tomorrow.

And the name of that company -- could we
see the companies again.

1              I guess Airespace isn't on there.  The

2   name of that company was Airespace.  Now, what they did

3   is they came up with something that they called a

4   controller that could manage a lot of different access

5   points.  And you heard something about that in

6   Mr. Werbner's opening, but we actually have them over

7   here.

8              In case you were wondering what these

9   things looked like, it's a little heavy.  This is a

10  controller (indicates).  So when you hear people talking

11  about a controller, that's what this is.

12              If Mr. Frahn could be Vanna White here.

13              Now this is an access point (indicated),

14  okay?  This is the thing that will be up in the ceiling.

15  It's got antennas on it, and that's what the wireless

16  devices connect to.  And the controller can help manage

17  a number of different wireless devices at once.

18              Now, Commil USA up here, that's the

19  Plaintiff in the case, and they don't make the -- the

20  evidence is going to show that they don't make anything.

21  They don't have any research and development labs.  They

22  don't create any jobs other than for lawyers and expert

23  witnesses.

24              Their only business, the only thing

25  they've done is filed this patent suit.  And as you've

1   heard already yesterday, it's owned by a guy named

2   Jonathan David.  He's a lawyer.  Nothing wrong with

3   being a lawyer.

4              I'm a lawyer.  My wife of 30 years is a

5   lawyer.  I love her -- well, I know I love her; I hope

6   she loves me.  Our youngest child, my daughter is in

7   college and wants to be a lawyer.  So there's nothing

8   wrong with him being a lawyer.

9              But the patent here is the one that they

10  bought from a company called Commil Ltd.  And Commil,

11  you know, the name is almost the same.  I guess the idea

12  was to suggest that the companies are related somehow,

13  but they really aren't.

14             Now, the patent in question is sometimes

15  called the '395; sometimes it's called the Arazi patent

16  after one of the inventors, the lead inventor.

17  Whichever it's called, we're talking about the same

18  patent.

19             But here's how Mr. David came to acquire

20  the patent.  He found out from his cousin -- and this is

21  what the evidence is going to show -- he found out from

22  his cousin that the original Commil company, these guys

23  (indicates), who said they were innovating Bluetooth

24  networks, had failed in their business.

25             They tried to do their technologies in

1  Bluetooth; they tried to do them in Wi-Fi.  Neither

2  worked, and their investors foreclosed on the patents.

3  And Mr. David's cousin, who was in the business of

4  dealing with that stuff, told him that you could pick up

5  these patents cheap.  And so he bought an entire

6  portfolio of patents, not just this one, but I think

7  there were seven or eight in all, for $400,000.

8              Now, they didn't buy the patents because

9  they wanted to use them to create technology or to build

10  a business.  They bought the patents just so that they

11  could sue Cisco and perhaps other parties.  And that's

12  why we're here.

13              Now, under the law, patents could be

14  bought and sold.  There's nothing -- you know, there's

15  nothing wrong with it.  People who had nothing to do

16  with the invention can sue if they own the patent.  But

17  that's what happened here.

18              This was a foreclosure purchase,

19  purchasing in a foreclosure sale of these patents from

20  the people who actually did it.

21              Now, let me talk to you a minute about

22  who's going to be testifying in this case, what

23  witnesses you're going to see, and what ones you aren't.

24              Apparently, the Plaintiffs don't plan to

25  call any fact witnesses to appear personally at this

1   trial.  We already heard yesterday that Mr. David, the

2   owner of the patents, isn't going to be coming.  And I'm

3   sorry that he's not feeling well, but he's not going to

4   be here.

5            None of the inventors -- there were three

6   inventors on this patent.  If you want to open up your

7   trial notebook and look at the first -- the first tab,

8   as His Honor showed you, in the very front, it lists the

9   names of the three inventors:  Mr. Arazi, Mr. Soffer,

10  and Mr. Barak.

11           After buying the patents, Commil USA made

12  deals with those guys to hire them as consultants, to

13  help them on this lawsuit, but none of them are coming

14  here to testify at trial.  None of the inventors are

15  going to be on the stand.  We're not going to hear from

16  them live.

17           And we're going to show you some of the

18  deposition testimony that we took from them, but the

19  Plaintiff isn't bringing them.

20           And you heard yesterday during jury

21  selection about some guy who knew patents better than

22  Mr. David, who read this patent.  Remember, Mr. David --

23  you were asked about Mr. David not having read the

24  patent before he bought it, and you're going to see

25  testimony that that's true.

1           And yesterday, it was suggested during

2   the -- during the jury selection, well, that's okay; he

3   hired some smart guy who knew patents better to read it

4   for him and advise him.   That guy is not testifying.   I

5   don't know who that guy is.   He's not going to be

6   testifying here either.

7           The only witnesses they're going to be

8   calling are their paid expert witnesses, two of them.

9           Now, as I said before, the issue you're

10  going to be asked to decide in this case is whether or

11  not Cisco's customers infringe this patent, and then

12  whether Cisco induced them to do so.   That is, that we

13  knew that they infringed, that they did it, and we

14  encouraged them to do it.

15          And His Honor is going to tell you that

16  if you find that Cisco's customers didn't infringe the

17  patent, the case is over.   We can't have induced them to

18  infringe.   If they didn't infringe, there's nothing

19  there.   And we're going to get back to that in a minute.

20          But before we look at the patent,

21  something that during Plaintiff's opening, he never

22  really had you do.   You never looked at the claims of

23  the patent.   We're going to go there in a minute.

24          Let's just say a few words about the

25  technology and let's see if we can demystify some of

1 this stuff.  You're going to hear a lot about two terms:

2 Wi-Fi and Bluetooth.

3          Now, some of you may already know what

4 these things are, and if so, please forgive me for

5 explaining them.  But they're both -- they're both forms

6 of wireless communications.  Both of them are

7 replacements for wires, but they do have some pretty big

8 differences.

9          Now, Wi-Fi is how we connect our

10 computers or our smart phones or devices like that,

11 iPhones or something like that, to the internet without

12 having to have a wire.

13          And some of you may be old enough -- I

14 know I am -- to remember the early days, the early days

15 of the internet when if you wanted to get on the

16 internet, you had to plug into a telephone line and dial

17 up.  It was slow; it was clunky.  That's how it started.

18 And then the technology moved forward, and there's

19 ethernet.

20          And now if you're lucky enough to have

21 sort of the high-speed broadband connection, you can

22 plug a different kind of cord into your computer with a

23 fatter -- fatter head on it, for those who remember, and

24 you can get on the internet that way.

25          Well, today you don't have to do that.  I

1    mean, right here in this courtroom, there's wireless

2    internet.  I don't know where the access point is or how

3    many there are or how the building is wired.  Could very

4    well be Cisco equipment.

5                    And under their theory, any lawyer who's

6    hooked up, including Plaintiff's counsel right here, I

7    guess his client didn't cut him a break -- but any

8    lawyer in this room who's got wireless connected to the

9    internet could very well be infringing the patent under

10   their theory.  Infringing the patent.

11                   And the same would be true if you're in

12   an airport or your hotel or your coffee shop or any of

13   these other places where -- these days more and more you

14   go and there's a big sign out front that says wireless

15   internet access.  So that's what Wi-Fi does.

16                   Now, Bluetooth also involves taking away

17   a wire, but it's used very differently.

18                   Could we see the picture of the young

19   lady with her phone?

20                   Here we go.  So this would be a common

21   use of Bluetooth, right?  Here's she's got her cell

22   phone, and she's got the plug in her ear.  With

23   Bluetooth, we get rid of the wire and instead, she's got

24   one of these little gizmos in the ear.

25                   You'll often see them in cars or trucks,

1    too.  I mean, if you see somebody walking down the

2    street or driving down the highway and they're having

3    a -- they're busy yabbering away at somebody, but

4    there's nobody there; you don't see a cell phone to the

5    ear, right?  You know what's going on.  You know what's

6    going on.

7                   They're Bluetooth; they're talking to the

8    speakers in their car or their truck, or they've got one

9    of those little -- when you get close enough, you'll see

10   one of those little things in the ear.  So that's what

11   Bluetooth does.

12                  And it's -- there's some big differences

13   that matter here.  Wi-Fi is a shared medium.  I mean, we

14   can have -- everybody in this courtroom could have --

15   could have their own little laptop computer and be

16   hooked up to the internet right through that access

17   point.  Everybody shares it.

18                  Bluetooth is one-to-one.  If I've got the

19   earpiece, it's talking to my phone.  It's not talking to

20   his phone; it's not talking to his phone; it's not

21   talking to any of your phones.  And, you know, if I get

22   in my car, I've got to disconnect and reconnect to talk

23   to the one in my car.  That's the way Bluetooth works.

24                  So you'll also hear about protocols

25   and -- and standards.  And let's talk about that for a

1  second.

2               Each of these different technologies has

3  its own.  For Wi-Fi, it's called 802.11.  For Bluetooth,

4  it was originally called 802.15, but it ended up just

5  becoming Bluetooth.  And so what is one of these

6  protocols or standards?

7               I mean, all it really is, is just sort of

8  a common way of communicating.  It's rules and

9  procedures for communicating.  And if you think about

10  it, it all makes sense, because this equipment we use

11  could come from lots of different manufacturers all over

12  the world.  And the components inside the equipment

13  could come from even more manufacturers even further

14  afield around the world.

15               So how do you know that any of these

16  things are actually going to work together, that they're

17  going to be able to talk to each other?

18               And the answer is what happens in each of

19  these industries, they get together, a bunch of the

20  smartest scientists and engineers, the people who really

21  know this stuff, and they sit them down in rooms and

22  they hash out the rules of the road.  They decide what

23  the -- what the standards are going to be.

24               And then they vote on them and they agree

25  on them and they publish them to the world.  And then

1  after that, everybody knows, okay, if I want to make

2  this stuff, I'm going to say it's 802.11-compliant.

3  That means I've read these standards and I've complied

4  with these standards.  I've complied with these

5  standards.

6          And that way, everybody you're doing

7  business with knows, oh, okay, we're all playing by the

8  same rules.  I mean, if you think about this like a big

9  meeting of people from all over the world, I mean,

10  what's the first thing you have to do before you can

11  start talking to each other.  You have to agree on a

12  language, right?

13          So this is like, okay, we've already

14  agreed we're going to speak English, and now we can

15  start having a conversation, and that's the way it

16  works.  And this kind of modern communication we have

17  today wouldn't work without it.

18          Now, and -- and in one of the -- in one

19  of the patent claims, you'll see the term a

20  communication protocol.  And the Court has defined

21  that -- you can find that behind Tab 2 in your

22  notebook -- as being a set of procedures required to

23  initiate and maintain communications between two or more

24  devices, okay?

25          So it's the same deal.  It's the same

1   deal.  These are the set of procedures that allow for

2   that communication.

3                Now, Bob O'Hara, who you're going to be

4   hearing from, was one of the people -- I told you about

5   the committee -- he was one of the people who developed

6   the very first Wi-Fi protocol, 802.11.  He was years

7   before Commil.  He was working on developing that

8   standard for Wi-Fi.  He was the technical editor of the

9   committee.  He was the guy who took all the proposals as

10  they were voted on and turned it into a finished

11  product, which is one reason why some people refer to

12  him as the father of Wi-Fi.  And he's going to tell you

13  all about that when he takes the stand.

14                Before we turn to the issues, though,

15  let's just look a little bit at the timeline.

16                Can we see our timeline?

17                So let's walk through this real quickly.

18  What the evidence is going to show, O'Hara, Bob O'Hara

19  started working on the Wi-Fi protocol, on 802.11, in

20  1997.  In 1999, he published it.  In 2001, he and a

21  couple of other colleagues formed Airespace.

22                Now, that's the company that figured out

23  how to do this controller and access point business for

24  Wi-Fi, and they did it in 2001.  They divided the

25  protocol.  They did it.  You know, we're going to be

1  asking all through this the question of, well, who did

2  these various things that the patent says it covers, and

3  one of them is dividing the protocol.

4          No mystery.  We've got the guy who did

5  it.  He and his -- he and his buddies did it, and he's

6  going to take that stand and he's going to tell you when

7  he did it and how he did it and why he did it, and why

8  he did it the way he did.  And it wasn't our customers.

9  They never touched it.

10         They -- in 2001, Airespace was formed and

11 they sat down and they divided the protocol and they

12 were in business.

13         In 2002, the Arazi, or the '395, patent

14 issues.  So in case you walked away from the Plaintiff's

15 opening thinking, well, gee, these guys at Airespace,

16 they just went to school on what the other guys had

17 done.  They did it first, blah, blah.

18         Patents aren't public until they're

19 published.  I mean, today it's a little different, but

20 in that timeframe, a patent wasn't known to anybody

21 other than the inventors and the Patent Office and their

22 lawyers until it was published.  And that didn't happen

23 until after our guys at Airespace, the company we

24 acquired, had already done their work and had already

25 come up with their solution to the problem, which is the

1 solution that's implemented in the Cisco products we're

2 talking about here.

3          In 2005, Cisco bought Airespace, and the

4 people who all came to work for Cisco.  And in 2007,

5 Mr. David bought Arazi, the Arazi patent, and sued

6 Cisco.

7          So now let's look at the issues you're

8 going to have to decide in this case.  And as I said

9 before, there are two things you have to decide.  First,

10 do Cisco's customers infringe, directly infringe the

11 claims of the patent?

12          And then and only then do you look at

13 whether Cisco induced them to do it.  If customers don't

14 infringe, as I said before, the case is over and we can

15 all go home.  So now -- and when I talk about the

16 customers here, one question you should have in the back

17 of your minds and you should be thinking about as you

18 listen to the Plaintiff's evidence is which customers

19 are they even saying infringe?

20          Who's the infringing customer?

21          Is it the company that buys the equipment

22 and puts it in the ceiling?  You know, is it Starbucks?

23 Is it the college student who sits down in the coffee

24 shop with his or her computer and decides this is a good

25 place to study for the afternoon and is hooked up to the

1  internet?

2              They don't even answer that question.  I

3  didn't hear an answer in the opening.  We haven't gotten

4  the answer yet.  Maybe before the trial is over, we're

5  going to hear it, but we haven't yet.

6              Now, let's put up the elements chart, if

7  we could.  Can we get the slide up, too?

8              I'm not sure which is easier for you to

9  look at, Ladies and Gentlemen.  You can take your pick.

10  You could also follow along in Claim 1 of the patent

11  behind Tab 1, but I think it's easier to follow -- I

12  think it's easier to follow by looking at it blown up

13  than in the book.  But you're welcome to do it whichever

14  way you'd like.

15              And, again, this is something that

16  Plaintiff's counsel didn't do.  They never showed you

17  the patent claim.

18              Now, to infringe a patent, somebody, a

19  person or an entity, one has to do each and everything

20  that the patent says.  Each and every one of those

21  elements has to be met.

22              And they're different kinds of patent

23  claims.  Mr. Werbner sort of said this.  He said that

24  there are apparatus claims, and there are method claims,

25  but he didn't quite -- and I'm sure he just misspoke,

1  but he didn't quite get the distinction right.

2  An apparatus claim is what a product does.  I mean, it's

3  the product.  What -- what an apparatus claim does is it

4  covers the product.

5              The patent claim here -- claims here --

6  and we're going to focus on Claim 1, but it's true for

7  the others as well -- is a method claim, and that's

8  different.  There's no thing that infringes a method

9  claim like this.

10             Someone, you know, a person, company, has

11 to do each and every one of the steps of the method

12 before there is infringement.  So it's not about what a

13 product does.  This is about what a person or a company

14 does.  And -- and it's got to be the same person and

15 it's got to be each element, okay?  And to the extent

16 that Plaintiff's counsel referred to any of these at

17 all, there were a bunch of them I'm sure you heard no

18 mention of during the opening today.

19             Does the old song two out of three ain't

20 bad, well, that may be for some purposes, but for patent

21 infringement, it also isn't good enough.  This isn't

22 pitching horseshoes, and it isn't throwing hand

23 grenades.  You get no credit for being close.

24             You have to show each and every element

25 is satisfied by the same person or the same company, and

1  it's their burden to prove all of that.  And you're

2  going to see on the evidence that they can't.

3           Now, there are three very specific

4  elements here, and we're going to walk through them one

5  by one.  The first one is dividing a short-range

6  communication protocol into a low-level protocol for

7  performing tasks that require accurate time

8  synchronization and a high level, which doesn't require

9  accurate synchronization, okay?

10           Now, that's a mouthful, so let's sort of

11  pause for a moment and take it apart.  There are two

12  different pieces of this thing -- of that element.

13           First, you have to divide the protocol

14  into two parts, a high level and a low level.  One level

15  is going to be in the access point.  The high level is

16  going to be up in the controller, okay?

17           So the first thing for someone to

18  infringe the patent, for a customer -- let's be more

19  specific -- to infringe the patent, he or she or it has

20  to -- it being the corporation -- has to divide the

21  protocol.  And there's not going to be any evidence in

22  this case that a single one of our customers divides the

23  protocol.

24           Dividing the protocol means taking all

25  those different steps and processes that have to occur

1  that are part of that protocol and dividing them.

2  Putting some in the controller and some in the access

3  point.  And what the evidence is going to show is that

4  that all happens -- that all happens before a single

5  customer gets their hands on this thing.

6           And once the customer gets their hands on

7  this thing, they can't change that allegation.  They

8  can't say I want this function over there and that

9  function over there.  That's a design decision that's

10 made by Cisco, by the people who create the product.

11          In this case, a design decision made by

12 Mr. O'Hara and his colleagues standing in front of a

13 whiteboard, and he's going to tell you -- he's going to

14 show you how they did it.

15          And, again, if they can't show that a

16 customer divides the protocol, because that's one of the

17 steps of this method claim, then a customer doesn't

18 infringe, and, again, we can all go home.

19          Now, the second -- the second thing --

20 and, again, there was something Mr. Werbner said.  When

21 he was talking about the patent, he said this was --

22 that the patent was a description of how you would

23 design a system that did this.  And I think he was -- he

24 was right on the money on that.  He was right on the

25 money on that.

1           This isn't a description or a teaching of

2  what a customer is going to do or how a customer is

3  going to use it.  This is a teaching of how somebody

4  designs the system.  And if we look at the very first

5  line of the patent itself, the abstract -- could we

6  highlight the abstract there?

7           Okay.  Then let's just focus in on that

8  first sentence.

9           And I think His Honor told you earlier

10  today that this abstract part of the patent is a brief

11  statement of the purpose of the invention.  I think

12  purpose was the word.  I hope I'm not -- I hope I got it

13  right in my notes.

14           Well, methods to create a cellular-like

15  communication system.  These aren't methods to use,

16  right?  Methods to create.  This was aimed at and

17  designed for -- designed for someone who was going to

18  build a system like Bob O'Hara, only he had already

19  built his before the patent came out, but it's not an

20  instruction on how to use something directed to the

21  consumer.

22           Now, the second -- the second thing we --

23  the second element of that claim -- if we could go back

24  to the claim chart -- is the notion that you're

25  sending -- that you're doing this kind of division based

1  on whether some things require a fast response or they

2  require a slow response.

3            And the idea was the things that require

4  fast response, realtime response would be in the access

5  point, because that's closer to the user and there are

6  more of them.  And the things that didn't require that

7  would be up at the controller.

8            Now, again, if -- if you conclude, based

9  on the evidence -- and this is going to be one of the

10 points where the witnesses on both sides actually

11 agree -- that customers don't divide the protocol, you

12 don't even have to get to this piece, because all you

13 need is one no, one no in any of these boxes, we're

14 done.

15           But what you're also going to find is

16 that, in fact, the division that was made by Mr. O'Hara

17 and his colleagues in what became the Cisco products

18 isn't based strictly on realtime versus non-realtime.

19           Now, there are lots of documents and --

20 and you heard about that, the talk about that as an

21 objective or as a basic guide or as, you know, a

22 principle, but -- but we don't have to rely on that.

23 It's not what they said they were doing or what they

24 thought they should be doing.  It's what did they

25 actually do.  And you're going to hear from Mr. O'Hara

1  when he describes it that, in fact, they didn't just

2  take everything that was realtime and put it at the

3  access point and put everything else upstairs.  They

4  didn't do that.

5           Number of reasons for that.  He'll

6  explain with respect to each of these different -- each

7  of these different processes, he's going to tell you

8  exactly why they made that decision.  And you'll see

9  that it wasn't all of one or all of the other.  So,

10 again, that takes you -- that's a second reason --

11 that's a second reason why the answer is no.

12           Could we see Slide 1694 that Plaintiff

13 prepared, please?

14           I'm just going to show you one example

15 from the slides that Mr. Werbner's side prepared and

16 then didn't end up using this morning.

17           Sorry.  There we go.

18           Okay.  Now, this was a slide they were

19 going to show you, I guess, to say that Cisco uses the

20 realtime function, splitting.  And what they highlight

21 is at the lightweight access point, that's the thin --

22 the lightweight access point, the access point, the

23 little thing that's in the ceiling -- realtime 802.11

24 MAC, okay?

25           Up in the wireless LAN controller, what

1  they highlighted is non-realtime 802.11 MAC.  Okay.

2  What they didn't highlight is the line right above,

3  realtime radio resource management.  So that's a

4  realtime function that they put at the controller rather

5  than the access point.

6            So their own little display here, this

7  document which I guess they decided not to show you this

8  morning, but which we may yet see from them during the

9  trial, right on its own face shows that they weren't

10  consistent in dividing based on realtime, right there.

11  Right there (indicates).

12            And, again, Ladies and Gentlemen of the

13  Jury, His Honor has told you that what the lawyers say

14  isn't evidence.  Absolutely, it's not.  I'm not just

15  going to tell you; I'm going to show you.  If either of

16  us is standing up here flapping our arms around and just

17  telling you stuff and not showing you, you should make

18  us show you.  And I just showed you.

19            Now, again, as I said, since Cisco's

20  customers do not divide the protocol and witnesses on

21  both sides are going to say that you don't have to get

22  into the realtime stuff, but if -- if you have any

23  doubts about this, this is a second reason why you can

24  say no; write a big no.  No, we don't divide.  No, we

25  don't do it based on -- on realtime versus non-realtime.

1          Now, third -- and this is the last of the

2   steps that I'm going to talk about this morning -- each

3   connection of a mobile unit with a base station.  Now,

4   the mobile unit, that's the -- that's the gizmo; that's

5   your iPhone; that's your smart phone; that's your laptop

6   computer; that's whatever computer-type device, big or

7   small, you're trying to hook up wireless.

8          For each connection of a mobile unit with

9   a base station running an instance of the low-level

10   protocol at the base station connected with the mobile

11   unit and running an instance of the high-level protocol

12   at the switch.  Okay.  Again, patent lawyer

13   gobbledegook.

14          So let's see what this means if you don't

15   have an engineering degree and you aren't a patent

16   lawyer.  The Court -- and this is another one of those

17   claim constructions you'll find in your notebook -- has

18   demystified this a bit, and what His Honor's determined

19   is that for each connection of a mobile unit with a base

20   station, that is, every time one of these units connects

21   with the base station -- and the base station is the

22   access point.

23          THE COURT:  You've got 10 minutes

24   remaining.

25          MR. GUTMAN:  Thank you.

1          There has to be a separate connection, a

2    separate version of the protocol running.  And you'll

3    hear from the witnesses -- and, again, Mr. O'Hara is

4    going to tell you, too -- that the customers who -- who

5    use Wi-Fi on any of these Cisco systems, do not run a

6    separate protocol for each instance, for each

7    connection.  It's a shared media.

8          Remember, that's the whole point of

9    Wi-Fi.  There's one protocol running at the base.

10   There's one at the controller.  That's true whether one

11   person's hooked up through that or whether it's a

12   hundred or 200 or whatever the limits of the system are.

13   Only one.

14         Again, if you answer that question, and

15   for this I don't need two out of three.  One will do.

16   One will do.  Then the case is over, and we can all go

17   home.

18         Now, assuming all of those were yeses,

19   okay, then the next question is, well, did Cisco induce

20   its customers to infringe a patent?

21         And -- and, again, not did we encourage

22   our customers to buy our product, because, of course, we

23   did.  Everybody does.  That's the whole point of being

24   in business.

25         But did we -- did we, knowing that the

1  patent was there and thinking this is a valid patent and

2  boy, oh, boy, did we go out and say here's how you

3  infringe it, I'm going to teach you how to divide; I'm

4  going to teach you how to run a separate instance; I'm

5  going to teach you how to do all these things; and I

6  want you to do it, knowing it's infringing?

7              And the answer to that is no.  There's no

8  proof of it.

9              Now, the first thing is to induce, you

10  had to know about the patent.  You can innocently

11  directly infringe a patent.  Somebody sitting here

12  hooked up to the access point, and by their theory,

13  directly infringing the patent, doesn't even know there

14  is a patent to infringe.  You can be an innocent

15  infringer, and you're still stuck.  That's one of those

16  things in patent law that doesn't make sense to a lot of

17  people who haven't dealt with it.

18              But that's true, but you can't innocently

19  induce infringement.  You have to know it.

20              Now, the evidence is going to show that

21  they never told us they thought any customer infringed

22  this patent until the day they filed the lawsuit.  They

23  didn't send the letter saying you infringe or your

24  customer infringes.  They didn't do anything of that

25  sort until the day they filed the lawsuit.  So what do

1   they look at?

2              Well, first they say we should have known

3   about the patent, because it was in a communication from

4   the United States Patent & Trademark Office to Cisco.

5              Now, what are they talking about there?

6              If you look at the first page of the

7   patent where it's got those other references -- can we

8   see the first page, please?

9              Okay.  This is -- this is the '395.

10  There are probably 20-some-odd of these things that are

11  cited here.  These are the references that the Examiner

12  looked at, some of which were provided to him by the

13  patent applicant; some of them he found on his own.

14  Every one of Cisco's 10,000, plus or minus, patent

15  applications has stuff like this.  Dozens and dozens of

16  different patents that are cited by the Examiner.

17             So their theory is -- and this

18  communication from the Patent & Trademark Office wasn't

19  a letter sent to the CEO of Cisco saying:  Excuse me,

20  sir, you need to know about this patent.  It was one of

21  those office actions that the Judge told you about this

22  morning.  It's in that prosecution history.

23             So their theory is that if one of the

24  many patents listed in any of Cisco's patents included

25  that patent -- that meant Cisco knew about it, cared

1  about it, should have been on notice, should have done

2  something.

3          You know, it's -- that's just not

4  realistic.  That just doesn't make sense.  If that were

5  true, I mean, yesterday, if I remember correctly,

6  Mr. Carroll asked all of you and the other prospective

7  jurors whether you knew anybody in the courtroom.  And I

8  think one person said yes, but nobody here, I think,

9  did.

10          Now, if their theory was right, all of

11  you answered that question wrong, or at least anybody

12  who's got a phone book in your house, you answered that

13  question wrong, because I'll bet Otis Carroll's name is

14  in that phone book.  So him being listed in this big

15  list was good enough, then everybody got that answer

16  wrong.

17          And that's the equivalent of what they're

18  doing here.  They're saying out of thousands and

19  thousands of these references, we should have known

20  about this one.  And by the way, all this occurred

21  before we even bought Airespace.  It was a patent in a

22  different field, and it was before we bought Airespace.

23          So why would we even be looking at that?

24          Now, the second thing they say is that

25  the former CEO of Commil, Mr. Dovev, told Cisco all

about it.  All about it.  And, again, arm-waving by

Plaintiff's counsel, but he didn't show you what

Mr. Dovev actually said.  And, again, Mr. Dovev is

another one of those witnesses, even though he's got a

stake in the outcome of this action, he's got a piece of

the action, if they win something, he didn't show up.

He's not showing up here for trial either.  So we can't

ask any questions of him.

            But let me show you what he said at his

deposition, and you can decide whether this proves that

he told Cisco about the patents.

            Can we highlight the testimony from

beyond?

            QUESTION:  Beyond what you've described,

do you recall any other specific things that you

discussed with Yoav?

            Now, Yoav, he says earlier in the

testimony, was a Cisco employee in Israel.  He didn't

remember his last name.  He was very vague about all

this.

            ANSWER:  I think -- I think I described

to him Commil's solution and Commil's core technology,

including its patents, very briefly, so without going

into much details.

            So this is the best they've got on this,

1   is that this -- Mr. Dovev, who's not coming here to

2   testify, so we can't find out, you know, how good's your

3   memory on this stuff, this is it.

4                QUESTION:  Do you remember that

5   specifically?

6                ANSWER:  I remember that was --

7                QUESTION:  Or are you -- or are you

8   just --

9                ANSWER:  No, no, no.

10                QUESTION:  I -- I'm assuming that you

11   might have talked it out.

12                ANSWER:  I'm digging deep to try and kind

13   of dig things out of my long-term memory, but I -- I --

14   I remember -- I remember --

15                Okay, he's not sure about the other

16   subject, but this stuff he remembers.

17                ANSWER:  I remember that we thought that

18   we could be interesting for Cisco, because we had

19   what -- what we believed to be the core technology and

20   the underlying technology of what they're using after

21   their Airespace acquisition.

22                After their Airespace acquisition.  Now,

23   Plaintiff's counsel told you this conversation here,

24   vague as it is, limited as it is, took place in 2004.

25                Could we please see Slide 2149 from

1  Plaintiff's deck?

2            This is the timeline that they were going

3  to show you this morning but decided not to.

4            MR. WERBNER:  Well, Your Honor, if I have

5  five more minutes, I will.  It wasn't a decision to...

6            MR. GUTMAN:  It's okay.  I just -- let me

7  just show you something, right?  The witness was quite

8  clear that the reasoning they were having this

9  conversation, the reason they were having this

10 conversation with Cisco, that he remembers sort of in

11 which they claim the patent was disclosed, because it

12 was going to be relevant to Cisco, because they had --

13 they had acquired Airespace.

14            The conversation, by their own account,

15 Dovev 1222 to 99 where they say they informed us of the

16 patent -- although he didn't say that in his

17 testimony -- that was late 2004.  On their own

18 timeline -- and the evidence at trial is going to prove

19 this -- when did we acquire Airespace for $450 million?

20 Not until the next year.

21            Each of these points, it's their burden,

22 and they can't meet the burden based on proof like this.

23 They just can't, and that's where you're going to be

24 when the evidence is done.

25            Now, finally, let me just say a quick

1   word about damages.  I don't want to belabor the point.

2   The evidence is going to show here that there is just no

3   support in the real world for the numbers they're

4   seeking.  They only paid $400,000 for this patent and

5   seven or eight others, and this technology, which was

6   originally developed for Bluetooth, isn't very valuable

7   to Cisco, and besides Airespace was already doing this

8   stuff.

9                   Now -- now -- and they were doing it in

10  Wi-Fi.  Now, again, the technology --

11                  MR. WERBNER:  Your Honor, I'm sorry.

12                  THE COURT:  What's the objection?

13                  MR. WERBNER:  Just not comparing the

14  products to -- to the -- to the other products but

15  rather the patent to the technology.

16                  THE COURT:  Well, I'll overrule that

17  objection.

18                  MR. GUTMAN:  Okay.  Now, so -- and,

19  again, I don't think there's any dispute that the

20  primary application of their technology was in the field

21  of Bluetooth and for telephone calls, whereas Cisco's

22  focus was on Wi-Fi.  That doesn't mean the patent is

23  restricted to that.

24                  His Honor is going to instruct you as to

25  what all of that means.  I don't mean to get in the

```
 1   middle of that, okay, but that's where they were

 2   focused.

 3              And you're also going to hear that --

 4   you're also going to hear that the products have a lot

 5   of other valuable features that have nothing to do with

 6   Commil's patent.  And as Mr. Carroll established with

 7   you yesterday, you don't get paid for -- for what wasn't

 8   yours.

 9              But in the end, what you're going to hear

10   about is a hypothetical negotiation that occurs where --

11   where we imagine a world in which Cisco and Commil

12   Limited sit down at the table and negotiate a deal.

13              THE COURT:  Mr. Gutman, you've used your

14   time.

15              MR. GUTMAN:  Can I complete the sentence,

16   Your Honor?

17              THE COURT:  You've used your time.

18              MR. GUTMAN:  Thank you.

19              THE COURT:  Ladies and Gentlemen, there

20   was a reference in the Defendant's opening statement

21   concerning a belief in the -- in the validity of the

22   patent.  You're not going to be deciding any questions

23   concerning the validity of the patent.  It's been

24   previously determine that the patent is valid.

25              So with that, Plaintiff, call your first
```

1  witness.

2              MR. WERBNER:  Yes, Your Honor.  We would

3  call Mr. Joe McAlexander.

4              May I remove this?

5              THE COURT:  Yes.

6              MR. WERBNER:  I assume we all need to see

7  him.  Oh, he's over there.

8              May I proceed, Your Honor?

9              THE COURT:  Yes, sir.

10     JOSEPH C. McALEXANDER III, PLAINTIFF'S WITNESS,

11                    PREVIOUSLY SWORN

12                    DIRECT EXAMINATION

13  BY MR. WERBNER:

14     Q.   Sir, you were sworn earlier in the day, and I

15  would like you to please introduce yourself to the

16  members of the jury.

17     A.   Certainly.  My name is Joe McAlexander.  Full

18  name is Joseph Colby McAlexander III.

19     Q.   Tell the jury your -- your educational and

20  work experience so they know what that is.

21     A.   I have a bachelor of science degree in

22  electrical engineering.  I was primarily focused in

23  systems integration and in solid state theory.  I have

24  been a part of the semiconductor and the systems

25  integration industry for the past 38 years, since 1972,

1  principally starting out after three years in the Army

2  at Texas Instruments in Houston and then Singapore and

3  Dallas for about 14 years.

4          That was up through 1986, and since 1986, I

5  have been involved in various aspects of systems

6  integration, consulting, aspects with the electronic

7  industry.

8      Q.   And I don't want to rush through your

9  background, but have you been working for a number of

10  years assisting me and Mr. Sayles in connection with the

11  technological aspects of this lawsuit?

12     A.   Yes, I have.

13     Q.   All right.  Had you worked with us before on

14  any other lawsuits?

15     A.   No, I have not.

16     Q.   All right.  You mentioned you have a degree in

17  electrical engineering.

18          In just a general way, would you let the jury

19  know what that entailed.

20     A.   Yes.  The bachelor of science degree, it's a

21  four-year degree.  It was from North Carolina State

22  University, 1969, a few years ago.  The degree itself,

23  the way it was provided to us at North Carolina State

24  was it provided an opportunity for us to get hands-on

25  experience with the electronics and systems.  And it

1  also provided the theoretical background for the way

2  systems operate so that whatever we learned in one

3  aspect could be applied in multiple different types of

4  electronic and electromechanical-type environments.

5          The course material involved the standard

6  general fare that one has when they go to school for the

7  general purpose studies, but it also involved quite

8  extensive studies in -- in the areas of thermodynamics,

9  mechanics, physics, computers as well as the electronic

10  aspect, the electrical engineering aspect both in

11  practical and in theory.

12     Q.   I apologize if I missed it.  I'm sorry.  I was

13  looking for a pointer, but did you mention already the

14  specific experience in communication protocols and

15  wireless communication systems?

16     A.   There was general background and theory as far

17  as the communication -- telecommunications, the way

18  wired and wireless operated from an educational or

19  academic standpoint, but the majority of my wireless

20  experiences come based on experience rather than what I

21  understood or learned 30-something years ago in school.

22     Q.   So how many years of real-world experience do

23  you have in the field that we're involved with here,

24  patent technology, electrical communications?

25     A.   38 years in the electrical and communications

 1  field, and I'd say about 12 or 13 years ago, I began

 2  some additional work directly in the wireless

 3  communication area, and I've been very entrenched in

 4  that particular aspect.  And I probably have 14 or 15

 5  patents of my own in the wireless technology.

 6       Q.   Mr. McAlexander, where do you live?

 7       A.   I live in Anna, Texas, which is north of

 8  McKinney about 10 miles.

 9       Q.   Do you do your work on your own, or are you in

10  a firm or business?

11       A.   I have my own company, and I have a staff of

12  technical experts in various different types of electro

13  and electromechanical fields.

14       Q.   Tell us a little bit about the name, location

15  of your business, and the type of people that you work

16  with just as general background.

17       A.   Okay.  My business is located in Richardson,

18  Texas.  I formed the company in 1988, and I've been

19  providing services to the industry in terms of

20  licensing, litigation support, and product evaluation

21  since 2002.

22            The staff that I have, each one in their own

23  right is a seasoned professional.  They're disciplined.

24  I've got a staff of consultants that are very skilled in

25  the actual design and fabrication of integrated

1 circuits, the components that actually go into the

2 wireless communications systems.

3          I have others on my staff who are very skilled

4 in -- in protocol -- communication languages, the actual

5 drafting and integration of software programs and the

6 firmware and the products.  I have others on the staff

7 that are telecommunication, everything from switching

8 systems at Bell Laboratories to -- to the more local

9 wireless-type setups.

10     Q.   If you --

11     A.   And I have others on the staff that range all

12 the way from audio to mechanical.

13     Q.   In regard to the work that you did on this

14 case, which we'll get into probably after lunch in quite

15 a bit of detail, I mean, generally, for how long and how

16 many hours have you been working to assist us relating

17 to the technological aspects here, and how did anybody

18 in your firm interact with you in that regard?

19     A.   As I recall, we began -- I began sometime in

20 the middle of 2009.  I had others on my staff that

21 actually started much earlier than that.  But it's been

22 several years.

23          And in terms of the way in which we operate,

24 I've got several on my staff that will do certain

25 aspects of it.  For instance, under my supervision and

1  control, we acquired and tested some of the access

2  controllers and the access points with wireless

3  communication devices.

4         So we actually established the testing

5  protocol, tested the products, ensured that we

6  understood not just what the material on documents that

7  were provided in this case said, but we actually took

8  the products, tested them to verify what the documents

9  had stated.

10     Q.   Were you in the courtroom when Mr. Gutman held

11  up the steps of the patent?

12     A.   Yes, I was.

13     Q.   Is the answer to those no, no, or no, or what

14  are the answers?  And then we'll come back to how you

15  formed that opinion.

16     A.   No -- the answers are not no, no, no.

17     Q.   What are they?

18     A.   Yes, yes, yes.

19     Q.   Did you test -- did your testing confirm that?

20     A.   Yes, they did.

21     Q.   Now, you mentioned that you have been working

22  for a couple of years.  Did you provide any written

23  material to Cisco so that they had the basis of why you

24  concluded these products infringed?

25     A.   Yes.  I -- I summarized the results of my

1   testing and evaluation and -- and reading and review of

2   the materials in the patent and an expert report.

3                    MR. GUTMAN:  Your Honor, I would object

4   and move to strike.  There's been no effort to qualify

5   the witness.

6                    THE COURT:  Overruled.

7                    MR. WERBNER:  We'll tender the witness as

8   an expert witness.  I didn't think that was in dispute,

9   but in light of the objection, we'll tender Mr.

10  McAlexander as an expert witness.

11                   MR. GUTMAN:  Your Honor, may I inquire as

12  to the scope of his work?  There is an issue as to

13  testimony that I anticipate will be elicited here or

14  that my friend will attempt to elicit that's beyond the

15  scope of his report.

16                   MR. WERBNER:  I'm not asking him about

17  beyond --

18                   THE COURT:  I'm --

19                   MR. WERBNER:  Yeah, sorry.

20                   THE COURT:  I'm denying that request.

21  The jury and the Court will hear his opinions.  Should

22  you have a specific objection you wish to raise to

23  testimony you believe to be outside of his report, you

24  may make it at that time.

25                   MR. WERBNER:  Thank you.  Should I

1 proceed, Your Honor?

2              THE COURT:  Please.

3      Q.   (By Mr. Werbner) How many patents did you say

4 that you have or that you were involved in inventing?

5      A.   Total, I have currently 29 U.S. patents.  I

6 have five patents issued in -- in foreign countries.  I

7 have another three that will be nationally staged in

8 Europe this next month.

9      Q.   So back to my question, in terms of the

10 reports, did you provide to Cisco and their -- through

11 their counsel detailed written explanations relating to

12 your opinion that their products were infringing the

13 '395 patent?

14     A.   Yes, I did.

15     Q.   And generally -- because we're going to look

16 in more detail after lunch -- are these ten-page

17 summaries, five-page summaries, or approximately how

18 extensive were these written reports you gave to Cisco

19 stating the basis for their products infringing?

20     A.   I don't have a precise number, but I would

21 estimate it's probably about 300 pages.

22     Q.   Were there documents -- testing documents,

23 spec documents, and other documents that Cisco turned

24 over in the lawsuit that were attached and -- and

25 incorporated and were part of this 300-page report?

1    A.   Yes.   There were numerous documents that were

2 provided during part of this proceedings, the discovery

3 process, and the documents included information with

4 regard to the source code, the actual code that --

5 that's inside of the devices that literally is the

6 engine that runs the devices, a number of documents with

7 regard to the architecture of how the systems not only

8 are conformed within themselves, such as the access

9 point or the controller that was held up earlier, but

10 also the way in which they communicate with each other

11 and the way they communicate with a wireless type of

12 remote device or cellular device.

13       And in addition to those documents, there were

14 a number of -- of documents that were provided with

15 regard to website information and -- and the way in

16 which the customers use the products.

17       I saw a number of documents with regard to

18 customer representations, and I also did a lot of my own

19 independent research and identified different documents

20 and internet-type information as well.

21    Q.   Cisco's counsel raised just a few moments ago

22 the issue about whether these accused products -- we'll

23 call these products that are in issue the accused

24 products, the accused access points and the accused

25 controller.

1            You're following me on that?

2       A.   Yes.

3       Q.   It was raised as to whether they actually do

4  split certain functions between the access point and the

5  controller on a realtime basis.

6            Did you hear that matter raised by Mr. Gutman

7  earlier?

8       A.   I heard it raised, yes.

9       Q.   You mentioned that you did testing after you

10  acquired the products.  Did the testing that you do have

11  anything to do with whether that split occurs on a

12  realtime basis or not?

13      A.   It -- it does.  My testing confirmed what the

14  documents said, but the splitting of this particular

15  protocol that is at issue and the one in which I

16  investigated was between the access point and the mobile

17  units.

18      Q.   All right.  Have you ever served as an expert

19  witness in a court of law before?

20      A.   Yes, I have.

21      Q.   How many times?

22      A.   In terms of testifying, probably 35 or so

23  times.

24      Q.   On what subjects?

25      A.   I've testified on subjects that involve

1   wireless communication.

2          I've testified on subjects that involve

3   systems integration, computers.

4          I've testified on subject matters involving

5   the actual design and fabrication of the integrated

6   circuits, the actual components down inside of these

7   small chips.

8          I've also testified with regard to display

9   technology and systems communication protocol.

10     Q.   In addition to giving Cisco your roughly

11  300-page report about your infringement conclusions in

12  this case, did you also sit down and give them

13  deposition testimony where they had the opportunity to

14  question you about the reasons why you drew those

15  conclusions about infringement?

16     A.   Yes.

17     Q.   How long did the Cisco lawyers question you

18  about your opinions?

19     A.   I don't recall exactly, but I believe the

20  deposition itself was over a period of two days.

21     Q.   All right.  Hundreds of pages?

22     A.   Yes.

23     Q.   So during this lawsuit, was Cisco -- or were

24  they not having an experienced engineer pointing out in

25  detail to them where their products were -- were

1  performing the steps of the '395 patent?

2      A.   Could you say the question again?

3      Q.   Yes, sir.

4           So during the lawsuit filed four years ago,

5  were you providing to Cisco written reports and

6  in-person testimony informing them about the conclusions

7  you drew from your studies that the products they were

8  selling were infringement of the '395 for performing the

9  steps?

10     A.   Yes.  Over the course of the last year and a

11 half, me personally, yes.

12     Q.   In the context of this case and this patent,

13 what does architecture mean?  You heard us say this was

14 about an architecture or design or a method.  Would you

15 give us in this context what architecture means?

16     A.   In the context, architecture is an

17 arrangement.  It's the configuration that -- that one

18 has between various components or apparatus or structure

19 for the purposes of communicating with each other.

20     Q.   All right.  From your experience, getting or

21 being part of the 26 patents and all the other

22 experience that you said, do you know the difference

23 between a patent that describes a method, a design,

24 versus one that -- that exists on a product or an

25 apparatus?

1    A.   Yes.  I understand that those are two types of

2 claims that can be written, one drawn to the apparatus

3 of structure and one drawn to the technique or method

4 that is performed by that structure.

5    Q.   Is one superior to the other in terms of the

6 rights accorded to it by the United States?

7    A.   No.  I'm not aware of any differentiation.

8    Q.   And as a practical matter, let's say the

9 construction of a 15-story building, is the architecture

10 important or not to the construction of that product?

11    A.   Yes, I would say so.

12    Q.   If you don't have the plans and the drawings

13 and the design, it might be a little harder or not to --

14 to be able to -- to do that?

15    A.   Well, if you don't have the conceptual

16 drawings, the blueprints, the mechanisms, the

17 constructional aspects of it then you might have a

18 vision of a structure, but, certainly, it would be

19 rather difficult to build it if you didn't have some

20 plan for it.

21         So there is a recipe or a methodology for the

22 building of the structure.

23    Q.   And in the '395 patent, just in general terms,

24 what is it directed to?

25    A.   In general terms, it's directed to a

1  short-range communication system that involves some

2  specific type of communication mechanism.

3      Q.   Well, let's break it down.  What is a

4  short-range communication system?  I guess that's

5  distinguished against a long-range or help us understand

6  that -- what is a short-range wireless communication

7  system?

8      A.   Well, short-range wireless communication

9  system refers first to wireless.  It means there is not

10  any connecting wire, so the connection is going to be

11  done through something such as radio frequency.

12          And short-range means that the transmitter and

13  receiver, the two components that are communicating with

14  each other, are going to be necessarily in a range

15  that's -- that's not going to require some intermediary

16  or long distance.

17          Now, I will tell you that in the art,

18  short-range versus long-range, there's not a bright line

19  that says, if you get exactly so many feet or meters

20  that now you will pass into the long range, but the

21  general understood -- understanding in the art is a

22  short-range is going to be anywhere from several

23  centimeters to multiple hundreds of meters.

24      Q.   Is a cellular system considered a short-range

25  communication system?

1      A.    No, it is not.

2      Q.    That's clearly a long-range communication

3 system.

4      A.    Yes, because that -- cellular systems are in

5 miles.

6      Q.    How many short-range communication protocols

7 are there?  Just one, two, how many?

8      A.    Oh, no, there are quite a few.  There are some

9 that are -- you know, for instance, the original, where

10 we had the handset at home where you could just pick up

11 a telephone, and you could just talk to that one base

12 station or your holding device, that certainly was

13 measured in tens of feet.

14           Once you get outside the house, it's very

15 difficult to still communicate back.  It's really

16 short-range.  That had a very specific protocol or

17 communication standard.

18      Q.    What was it called?  DECT?

19      A.    Yeah, DECT.

20      Q.    Okay.

21      A.    The other one is a wireless communication

22 protocol, such as Wi-Fi, that goes -- that uses the

23 802.11 standard.  That is a specific protocol.

24           Another one, which is kind of intermediary

25 between those two, is -- is Bluetooth, which has a range

1  of about 20 to 30 feet.

2      Q.    How widely accepted is it that the in-house

3  cordless phone Bluetooth and Wi-Fi -- how widely

4  accepted is it among people in that field that those are

5  short-range communication protocols?

6      A.    Widely accepted.

7      Q.    Now, have you, as your work in this case, also

8  evaluated the reports and the depositions of Cisco, what

9  they've put forward in the case?

10     A.    Yes, I have.

11     Q.    Have you seen, or have you not, them take a

12  position as to whether Wi-Fi is short-range or not?

13     A.    I have seen -- during the course of this

14  proceeding, I've seen testimony -- or I've seen the

15  Defendant taking the position that Wi-Fi is not

16  short-range.

17     Q.    Is that kind of right?

18     A.    It's not even close to being right.

19     Q.    When we say protocol -- because I said

20  short-range communication system, but a short-range

21  communication protocol, when you put protocol in that

22  phrase, what is that saying?

23     A.    What that -- protocol is the communication

24  language.  When I'm speaking with you, we have a

25  specific language that we are communicating in that both

1  you and I understand, hopefully.

2          If I'm communicating with a colleague in

3  France, then I'm going to speak in French.  There was a

4  communication language, a protocol.

5          The protocol means that the communication has

6  to be in accordance with the standard.  And the standard

7  has to be such that there is a way that both parties in

8  the communication can comprehend and decipher the

9  information.

10          So in wireless technology, information is

11  being sent from one unit to another through the air.

12          And clearly, if the two units, the one sending

13  and the one receiving, are not communicating in the same

14  language, yes, the receiving unit might receive it but

15  will not be able to interpret what it means.

16          So they both have to be resident in their

17  system, both at the receiving end and the transmitting

18  end, the appropriate type of protocol communication

19  language so that they both can comprehend.

20      Q.   From your review of the '395 patent and the

21  language in the claims -- you're familiar with that?

22      A.   Yes.

23      Q.   From the language used in there, does the --

24  what short-range communication protocols does the patent

25  cover?

1     A.   It covers communication languages between --

2  that are wireless and that are short-range.

3     Q.   Mainly --

4     A.   It does not specify a specific type.  It's not

5  limited to a particular type of language.

6     Q.   Is it limited to Bluetooth?

7     A.   No.

8     Q.   Is it limited to Wi-Fi?

9     A.   No.

10    Q.   Is it limited to that protocol that the

11 hand -- the handless cord?

12    A.   No.

13    Q.   Does it cover those?

14    A.   It covers them, but it's not limited to them.

15    Q.   It covers all of them?

16    A.   Covers all of them and others.

17  MR. WERBNER:  Your Honor, may I, for a moment, approach

18 to take my laptop?

19              THE COURT:  Yes.

20              MR. WERBNER:  Thank you, Your Honor.

21    Q.   (By Mr. Werbner) Mr. McAlexander, I'm standing

22 here at the podium with my laptop, and I have Wi-Fi

23 capability in here.  So assume that.

24         And what I want to know is, if I get on the

25 internet here with my pass code that I've been given,

1 boom, I'm on the internet, where is the wireless and

2 where is the wired?

3          In other words, take me down the highway here

4 from -- from here, if I'm sending an e-mail, how is it

5 getting back to my office in Dallas?

6     A.    All right.  Well, for this particular example,

7 assuming that the -- that there was Wi-Fi or wireless

8 that's available in this area, which I know there is,

9 then somewhere in this room, either above the ceiling or

10 at the wall, possibly in several different points, there

11 will be an access point.

12          And the access point will be able to

13 communicate with the Apple notebook computer that you're

14 holding, because there is a specific communication

15 protocol standard, 802.11, which is a short-range

16 communication protocol, that is both operative in the

17 Apple computer you're holding and is also operative in

18 the access point that is somewhere else in this room.

19 Because both of the systems, both the Apple computer and

20 the access point, have their own resident 802.11

21 protocol, then when they communicate with each other,

22 they are communicating with a common language.

23          Now, their communication is done through radio

24 frequency signals that are transmitted back and forth

25 between the Apple Computer and the access point

1  somewhere else in the room.

2      Q.   Let me stop you.

3           In the words of the '395 patent, what would

4  this laptop be called?

5      A.   Well, in the words of the '395 patent, if

6  you're asking as far as the claim, this would be -- that

7  would be defined in the claim as a mobile unit.

8      Q.   Okay.  So this is a mobile unit.  Does the

9  patent anywhere say whether it's only a laptop?

10     A.   No.  It -- it refers to it as a mobile unit,

11 and elsewhere in the spec, it elaborates on what those

12 type units can be, but it's not limited to a laptop.

13     Q.   So, anyhow, let me -- let me put a little more

14 detail in what would be helpful, I think, to the jury.

15 Let's say that the system in this courtroom is the

16 accused product.  In other words, one of these access

17 points that you have found to be infringing is --

18 there's several of them around the courthouse, including

19 one up above us, and then it goes to a switch or a

20 controller, like that big heavy one that Mr. Gutman held

21 up.

22          And that's the setting I want to set for you

23 to help us understand the path that is occurring between

24 those.  We have a little computer animation, but just

25 for now, can you describe that.

1    A.   Sure.  I believe I've described the

2  communication wirelessly between the Apple notebook

3  computer and that hidden access point.

4         Once the information is received at the access

5  point, the information is then transferred by wire

6  using, typically, an ethernet cable, is what it's

7  called.  You find these in hotels.  You plug it into the

8  wall.

9         And this ethernet cable then transmits -- or

10  transfers the appropriate portions of that communication

11  that's necessary through a wire up to a controller.  The

12  controller is configured to be able to be wired to

13  multiple different access points.

14         So that controller which maybe sits behind in

15  some office actually has connectivity wire -- in wired

16  fashion to multiple different ones of these access

17  points.

18         So one could say that all of the courtrooms

19  have access points and are configured with a wired

20  ethernet cable back to the main controller.  The main

21  controller sits as kind of a hub orchestrating, but it

22  orchestrates it from behind the scenes.

23    Q.   And how would you contrast the system if we

24  had the old architecture where we had just standalone

25  autonomous or fat access points with no controller in

1   the system at all versus the accused products that have

2   what they call the thin or lightweight access points

3   where some of the functionality has been removed, aren't

4   in this new controller?

5          Can you sort of help us with the tutorial

6   about the differences between those two architectures?

7      A.   Sure.  The older system, you still have a

8   notebook computer.  There is still wireless

9   communication to an access point.  But all of what is

10  necessary to handle the communication is located there

11  at the access point.

12         It can still be then wired back to a computer,

13  but it's only for the purpose of, for instance, gaining

14  access to the internet or something of that nature.  The

15  computer that it goes to is to give you access, but the

16  computer does not control the access point, because all

17  of the control is in the access point.

18         Now, in the new system, the one that's --

19  that's identified by this -- by the patent that we're

20  discussing, this adds a level of communication

21  capability to it that allows you, if it is exercised to

22  its fullest extent, according to what the specification

23  shows, is that you can take that Apple laptop that you

24  have that is connected wirelessly to an access point

25  here, and you can walk out the door, down the hallway,

1  down to another courtroom or downstairs, and you will

2  maintain connectivity throughout because it -- it has

3  changed the way in which the communication is used and

4  divided so that it can maintain that communication, and

5  you don't all of a sudden drop when you go from one room

6  to another room.

7       The old system, where you communicated

8  directly with only one access point, as soon as you left

9  the short-range environment and moved down the hall to

10  another area, you would drop the communication.

11       With this system, the protocol has been re --

12  rearranged in such a way, in a very novel way, to permit

13  the capability to actually migrate and roam without

14  having the loss of connectivity.  That's the end result

15  of what can be achieved by implementing this claimed

16  invention.

17     Q.   What is the novel part that has made this

18  change where you can have that kind of seamless roaming

19  without the disconnect?

20     A.   The novel part, as -- as the claimed invention

21  will show, is that the inventors looked at the actual

22  structure of the language, of the communication protocol

23  that existed between the computer, the mobile unit, and

24  the access point.

25       And the patent calls the access point a base

1  station.   So you've got a mobile unit and a base.

2  You've got an access point and a computer.

3        It looked at the nature of that communication

4  protocol, and the inventors decided that if they could

5  take that protocol, that communication, and divide that

6  communication protocol around a parameter of whether or

7  not parts of it are really required to be exercised

8  there in a time-sensitive fashion, the required time

9  synchronization -- excuse me -- time synchronization.

10  And other parts of the protocol were not as imperative

11  to be handled as quickly, not being handled realtime,

12  the words we've seen earlier.

13        So by making that division, the inventors

14  established the fact when the proto -- when the

15  communication occurred from the mobile unit to the

16  access point using this standard communication protocol,

17  that the part of that received message traffic that was

18  associated with having to deal with it right then,

19  immediately, realtime, was handled only at the access

20  point.

21        And the rest of that communication protocol,

22  the rest of that language that was not necessary to

23  handle and keep that communication realtime, could be

24  pushed uphill through the wired system to the

25  controller.

1          So the controller then participated in some of

2   the handling of that message traffic where before, in

3   the fat example, all of it had to be handled at the

4   access point.

5      Q.    And is that what resulted in the ability to

6   roam seamlessly, moving from one access point to the

7   other smoothly without the clicks and the gaps that had

8   previously existed when that occurred?

9      A.    It is.  Some -- some of the inventions, as

10  claimed, don't go so far as to requiring that seamless

11  integration, but what I've just described to you is --

12  is the fundamental aspect of -- and the grounds upon

13  which the rest of the -- of the features have been

14  embodied.

15     Q.    The patent speaks in the specs and in certain

16  claims about data, voice, and video.  Would you explain

17  to the jury how data, voice, and video relates to this

18  particular patent?

19     A.    Yes.  If I can use an example, either the

20  computer -- you might think about your cellular phone.

21  Cell phones today also have -- most have not just the

22  ability to communicate long distance through their

23  cellular network, but you've got another ability that's

24  on the newer phones, that they can communicate Wi-Fi.

25  They can also communicate short distance.

1          In this communication, you can communicate

2     data.  For instance, text information could be data.

3     You punch in a name and send a text message.  It can

4     communicate video.  Phones today, computers today, you

5     can take a photograph, and you can transfer the video.

6     You can also communicate voice.  Voice with computers is

7     now called voice over internet or VoIP.

8          So through the same instrumentality, such as

9     the computer, you can communicate data, you can

10    communicate voice, and you can communicate video.

11    Each one of these have different file structures and

12    different nuances.  Obviously, the video is called

13    streaming video, and it's very large files, whereas data

14    can be in a very small file.

15         And voice has the added requirement that you

16    have to somehow take this -- this voice, including not

17    only the language that's said, but the intonation and

18    the volume and the frequency and all of that, and you

19    have to somehow package this down into a digital format,

20    transfer it, and have it be unpackaged by the other side

21    so that they can actually hear and understand that it's

22    really you talking.

23         So these -- these are different layers of

24    complexity.

25         Q.   Now, the accused products -- and we'll show

1  the jury a list later -- the controllers and the access

2  points, the lightweight, the Cisco Unified Wireless

3  Network, do those devices route data, video, voice, none

4  of the above, all of them?

5      A.   Yes to all of them.

6      Q.   All right.  Are all of those different types

7  of information, the voice, the video, and the data, is

8  it routed by the controller or not?

9      A.   It is.  If the information is -- if that

10  particular set of information, video or voice or

11  whatever is transferred, for instance, from a mobile

12  unit through an access point to the controller, then the

13  controller has the ability to route that information.

14      Q.   Maybe just before the lunch break, can you

15  pull up that 34-second animation, please?

16          Do you have a laser pointer or some kind of

17  pointer up there?

18      A.   Yes, I do.

19      Q.   All right.  And anytime you want to stop it,

20  just call out and it will be stopped, but if you could

21  walk us through this animation.  Sort of it sums up what

22  you've been telling us.

23          (Animation playing.)

24      A.   All right.  What we see here is -- and stop it

25  at this point.

1          What we have now is a particular individual

2   sitting in a conference room wirelessly communicating

3   from his computer to an access point -- here's the

4   computer -- to an access point, and then the access

5   point will be connected through a wire back to a

6   controller, which is shown in an adjoining room.

7          And now, at this stage, I believe, if you run

8   it a little bit more, we have another person coming into

9   the room.  And you can see -- stop it now -- that now we

10  have the blue representing the blue-shirted gentleman

11  and the green for the green-shirted gentleman.  Both of

12  these, you can see, are communicating through this

13  access point.

14         And so now this access point is in -- is

15  linked to and able to communicate with now two

16  individuals.  And if you'll notice, the way it operates

17  is that the information comes in, but it's transferred

18  sequentially.  So --

19     Q.   What do you mean?

20     A.   What that means is, for instance, if this

21  person in the blue was sitting down and had the original

22  control and someone else walked into the room, well, one

23  way you could prioritize a system like this is, I'm not

24  going to connect to the second individual until the

25  first one has finished communicating.

1    Well, if you do that, you're going to have a

2 very, very disgusted young man that's walking in this

3 room here, because he's not going to be serviced until

4 this guy stops typing.

5    So what occurs is, the information is being

6 received by this access point, and the access point

7 rolls or changes who it's communicating with, and it

8 does it so fast that it appears seamless.

9    You sitting on the computer and another person

10 walking in the room, as far as you're concerned, the

11 access point is communicating to you and you alone,

12 because it doesn't look like there's any time loss.

13    And the way it occurs is, the access point is

14 selectively alternating between the two different mobile

15 units, and then it's taking that information in on an

16 interdigitated fashion, one followed by another followed

17 by another, and then that information is then

18 transferred through the wire to the controller for then

19 later use or later propagation to some other entity.

20    Q.   Let me make that a little simpler.  Is the

21 controller going to be connected to the wired

22 infrastructure of that company or that office?

23    A.   That is -- that is a typical arrangement,

24 that's correct.  That -- that controller would be part

25 of a local area network where it intertwines other

1  computers, printers, multiple different types of system.

2      Q.    Now, these individuals in the green and the

3  blue shirts, in respect to voice, data, and video,

4  what's happening in this animation?

5      A.    Well, in particular, this animation, at least,

6  it is showing the person walking into the room -- excuse

7  me -- the person who is sitting down appears to be

8  typing.  So there is some data traffic that is occurring

9  there.

10         As this person walks into the room, he may

11 not -- he may or may not already be engaged with -- with

12 one of the other access points in the other room.  This

13 may be his first initiation.

14         At that point, this would be a joining

15 mechanism where the control -- the access point is

16 establishing a -- a communication with that individual

17 so that data or video can be transferred.

18     Q.    Is anybody using a phone here?

19     A.    Let's run the animation a little bit more.

20         So you can see now that we have two different

21 individuals, one who has -- you can stop it now -- one

22 who is using a phone in a short-range communication

23 protocol and the other who is using a computer.

24         So the access point permits, if you have -- if

25 you're following the standard communication protocol

1    that's on that access point, any unit that's mobile

2    that's in that area could communicate, whether it's a

3    cell phone, whether it is a PC, whether it is a PDA,

4    anything it can Wi-Fi communicate with.

5         Q.   Let me ask one last question, if I may,

6    because I know we're going to be on our lunch break.

7              How do we know that this being depicted is the

8    Split MAC lightweight accused products instead of the

9    old fat autonomous?

10        A.   Well, several signatures, one of which the

11   access point is connected back to a controller.  If it

12   was fat, it would not be connected back to a controller.

13   That's -- that's the primary signature that one sees.

14             MR. WERBNER:  All right, Your Honor.

15   Thank you.

16             THE COURT:  All right.  We'll break for

17   lunch, Ladies and Gentlemen.  Take an hour and 15

18   minutes.  We'll try to start right at 1:15.  Enjoy your

19   lunch.  Remember my prior instructions, and don't talk

20   about the case.

21             Y'all are excused.

22             LAW CLERK:  All rise for the jury.

23             (Jury out.)

24             THE COURT:  All right.  You may step

25   down.

1          THE WITNESS:  Thank you, sir.

2          THE COURT:  Y'all be seated.

3          Mr. Strachan, do you have a proffer of

4   your damages license exhibits?

5          MR. STRACHAN:  Your Honor, the exhibits

6   to which we're going to ask be admitted are the same

7   ones that the Court had a hearing on and admitted in the

8   previous trial.  We are not going to ask you to

9   reconsider the ones you excluded.

10         THE COURT:  Okay.

11         MR. SAYLES:  But we would ask you to take

12  judicial notice of the predicate that was laid for the

13  Court that were previously admitted, as well as the

14  testimony during the trial concerning them.

15         THE COURT:  Mr. Ostrow, it's my

16  understanding y'all are maintaining your objection to

17  the admissibility of those license agreements on the

18  same grounds that you did in the previous trial?

19         MR. OSTROW:  Yes, sir, and in the case

20  law that's developed since, sir, I think it's even more

21  clear, at this point, they should not come in.

22         THE COURT:  Okay.  All right.  I'm going

23  to take judicial notice of the predicate that was laid

24  last time, and I'm going to admit those same agreements

25  that I admitted last time.  And I overrule the

1  Defendant's objections.

2           Now, do you want to go ahead, Mr. Ostrow,

3  and introduce your license agreements?

4           MR. OSTROW:  We would like to.

5  Mr. Carroll was going to be here.  He's out with

6  Mr. Becker.

7           THE COURT:  Well, we can do it now.  What

8  I told them in chambers is, we could, you know, see

9  where we were on time and do it at the afternoon break

10 or this afternoon.  I'm happy to -- I've got some time

11 now, but I can just as easily eat lunch.

12          MR. OSTROW:  Let me go -- Your Honor,

13 would you give me one second?  And I'll go see if I can

14 find him.

15          THE COURT:  I'll be glad to.

16          MR. OSTROW:  Thanks.

17          (Pause.)

18          MR. OSTROW:  Your Honor, we found

19 Mr. Carroll, and we're prepared to go now, if it's

20 convenient for the Court.

21          THE COURT:  That's fine.  Which ones is

22 he introducing?  Which exhibits do you want to

23 introduce?

24          MR. OSTROW:  The same exhibits we used

25 last time, Your Honor.

```
 1                    THE COURT:  Okay.  You want to lodge the
 2   same objections that you did last time, Mr. Werbner?
 3                    MR. OSTROW:  There were no objections
 4   last time, Your Honor.
 5                    MR. WERBNER:  We have an objection we'd
 6   like to make that --
 7                    THE COURT:  Okay.
 8                    MR. WERBNER:  Should I now?
 9                    THE COURT:  Well, let's -- how many of
10   them are there, Mr. Carroll?
11                    MR. WERBNER:  There were four.
12                    MR. CARROLL:  I believe that's right,
13   Your Honor.
14                    THE COURT:  Okay.
15                    MR. CARROLL:  And I guess I'm unclear on
16   what we're doing.  Is the objection going to come first?
17                    THE COURT:  Well, I guess, which exhibit
18   numbers are you offering?  And then I'll let him make
19   his objections.
20                    MR. CARROLL:  Do we have -- I don't have
21   those numbers.
22                    MR. OSTROW:  The VIA license, Your Honor,
23   the Qualcomm license, the Interdigital license, and one
24   of the 3G licenses.  We'll get you the exhibit numbers.
25   Those are the four licenses we proffered last time.  We
```

1  intend to proffer them again.

2           THE COURT:  What was the one you said

3  after the Interdigital license?

4           MR. OSTROW:  I believe we referred to it

5  last time as the 3G licensing portfolio.

6           THE COURT:  Okay.  And tell me what your

7  objection is, Mr. Werbner.

8           MR. WERBNER:  Your Honor, Plaintiff

9  objects to all of them on one single ground, which is

10 that all of them use an improper methodology, which is

11 clearly unreliable, and that is, they take the stated

12 royalty in each of those licenses and reduce them -- at

13 least three of them do -- by 90 percent under the

14 witness' testimony that it's appropriate to take these

15 and give them the 90-percent haircut.

16           And we think that as a matter of law,

17 that that is not a sufficiently sound methodology to use

18 those to support this 1/10th amount.

19           I say three out of four.  The -- the VIA

20 licensing, it's a little bit different, because this is

21 one where it -- this portfolio -- and all of these are

22 portfolios, but in VIA, it spelled out something like

23 from a nickel to 55 cents per product.

24           And Mr. Becker -- Dr. Becker has said:

25 Okay.  Well, I'll take 55 cents, and I'm going to take

1   an access point of Cisco, which is 400-and-some-odd

2   dollars, and I'm somehow going to translate that 55

3   percent into .12 percent.

4               I mean, that's not a -- a -- a

5   methodology sort of for the gatekeeping function that

6   the new cases of the Federal Circuit require.

7               So it's not a situation where here's a

8   patent for 2 percent, and there's really not the same

9   technology.  This is the situation where we might just

10  say it's -- it's just improper and unsound and

11  unreliable math.

12              And this -- what I outlined is all stated

13  in his report and was stated in the trial record of the

14  prior trial, and as we examine that, that should not

15  pass through the gatekeeper.

16              Thank you.

17              THE COURT:  Okay.  How do you intend to

18  use the four licenses?

19              MR. CARROLL:  I beg your pardon, Your

20  Honor?

21              THE COURT:  How do you intend to use the

22  four licenses?

23              MR. CARROLL:  We're going to use them as

24  the basis for Dr. -- obviously, for Dr. Becker's opinion

25  as to what would have been the conclusion of the

 1  hypothetical negotiation, Your Honor.

 2              THE COURT:  Well, I understand that, but

 3  what's he going to say specifically about each of the

 4  four?

 5              MR. CARROLL:  All right.  He's certainly

 6  here.  We can put him on, if you choose.

 7              THE COURT:  Well, I'll take your summary

 8  of what he's going to say.

 9              MR. CARROLL:  All right.  Your Honor --

10              THE COURT:  I mean, I understand it's

11  going to be part of the basis of his opinion that the

12  royalty ought to be low, but what I'm interested in is

13  exactly what he -- how he's going to arrive at that

14  conclusion.

15              MR. CARROLL:  Well, and, again, the

16  analysis is in the paperwork, and in the response to the

17  general attack by Mr. Werbner on the three of the four,

18  I think what Dr. Becker did was what the case law

19  requires and what we say Mr. Carlile failed to do, and

20  that is, he, in fact, allocated from licenses he thought

21  comparable to a situation as in the case in suit when

22  you had a very small technological contribution to an

23  overall product system, such as 802.11.

24              That explains why Dr. Becker made the

25  adjustments that he made.  That's for the 3G, Qualcomm,

```
 1  and Interdigital, and I would just comment that I guess
 2  they're not complaining about the comparability.
 3                  Is that right, Mr. Werbner?
 4                  MR. WERBNER:  Well, I don't like any of
 5  it, but --
 6                  MR. CARROLL:  I mean, you're not
 7  challenging the fact that they're on point in terms of
 8  the technology.
 9                  MR. WERBNER:  Well, what I would suggest,
10  I have Pages 45 on his Factor 12, if the Court wanted to
11  look at it over lunch, but it makes very clear the
12  methodology that I just described.
13                  But to answer Mr. Carroll specifically, I
14  didn't make any objection about it being off the
15  technology.
16                  THE COURT:  Hand that up.
17                  MR. WERBNER:  But I do -- I may want to
18  cross-examine him about that, but I'm not objecting to
19  the exhibits on that ground.
20                  If it would be helpful for Your Honor,
21  Dr. Becker can lay the predicate for all the --
22                  THE COURT:  Well, I'll do it by proffer.
23  I just -- there was no objection at the last trial.
24                  MR. OSTROW:  Yes, sir.
25                  THE COURT:  And I went through this
```

1  exercise with respect to those that -- all that were

2  objected to last time.  I wanted to give y'all the same

3  opportunity to make your proffer before I rule on the

4  admissibility of exhibits.

5                  MR. CARROLL:  May we call him to do that

6  very thing, Your Honor?

7                  THE COURT:  Yes.

8                  MR. CARROLL:  And he has not been sworn,

9  Your Honor.

10                  COURTROOM DEPUTY:  I need to swear you

11  in.

12                  (Witness sworn.)

13                  DEFENDANT'S PROFFER

14           STEPHEN BECKER, DEFENDANT'S WITNESS, SWORN

15                    DIRECT EXAMINATION

16  BY MR. CARROLL:

17      Q.   Dr. Becker, you were in the courtroom when Mr.

18  Werbner set out the basis of his objection for your

19  methodology in applying the 3G, Qualcomm, and

20  Interdigital license rates to what you believe would

21  have been appropriate for the hypothetical negotiation.

22           You heard that, did you not?

23      A.   Yes, I did.

24      Q.   Would you explain to Judge Everingham why you

25  did what you did and why you believe that was

1  appropriate.

2      A.   Yes, I can.  And it's really on the

3  Interdigital and Qualcomm rates.

4          What I heard Mr. Werbner say is that I simply

5  took a factor of 90 percent with -- and implied, I

6  guess, without support, that I was just cutting that

7  down to get from a portfolio rate to a single patent

8  rate.

9          What he didn't point out is that I have

10  extensive analysis and data in my report that supports

11  the factors that are used to convert a portfolio rate to

12  a single patent rate.  They're laid out in my report.

13  They were presented as part of my testimony, and they

14  would be the sorts of things that I would intend on

15  presenting at trial here to support that adjustment from

16  a portfolio rate to a per-patent rate.

17      Q.   All right.  And let's talk about the -- why

18  you're here.  Let's talk about the -- what does that

19  leave VIA and 3G?

20      A.   Right.  Let me get to that here just real

21  quick.  The -- the VIA rate that -- that we talked about

22  is one that I do not feel I need to take the adjustment

23  down from a portfolio rate to an individual patent rate.

24  And the 3G licensing rate is a program where they offer

25  both per-patent rates and portfolio rates.  So there we

1 have direct data in the licensing program to compare the

2 per-patent rate to a portfolio rate.

3         So, again, I don't think Mr. Werbner's

4 characterization is correct.

5     Q.    And the VIA suite of licenses, are those

6 companies which contribute essential patented technology

7 to 802.11 standard devices?

8     A.    Yes, they are.

9     Q.    And does that include Sony, NTT, LG, Philips,

10 Japan Radio, Fujitsu, France, Telecom, and ETRI,

11 E-T-R-I?

12    A.    Yes.

13    Q.    And do they have approximately at least 75

14 core patents that they are willing to license as a group

15 based on the rate that your report describes?

16    A.    Yes.

17    Q.    And have you, in fact, for the hypothetical

18 negotiation, given an opinion that's in excess or more

19 favorable than the most expensive per-unit rate that the

20 VIA program calls for?

21    A.    Yes.  Under my Georgia-Pacific Factor

22 analysis, I adjust that rate up significantly for the

23 factors that are outlined in my testimony.

24    Q.    All right.  Is there anything else that you

25 believe helpful to the Judge at this stage in support of

1  the challenge -- or in answer to the challenge that your

2  methodology in adjusting the rates of these four

3  comparables is infirm?

4      A.   No, not other than just to point out that

5  there's quite a bit of analysis and data in -- that I

6  have to back up that adjustment.

7      Q.   All right.

8             MR. CARROLL:  I pass the witness, Your

9  Honor.

10             THE COURT:  Cross-examination?

11             MR. WERBNER:  Just briefly.  I think

12  briefly.

13                    CROSS-EXAMINATION

14  BY MR. WERBNER:

15      Q.   This will help me --

16             MR. WERBNER:  May I use the ELMO, or do

17  you have this on the --

18             TECHNICIAN:  Yes.

19             MR. WERBNER:  Okay.  Put up the

20  Interdigital.  It's No. 2153.

21             This, Your Honor, is an example, and I'll

22  be more specific.  Our Interdigital, the 2 percent was

23  taken, and it turned into .2.

24             Dr. Becker just now claims that there's a

25  lot of basis, but he hasn't established what that is.

And my recollection is that that would be insufficient. This is just not something that should go to the jury on the basis of what he says.

He found, I recall, some other and made them one of these four, but he took one situation where the patent in that case had X for the whole thing and Y for the other, and because that was a 10-percent -- or 90-percent variation, then he says:  That's my basis for coming over here and doing it to these others.

And I don't think there's been sufficient showing that -- that that's a comparable or an acceptable way to do it.

If we can go to the -- to the -- to the Broadcom, I believe it is -- or Qualcomm, No. 2152. Qualcomm is a good case that -- I mean, Broadcom, but this is Qualcomm, so -- and this is -- this is the same thing.  Supposedly based on that, or maybe one supports the other, the range in the portfolio was 5 to 5.7.

So he just says:  Well, I'll -- I'll be -- you know, I'll just take the high number and take 90 percent, and there we have it again.

On VIA, it is different, but it's what I mentioned, which is 2154.  The fallacy here is, that's the one where I said in this sort of pool of licenses, it has a schedule that just says anybody that wants to

1   take something -- because this was the group of 802.11

2   products, so if you want to do -- you want to build a

3   product that has 802.11, you got to -- you got to get a

4   license from this group.

5                    And based on the number of products that

6   you sell, you either have to pay a nickel, I think if

7   it's above 404 million or something like that, or to 55

8   cents.  So, again, Dr. Becker says:  Okay.  I'll just --

9   I'll just put it up to the highest, and then I'm going

10  to adjust it.

11                   And how he gets to the .12, there's no

12  showing of what the product is that would be over there

13  on the left.  There's no showing that it's comparable to

14  how he gets down.

15                   How he gets down is, let's take an access

16  point, one of the accused access points, and let's just

17  see what the ratio is between a -- 55 cents to some

18  other product, and that ratio results in .12.

19                   I'm doing the best I can.  That's how I

20  read it.  But it looks like voodoo math to me, with all

21  due respect, so we object.

22                   THE COURT:  All right.  Well, I'll take

23  notice of his prior testimony in the case and consider

24  the objections and the proffer.  I'm going to overrule

25  the objection, and I'll allow him to rely on those four

1  licenses.

2            MR. CARROLL:  Thank you, Your Honor.

3  May Dr. Becker step down?

4            THE COURT:  He may.  I'll see you at

5  1:15.

6            LAW CLERK:  All rise.

7            (Lunch recess.)

8            *      *      *      *

9                 CERTIFICATION

10

11            I HEREBY CERTIFY that the foregoing is a

12  true and correct transcript from the stenographic notes

13  of the proceedings in the above-entitled matter to the

14  best of my ability.

15

16

17

18  /s/_____              _____
    SUSAN SIMMONS, CSR                      Date
19  Official Court Reporter
    State of Texas No.:  267
20  Expiration Date:  12/31/12

21

22

23  /s/_____                  _____
    SHELLY HOLMES, CSR                      Date
24  Deputy Official Court Reporter
    State of Texas No.:  7804
25  Expiration Date  12/31/12